**IN THE UNITED COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No.  22-4689** |
| | **)** | **3:21-cr-0049-GMG-RWT-2** |
| **DIANA TOEBBE,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**DIANA TOEBBE'S OPPOSITION TO**
**GOVERNMENT'S MOTION TO DISMISS**

On the day of her sentencing, Diana Toebbe, accomplice to espionage and government cooperator, walked into court with a joint recommendation of 3 years' incarceration. She walked out of court having been sentenced to almost 22 years in prison. This sentence was roughly 3 years greater than her co-defendant husband, the principal offender, (who received a little over 19 years) and 13 years above the low-end of the guidelines contemplated in the binding plea agreement.

While true, Mrs. Toebbe signed a plea agreement waiving her right to appeal, she did not, and cannot, knowingly and voluntarily waive her right to a fair and adequate sentencing process. Because the district court's errors at the sentencing hearing raise serious issues of process that transcend the plea agreement and because it would be manifestly unjust to enforce the appellate waiver in this case, she respectfully requests that this Honorable Court deny the government's motion to dismiss.

## **BACKGROUND**

### **I. Mrs. Toebbe's conduct**

Before this all began, Diana Toebbe was a high school humanities teacher in Annapolis, Maryland, living a quiet suburban life with her husband, a civilian nuclear engineer for the Navy, and their two school-aged children. Mrs. Toebbe suffered from severe, well-documented, longstanding depression which was exacerbated by external pressures she faced around the time of her offense. When her husband approached her about an idea for stealing classified information from his office and selling it, allowing them to live abroad, Mrs. Toebbe expressed initial skepticism, but did not dissuade him. Over the course of several months, Mr. Toebbe stole classified documents from his office, scanned them, put them on SD cards, and contacted a foreign government with the hope of eliciting interest in a financial arrangement in exchange for the information. Mrs. Toebbe did none of this. She did not concoct the plan, did not steal any classified information (indeed she did not have a security clearance to have access to the information) did not scan, copy, or store any classified information, and did not contact or communicate with any believed foreign governments. By all accounts, the extent of Mrs. Toebbe's involvement in this scheme essentially amounted to acting as a look out on three "dead drops" of information.

As the prosecutor himself said:

> Mr. Toebbe is the one who selected classified information to smuggle from a secure government facility. He then smuggled it from that facility. He digitized the removed documents and uploaded them to an

encrypted laptop. He got rid of the removed documents, the hard copies. He created encrypted email accounts. He opened cryptocurrency wallets. He communicated with -- he contacted the government by mailing a proposal letter. He then communicated with a purported foreign official to develop a plan to exchange restricted data for monetary payment. He uploaded classified information to SD cards to be left at dead drops. He concealed the SD cards in a peanut butter sandwich, gum packages, and a Band-Aid wrapper. He serviced the dead drops. He provided the decryption key for the SD cards. He provided the instructions for cryptocurrency payments.

The defendant did none of those things. Really her offense boils down to acting as a cover and a lookout on three occasions in a three-month period. Nothing more than that. Nothing less.

Def.'s Ex. 1, *Trans. of First Sent. Hearing*, at 12-13.

After Mrs. Toebbe and her husband were initially arrested and ordered detained pending trial, she employed the cover story that her husband created. She also attempted to send him two letters through covert means at the jail referencing the same story. These letters never reached Mr. Toebbe and in the words of the prosecutor, "they had no impact whatsoever on the prosecution of this case." Def. Ex. 6, *Trans. of Second Sent. Hearing* at 33.

## II. The first plea agreement

Thereafter, Mrs. Toebbe accepted responsibility for her conduct and entered into a plea agreement with the government. This plea agreement contained a binding term of incarceration for a period of three years, *see* Gov. Mot. to Dismiss, ECF No. 12, Ex. 1, which at all relevant times the parties maintained was the appropriate resolution in this case, properly accounting for, among other factors, her role in the offense and substantial assistance to the government. *See* Def.'s Ex. 1 at 11-15 ("the Government believes that the statutory sentencing factors do support

a sentence of 36 months for Ms. Toebbe in this case for a few reasons…" noting her limited, non-essential role in the offense; sentencing disparities; her post-plea cooperation which "substantially assisted the Government; and the Navy's consultation and agreement with the sentence").

