```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                       Plaintiff,

 6   vs.                      Criminal Action No. 3:21-cr-49-1,2

 7   Jonathan Toebbe,
     and Diana Toebbe,
 8                       Defendants.

 9

10          Proceedings had in the Sentencing Hearing in the

11   above-styled action on August 16, 2022, before the Honorable

12   Gina M. Groh, United States District Judge, at Martinsburg,

13   West Virginia.

14

15                       APPEARANCES

16   On behalf of the United States of America:

17          Jarod J. Douglas
            Assistant United States Attorney
18          United States Attorney's Office - Wheeling
            P.O. Box 591
19          Wheeling, West Virginia 26003

20          Jessica Lieber Smolar
            Assistant United States Attorney
21          United States Attorney's Office - Pittsburgh
            700 Grant Street, Ste. 4000
22          Pittsburgh, Pennsylvania 15219

23

24   The defendants were present in person.

25   Proceedings reported by means of stenotype; transcript produced
     by official court reporter.
```


Exhibit 1

```
 1                         APPEARANCES  (Continued)

 2

 3    On behalf of the United States of America:

 4              Matthew J. McKenzie, Esq.
                United States Department of Justice
 5              950 Pennsylvania Avenue, NW
                Washington, DC 20530
 6

 7    On behalf of the defendant, Jonathan Toebbe:

 8              Mr. Nicholas Compton
                Assistant Federal Public Defender
 9              Federal Public Defender's Office
                651 Foxcroft, Ste. 202
10              Martinsburg, West Virginia 25401

11    On behalf of the defendant, Diana Toebbe:

12              Barry P. Beck, Esq.
                Power, Beck & Matzureff Law Offices
13              308 West Burke Street
                Martinsburg, West Virginia  25401
14

15              Edward B. MacMahon, Jr.
                Edward B. MacMahon, Jr., Esq.
16              107 East Washington Street
                Middleburg, Virginia  20118
17

18    United States Probation Officers C. Bartholamay and M. DeHaven

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (August 16, 2022, at 1:00 P.M.)
3                         - - -
4         THE COURT:  Please be seated, everyone.  Good
5    afternoon, Counsel.
6         MR. DOUGLAS:  Good afternoon, Your Honor.
7      (Simultaneous speech.)
8             THE COURT:  We'll call our cases.
9             THE CLERK:  This is the case of the United States of
10   America versus Jonathan Toebbe and Diana Toebbe, Criminal No.
11   3:21-cr-49, defendants 1 and 2.
12     The Government is -- the Government is represented by
13   counsel, Jarod Douglas, Jessica Lieber Smoler, and Matthew
14   McKenzie.  The defendants are present in person and by counsel,
15   Nicholas Compton for Mr. Toebbe, Barry Beck and Edward
16   MacMahon, Jr. for Ms. Toebbe.
17     Are the parties ready to proceed?
18             MR. DOUGLAS:  The Government is ready, Your Honor.
19             MR. COMPTON:  Mr. Toebbe is ready, Your Honor.
20             MR. BECK:  Your Honor, Mrs. Toebbe is ready.
21             THE COURT:  All right.  Thank you, Counsel.
22     Ms. Toebbe, I'm going to ask you to stand and raise your
23   right hand.  We're going to get you under oath to answer any
24   questions I may have for you today, ma'am.
25     (The defendant, Diana Toebbe, was sworn in.)
```

```
 1                    THE CLERK:  Thank you.

 2                    THE COURT:  Ms. Toebbe, I'll remind you now -- you

 3    may have a seat, gentlemen.  You may have a seat.  That's fine.

 4      I'll remind you now you're under oath, and if you make any

 5    untruthful statements or answers during today's proceeding,

 6    those untruthful statements or answers could form the basis for

 7    a separate action for perjury or false swearing.  That having

 8    been said, feel free to ask questions.  If you don't hear

 9    something, ask for it to be repeated.  If you don't understand

10    something, ask for an explanation.  And at all times, feel free

11    to consult with your lawyers.

12      Mr. Beck, have you received a copy of the presentence

13    investigation report and reviewed it to your -- with your

14    client?

15                    MR. BECK:  Yes, we have, Your Honor.

16                    THE COURT:  All right.  And, Ms. Toebbe, most

17    importantly, have you received a copy of that report --

18                    MS. TOEBBE:  Yes.

19                    THE COURT:  -- and reviewed it to your satisfaction

20    with your lawyer?

21                    MS. TOEBBE:  Yes, Your Honor.

22                    THE COURT:  Has the Government received both the PSR

23    in Ms. Toebbe's and Mr. Toebbe's case?

24                    MR. DOUGLAS:  Yes, Your Honor.

25                    THE COURT:  All right.  Same process for you,
```

1   Mr. Toebbe.  If you would please stand, we're going to get you

2   under oath.

3        (The defendant, Jonathan Toebbe, was sworn in.)

4             THE CLERK:  Thank you.

5             THE COURT:  Please be seated.

6        Mr. Toebbe, I'm reminding you now that you're under oath.

7   That if you make any false statements or untruthful answers

8   during today's hearing, those untruthful statements or answers

9   could form the basis for a separate action for perjury or false

10  swearing.  That having been said -- same with Ms. Toebbe --

11  feel free to ask questions.  If you don't hear something, ask

12  for it to be repeated.  If you don't understand something, ask

13  for an explanation always.  And always feel free to consult

14  with your attorney, Mr. Compton.

15            MR. TOEBBE:  Yes, Your Honor.

16            THE COURT:  Mr. Compton, have you received the

17  presentence investigation report and reviewed it with your

18  client?

19            MR. COMPTON:  Yes, Your Honor.

20            THE COURT:  And, Mr. Toebbe, have you, in fact,

21  received that report and reviewed it to your satisfaction with

22  your lawyer?

23            MR. TOEBBE:  Yes, Your Honor.

24            THE COURT:  Counsel, as we all know, we're here today

25  for sentencing for Mr. and Ms. Toebbe.  Are there any witnesses

1    to be called today at any stage in this proceeding?

2              MR. DOUGLAS:  Your Honor, there is a representative

3    of the victim, the Department of the Navy, that would like to

4    make a victim impact statement whenever the Court deems that

5    appropriate.