The district judge rejected this plea agreement. In doing so, the court characterized a three-year term in prison as "relatively minimal incarceration," called an espionage offender "a felon of the worst kind," questioned the immutable fact submitted by all parties (including the Navy) that the information at issue was classified at the "Confidential" level rather than "Secret" or "Top Secret," and speculated, without evidence, that Mrs. Toebbe might possess passcodes to other crypto wallets which her husband may have created to hide the proceeds of their unlawful activity. *See* Def.'s Ex. 1 at 9-10; 31.

### III. The second plea agreement and the government's sentencing recommendation

The parties then entered into a second plea agreement. This agreement bound the district court to the low-end of the guidelines range, which the plea agreement contemplated as nine years.[1] To the government's credit, and because it was, and has always been, the right resolution, the government maintained its

---

[1] The plea agreement (in paragraphs 4 and 15) set forth a base offense level of 37, a 3-level reduction for acceptance of responsibility, ████████████████████████ ███████ *See Gov. Mot. to Dismiss*, ECF No. 12, Ex. 2. This results in an offense level 31. Ms. Toebbe, with no criminal history, is a criminal history category I. The corresponding guidelines range is 108-135 months.

position and the parties jointly recommended a sentence of three years

imprisonment:

> THE COURT: So the government is asking me to grant the motion for variant sentence and not sentence this defendant to any more than 36 months, 3 years?
>
> MR. DOUGLAS: Yes, Your Honor.
>
> THE COURT: Why would I do that when that's the very heart of the basis for why I rejected the plea agreement itself, the original plea agreement, in Ms. Toebbe's case?
>
> MR. DOUGLAS: For all the reasons we've previously stated, Your Honor.
>
> THE COURT: Okay. Recite them again.
>
> MR. DOUGLAS: The seriousness of the offense. She is not the person with access. The disparity that this would create for someone who was simply a lookout on two or three occasions, because of her cooperation, because there is no concern about there being a Plan C. And for all those reasons under 3553(a), this should not be a sentence anywhere near 262 months.
>
> THE COURT: And you're asking me to sentence her to 3 years, 36 months?
>
> MR. DOUGLAS: Yes, Your Honor.

Def.'s Ex. 6 at 68.

### IV. The district court's sentence

Despite the government's insistence that Mrs. Toebbe's sentence "should not

be a sentence anywhere near 262 months," *id.*, the district court made every

adverse finding possible against Mrs. Toebbe to increase the binding guidelines

range from the 108 months contemplated in the plea agreement ▮▮▮▮▮ to 262

months. Then the district court sentenced Mrs. Toebbe to 262 months, a period

almost three years greater than that of her husband, the principal offender, and 19 years greater than the joint recommendation of the parties.[2]

First, over the joint recommendation by both parties, the district court ████

████████████████████████████████████████████████████████████████

████████████████████████████████████  ████████  ████

Then, the district court added two offense level points for obstruction of justice based on the intercepted notes that Mrs. Toebbe attempted to send to her husband before she ever entered into a plea agreement and which the government insisted had "no impact whatsoever on the prosecution of this case." *See* Def. Ex. 6 at 33.

After that, based on the obstruction of justice enhancement for conduct that predated any plea agreement, contrary to the PSR, and over the objection of both defense and prosecution, the district court denied Mrs. Toebbe her three-level reduction for accepting responsibility. The defense was not the only party protesting this finding; the prosecutor also argued it was unwarranted and excessive:

> MR. DOUGLAS: Her conduct was early on in the case. She has pled guilty twice -- twice in a timely manner that avoided any trial preparation and, in fact, allowed us to focus on Mr. Toebbe's cooperation which again -- I don't think it's a small matter  - the Department of Navy highly valued….
> ….
>
> MR. DOUGLAS: The prosecution is the victim of this obstruction of justice -- right? -- because we're talking about affecting the prosecution. So I'm trying to give the Court the perspective that the prosecution had in this case and how it actually worked.

---

[2] The Court also imposed a fine of $50,000, which was $3,000 more than the fine that her husband received.

THE COURT: Okay.