6              THE COURT:  And who is that?

7              MR. DOUGLAS:  Your Honor, that is William J. Houston.

8    He's a vice admiral in the Department of Navy.

9              THE COURT:  He's the one that authored the victim

10   impact statement that was attached to your --

11             MR. DOUGLAS:  That is correct, Your Honor.  He

12   authored the victim impact statement attached to the

13   unclassified sentencing memorandum filed in Mr. Toebbe's case.

14             THE COURT:  Okay.  Thank you.

15        Counsel, in preparation for today's hearing, I did review

16   the indictment, the sentencing memorandum that we touched on

17   briefly, the presentence investigation report, and other

18   relative filings.  During my preparation -- I need to be

19   honest -- I developed some general concerns about these plea

20   agreements, Counsel.  So I have some -- I'm going to have some

21   questions for you before we proceed any further.

22        But at the outset, for everyone involved in these questions

23   and answers, we need to be clear no classified information is

24   discussed in this courtroom today.  If the need arises to

25   reference or discuss classified materials, we will recess.  The

1  Court will conduct a closed proceeding on the record with the

2  necessary participants in another location.

3     As a preliminary matter in this case, both of these

4  defendants entered into plea agreements containing binding

5  sentencing ranges.  In other words, these agreements tie the

6  Court's hands to a large extent because I must impose a

7  sentence within the binding range agreed to by the parties

8  regardless of the advisory guideline range, the Court's usual

9  ability to vary upward or downward from the advisory guideline

10 range, or the sentencing factors the Court is required to

11 consider when fashioning an appropriate sentence.

12 Particularly, in Ms. Toebbe's case, the binding range is no

13 more than 36 months so I'm quite limited when considering the

14 advisory guideline range and the statutorily-allowed penalties.

15    That having been said, my first question is going to be for

16 you, Mr. Douglas, but to preface it, the indictment contains

17 three counts in which both defendants are named.  Count 1

18 alleges a conspiracy to communicate restricted data.  Counts 2

19 and 3 allege communication of restricted data on two separate

20 dates.  Both defendants have pled guilty to Count 1 of the

21 indictment which alleges they conspired to communicate

22 restricted data.  According to the indictment, the object of

23 the defendants' conspiracy was to enrich themselves by

24 demanding and accepting payment in return for communicating,

25 transmitting, or disclosing to a foreign nation information

1 involving or incorporating restricted data. The term

2 "restricted data" is used throughout the indictment.

3     My question, Mr. Douglas, is whether any of the restricted

4 data involved in the conspiracy or referenced in this

5 indictment anywhere or involved in the offense conduct in this

6 case was classified at a top-secret level?

7          MR. DOUGLAS:  No.  The answer is no, Your Honor.

8 None of it was at the top-secret level.  None of it was at the

9 secret level.  All the data we're talking about is at the

10 confidential level which is that third level when you come down

11 from top secret to secret to confidential.

12          THE COURT:  In all the documents that were reviewed,

13 Mr. Douglas and Mr. Compton and Mr. Beck, nothing was marked

14 secret or top secret?

15          MR. DOUGLAS:  That is correct, Your Honor.

16          THE COURT:  You understand why I ask that question?

17          MR. DOUGLAS:  Yes, Your Honor.

18          THE COURT:  Because it pertains to the calculation of

19 the guidelines.  In order to get a picture of what we were

20 looking at, both the recommended guideline range with regard to

21 these pleas that are before me to determine whether I'm

22 accepting or rejecting them but also, if it was classified at

23 another level, the guideline ranges would change.  In fact, it

24 may be helpful for us to take a look at the chart that we have

25 prepared and even asking you all to advise the Court whether

1  this -- these pleas in either one of these cases are within the

2  community's interest.

3  So I'll go ahead and pass out what I used to make it easier

4  for me to wrap my mind around what we were looking at both with

5  the binding pleas and also with regard to information if it was

6  not at this lower level.  I've got a copy for each of you at

7  counsel table for Mr. Douglas, Mr. Beck, and Mr. Compton.  And

8  then we'll go ahead and make a copy for Chad so the record is

9  clear what we were reviewing.

10  MR. BECK:  Your Honor, actually, unless I'm

11  overlooking it, we don't have a copy of that document.

12  THE COURT:  I used that in preparation this week for

13  today's hearing so I'm going to go ahead and have Mr. Mullen

14  pass them out now.

15  MR. BECK:  Okay.  Understood, Your Honor.

16  THE COURT:  I'll give you a moment to look at that.

17  While they're looking at that, where's Admiral Houston?

18  Are you here?

19  If I accept this plea, I'm going to go ahead and give you

20  the opportunity to address the Court as Mr. Douglas told me you

21  would, but -- and this may sound like a simple question, but

22  this is -- my business is the law, and I understand that you're

23  the commander of the Submarine Forces in the Atlantic?

24  ADMIRAL HOUSTON:  Yes, Your Honor.

25  THE COURT:  None of this information involved in this

1    conspiracy was classified secret or top-secret level?

2              ADMIRAL HOUSTON:  Yes, Your Honor.

3              THE COURT:  So that's an accurate statement?

4              ADMIRAL HOUSTON:  Yes, Your Honor.

5              THE COURT:  Okay.  Thank you, sir.

6        Setting that aside, Counsel, knowing that we're all on the

7    same page with regard to the classification level of this

8    information, I am still not inclined to accept the plea

9    agreements in these binding ranges because they're below the

10   advisory guideline range in Ms. Toebbe's case or my hands are

11   tied with regard to Mr. Toebbe's case.  So I'm going to hear

12   from each of you why I should accept these pleas and sentence

13   these defendants to relatively minimal incarceration

14   considering the backdrop of their alleged offenses.

15       Mr. Douglas, we'll start with you.

16             MR. DOUGLAS:  Thank you, Your Honor.  I appreciate

17   the opportunity to be heard.  With regard to Mrs. Toebbe, Your

18   Honor, the appropriateness of the 36-month sentence starts with

19   a careful review of that sentencing guideline section that the

20   Court was referencing.  As the Court indicated, all that

21   guideline section says is what the base offense level should be

22   depending on what type of information it is.  There is no

23   specific offense characteristic.  For example, there's no

24   sentencing enhancement for the quantity of classified

25   information that a defendant gathered or for the number of

1  transmissions that a defendant made.