MR. DOUGLAS: She pled guilty and accepted responsibility so we could then focus on him. Get his cooperation which was very valuable to the Department of Navy. Then she even did more than that by supplementing his cooperation because there was a piece of information that he said she had, and she gave us immediately, and it was extremely helpful in assessing the scope of his conduct and any further potential damage.

....

MR. DOUGLAS: Still, in the government's opinion, she accepted responsibility and she cooperated. And now she's facing ten more years for two letters that –

THE COURT: You find that laughable?

MR. DOUGLAS: -- did not -- did not make it to the defendant –

THE COURT: You find that laughable, Mr. Douglas?

MR. DOUGLAS: It had no effect.

THE COURT: No, my question is, do you find that laughable?

MR. DOUGLAS: I find it to be under the application of the 3553 factors excessive to go ten years on top of a sentence for two letters that did not make it to the recipient and had no effect on the case.

Def.'s Ex. 6 at 38-40; 63-64.

**V. The district court's repeated rejections of positions jointly held by the adverse parties**

Throughout the proceedings, the district court repeatedly took positions

contrary to those jointly held by both prosecution and defense. In doing so, the

district court: assumed the role of ████████████████████████████████████████

showed little regard to sentencing disparities; relied on inapt analogies; developed

7

and relied on a theoretical and unfounded "Plan C;" contrary to the agreed upon and well-established facts, speculated that Mrs. Toebbe was the one who actually created the criminal scheme; and ultimately sentenced Mrs. Toebbe to a term of imprisonment that the district court itself explained afforded Mrs. Toebbe no benefit for her decision to plead guilty and cooperate with the government.



███████████████████████████████████ ██ ███████████████████████████

████████████████████████████████████████████████████████ ██ ██

b. *Failure to account for unwarranted sentencing disparities*

Both the defense and the prosecution provided the district court with comprehensive information supporting a three-year sentence. *See* Def.'s Ex. 1 at 14 (prosecutor explaining that "the requested sentence avoids unwarranted sentencing disparities," and detailing the cases of Marjorie Mascheroni and Gwendolyn Myers); *See* Def.'s Ex. 4, *Defendant's Sentencing Disparities Chart.* Not only the did the district court fail to appropriately account for these cases, the district court created an unwarranted sentencing disparity within Mrs. Toebbe's own case, sentencing Mrs. Toebbe's husband, the principal offender to three years less that Mrs. Toebbe. As the prosecutor stated: "It's universally accepted that the person with access, the person who is trusted, the person who has the specialized knowledge of the classified information should be punished more severely than someone who might have helped in some way. For example, as a lookout…. this will be a disparity. If the Court sentences Mrs. Toebbe to the low end of this range or even half the low end of this range, it will be a disparity … as has been accepted by several courts across this land, acts as should be punished more severely, period. And it's logical. The person who had -- it couldn't have been committed without him." Def.'s Ex. 6 at 62-63; *see also* (prosecutor stating that the government "stands by its previous recommendation… this is not a case for such a disparity.").

### c. *Employing inapt analogies*

The district court also continued to analogize Mrs. Toebbe's conduct to bank robbery, *see id.* at 62-63; 75-76 despite the prosecution's insistence that the analogies were unsuitable. *See id.* ("Completely different situation. This isn't a drug case. This isn't a bank robbery. This isn't a murder for hire. This is an espionage case.").

### d. *Developing and then relying on a theoretical and baseless "Plan C"*

Throughout Mrs. Toebbe's case, the district court continued to develop and rely on a theory, without evidence, that she and her husband had an undisclosed plan to sell additional classified information following their release from prison. *See* Def.'s Ex. 5 at 20 (wondering whether there is some "exit plan" out there); at 22 ("I find, there's still some uncertainty regarding whether it's the entire substance of the conspiracy…"); Def.'s Ex. 6 at 52, 65-66 (pondering the existence of a "plan C"); at 53 (speculating that "she may know where it's buried.")  All *three* parties – the government, Mrs. Toebbe's counsel, and Mr. Toebbe's counsel—impressed upon the court the non-existence of a "Plan C." *See e.g.* Def.'s Ex. 6 at 52,103. The prosecutor articulated it best, stating:

> **Your Honor, there is no evidence of a Plan C, full stop**. This was not a fly-by-night investigation conducted by amateurs. This was the Federal Bureau of Investigation. We're talking about an entire squad from the FBI Field Office in Pittsburgh comprised of numerous agents and analysts. They received support from several field offices across the entire country, including the Baltimore Field Office, the Washington Field Office, headquarter support, support from Quantico. They also had support from the NCIS in this case.