2          THE COURT:  But the recommended guideline range is

3  151 to 188 months and this plea is to -- the binding plea is to

4  36 months.  That's significant variance below the low end of

5  the recommended guideline range.

6          MR. DOUGLAS:  Correct, Your Honor.  It is a quarter

7  of the low end of the range as calculated.  That's the

8  guideline range that we calculate for anybody.  If you would

9  have called an old college buddy to drive him one time to

10 Harpers Ferry that would also be facing a low end of 12 years.

11 If that college buddy drove him there 15 times, he would be

12 facing a low end of 12 years.

13     So the varied sort of brief framework of that section, the

14 Government would argue, indicates a heavy reliance on the

15 statutory sentencing factors to fashion a sentence that is

16 reasonable considering a defendant's level and nature of

17 involvement in the offense.  And the Government believes that

18 the statutory sentencing factors do support a sentence of 36

19 months for Ms. Toebbe in this case for a few reasons.

20     First, the history and characteristics of the defendant.

21 The defendant is married to her codefendant, but we must be

22 careful to discern important differences in their

23 characteristics.  Mr. Toebbe is an expert on classified

24 submarine information through years of education, training, and

25 experience.  The defendant here, Diana Toebbe, has no

1    specialized understanding of this information.  The

2    significance is that she did not as fully understand the extent

3    of the damage that could be caused by providing the information

4    to a foreign nation, and she did not employ a special skill as

5    this defendant did.

6       Mr. Toebbe was long employed by the Navy.  Long held a

7    security clearance.  Long had been granted access to classified

8    information, and he had been many times trained on the proper

9    handling of classified information.  Mrs. Toebbe was not

10   employed by the Navy.  She had no such clearance.  No such

11   access.  No such training.  Thus, Mrs. Toebbe's actions are not

12   as fully informed and do not involve an abuse of a position of

13   trust as it does for Mr. Toebbe.

14      Second, the nature and circumstances of the offense.  The

15   defendant, Mrs. Toebbe's, offense conduct.  Again, she is

16   married to her co-conspirator.  Under basic conspiracy laws,

17   she's criminally responsible for her co-conspirator's

18   reasonably foreseeable conduct.

19          THE COURT:  Regardless of whether she was his wife or

20   not.

21          MR. DOUGLAS:  Correct.  And so we've got to look at

22   what her conduct was.  Mr. Toebbe is the one who selected

23   classified information to smuggle from a secure government

24   facility.  He then smuggled it from that facility.  He

25   digitized the removed documents and uploaded them to an

1   encrypted laptop.  He got rid of the removed documents, the

2   hard copies.  He created encrypted email accounts.  He opened

3   cryptocurrency wallets.  He communicated with -- he contacted

4   the government by mailing a proposal letter.  He then

5   communicated with a purported foreign official to develop a

6   plan to exchange restricted data for monetary payment.  He

7   uploaded classified information to SD cards to be left at dead

8   drops.  He concealed the SD cards in a peanut butter sandwich,

9   gum packages, and a Band-Aid wrapper.  He serviced the dead

10  drops.  He provided the decryption key for the SD cards.  He

11  provided the instructions for cryptocurrency payments.

12     The defendant did none of those things.  Really her offense

13  boils down to acting as a cover and a lookout on three

14  occasions in a three-month period.  Nothing more than that.

15  Nothing less.

16          THE COURT:  Isn't the lookout for a robbery just as

17  guilty as the lookout -- as the person who is committing the

18  robbery?

19          MR. DOUGLAS:  Yes and absolutely should be punished.

20  Should be a felon.  Should be a spy for life.  Should go to

21  prison.  But not commensurate with anywhere near someone like

22  Jonathan Toebbe, who is the one who stole it.  In fact, her

23  contribution was not even essential.  It was not essential to

24  the commission of the offense.  In fact, on one of the

25  occasions, he serviced the dead drop by himself without her

```
1   even being there.  So he would have done this without her and
2   would have been able to do it without her.
3        Third, the requested sentence avoids unwarranted sentencing
4   disparities.  There have been other husband and wife espionage
5   cases as we've outlined in our sentencing memorandum.  Marjorie
6   Mascheroni, who received a sentence of 12 months and a day in
7   2014, and Gwendolyn Myers, who received a sentence of 81 months
8   in 2010.
9        Both the defendant, Ms. Toebbe, and Ms. Mascheroni played
10  limited passive roles in schemes led by their husbands who
11  abused positions of trust by removing restricted data from
12  their places of employment and offering it for sale to a
13  foreign nation.
14       Now, Gwendolyn Myers was more significantly involved in the
15  scheme with her husband than Mrs. Toebbe here.  Myers acted as
16  an agent of a foreign intelligence service for three decades.
17  Myers was also an active participant in meetings with the
18  undercover FBI agent.
19       So what the Government was trying to express there is this
20  isn't an outlier.  This wouldn't be an outlier for Diana Toebbe
21  to receive three years in prison for this.  It would not be an
22  outlier when you look at other husband and wife espionage cases
23  and look at the roles that those wives played in those cases.
24  So considering those cases, this sentence of 36 months would be
25  reasonable.
```

1    Fourth, the defendant's post-plea cooperation provides

2  further support for the requested sentence we argue.

3  Mr. Toebbe had opened several cryptocurrency wallets and for

4  one of the wallets, he had asked her to remember the pass

5  phrase.  That was her only additional involvement that we have

6  discovered.  And the defendant, Mrs. Toebbe, cooperated by

7  providing us with that pass phrase.  And that cooperation in

8  that regard substantially assisted the Government by allowing

9  us to corroborate Mr. Toebbe's claim that no payments have been

10  received on that wallet.  As is more fully discussed in the

11  Government's classified sentencing memorandum filed in

12  Mr. Toebbe's case, the ability to corroborate that claim was

13  critical to a larger damage assessment concerning Mr. Toebbe's

14  offense conduct.