It was an extensive investigation. It included three dozen search warrants across multiple districts. We searched electronic devices, electronic accounts. We searched their residence. We searched their vehicles. We searched his Naval Reactors office. We searched his satellite office on the campus of the Naval Academy. We also obtained search warrants for location information on their cell phones. We also obtained a search warrant to place a tracking device on Mr. Toebbe's vehicle they traveled to and from work. We had the GPS information on their phones for several months. We had the tracker on his car for several -- for a couple of weeks. And there just is no evidence that there was some other location that he was -- could be storing something.

Then we meet with him for over 20 hours, and he gives us access to his heavily-encrypted laptop. And it's clear from the review of the laptop, it was the universal laptop that contained all of the restricted data that he had been referencing in the letters that he was dropping at the sites. **So there is no evidence that there is some type of Plan C. In fact, all of the evidence goes against such a conclusion.**

*Id.* at 65-66 (emphasis added).

Yet despite the assurances from all three parties, including the party who conducted a thorough and complete investigation of the case, the district court nevertheless sentenced Mrs. Toebbe in part on the basis of a non-existent "plan C" involving non-existent classified information that Mrs. Toebbe does not have. *See id.* at 79 (explaining that the 262-month sentence was necessary because, "[l]ooking at the length of this sentence and given likely technological and military advances, by the time this defendant is released from imprisonment, any information she has would most certainly be outdated, stale, and worthless to any nation who would want to cause us harm.").

### e. *Speculating that Mrs. Toebbe actually created the criminal scheme contrary to the agreed upon and well-established facts*

The court repeatedly rejected the undisputed fact that Mr. Toebbe was the individual who came up with the illegal plan. The prosecutors debriefed Mr. Toebbe for over 20 hours, they had access to all his electronics, and he himself never denied coming up with this scheme. Indeed, the prosecutor described Mr. Toebbe as "the person who came up with this idea." Def.'s Ex. 1 at 16; *see also* ███████████████

███████████████████████████████████████ ████████████ ███████

███████████████████████████████████████████████████████ █████

███████████████████████████████████████ ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████ Yet, when imposing a 262-month sentence the court insisted that "it was most probably Mrs. Toebbe that [sic] was driving the bus." Def.'s Ex. 6 at 77.

### f. *Affording no benefit for pleading guilty*

As explained *supra* §III, Mrs. Toebbe's binding guidelines range contemplated in the plea agreement ████████████████ was 108 months. The language in the agreement appropriately reflected a three-level decrease in offense level points, accounting for Mrs. Toebbe's decision to accept responsibility and plead guilty. This plea agreement was executed after the letters at the jail had already been intercepted and provided to the prosecutor. Thus, when contemplating, drafting, and executing the plea agreement, that conduct was accounted for.

13

Contrary to the language in the plea agreement, the district court denied Mrs. Toebbe acceptance of responsibility – one of the primary motivating factors in accepting a plea – and instead sentenced Mrs. Toebbe to guidelines that were the same as if she had proceeded to trial under the "worst case scenario." Specifically, the district court stated:

> I compared the defendant's exposure, worst case scenario if she went to trial and was convicted on all three counts, to the guideline calculations pursuant to the plea agreement [as the district court calculated them].… there is no difference between the guideline calculations [as the district court calculated them] if Mrs. Toebbe had gone to trial and been convicted on all three counts and if the Court accepted the binding plea under the guideline calculations, which I found to be appropriate and applicable in this case.

Def.'s Ex. 6 at 78-79.