15    Lastly, Your Honor, the Government consulted with the

16  Department of the Navy, the victim in the case, and knowing the

17  full scope of the defendant's conduct and the potential damage

18  that the overall offense caused, the Navy fully supports a

19  sentence of 36 months for this defendant.  And the Government

20  argues that it is a reasonable sentence under the statutory

21  sentencing factors as applied to this very obtuse guideline

22  section and very -- applies the same to everybody.  And so we

23  would ask the Court to accept the 36 months.

24        THE COURT:  And the 36 months you believe,

25  Mr. Douglas, is within the best interest of the community given

1   the impact Ms. Toebbe's actions had on national security?

2            MR. DOUGLAS:  Your Honor, the Government believes

3   that for the protection of the community, the person who came

4   up with this idea, who had the access to do this, who had the

5   specific knowledge to do it, to know not just -- I mean it's --

6   I'm a janitor.  I work at this place.  Let me grab this stuff

7   off the desk and sell it.  But someone who worked with this for

8   ten years.  That person is the one that I believe the community

9   would be most concerned about.

10       The Government is not declining prosecution and not

11   pursuing Diana Toebbe.  We believe that there still is a

12   deterrence factor that is shown by the Government pursuing

13   someone who stood three times with her hands on her hips next

14   to him while he's servicing the dead drop.  She did that three

15   times and looked around, and she's being prosecuted and will be

16   labeled a spy the rest of her life, and she's 46 years old.

17       So we do believe there are some other deterrence factors

18   that are still here.  I know it sounds like a defense counsel

19   argument.  We don't normally say, oh, she's going to be a

20   felon.  It's the felon of a worst kind.  That's what she's

21   going to be.

22            THE COURT:  It is a felon of the worst kind.  That's

23   why the 36 months troubles me.

24            MR. DOUGLAS:  Yes.

25            THE COURT:  We sentence drug dealers every day in

1  this court that are lower-level drug dealers that go to prison

2  for way longer than 36 months, and they also don't understand

3  the impact on this opioid epidemic your office is fighting --

4          MR. DOUGLAS:  Right.

5          THE COURT:  -- in this community and this country.

6          MR. DOUGLAS:  And the Government certainly

7  understands that there are other types of offenses that are

8  sentenced sometimes more severely than the Government is

9  proposing in this case.  But dealing with the Justice

10  Department, the National Security Division, dealing with the

11  FBI, dealing with the Department of Navy throughout this case

12  for really over a year at this point and learning about those

13  other cases that have been out there with husband and wives,

14  again, the Government does not believe this is an outlier.

15  This would not be an outlier to sentence this defendant to 36

16  months.  And we believe it's reasonable for the reasons we

17  stated, and we would ask the Court to accept it.

18          THE COURT:  Thank you, Mr. Douglas.

19          MR. DOUGLAS:  Thank you, Your Honor.

20          THE COURT:  Mr. Beck --

21          MR. BECK:  Yes, Your Honor.

22          THE COURT:  -- why should I accept this plea?

23          MR. BECK:  I'm sorry, Your Honor?

24          THE COURT:  Why should I accept this plea?

25          MR. BECK:  Your Honor, I don't want to repeat

1  everything that Mr. Douglas said.  I think he eloquently
2  articulated the distinction between the level of involvement of
3  our client, Mrs. Toebbe, and her husband, Mr. Toebbe.  I think
4  the best way to summarize it -- and Mr. Douglas did this in
5  ways that none of us would be standing here -- at least
6  Ms. Toebbe and myself and her counsel -- if it wasn't for her
7  husband's involvement and instigation of this offense.
8      She indeed got involved in it at some point voluntarily and
9  knowingly, but it was at a highly limited level.  And as
10  Mr. Douglas said, she never had access to it.  She never had a
11  position of trust with the government.  And, frankly, like me
12  and most of the people in this courtroom, she probably wouldn't
13  have known what it was if she read it.  Now, she understood, of
14  course, it should not have been distributed, and that's where
15  her crime occurred.  But, again, it's -- she wasn't the one --
16  she's not why we're here today.  It's because her husband had
17  an ill-conceived idea to make money, and she agreed to go along
18  with it at some point.
19      Secondly, Your Honor, the Court, in addition to the
20  guidelines, has to consider -- is required to consider the
21  history and characteristics of the defendant.  In this case,
22  Ms. Toebbe has no criminal history whatsoever.  She is a mother
23  of two children that she, up until getting involved in this
24  mess, had been devoted to and raised.  And she was a teacher, a
25  school teacher, and from what I understand, a successful school

1  teacher.  Unfortunately for her, she also had some -- I'll say
2  personal issues.  I don't want to lay all her problems out
3  before the Court or actually before the public in general, but
4  she had some significant personal issues and family issues that
5  I would describe as pretty tremendous and somewhat unusual for
6  folks that this Court sees.  Those factors don't excuse what
7  she did, but it certainly casts some light on why she exercised
8  such poor judgment here.  She had troubles.  And by all
9  accounts, from the outside, she looked like a normal, happy
10 individual living a suburban life in Annapolis, but underneath
11 that, there were some significant issues that probably played a
12 role in what she did here.
13     She certainly regrets, Your Honor, what happened here.
14 She -- you know, it was out of character.  She's never done
15 anything wrong in her life.  She -- once she gets whatever
16 sentence this Court imposes, if the Court accepts the plea and
17 imposes the agreed-upon sentence, she's going to do those 36
18 months in a federal prison.  She's already been serving time in
19 -- you know, I don't want to disparage our local jail, but
20 doing time there is certainly harder than doing it in most
21 places; and she's been doing time there for the last ten
22 months.  But when she does get out, Your Honor, she will
23 have -- she will have lost everything that she ever had in her
24 entire life.  She will have lost her husband.  She will have
25 lost so much time with her children.  She will have lost her

1   career.  She will unlikely, I think, ever be able to work in a

2   field that she's worked in the past.  And she will most likely

3   never have any meaningful contact for the near future with her

4   husband.  And this conviction will be with her the rest of her

5   life.  She will never -- this will be a scarlet letter that

6   will live with her forever.