## **ARGUMENT**

### I. **Legal standard**

"[A] defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992); *see also United States v. Johnson*, 410 F.3d 137, 151 (4th Cir. 2005). ("An appeal waiver does not always preclude an appeal."). A "general waiver of the right to appeal sentence in plea agreement does not bar appellate review of a claim that the sentence was imposed in violation of certain 'fundamental and immutable' constitutional guarantees." *United States v. Attar*, 38 F.3d 727, 732 (4th Cir. 1994) (citing *United States v. Bushert*, 997 F.2d 1343, 1351 n. 18 (11th Cir. 1993)); see also, *United States v. Archie*, 771 F.3d 217, 223 (4th Cir. 2014)(appellate waiver is unenforceable if "the sentencing court violate[s] a

fundamental constitutional or statutory right that was firmly established at the time of sentencing.")  "[A] defendant who waives the right to appeal nevertheless 'retains the right to obtain appellate review of his sentence on certain limited grounds,' even if those grounds are *not* specified in the plea agreement." *United States v. Marsh*, 944 F.3d 524, 528 (4th Cir. 2019)(citations omitted)(emphasis in original).

"[D]ue process may require that an appeal be heard despite a previous waiver." *United States v. Howle*, 166 F.3d 1166, 1169 n.5 (11th Cir. 1999). "[The Court] may decline to enforce a valid appeal waiver … if enforcing the waiver would result in a miscarriage of justice." *United States v. Burt*, 734 F. App'x 881, 884 (4th Cir. 2018) (citing *United States v. Ware*, 623 F. App'x 119, 120 (4th Cir. 2015)).

An appeal waiver may also be set aside "when constitutional concerns are implicated, whether those concerns be related to a particular constitutional provision such as the ex post facto clause, or whether it simply appears that the ultimate sentence is so far beyond the anticipated range that to deny the right of appeal would raise serious questions of fundamental fairness. [The court] may also … accept such an appeal for lesser improprieties, including abuse of judicial discretion." *United States v. Rosa*, 123 F.3d 94, 101 (2d Cir. 1997).

This is part of a broader policy concern. "[T]he modicum of finality purchased with unilateral appellate waivers must be weighed against the cost of erroneously long sentences to both the public and the individual defendants. The public is perhaps better served by keeping inviolate the mechanisms aimed at ensuring a

defendant receives fair punishment, namely effective assistance of counsel, an impartial sentencing tribunal, and meaningful oversight to correct either deficiencies in attorney performance or judicial errors that result in prejudice." *United States v. Mutschler*, 152 F. Supp. 3d 1332, 1341 n.8 (W.D. Wash. 2016); *see also United States v. Townsend*, No. 19-20840, 2021 U.S. Dist. LEXIS 37403, at *15 (E.D. Mich. Mar. 1, 2021) (Expressing dissatisfaction with the unilateral nature of appeal waivers given that Congress intended that both the defendant and the government would be permitted to appeal a criminal sentence and that prohibiting the defendant from appealing a suspected guideline calculation mistake, but allowing the government to do so, inevitably will lead to "systemic distortion" and "skewed case law, . . .")(citing *United States v. Perez*, 46 F. Supp. 2d 59, 69 (D. Mass. 1999); *United States v. Raynor*, 989 F. Supp. 43, 46 (D.D.C. 1997)).

## II. Mrs. Toebbe did not waive her right to this appeal because she did not, and cannot, waive her right to a fair sentencing process.

In this case, as the prosecutor correctly notes, Mrs. Toebbe waived her right to appeal her *conviction* and *sentence*. *See* ECF No. 12 at 1 (emphasis added). However, Mrs. Toebbe did not, and cannot, waive her right to the adequacy of the sentencing process. *See Attar*, 38 F.3d at 732 ("[A] defendant's agreement to waive appellate review of his sentence is implicitly conditioned on the assumption that the proceedings following entry of the plea will be conducted in accordance with constitutional limitations."); *see also Gardner v. Florida*, 430 U.S. 349 (1977) (explaining that a defendant has a right to due process during the sentencing stage).

In this case, the errors committed by the district court "were errors that the defendant[] could not have reasonably contemplated when the plea agreements were executed." *See United States v. Blick*, 408 F.3d 162, 172 (4th Cir. 2005). Thus, it is "not reasonable (or fair)" to enforce the appeal waiver. *Id.* In *Blick,* this Court enforced the defendant's the appeal waiver because "Blick was sentenced precisely in the manner that he anticipated." *Id.* Mrs. Toebbe, however, was not.