7       So going back to the Court's point about drug defendants, I

8   agree there are many drug defendants that often come before the

9   Court that get similar or sometimes more time.  The only thing

10  I would say, Your Honor, is, at least in my experience, a great

11  deal of those, if not most of them, come before the Court

12  having had, shall I say, a checkered past, prior convictions,

13  run-ins with the law.  Indications that they can't comply with

14  the law; and, therefore, more sentencing time is justified to

15  protect the public.

16      In Mrs. Toebbe's case, Your Honor, I dare say that --

17  especially because she has no knowledge of nuclear science or

18  nuclear submarines -- she will never be a risk to the public

19  again.  You know, she will be someone who will live the rest of

20  her life with this scarlet letter on her, and hopefully she

21  will do the best she can; but her punishment, Your Honor, will

22  last forever.

23      So those are the reasons, Your Honor, in addition to what

24  Mr. Douglas said about the nature of the limited number of

25  other cases where individuals like Mrs. Toebbe have been

1  prosecuted.  And I would just say as I read in the case

2  involving the woman in New Mexico, the spouse of that

3  individual, one could certainly -- at least I read it -- that

4  person was more involved than Mrs. Toebbe was in this

5  particular case, and the judge there felt that that was an

6  appropriate sentence given under the circumstances.  So that's

7  why we're asking that the Court accept this plea, Your Honor,

8  and impose the sentencing of 36 months.  Thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Beck.

10     Mr. Douglas, wasn't the Elizabeth Shirley case your case,

11 3:20-cr-21?

12          MR. DOUGLAS:  That was -- yes, Your Honor, as well as

13 Mr. Compton and Mr. MacMahon were co-counsel on that case

14 representing her.

15          THE COURT:  Didn't she get more time than 36 months?

16          MR. DOUGLAS:  Yeah, she got about seven years or so,

17 and so about, you know, double.  She was the contractor who had

18 the clearance.  She stole the documents.  She also kidnapped

19 her own child and went to Mexico.  And there were indications

20 that she was making attempts or at least planning to transmit

21 the information herself to a foreign nation.

22     So the Government would argue that is distinguishable; and,

23 again, it's not a sentencing disparity with Elizabeth Shirley

24 either.

25          THE COURT:  She didn't -- Ms. Shirley didn't transmit

1  any information, however, did she?  She was trying to make the

2  contacts.

3         MR. DOUGLAS:  She did not transmit it, no.  She was

4  preparing to transmit.  And it did involve secret and even

5  top-secret classified information.  So not in this area of

6  confidential.  It was at the highest levels of classified

7  information.

8         THE COURT:  Thank you, Mr. Douglas.

9         MR. DOUGLAS:  Thank you, Your Honor.

10        THE COURT:  Would you comment further on Mr. Toebbe's

11 plea or --

12        MR. DOUGLAS:  Yes.

13        THE COURT:  -- did you -- do you think you covered

14 it?  I'm not certain whether you did so --

15        MR. DOUGLAS:  No, I did not.  I didn't really.  If I

16 may.

17        THE COURT:  Yes, sir.

18        MR. DOUGLAS:  Your Honor, what the proposed binding

19 term does in Mr. Toebbe's case is it cuts off a couple of years

20 from the top end, and, of course, as I think the Court alluded

21 to, would prevent the Court from giving an upward variant

22 sentence.  The reason for that is a little more

23 straightforward, and it's been explained in the Government's

24 classified sentencing memorandum that his post-plea cooperation

25 was substantial.  Very substantial.  Not in the eyes of me, not

1  in the eyes of the U.S. Attorney's Office, but in the eyes of
2  the Department of Navy and the FBI.
3      It was critical to a larger assessment of that defendant's
4  conduct which we may have never known.  The Navy would never
5  have known what his conduct was and what the scope was without
6  his cooperation.  And so we anticipated that going into the
7  plea agreement.  That's why the plea agreement doesn't just say
8  our typical "we'll be completely forthright and truthful," but
9  it says you're going to give us access to computers, you're
10 going to give us access to the encrypted email accounts, which
11 we can't get access to.  They're in Switzerland.  And there's
12 not really a way to get access to those in a way that can be
13 used.  And so that was a -- that was -- he enabled us --
14 completely himself enabled us to be able to make that damage
15 assessment that the Department of Navy is highly grateful for.
16     So that's why we have proposed this binding term which
17 simply just cuts two years off the top and avoids an upward
18 variant sentence.  Otherwise, it's still -- a large portion of
19 that binding range overlaps with what would have been the range
20 as calculated or what is the range that's calculated.  So
21 really for that reason, we believe that it's reasonable and ask
22 the Court to accept it.
23          THE COURT:  Thank you, Mr. Douglas.
24          MR. DOUGLAS:  Thank you.
25          THE COURT:  Mr. Compton, in minimizing Ms. Toebbe's

1  role, the lawyers have cast your client in a much different

2  light.  Why do you -- what can you tell me to convince me that

3  I should accept your client's plea?

4          MR. COMPTON:  Well, Your Honor, again, I won't

5  belabor what Mr. Douglas has said, but the binding term does --

6  it's not exact with regard to the guideline range that's called

7  for, but it does track pretty closely, and it does reflect the

8  extensive cooperation that Mr. Toebbe provided.  I think I had

9  mentioned that, you know, we are talking about days long

10 meetings.  Three in total.  And I think Mr. Douglas accurately

11 represented what was provided, including information that the

12 Department of Navy would not have known but for Mr. Toebbe.

13    I know the Court has read the sentencing memos,

14 particularly the classified memos.  I would just implore the

15 Court to again look at those.  In my opinion, that alone

16 justifies the slight modification that the binding term makes

17 to the guideline range.  You know, whether the Court imposes

18 the low end of that range or the high end of that range, the

19 Court does have discretion in that sense with regard to the

20 binding term.  The Court can take into consideration within the

21 binding term the 3553(a) factors in this case.  So I think the

22 Court is not limited in that sense.

23    You know, again, these are serious crimes, but we are

24 talking about serious punishment.  Twelve and a half years to

25 seventeen and a half years is not a slap on the wrist.  The

1   defendant, who has never been in trouble before, is going to

2   have a felony conviction which is not -- for someone like

3   Mr. Toebbe is not insubstantial.  He will never hold a

4   classified -- a clearance again which means any work that he

5   has known up to this point, he will never be able to do for the

6   rest of his life.  That also means that there is almost zero

7   chance of recidivism in this case.