Mrs. Toebbe didn't anticipate, nor did the plea agreement contemplate, that the district court would violate the principle of party presentation. Mrs. Toebbe didn't anticipate, nor did the plea agreement contemplate, a sentence above the binding guidelines as outlined in the plea agreement█████████████████

████████ Mrs. Toebbe didn't anticipate, nor did the plea agreement contemplate, an unfounded enhancement for obstruction of justice. Mrs. Toebbe didn't anticipate that the district judge would abandon her role as neutral arbiter, refusing to credit even the most basic factual premises universally accepted by all parties, and developing and relying on a theoretical "plan C," a notion that the *prosecutor* vehemently tried to dispel. *See* Def.'s Ex. 6 at 65-66 ("Your Honor, there is no evidence of a Plan C, full stop."). And certainly Mrs. Toebbe didn't anticipate, nor did the plea agreement contemplate, Mrs. Toebbe being denied credit for doing the very thing she did – plead guilty.

By inserting itself to the degree that it did, the district court so severely infected the sentencing the sentencing process that Mrs. Toebbe's due process rights were violated during the course of the sentencing hearing.

### III. Mrs. Toebbe did not receive a fair sentencing process because the district court abandoned its role as neutral arbiter, repeatedly violated the principle of party presentation, and sentenced Mrs. Toebbe based on inaccurate information.

The district court improperly inserted itself in the proceedings, abandoning its role as neutral arbiter and repeatedly violating the principle of party presentation, as well as sentenced Mrs. Toebbe based on inaccurate information. This occurred when: the district court improperly denied Mrs. Toebbe acceptance of responsibility; improperly █████████████████████████████████████ ██████ ignored sentencing disparities; and based the sentence on facts that did not exist. Even if each of these errors on their own do not constitute a procedural process violation, collectively, the district court's errors infected Mrs. Toebbe's hearing to such a degree that Mrs. Toebbe was denied a fair process. *See e.g. United States v. Martinovich,* 810 F.3d 232, 240 (4th Cir. 2016)(Wynn, J. concurring)(explaining that improper interference and excessive interruptions "tends to undermine the public's confidence in the integrity of the judiciary. But more importantly, such conduct challenges the fairness of the proceeding.").

Moreover, that these failings all occurred over the protests of both the prosecution and the defense jointly, makes it even more clear that the district court failed to remain neutral and provide a fair sentencing process. The district court "departed so drastically from the principle of party presentation as to constitute an abuse of discretion." *United States v. Sineneng-Smith,* 140 S. Ct. 1575, 1578 (2020).

"In our adversarial system of adjudication, we follow the principle of party presentation." *Id.* at 1579. "[I]n both civil and criminal cases, in the first instance

and on appeal…we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States,* 554 U.S. 237, 243-44 (2008) This is because "as a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *Sineneng-Smith*, 140 S. Ct. at 1579 (citing *Castro v. United States*, 540 U.S. 375, 381-383, 124 S. Ct. 786, 157 L. Ed. 2d 778 (2003)).

"[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us." *Greenlaw* 554 U.S. at 244 (citing *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987); *see also Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207, 1214 (7th Cir. 1993) ("Our system . . . is not geared to having judges take over the function of lawyers…."). "Acting to the contrary … increases the chances that we may decide an issue erroneously…." *United States v. McReynolds*, 964 F.3d 555, 571 (6th Cir. 2020)(Giffin, J. dissenting)(citations omitted). By ignoring the jointly held positions of the two adverse parties both on matters of fact and law in this case, the district court created and decided issues erroneously, and denied Mrs. Toebbe a fair sentencing process.







> b. *The district court improperly denied Mrs. Toebbe acceptance of responsibility*

The district court in this case *sua sponte* raised a question of Mrs. Toebbe's acceptance of responsibility and then denied her the credit for pleading guilty. No party in this case (of the two adverse parties and the probation office) raised an issue of forfeiting Mrs. Toebbe's acceptance of responsibility points under the guidelines. In fact, the prosecutor, Mrs. Toebbe's adversary, vehemently opposed this decision, calling the district court's decision "excessive." Def.'s Ex. 6 at 64; *see also id.* at 38-41 (prosecutor arguing "all th[e] reasons" why Mrs. Toebbe should not be denied acceptance of responsibility). This alone violates the well-established principle of party presentation, displays another instance in which the district court improperly intervened, and warrants appellate consideration and ultimately reversal by this Court.