8       But the punishment itself is that type of punishment that

9   is reserved for -- the Court had mentioned drug cases earlier.

10  It's reserved for those most serious of the drug cases, the

11  career offenders.  The folks that have done this twice or three

12  times before and have now come back to the Court not having

13  learned their lesson.  That's this type of punishment.  It's

14  only slightly less punishment than we see when somebody has

15  committed a crime that's resulted in the death of another

16  individual.

17      This is serious punishment that the defendant is facing.

18  And, in fact, if the Court, in looking at the Government's own

19  sentencing memo, the unclassified version -- I know the

20  Government is trying to make another point there, but when the

21  Court looks at those cases that deal with the 2274, the

22  restricted data charges -- not the 794, the other charges --

23  but the restricted data charges, this offense and this

24  guideline range, this binding term range is much higher than

25  what those defendants received.

1      Now, the Government says that the difference is because

2  Mr. Toebbe actually made contact whereas these folks had always

3  happened to be talking to the FBI.  But Roy Oakley was

4  sentenced to 72 months of imprisonment.  Mr. Oakley had only

5  been -- happened to be only dealing with the FBI, but

6  Mr. Oakley delivered -- according to the Government, delivered

7  uranium enrichment fuel rods and associated items to an

8  undercover FBI agent who he thought was a foreign government.

9  I mean, we're talking dirty bombs there.  That's significant in

10  my opinion, and Mr. Oakley was sentenced to 72 months.  Again,

11  Mr. Mascheroni, a 2274 charge, 60 months.

12          THE COURT:  Mr. Mascheroni was 70 years old too;

13  correct?

14          MR. COMPTON:  Well, and what I'm suggesting, Your

15  Honor, is that -- yes, he was 72.  So the defendant is not as

16  old, and he made contact.  So that could account for, I would

17  say, the difference between 60 months and 151 months to put the

18  binding term in perspective for the Court.

19      Mr. Awwad wasn't even convicted of the 22 -- he was

20  convicted of attempted 794.  So, you know, and, again, with

21  regard to the others, the Government, in trying to make the

22  comparison with the 794, those -- each of those individuals,

23  while they did make contact, they were all -- this was all

24  top-secret information that they were -- or secret -- secret or

25  top-secret information that they were dealing with, and most of

1    these individuals -- Peter Debbins, Mariam Thompson, Jerry Lee
2    -- what were they involved in?  Classified national defense
3    information regarding deployed Special Forces.  Providing
4    Russian intelligence agents with names -- names.  Information
5    about -- personal identifying information about former Special
6    Forces team members so the agents can evaluate those
7    individuals.  Mariam Thompson.  True names.  Personal
8    identifying information.  Background information.  Photographs
9    of human assets.
10        This is the type of stuff that 794 deals with because it's
11   -- we're talking about actual identifiable individuals who are
12   put in harm's way and are facing death because of what the
13   individuals did.  And what were they sentenced to?  Mr. Debbins
14   was sentenced to 188 months.  That's within the range that
15   we're talking about for Mr. Toebbe, and Mr. Toebbe wasn't
16   giving out names of Special Forces that could be killed because
17   of his actions.  Mariam Thompson was --
18            THE COURT:  Couldn't servicemen be killed because of
19   his actions?
20            MR. COMPTON:  Well, of course, there's damage, Your
21   Honor, and that's what the -- that's what the classification
22   is, and that's why the punishment is there.  Damage.  Could
23   service members be killed?  Yes.  In a theoretical sense,
24   somebody could be put into danger and somebody could be put
25   in -- just like when a drug dealer deals 5 grams of crack, it's

1  possible that society is put at risk and so somebody out there

2  could be killed.  But the differences between a hypothetical

3  possibility of somebody being -- a service member being killed

4  and Mr. Debbins and Ms. Thompson, who are providing actual

5  names and photographs of individual people who are involved in

6  human intelligence for the government -- here is their name.

7  Here is their photograph.  Here is what they're doing.  By the

8  way, if you want to go kill them because they were helping

9  target the Quds Force commander.

10     That's not what we have here.  But that's not to say --

11  and, you know, we get -- in an effort to -- and I noticed this

12  as we were preparing -- preparing for this hearing.  In an

13  effort to, you know, push back a little bit on some of the

14  Government's arguments in here now in an effort to convince the

15  Court to take this, we're not trying to minimize his activity,

16  his involvement.  It was serious.  It is serious.  It involved

17  serious misconduct.  He has taken responsibility for that.  He

18  has done everything he can post-misconduct, as you heard just

19  now from Mr. Douglas, to try and do whatever he can to make it

20  right.  And this guideline, this binding term, is the

21  punishment that goes along with it.

22     It's not -- it's not, Your Honor, a slap on the wrist.

23  It's not nothing.  It's more than not nothing.  It's something.

24  It's substantial.  And it reflects the guideline that's called

25  for, but not only that, the 3553(a) factors and this

1   defendant's significant, significant cooperation with the

2   United States as outlined by both Mr. Douglas and in our

3   collective memorandum.

4       So I would urge the Court to adopt this plea.  The Court

5   still has discretion within the range to impose a sentence that

6   the Court thinks is appropriate.  It's not a slap on the wrist.

7   It is a significant punishment for Mr. Toebbe combined with all

8   of the other felony -- the felony conviction, the loss of

9   clearance activity, and everything else that we talk about in

10  our memorandum.  So we would encourage the Court to adopt the

11  binding term.

12          THE COURT:  Thank you, Mr. Compton.

13      Counsel, for all three of you, anything else for me to

14  consider before I recess to give this some more time for

15  thought?