Further, Mrs. Toebbe was objectively entitled to the acceptance of responsibility reduction because her conduct predated the plea agreement and the government was aware of this conduct at the time the plea agreement was executed. The district court's ruling erroneously would mean that if a defendant ever, at any point, attempts to obstruct justice, he can never accept responsibility for it for the purposes of the guidelines. Courts have rejected this faulty notion, not only because it is illogical, but also based on sound policy concerns. For example, as the district court stated in *United States v. Torres-Teyer*, "Were courts to hold that any obstructive conduct, however early in the investigation or prosecution of a case and whatever its relationship to the charges ultimately brought, forever disentitled a defendant to credit for later acceptance of responsibility, this incentive would be ill served." 322 F. Supp. 2d 359, 368 (S.D.N.Y. 2004); *see also United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003)("Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." (citing *United States v. Hopper*, 27 F.3d 378 (9th Cir. 1994)).

c. *The district court improperly ignored sentencing disparities*

The district court denied Mrs. Toebbe a fair sentencing process when it ignored stark, unwarranted sentencing disparity it created over the objections of both parties. *See United States v. Zuk*, 874 F.3d 398, 412 (4th Cir. 2017)(vacating

the defendant's sentence and remanding for resentencing based in part on the district court's sentence producing an unwarranted sentencing disparity).

The most obvious error was the undue disparity that the district court created in this very case, sentencing Mrs. Toebbe to nearly three years more imprisonment than her husband, the principal offender, and also fining her $3,000 more than her husband. Doing this, the prosecutor explained defied "universally accepted" principle "that the person with access, the person who is trusted, the person who has the specialized knowledge of the classified information should be punished more severely than someone who might have helped in some way." Def.'s Ex. 6 at 62; *see also id*. at 67 (prosecutor explaining that the government "stands by its previous recommendation," of three years incarceration, that "this is not a case for such a disparity.").

Further, the counsel for both Mrs. Toebbe and the government submitted sentences for other accomplices who committed espionage crimes. They ranged from individuals who were not charged at all to highest sentence of 81 months in prison. *See* Def.'s Ex. 4. The average sentence in this chart was 32 months. Not one sentence was even close to the 262-month sentence that Mrs. Toebbe received. The district court failed to account for these during the sentencing process when it imposed its "excessive" sentence. *See* Def.'s Ex. 6 at 64.  Thus, like in *Zuk*, 874 F.3d at 412, "magnitude of this disparity" requires appellate review, and ultimately reversal, and remand.

      d.   *The district court improperly based Mrs. Toebbe's sentence on inaccurate information.*

A defendant has a due process right to be sentenced based on accurate information, and the threshold for accuracy is whether the information has "sufficient indicia of reliability to support its probable accuracy." *United States v. Pulley*, 601 F.3d 660, 665 (7th Cir.2010); *see also United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009) (A sentencing court necessarily has "discretion to draw conclusions about the testimony given and evidence introduced at sentencing," but "due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations."). In *United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007), the Second Circuit found procedural error where the district court, over defense counsel's objection, enhanced the defendant's sentence based on the uncorroborated assumption that he had sexually abused a minor "on repeated occasions," where the defendant pled guilty to only a single instance of felony sexual abuse.

In this case, the sentencing errors were even more speculative and far-reaching. Specifically, the district court repeatedly referenced a "Plan C" that the district court surmised existed with no factual basis and contrary to the firm representations of all three parties (prosecution and both defendants). *See e.g.* Def.'s Ex. 6 at 65-66. Not only did the district court repeatedly reference this mere suspicion, the district court also developed and relied on this theory as a basis to justify Mrs. Toebbe's 262-month sentence. Def.'s Ex. 6 at 79 (explaining that the length of the sentence accounts for any classified information Mrs. Toebbe still has so that it will be "stale" and "worthless" by the time she is released).