16          MR. DOUGLAS:  Your Honor, one very quick thing with

17  regard to Mr. Toebbe.  Kind of alluded to there, but to drive

18  this point home specifically.  In the jurisprudence of

19  restricted data cases, this Atomic Energy Act, which has been

20  around since the '50s, a sentence within the range that the

21  parties are proposing would be the most significant sentence

22  ever given.  I think there was -- maybe around in the '50s,

23  there might have been a life, but in modern times, a sentence

24  between 12 and 17 years would be one of the most, if not the

25  most, significant sentences in the history of the Atomic Energy

1   Act.  So I just wanted to make that clear for the Court's

2   consideration as well, Your Honor.

3           THE COURT:  Thank you, sir.

4     We're going to take a recess.  We'll get back on the record

5   as soon as I can.

6       (Recess 1:45 P.M. to 2:21 P.M.)

7           THE COURT:  Please be seated, everyone.  We have

8   everyone here for the hearing.  Back on the record.

9     Counsel, as I stated at the beginning of this hearing, I

10  had some concerns with whether or not the Court should accept

11  or reject these plea agreements as presented to the Court.  I

12  reviewed everything that had been filed with the Court prior to

13  today's hearing, and today I've listened to the arguments of

14  counsel, and I considered the 3553(a) factors.

15    The defendants in this case pleaded to conspiracy to

16  communicate restricted data, which is a very serious crime.  So

17  serious, in fact, that it's punishable by life imprisonment by

18  statute.  The advisory guideline ranges in this case suggest a

19  sentence higher than what the Court may impose based upon the

20  binding terms contained within each defendant's plea agreement.

21  Moreover, looking at the -- even the high end of Mr. Toebbe's

22  binding range, that's about 17 1/2 years.  So what's to say he

23  gets out early with good time, and the information he still

24  possesses and has access to is still in step with current

25  technology, and he uses that and provides it to another country

1   that gains an advantage over this country?

2       What if Ms. Toebbe has other pass codes memorized?  I think

3   it was Mr. Douglas who referred to her having a pass code

4   memorized.  What if she has other pass codes memorized that she

5   can use when she gets out in about two years?

6       Make no mistake these defendants have been charged with

7   very serious crimes.  And as you all know, sometimes I may

8   question counsel about whether or not I should accept a plea,

9   and I listen to your arguments, but in the end, I generally

10  honor plea agreements negotiated by the parties even when they

11  have binding ranges.  But I find the sentencing options for the

12  Court in this case that are available to me strikingly

13  deficient in this case.

14      For example, Ms. Toebbe's plea agreement limits this Court

15  to imposing a sentence of no more than 36 months for an active

16  participant in a conspiracy to communicate restricted data.  An

17  act that was apparently done for selfish and greedy reasons but

18  that could have easily caused great harm to the Navy, the

19  United States, servicemen, and even the world.  These are tough

20  times we're in.

21      The time contemplated by Mr. Toebbe's plea also falls short

22  given the background of the parties' motivation, his trusted

23  employment position, and threats to national and global

24  security and service personnel alone that his actions caused.

25      I found quite revealing the victim's impact statement

1   provided to the Court by the Government.  That statement
2   prepared by Vice Admiral William Houston.  It gave this Court
3   quite a lot of food for thought, and just briefly touching upon
4   some comments by the vice admiral that I find most significant.
5   He stated, "Mr. Toebbe captured some of the most secure and
6   sensitive information about our nuclear-powered fleet.  A
7   critical component of national defense has been irreparably
8   compromised.  Mr. Toebbe served as a nuclear engineer with the
9   Naval Nuclear Propulsion Program, or Naval Reactors, as a
10  federal government civilian employee.  This information
11  concerned the design, arrangement, development, manufacturing,
12  testing, operation, administration, training, maintenance and
13  repair of the propulsion plants of nuclear-powered vessels.  By
14  definition, it's comprised of information that provides a
15  strategic advantage to our nation in dealing with foreign
16  adversaries.  The information Mr. Toebbe disclosed and tried to
17  sell to a foreign nation is related to the design and operation
18  of nuclear-powered submarines."
19      There's also a statement that "Our adversaries -- anywhere
20  on the world's oceans, including under the polar ice,
21  undetected and at maximum capability for extended periods."
22  That's how that submarine operates.
23      The vice admiral states, "Mr. Toebbe's illegal conduct has
24  now threatened those critical military advantages.  The nation
25  has spent billions of dollars developing naval nuclear

```
 1  propulsion technology.  Mr. Toebbe's actions have compromised
 2  the integrity of this protected information, thereby
 3  undercutting the military advantage afforded by decades of
 4  research and development.  This information could provide
 5  foreign navies the opportunity to close the gap in capabilities
 6  which would require an extraordinary effort and resources to
 7  restore.  Resources will now be needed to develop information
 8  and technologies to account for the information Mr. Toebbe
 9  compromised.  This information could be used by an adversary to
10  harm or disable currently operating U.S. nuclear submarines.
11  The lives of nearly 25,000 active duty submarine sailors today
12  are at great risk" -- or at greater risk rather -- "than they
13  were before directly due to Mr. Toebbe's actions.  Mr. Toebbe
14  undertook these actions not because of some disadvantage due to
15  ignorance or lack of professional opportunity, development, or
16  training.  Rather, he did so in spite of and directly contrary
17  to receiving years of basic and advanced training about these
18  submarine operational systems and the critical importance of
19  maintaining secrecy."
20      There's a statement that Mr. Toebbe and his deliberate
21  actions betray the trust that the Navy and the nation placed
22  upon him.
23      Close to the end, the vice admiral comments that "Such
24  conduct poses a very real and profound threat to national
25  security allowing our adversaries access to one of our prized
```

1  strategic advantages."

2      Counsel, it's not in the best interest of this community

3  or, in fact, this country to accept these plea agreements.

4  Therefore, I'm rejecting them as presented to me.  There's no

5  question that the binding terms are outside the guideline

6  range.  The only question is whether they're outside the range

7  for justifiable reasons, and I don't find any justifiable

8  reasons for accepting either one of these plea agreements.

9      Given that, Counsel, we need to make sure that the

10 defendants understand that I'm not required to follow the plea

11 agreement, and I need to give the defendants, each of them, the

12 opportunity to withdraw their pleas.