The district court also premised Mrs. Toebbe's 262-month sentence on an unfounded theory that Mrs. Toebbe "was most probably…driving the bus." Def.'s Ex. 6 at 77. This notion was again opposed by both prosecution and defense. *See e.g.* Def.'s Ex. 1 at 16 (prosecutor referring to Mr. Toebbe as "the person who came up with this idea."); Def.'s Ex. 3 at 3 (Mrs. Toebbe "described a previously unknown detail of *Mr. Toebbe's plan* in the event they were detected by law enforcement.") (emphasis added); Def.'s Ex. 2 at 10 (Mrs. Toebbe "joined a conspiracy with her husband that lasted a matter of months and in which she was a more passive participant."). And the district judge continued to rely on faulty analogies. *See* Def.'s Ex. 6 at 62-63 (prosecutor explaining that this is a "completely different situation. This isn't a drug case. This isn't a bank robbery. This isn't a murder for hire. This is an espionage case.").  Thus, the sentencing hearing violated Mrs. Toebbe's due process rights because she was not sentenced based on "reliable evidence," but instead on "speculation or unfounded allegations" refuted by both parties. *England*, 555 F.3d at 622.

**IV. To uphold the sentence would be a miscarriage of justice**

Diana Toebbe's "ultimate sentence [was] so far beyond the anticipated range that to deny the right of appeal would raise serious questions of fundamental fairness." *Rosa*, 123 F.3d at 101. The Court need not take defense counsel's word for it. The prosecutor in this case called such a sentence "excessive" and explained that it violated a universally held principle on levels of culpability. *See* Def.'s Ex. 6 at 62, 64.

As explained above, Mrs. Toebbe's sentence was premised on faulty suspicions, not facts; it violated the principle of party presentation; it far exceeded that of any similar offender; it exceeded the principal offender's sentence by three years; exceeded the guidelines outlined in the plea agreement and ▆ by 13 years; exceeded the joint recommendation of the parties by 19 years; and her sentence denied her credit for the very things she did – plead guilty and cooperate with the government.

To condition a plea agreement on waiving one's right to appeal, but then have the district court ignore almost all the provisions in that plea agreement except for the appeal waiver frustrates the plea process as a whole. In other words, Mrs. Toebbe signed a plea agreement with an appellate waiver with an understanding that she would be credited for doing just that – pleading guilty. Instead, the district court sentenced her as though she had *not* pled guilty. *See* Def.'s Ex. 6 at 78-79 (calculating the guidelines "worst case scenario" if she had gone to trial and finding no difference). If the plea agreement is meaningless to show she accepted responsibility and cooperated, then it is meaningless with respect to showing she waived her right to appeal as well.

Finally, declining to enforce the appeal waiver in this case would not undermine precedent for future appellate waivers. To the contrary, it would maintain the *status quo*, that is maintain a defendant's incentive to plead guilty and cooperate with the government, which particularly in national security matters, will

always be of critical importance. For all these reasons, to uphold the sentence itself on the basis of an appeal waiver would be a miscarriage of justice.

<b><u>CONCLUSION</u></b>

Ms. Toebbe did not, and cannot, knowingly and voluntarily waive her right to a fair and adequate sentencing process. Because the district dourt's errors at the sentencing hearing raise serious issues of process that that transcend the plea agreement and because it would be manifestly unjust to enforce the appellate waiver in this case, she respectfully requests that this Honorable Court deny the government's motion to dismiss.

Respectfully Submitted,
DIANA TOEBBE
By Counsel
_____/s/_____
Jessica N. Carmichael, Virginia Bar 78339
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com

Barry P. Beck, WV Bar 4225; VA Bar 28858
POWER BECK & MATZUREFF
308 W. Burke Street
Martinsburg, WV  25401
(304) 264-8870
bpbeck@frontier.com

## <u>CERTIFICATE OF SERVICE</u>

I, Barry P. Beck, counsel for Diana Toebbe, hereby certify that on the 16th

day of February, 2022, the foregoing **DIANA TOEBBE'S OPPOSITION TO**

**GOVERNMENT'S MOTION TO DISMISS** was electronically filed with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to

all counsel of record.

 /s/ Barry P. Beck
Barry P. Beck