13     I'm advising you, Mr. Toebbe and Ms. Toebbe, of that fact,

14 and I'm advising you that if your plea is not withdrawn, I may

15 dispose of this case less favorably towards you than your plea

16 agreement contemplated.  Meaning I -- if you don't withdraw

17 your plea, I can sentence you outside that binding range.  If

18 you do withdraw your plea, dates will then be set for trial.

19 That's not to say you can't go back to the drawing board and

20 formulate a different plea, but I'm rejecting this one as --

21 this plea agreement as presented.

22     Given that, is there anything you don't understand,

23 Ms. Toebbe, about what I've just told you?

24          MS. TOEBBE:  No, Your Honor.

25          THE COURT:  Mr. Toebbe?

1          MR. TOEBBE:  I am.

2          THE COURT:  Is there anything you don't understand

3   about what I've just told you?  That you have the opportunity

4   to withdraw your plea because if you don't, I'm not restricted

5   in any way in sentencing you?

6          MR. TOEBBE:  No, Your Honor.  I understand.

7          THE COURT:  Okay.  Now, Mr. Compton and Mr. Beck and

8   Mr. Douglas, knowing the gravity of these offenses and the

9   sentencing that the Court can contemplate in this case,

10  ordinarily, we -- I take a brief break.  I come back on the

11  record and allow you -- allow you a bit of time to consult with

12  your clients to determine what you want to do.  Would you

13  prefer for me to give you until the end of the week to let the

14  Court know what your clients have decided, and then we can

15  either set dates in an order for trial or reset this for

16  sentencing?  We've got some light days in September that we

17  could reset this for sentencing.

18         MR. COMPTON:  Your Honor, I would probably just need

19  about actually five minutes to make sure Mr. Toebbe understands

20  the Court -- what the Court has advised and what my anticipated

21  advice to him is going to be.  I would -- I'm speaking for

22  myself.  I would prefer an order from the Court setting trial

23  dates so that we can then, I guess, work with that if we need

24  additional time through a motion to continue or something along

25  those lines.

```
1              THE COURT:  Mr. Beck.
2              MR. BECK:  Your Honor, I think I agree with
3   Mr. Compton that if we could have just a brief recess so I can
4   make sure, absolutely sure, Ms. Toebbe understands what her
5   options are and then proceed.  I don't think it would take more
6   than five minutes.
7              THE COURT:  Okay.  Then why don't we go ahead and
8   take about five.  We'll make sure you all are ready before I
9   come back out here to get on the record.
10             MR. BECK:  Thank you, Your Honor.
11        (Recess 2:32 P.M. – 2:45 P.M.)
12             THE COURT:  Please be seated, Counsel.
13        We are back on the record.  We took a brief recess while
14  counsel conferred with their clients to determine whether they
15  wanted to stand upon their plea after rejection of the plea
16  agreement by the Court and receive a sentencing on their plea
17  or withdraw their plea and have us set trial dates.
18        Mr. Compton.
19             MR. COMPTON:  Your Honor, after speaking with
20  Mr. Toebbe, I believe he'll exercise his privilege under the
21  Federal Rule 11 and withdraw from the plea agreement at this
22  time, and we would ask that the Court set trial dates.  I would
23  only request that the -- just the Court recognize the complex
24  nature of this case when it's setting the trial date in the
25  future.
```

```
 1              THE COURT:  Absolutely.
 2        Mr. Toebbe is everything Mr. Compton told me accurate?
 3              MR. TOEBBE:  I'm sorry, Your Honor.  I couldn't hear
 4   you.
 5              THE COURT:  Is everything Mr. Compton told me
 6   accurate?  In other words, you wish to withdraw your plea of
 7   guilty and have me set trial dates?
 8              MR. TOEBBE:  Yes, Your Honor, I wish to withdraw my
 9   plea.
10              THE COURT:  Okay, sir.
11        Mr. Beck.
12              MR. BECK:  Your Honor, Ms. Toebbe would also like to
13   withdraw her plea and respectfully request the Court set a
14   trial date at an appropriate time.
15              THE COURT:  Ms. Toebbe, is what Mr. Beck just told me
16   correct?  You wish to withdraw your plea of guilty and have the
17   Court set trial dates?
18              MS. TOEBBE:  Yes, Your Honor.
19              THE COURT:  All right.  Understanding this case is
20   going to take some work for everyone involved, including the
21   Court, I'm looking at the -- I think what the latest trial date
22   according to our calculations can be is in January.  So we can
23   set this for pretrial January 12, 2023, at 9:30 for pretrial
24   and January 17, 2023, at 9:00 for jury trial.
25        Counsel, if those dates don't work, then just file a
```

```
 1   motion, and we can work with that.
 2              MR. COMPTON:  Thank you, Your Honor.
 3              MR. DOUGLAS:  Thank you, Your Honor.
 4              THE COURT:  Anything further on behalf of the
 5   Government?
 6              MR. DOUGLAS:  No, Your Honor.  Thank you.
 7              THE COURT:  Anything further on behalf of your
 8   client, Mr. Compton?
 9              MR. COMPTON:  No, Your Honor.  Thank you.
10              THE COURT:  Anything further, Mr. Beck, on behalf of
11   your client?
12              MR. BECK:  No thank you, Your Honor.
13              THE COURT:  The defendants are remanded to the
14   custody of the United States Marshal.
15
16                   (Hearing concluded at 2:47 P.M.)
17
18
19
20
21
22
23
24
25
```

1                              CERTIFICATE

2

3          I, Kate A. Slayden, Registered Professional Reporter

4     and Official Court Reporter of the United States District Court

5     for the Northern District of West Virginia, do hereby certify

6     that the foregoing is a true and correct transcript of the

7     proceedings had in the above-styled action on August 16, 2022,

8     as reported by me.

9          I certify that the transcript fees and format comply

10    with those prescribed by the Court and the Judicial Conference

11    of the United States.

12          Given under my hand this 22nd day of September 2022.

13

14                              /s/Kate A. Slayden

15

16                              Kate A. Slayden, RPR
                                Official Reporter, United States
17                              District Court for the Northern
                                District of West Virginia
18

19

20

21

22

23

24

25
