```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                         Plaintiff,

 6   vs.                    Criminal Action Nos. 3:21-cr-49-1,2

 7   Jonathan Toebbe,

 8   Diana Toebbe,

 9                         Defendants.

10

11          Proceedings had in the Sentencing Hearings in the

12   above-styled action on November 9, 2022, before the Honorable

13   Gina M. Groh, United States District Judge, at Martinsburg,

14   West Virginia.

15                          APPEARANCES

16   On behalf of the United States of America:

17          Jarod J. Douglas
            Assistant United States Attorney
18          United States Attorney's Office
            P.O. Box 591
19          Wheeling, West Virginia  26003

20          Jessica Lieber Smolar
            Assistant United States Attorney
21          United States Attorney's Office
            700 Grant Street, Ste. 4000
22          Pittsburgh, Pennsylvania 15219

23

24   The defendants were present in person.

25   Proceedings reported by means of stenotype; transcript produced
     by official court reporter.
```

Kate A. Slayden, CCR, RPR
217 West King Street, Room 214, Martinsburg, WV  25401
304-267-5688



1                        <u>APPEARANCES</u> (Continued)

2

3   On behalf of the United States of America:

4           S. Derek Shugert, Esq.
            United States Department of Justice
5           950 Pennsylvania Avenue, NW
            Washington, DC 20530

6

7   On behalf of the defendant, Jonathan Toebbe:

8           Nicholas Compton
            Assistant Federal Public Defender
9           Federal Public Defender's Office
            651 Foxcroft, Ste. 202
10          Martinsburg, West Virginia 25401

11  On behalf of the defendant, Diana Toebbe:

12          Barry Beck, Esq.
            Power, Beck & Matzureff Law Offices
13          308 West Burke Street
            Martinsburg, West Virginia  25401

14

15          Jessica Carmichael, Esq.
            Carmichael Ellis & Brock, PLLC
16          108 N. Alfred Street, 1st Floor
            Alexandria, Virginia  22314

17

18

19  Probation Officer Michael C. DeHaven was present.

20

21

22

23

24

25

3

```
 1                    P R O C E E D I N G S
 2              (November 9, 2022, at 11:09 A.M.)
 3                        - - -
 4          THE COURT:  Please be seated, everyone.  We will call
 5  our cases.
 6          THE CLERK:  This is the case of the United States of
 7  America versus Jonathan Toebbe and Diana Toebbe, Criminal
 8  Numbers 3:21-cr-49, defendants 1 and 2.
 9      The government is represented by counsel, Jarod Douglas,
10  Jessica Smolar, and Derek Shugert.  The defendants are present
11  in person and by counsel Nicholas Compton for Mr. Toebbe, Barry
12  Beck and Jessica Carmichael for Mrs. Toebbe.
13      Are the parties ready to proceed?
14          MR. DOUGLAS:  The United States is ready, Your Honor.
15          MR. COMPTON:  Jonathan Toebbe is ready, Your Honor.
16          MR. BECK:  Good morning, Your Honor.  Mrs. Toebbe is
17  ready.
18          THE COURT:  Good morning.  All right, counsel, I'm
19  going to go ahead and get the defendants under oath.  We'll
20  start with Mrs. Toebbe.
21      If you'll stand and raise your right hand, please, ma'am,
22  we're going to get you under oath to answer any questions I may
23  have for you today.
24      (The defendant, Diana Toebbe, was sworn in.)
25          DEFENDANT DIANA TOEBBE:  I do.
```

```
1                    THE CLERK:  Thank you.

2                    THE COURT:  Ms. Toebbe, I'll remind you now you're

3      under oath, and if you make any untruthful statements or

4      answers during today's proceeding, those untruthful statements

5      or answers could form the basis for a separate action for

6      perjury or false swearing.  That having been said, feel free to

7      ask questions.  If you don't hear something, ask for it to be

8      repeated.  If you don't understand something, ask for an

9      explanation.  And at all times, feel free to consult with your

10     lawyers.  Fair enough?

11                   DEFENDANT DIANA TOEBBE:  Yes, ma'am.

12                   THE COURT:  All right.

13        Mr. Toebbe, if you will please stand.  We're going to

14     administer the same oath.

15                   THE CLERK:  If you'll raise your right hand, sir.

16        (The defendant, Jonathan Toebbe, was sworn in.)

17                   DEFENDANT JONATHAN TOEBBE:  I do.

18                   THE CLERK:  Thank you.

19                   THE COURT:  Mr. Toebbe, the same thing for you.

20     You're under oath now.  If you make any untruthful statements

21     or answers during today's proceeding, those untruthful

22     statements or answers could form the basis for a separate

23     action for perjury or false swearing.  That having been said,

24     feel free to ask questions.  If you don't hear something, ask

25     for it to be repeated.  If you don't understand something, ask
```

1  for an explanation.  And at all times, feel free to consult

2  with your lawyer.  Fair enough?

3          DEFENDANT JONATHAN TOEBBE:  I understand.  Thank you,

4  Your Honor.

5          THE COURT:  You're welcome.

6     Before we get started, Mr. Douglas and Mr. Compton and

7  Mr. Beck, in looking at the money that was recovered in this

8  case, it appears as though $54,300 of the 100,000 was

9  recovered, that earnest money, but there's still $45,700

10 unaccounted for.  Is that the amount?

11         MR. DOUGLAS:  That is the correct figure, Your Honor.

12         THE COURT:  All right.  Where did the rest of the

13 money go?

14         MR. DOUGLAS:  The rest of the money is accounted for

15 Your Honor, in Mr. Toebbe's report that he spent a certain

16 amount of it.

17         THE COURT:  Uh-huh.

18         MR. DOUGLAS:  Okay.  And then in addition to that,

19 the fluctuation of the value of the Monero cryptocurrency

20 which, according to the FBI -- and they kind of have a little

21 more of an expertise in that than I do -- it matched to the

22 fluctuation that had occurred during that passage of time

23 before we were able to get access to it.

24         THE COURT:  And that's your understanding,

25 Mr. Compton and Mr. Beck, as well?

| | |
|---|---|
| 1 | MR. COMPTON:  Yes, Your Honor. |
| 2 | MR. BECK:  Agreed, Your Honor.  That's our |
| 3 | understanding. |
| 4 | THE COURT:  And I know I had a question that I think |
| 5 | probation had gotten with you on, Mr. Douglas, about |
| 6 | restitution.  If that could be ordered in restitution.  The |
| 7 | remaining amount that was unrecovered.  But apparently, |
| 8 | according to the section under which the plea has been made, |
| 9 | unless restitution is specifically in the plea agreement, then |
| 10 | the Court can't order restitution? |
| 11 | MR. DOUGLAS:  Yes, Your Honor.  So my understanding |
| 12 | of the restitution law is that either it's mandatory |
| 13 | restitution, and there's enumerated offenses that doesn't |
| 14 | include this offense -- |
| 15 | THE COURT:  Right. |
| 16 | MR. DOUGLAS:  -- or if it's discretionary, then the |
| 17 | parties still need to agree to it in the plea agreement under |
| 18 | 3663(a)(3) which the plea agreement is silent on that issue. |
| 19 | THE COURT:  Okay.  We're going to take a quick break |
| 20 | real quick and get back out here on the record, and then we'll |
| 21 | get started.  What I plan to do -- I don't know whether our |
| 22 | courtroom deputy let you all know or not -- is we'll start with |
| 23 | Mrs. Toebbe, and then we'll move on to Mr. Toebbe's sentencing. |
| 24 | I will let you know that I'm inclined to take these pleas |
| 25 | today. |

```
1         (Recess 11:24 A.M. – 11:31 A.M.)

2              THE COURT:  Please be seated, everyone.

3      All right.  We'll proceed with Ms. Toebbe's matter first.

4  Has defense counsel received the presentence investigation

5  report?

6              MR. BECK:  We have, Your Honor.

7              THE COURT:  And have you, Ms. Toebbe, received that

8  report and reviewed it to your satisfaction with your lawyer?

9              DEFENDANT DIANA TOEBBE:  Yes, ma'am.

10             THE COURT:  The government has received and reviewed

11 it of course?

12             MR. DOUGLAS:  Yes, Your Honor.

13             THE COURT:  And referring to the latest versions;

14 correct?

15             MR. DOUGLAS:  Yes, Your Honor.

16             THE COURT:  All right.  We do have some objections to

17 the report so let's go ahead and take care of those now.

18     Mr. Beck, I'm looking through these.  Objection No. 1 to

19 what's now page 23, paragraph 154.  That report has been

20 revised so are you satisfied with that?

21             MR. BECK:  We are, Your Honor.

22     May I use the podium, Your Honor?

23             THE COURT:  Absolutely.

24             MR. BECK:  Thank you, Your Honor.

25     Yes.  That objection has been resolved, Your Honor.
```

```
 1              THE COURT:  Okay.  And then Objection No. 2, is that
 2   just a holdover from the last time we were here before the
 3   Court on the Court's consideration of the original plea
 4   agreement?  Because it refers to a downward variance, but we've
 5   got a binding in Ms. Toebbe's case to the low end of the
 6   guideline range.
 7              MR. BECK:  It is -- well, not more than the low end,
 8   Your Honor.
 9              THE COURT:  Right.
10              MR. BECK:  Yeah, I suppose it is a holdover to the
11   extent that we're still requesting that the Court go below the
12   guidelines.  Not --
13              THE COURT:  Okay.  So let's put it this way.  Because
14   you filed the new motion for a variant sentence below the low
15   end of the guideline range, this really dovetails into that so
16   the objection is no longer before the Court because I -- you
17   know I'm going to consider your motion for variant sentence?
18              MR. BECK:  I'm sorry, Your Honor?
19              THE COURT:  This objection is no longer technically
20   before the Court because you know I'm going to consider your
21   motion for variant sentence which is the same thing?
22              MR. BECK:  Correct.
23              THE COURT:  Okay.  So we can say it's withdrawn
24   because I'm considering your motion?
25              MR. BECK:  That's correct, Your Honor.
```

```
1              THE COURT:  Okay.  I do have a question on if I

2    rejected the plea because it was woefully insufficient the last

3    time around on round one, why Ms. Toebbe believes that I would

4    consider a three-year sentence at this point?

5              MR. BECK:  Well, Your Honor, I hope that --

6              THE COURT:  And I'll -- you can further explore that

7    later when we get to the dispositional phase --

8              MR. BECK:  Right.

9              THE COURT:  -- but I am curious.

10             MR. BECK:  Well, Your Honor, I would hope -- and this

11   may -- I don't want to tout our horn too much here, but I would

12   hope that this time, the Court has been given information from

13   us that casts more light on what other courts have considered

14   reasonable sentences in these kind of cases.  As you know, we

15   presented the Court with a memorandum --

16             THE COURT:  That said they were all very low.  We

17   double checked that and everything was correct.

18             MR. BECK:  Well, Ms. Carmichael and I spent a lot of

19   time on that, Your Honor, trying to --

20             THE COURT:  I can see that, and I appreciate that.

21             MR. BECK:  -- trying to give the Court a greater

22   perspective on these kind of cases because, quite frankly, I've

23   never had one before.  And I know the Court has had a few, but

24   they tend to happen in other places more often.  So we wanted

25   to give the Court a greater perspective on what might be a
```

1  reasonable sentence in this case, particularly in light of what

2  we believe are mitigating factors here concerning Ms. Toebbe's

3  role in the offense and her personal history and

4  characteristics.

5      So that's why we come before you today again, Your Honor,

6  at least asking you to consider a three-year sentence and, at a

7  minimum, consider a sentence below the applicable guideline

8  range.

9           THE COURT:  Okay.  That takes care of all the smaller

10  objections as well.  Let's back up to the objections now.  Now

11  we have this more meaty objection with regard to the

12  enhancement for the obstruction which is still on the table

13  because that was included in the guideline calculations by the

14  probation officer in the PSR.  Correct?

15           MR. BECK:  Right, Your Honor.

16           THE COURT:  And that's the last objection that the

17  defendant raises to the PSR?

18           MR. BECK:  That's correct, Your Honor.

19           THE COURT:  Okay.  And there were some clarifications

20  by the government with regard to the PSR.  Let's flip over to

21  that.

22      Mr. Douglas, what's styled as Objection No. 2 but you note

23  in the beginning this is --

24      You can stay there, Mr. Beck, because this is going to be

25  real quick.

```
 1              MR. BECK:  Oh, okay.
 2              THE COURT:  Thank you.
 3       This -- it states this is less of an objection and more of
 4    a request for clarification.  Was that just clearing up how the
 5    plea agreement was presented to the Court in that PSR?
 6              MR. DOUGLAS:  That as well as trying to provide some
 7    additional context to what we discussed in those letters --
 8              THE COURT:  Okay.
 9              MR. DOUGLAS:  -- specifically regarding sort of a
10    predetermined cover story that was discussed to the extent that
11    that is something the Court considers or gives any weight.
12              THE COURT:  Well, that was Objection No. 1 that you
13    stated this is less an objection, more of an offer, and I
14    understand that.  And I'll await your response after Mr. Beck
15    puts forth his argument against that enhancement.  But there
16    was a second one that was objection -- this is less of an
17    objection, more of a request for clarification, but it dealt
18    with the terms of the binding plea agreement.
19              MR. DOUGLAS:  Yes.  The way that the government
20    originally read that paragraph in the presentence report seemed
21    to be not accurate to how the provision is in the binding plea
22    agreement.
23              THE COURT:  And now you're satisfied with the
24    revision?
25              MR. DOUGLAS:  Yes, Your Honor.
```

```
1              THE COURT:  Okay.  You as well, Mr. Beck?

2              MR. BECK:  Correct, Your Honor.

3              THE COURT:  Okay.  So that leaves only the objection

4    to the enhancement for the obstruction?

5              MR. BECK:  That's right, Your Honor.

6              MR. DOUGLAS:  Yes, Your Honor.

7              THE COURT:  Okay.  Just to make the record clear on

8    this so the record is clear in case there's any appellate

9    review of this, what we're talking about is that on

10   October 4th, probation office -- of this year -- the probation

11   office received information that some months prior, Mrs. Toebbe

12   made attempts to contact her husband, Mr. Toebbe, through

13   illicit channels of communication.  Specifically, on two

14   occasions, she tried to send handwritten letters to him.  And

15   those were intercepted, of course, by those folks monitoring

16   the communication between the codefendants at the jail;

17   correct?

18             MR. BECK:  That's right, Your Honor.

19             THE COURT:  Mr. DeHaven, since you're the PO on this

20   case, when did these letters first come to your attention just

21   to make sure it's clear on the record?

22             MR. DEHAVEN:  The first copy of a letter we received

23   was provided by regional jail staff I believe on October 7th.

24   On October 9th, the government provided copies of both the

25   letters in question.
```

1          THE COURT:  Okay.  And you had reached out to the

2    jail --

3          MR. DEHAVEN:  Yes.

4          THE COURT:  -- based on a request from the Court on

5    whether there was any interception of anything that would

6    affect my determination at sentencing in this case and whether

7    to accept these pleas in fact?

8          MR. DEHAVEN:  Yes, Your Honor.  Subsequent to the

9    Court's rejection of the previous plea agreement and the

10   defendant's entry of a second guilty plea, our office reached

11   out to the jail at the Court's request and in an effort to

12   provide supplemental information for the presentence report.

13   We requested information regarding their status, any issues,

14   disciplinary concerns, or other problems at the jail, and

15   that's when we were made aware of the attempts at

16   communication.

17         THE COURT:  And who did you receive these letters

18   from?

19         MR. DEHAVEN:  The first --

20         THE COURT:  The jail or the government?

21         MR. DEHAVEN:  Initially, we received one letter from

22   the jail on October 7th.  The government also was working to

23   provide copies of the letters.  They provided copies of both

24   letters to us on the 9th.

25         THE COURT:  And for a full understanding, how does it

1  come about that the jail comes into this information, and what

2  do they do when they obtain information such as this?

3          MR. DEHAVEN:  My understanding is the ingoing and

4  outgoing mail of both Mr. and Mrs. Toebbe was monitored by jail

5  staff with information being provided to the government.  The

6  first letter in question, I believe the December letter, was

7  attempted to be transmitted through another inmate, an inmate

8  trustee in the laundry room, and was intercepted.  The second

9  letter was attempted to be mailed out of the jail with a

10  falsified return address.  It came back in, and in the process

11  of monitoring the mail, incoming and outgoing, the jail

12  discovered it.

13          THE COURT:  So I presume that the government gets

14  these intercepted communications close in time to when they're

15  intercepted?

16          MR. DEHAVEN:  Yes.  I believe both letters were in

17  possession of both the government and defense counsel in early

18  January of 2022.

19          THE COURT:  So I guess my question is, Ms. Smolar or

20  Mr. Douglas, why weren't these provided to the Court?

21          MR. DOUGLAS:  Your Honor, really, you know, as this

22  came up, as -- and everything he described is accurate.

23  Mr. DeHaven.  When this came up in early October -- and he only

24  really brought to the attention the first letter.  Said, oh,

25  well, actually there's two letters.  Okay.

```
 1          THE COURT:  Okay.  I appreciate your filling in the
 2   blanks on this.
 3          MR. DOUGLAS:  Yes.  And, Your Honor, it was not any
 4   kind of a deliberate decision, as I've indicated to
 5   Mr. DeHaven, that we sort of withheld that from the probation
 6   office.  Of course not.  At the point where they entered the
 7   pleas, we kind of moved on.  Moved on to getting their
 8   cooperation, which the Department of Navy values extremely in
 9   this case, and got both of their cooperations.  And so we
10   weren't even really considering the letters at all anymore at
11   that point in time.
12          THE COURT:  And no one thought, Ms. Smolar or you,
13   that it would have been important for the Court to consider the
14   letters considering their nature?
15          MR. DOUGLAS:  In hindsight at this point, Your Honor,
16   obviously, I can see where this would be something that's
17   relevant to the Court.
18          THE COURT:  All right.  Well, to be clear on the
19   record on these -- thank you.
20          MR. DOUGLAS:  Thank you.
21          THE COURT:  The first letter is dated December 21,
22   2021, and it starts with, "Flush this once you've read it."
23      "Dear Jon,
24      "Flush this once you've read it.  My feelings right now are
25   very complex and include feeling betrayed, lied to, abandoned,
```

1  and cheated.  But you don't simply throw away 18 years of

2  marriage.  I still love you.  Beyond that, I don't know what to

3  think.

4      "First, it was a bitcoin algorithm that was going to make

5  us our millions.  Then it was selling the algorithm itself.

6  Then it was these privacy deals with encryption keys and God

7  knows what else.  And the whole time, it was all bullshit.

8  You've put me in great danger.  Even with the weakness of the

9  government's case, I may still be convicted on circumstantial

10  evidence.  I could go to jail for life for something I didn't

11  do.

12      "My lawyers don't think they will give you a plea deal that

13  doesn't involve me pleading guilty too.  I may rot in here

14  unless you do what you're probably trying to avoid doing.

15  Plead guilty.  Tell them the truth.  I didn't know anything

16  about any of this.  That's the only way I get out of here.  I

17  hate to ask you to do it, but if you don't for me, do it for

18  our sons.  They deserve to be raised by one of us.

19      "They are going to appeal the rejection of my detention

20  hearing, but my lawyers don't have any much hope of that

21  succeeding.  They really think that the best hope for me is a

22  guilty plea from you.  I don't know why you chose to do what

23  you did.  I can't hope to ever understand the mindset, but I

24  hope I can still count on you to do the right thing and tell

25  the truth at this stage.  If you plead guilty, they may still

1  be lenient with you.

2      "I'm always thinking about you and praying you will do

3  what's right."

4      And then she signed it "Love, Diane."  But there's a PS

5  that says, "I'm so sorry for not sending more messages through

6  the phone.  They're always listening.  I was told if I even

7  said I love you, it would be used against me."

8      And there's a second part to this letter.

9      "When you get this, please reply.  My roommate works in the

10  laundry and can intercept and deliver messages.  If your

11  laundry bag has a note for me, tie a sock around the knot of

12  the bag.  That way she will know to get the note before it goes

13  in the wash."

14      And then she says, "I'm now in BJ.  Goldie will still do

15  letters for us."

16      Then there's a second letter, January 4, 2022, and this one

17  was sent by what they call or refer to in the jail as a

18  boomerang where Ms. Toebbe, as confirmed on the envelope -- a

19  copy of which the Court has received -- put Mr. Toebbe's name

20  in the return address there at the ERJ here in Martinsburg in

21  the return address spot.  And then it went to L. Toebbe at --

22  who I presume is a fake person -- at a fake address in

23  Martinsburg.  So basically, it's sent.  It boomerangs.  When it

24  comes back, it goes to the return address so that's how

25  Mr. Toebbe would have gotten ahold of it if it wasn't

1  intercepted.

2      This letter of January 4, 2022, reads:

3      "Dear Jon,

4      "I'm trying again to get a message to you.  My friend

5  swears that this will work.  It's called boomeranging.  The

6  things you learn in this place.  I originally tried to send you

7  a message by the laundry, but this may be safer.  Tell me if

8  you got my first note by pulling the same trick in reverse.

9      "I'd tell you that this place is hell, but you already know

10 that.  What you may not know is that my lawyers aren't so sure

11 of my chances unless you plead guilty and tell the truth that I

12 had nothing to do with this and give up the locations and/or

13 passwords for where you've hidden the money and the secrets.

14 They think I'm a flight risk who will defect and sell what you

15 had if they let me out.  And they won't give you a plea deal

16 that isn't contingent on my taking one too.  Also, we need your

17 testimony to get me out, and we can't call you as a witness

18 unless you've pleaded guilty."

19     And then she struggles with whether it's "pled" or

20 "pleaded" and then says "sigh."

21     "My lawyers say you will have to do this eventually.  I

22 don't know what you're being told.  My feelings are all over

23 the place.  Of course I love you.  I've loved you for 20 years,

24 but I also feel hurt, betrayed, abandoned, and lost.  All that

25 talk about bitcoin and about some of the algorithm and then the

1   privacy" -- I don't understand what that means -- "and then the

2   privacy" -- I can't understand the word.  The privacy nuts

3   maybe -- "who could have been criminals for all we knew."  I

4   think the word is "nuts" there.

5       "I believed you, and it was all bullshit.  Right now I need

6   to focus on the boys and getting back to them to give them

7   something of what remains of their childhood.  They deserve

8   that much.

9       "I wish I knew what else to say.  You heard, I think, that

10  I got moved to B5 because I was being threatened.  That was

11  scary as hell.  And if it happens again, the only place they

12  can put me is solitary since they don't have protective

13  confinement for women here.  I am scared.  I'm keeping my head

14  down, but I just never know when it will start up again.

15  Please tell me what you're thinking.  I'm so desperate and

16  alone.

17      "Love, Diana."

18      So that's not obstructing, Mr. Beck?

19          MR. BECK:  Well, Your Honor, if I may first touch on

20  the question you asked Mr. Douglas about the Court not having

21  this information previously.

22          THE COURT:  Did you?  When did you get it?

23          MR. BECK:  I had it -- I think I had -- I had one

24  letter for sure.  I think I had both of them, and I'm not

25  saying I didn't have both of them.  I certainly had one of

1    them.

2              THE COURT:  I don't expect -- in asking that

3    question, I don't expect for you as the defense attorney to be

4    throwing a shovelful of dirt on your defendant when she's

5    already down -- on your own client.  So I'm not saying you

6    didn't provide anything you should have to the Court, but I'm

7    curious as to when you received it.

8              MR. BECK:  It was certainly in the -- it was prior to

9    the entry of our first plea, Your Honor.  The exact date I

10   cannot say, but Mr. Douglas -- I have no doubt his side

11   provided it to us in a timely manner.  We were --

12             THE COURT:  So the -- so we were here on the -- so it

13   was before you entered the -- before you reached the first plea

14   agreement or before we came here for the Court to consider the

15   plea?

16             MR. BECK:  I'm certain it was before we reached the

17   first plea agreement, Your Honor.

18             THE COURT:  And when did you reach the first plea

19   agreement in this case?

20             MR. BECK:  I have it here in my notes, Your Honor,

21   but --

22             THE COURT:  I'll find it.  I only have the second one

23   here in front of me easily retrievable.

24             MR. BECK:  I believe it was February of this year,

25   Your Honor, if I'm not mistaken.

```
1              THE CLERK:  2/14.

2              THE COURT:  2/14.  That's when it was signed.

3              MR. BECK:  Okay.  February this year.

4              THE COURT:  Okay.  Thanks, Chad.

5              MR. BECK:  So I do, in fact, believe Mr. -- I mean,

6    Mr. Douglas may be able to confirm this but -- and I don't want

7    to misstate this, but I'm fairly certain that we were aware of

8    at least one of the letters prior to entry of the first plea

9    agreement.

10             THE COURT:  Did you ever -- were you ever aware of

11   them, Mr. Compton?

12             MR. COMPTON:  Yes, Your Honor.

13             THE COURT:  Okay.  When did you receive them?  Again,

14   I don't expect you to throw dirt on your client to bury him on

15   this sort of information to bring it to the Court's attention.

16             MR. COMPTON:  I don't recall honestly, Your Honor,

17   when exactly I received them.  It was close in time to when

18   they were intercepted and shortly after the government, I

19   believe, was made aware.  I --

20             THE COURT:  So before you all came here for me to

21   consider the original plea agreements?

22             MR. COMPTON:  I'm almost positive it was before the

23   change of plea hearing which was on the 14th.  I believe it was

24   closer in time to when they were intercepted.

25             THE COURT:  Okay.  Thank you.
```

```
1        Mr. Douglas.
2             MR. DOUGLAS:  Yes, Your Honor.  The -- both letters
3   were sent to both counsel within a week or so of our receipt of
4   them so within the first half of January 2022 which would be a
5   month before the first pleas were reached.
6             THE COURT:  Thank you.
7        Mr. Beck.
8             MR. BECK:  So, Your Honor, I just want to explain
9   that we had the letters.  We subsequently entered -- and
10  obviously having received the letters, it was disappointing to
11  counsel that Mrs. Toebbe had made this effort.  We certainly --
12  you know, as attorneys we weren't happy with that, but after
13  we -- well, a couple things.  We -- after we entered the plea
14  agreement and while we were negotiating it, I can say and I can
15  confess that it never occurred to me that these would rear
16  their heads again and became an issue at the sentencing
17  hearing.  Perhaps -- and I can explain in a moment why the
18  thinking was in that direction at the time.  Some of it was
19  though that it was, as Mr. Douglas said, we reached a plea
20  agreement; and it's like after the ballgame where everybody is
21  fighting during the game and hates each other.  You come
22  together, you shake hands, and, you know, all sins are
23  forgiven.  And it just never --
24            THE COURT:  But the referee never saw the
25  interaction.
```

1          MR. BECK:  I agree, Your Honor.

2          THE COURT:  The referee that has to make the call.

3  Right?

4          MR. BECK:  The referee had to make a call here.  But

5  -- and, again, I'll discuss in a moment why the other factors

6  that I think went into our not thinking this would be an issue,

7  in addition to the fact that we were at that stage where we had

8  entered a plea agreement with the government, and we were --

9  had a binding plea, and there really wasn't any more that we

10  were fighting about, and Mrs. Toebbe was cooperating and had

11  admitted her guilt.  So I --

12          THE COURT:  So she -- so admitted her guilt by

13  saying -- by not saying I just thought this was some bitcoin

14  thing.  She admitted her guilt in the charge to which she is

15  about to be --

16          MR. BECK:  That's right.

17          THE COURT:  -- about to be found guilty.  Right?

18          MR. BECK:  Right.  And, you know, at that point --

19          THE COURT:  So the bitcoin was a cover story?

20          MR. BECK:  No question, Your Honor.  And I want to

21  talk about that for a second if I can.  So the question before

22  the Court now is whether or not her ill-advised and unfortunate

23  decision to try to send these letters to her husband should

24  justify an obstruction of justice enhancement under the

25  guideline.  And what I would say to that, Your Honor, is that

1    the guideline itself talks about two kinds of obstruction as I

2    read it in Commentary No. 1.  It talks about the classic type

3    of obstruction that we have seen more often in this court and

4    other courts where someone is indicted.  There's a witness

5    that's going to testify against them.  They either make threats

6    to them or their family or they try to bribe them.  But there's

7    no --

8              THE COURT:  Or they try to encourage them to perjure

9    themselves --

10             MR. BECK:  That's right, Your Honor.

11             THE COURT:  -- as she did here.

12             MR. BECK:  The --

13             THE COURT:  Plead guilty and tell them I'm innocent.

14             MR. BECK:  The distinction though, Your Honor, I

15   think is that in those scenarios, the classic type of

16   obstruction, there is no preconceived plan between the two

17   parties that are subject to -- that are the subject of the

18   alleged obstruction.  In other words, the person who is on

19   trial didn't have a plan prior to getting arrested and

20   prosecuted.  That, hey, I'm going to threaten you, and you're

21   going to tell -- that's usually not what we're talking about.

22   And the reason I say that, Your Honor, is if you look at

23   Commentary Note 1, it makes a distinction about obstructed --

24   obstructive conduct that occurred prior to the start of the

25   investigation, and it talks about that sometimes may be covered

1   if the conduct was purposely calculated and likely to thwart

2   the investigation or prosecution of the offense.

3         THE COURT:  And it was -- right? -- because that was

4   their cover story on how Mrs. Toebbe was innocent, and her

5   husband was going to take the fall for it.  So maybe in the

6   usual case, defendants aren't as smart as these two, but

7   they're -- this offense of -- that's about to be the offense of

8   conviction involves a covert operation.  Stuff in a thumb drive

9   and a peanut butter sandwich.  A lot like stuff in a contraband

10  note at the jail, against the jail rules, into a laundry basket

11  with a sock tied around it.  Right?

12        MR. BECK:  Right, Your Honor.  You're correct.  This

13  was a preconceived, preplanned cover.

14        THE COURT:  And then she continued it at the jail.

15        MR. BECK:  Well --

16        THE COURT:  She kept that plan in action.  She wrote

17  a note to the defendant, to Mr. Compton's client, Mr. Toebbe,

18  that basically pressures him with, oh, I'm so scared.  My

19  children.  You got to tell the truth which she knew wasn't the

20  truth.  When you plead guilty, you know, you plead guilty, and

21  you deploy this -- basically to me, how I interpret this is now

22  it's time to deploy the cover plan.  So you go forth, and you

23  plead guilty, and you perjure yourself and tell them I had

24  nothing to do with this.

25        MR. BECK:  What I would say to that, Your Honor,

1  first of all, is that -- I think it's -- it should be

2  considered a factor in the Court's evaluation of this that

3  there's no dispute that the plan, the cover, was the brainchild

4  of Mr. Toebbe who was running this operation.

5          THE COURT:  It looks like she's driving the bus, and

6  it looked like she was driving the bus in the communications

7  that I had to review in preparation for the bond appeal

8  decision that Magistrate Trumble made way back when I first got

9  involved in this case as well.

10         MR. BECK:  Well, there were communications between

11 her and Mr. Toebbe where they talked about what they were doing

12 and why.  But I don't think there's any dispute -- and, you

13 know, if the government disagrees or Mr. Toebbe disagrees, they

14 can certainly tell the Court -- that this was his cover plan to

15 purposely protect Mrs. Toebbe in the event they were both

16 captured so that there would be someone remaining to take care

17 of their children.

18         THE COURT:  Okay.  Let's ask Mr. Compton as you

19 referred to Mr. Toebbe's counsel.

20    Mr. Compton, who is driving the bus on this cover story?

21         MR. COMPTON:  Your Honor, I am hesitant to insert

22 Mr. Toebbe into this scenario.  Mr. Toebbe never received these

23 communications from the codefendant.  I am aware through

24 communications with my client that prior to them being

25 arrested, they had discussed what would happen if they were to

1   be arrested.  I'm also aware that when Mr. Toebbe was arrested

2   and counsel was appointed that we had proceeded on the path

3   that the Court is now -- has seen over the last several months,

4   including our interactions with the government and our

5   compliance with paragraph 7 of the plea agreement.

6       Mr. Toebbe -- I mean to the extent I can answer the Court's

7   question, Mr. Toebbe did not direct Mrs. Toebbe in any way to

8   write these letters.  He didn't send her any letters that I'm

9   aware of --

10          THE COURT:  You're unaware -- are not aware of them

11  either?

12          MR. COMPTON:  So, again, I guess I'm hesitant to

13  insert Mr. Toebbe into this.  He has proceeded on the path --

14          THE COURT:  On his own path.

15          MR. COMPTON:  -- from the very beginning of his case.

16  I believe he has been truthful and honest throughout.  I know

17  that doesn't quite answer the Court's question.

18          THE COURT:  That's fair.  As his counsel looking out

19  for his best interest, I suppose that puts you in a bad spot,

20  and that's as far as you can go.  So I understand that.

21          MR. COMPTON:  Thank you.

22          THE COURT:  Mr. Douglas, did you have something to

23  add before we go back to Mr. Beck?

24          MR. DOUGLAS:  Yes, Your Honor.  The government would

25  just caution that the information came from Mr. Toebbe pursuant

1   to his plea agreement, his debrief information, and deserves

2   some protections which is why, you know, that probably also

3   shouldn't be gotten into.  Also the way that the --

4           THE COURT:  You can't get into the cover story?

5           MR. DOUGLAS:  To ask him about his cover story when

6   he told us under a plea agreement?  It was debrief information

7   that has protections under the guidelines.  That just -- I'm

8   just -- I'm just --

9           THE COURT:  Okay --

10          MR. DOUGLAS:  I'm just letting the Court --

11          THE COURT:  -- that's fair.

12          MR. DOUGLAS:  -- know as matter of fact --

13          THE COURT:  That's fair.

14          MR. DOUGLAS:  -- it was debrief information.  That's

15   all.

16          THE COURT:  That's fair.  And I think having these

17   letters before me and reading them in the same vein as I read

18   all jail correspondence both in years as a prosecutor and here

19   on the bench, I have a pretty good understanding, I believe, of

20   what the motivation was for the letters, what the intent was,

21   and whether or not Ms. Toebbe obstructed or not.  So thank you,

22   Mr. Douglas.  We're going to take you out of the hot seat,

23   Mr. Compton.

24      I think I have all I need, but I will entertain your

25   argument on the objection further, Mr. Beck, as far as you want

1  to go in the hope that for you and your hope, I guess, that you

2  can convince me otherwise.

3          MR. BECK:  Well, Your Honor, I just have one more

4  point I'd like to make with regard to this issue.  Even though

5  counsel -- and I understand counsel's concerns about saying too

6  much and the government's as well.  There's -- I don't think

7  there's any dispute, and I think Mr. Compton did acknowledge

8  this was a preconceived plan by the parties.  And the guideline

9  talks about influencing someone to commit perjury or

10  intimidating, threatening, or otherwise unlawfully influencing.

11      When I look at these letters, Your Honor, obviously, when

12  Mrs. Toebbe falsely stated in them that this was about a

13  bitcoin operation and that he had falsely told her it was, he,

14  if he had received them, would have immediately known that was

15  part of the plan because he knew that was not true.  So --

16          THE COURT:  But -- and she knew it was not true, yet

17  she says, "Tell the truth."

18          MR. BECK:  Which that's the point I forgot to

19  mention, Your Honor.  I'm not sure it's going to sway the

20  Court's decision, but her declarations of innocence at that

21  time are not obstruction of justice per the guidelines.  So

22  that fact alone -- you know, if it wasn't for the fact that she

23  was communicating with him, I don't think we -- there would be

24  any arguments of obstruction of justice because under the

25  guidelines --

1      THE COURT:  No.  If she came in here before she pled

2  guilty and said, "I'm not guilty," that's her right.  But what

3  she's done in a letter is encourage him to lie.

4      MR. BECK:  Well, that was the point I was going to

5  make before I got sidetracked, Your Honor, and I apologize for

6  that.  Is that how -- what I'm failing to understand is what

7  would her saying that I'm following the plan that you agreed to

8  and you already told me you were going to follow, how does that

9  influence him to do something he wasn't already going to do?

10  In other words, it wasn't --

11      THE COURT:  People change their mind once they're

12  incarcerated and deals are being wheeled and dealed between

13  defense counsel and the government.  Sometimes folks -- their

14  position changes, and they decide to save their own petard

15  instead of somebody else's, Mr. Beck.  You know, maybe --

16      MR. BECK:  I understand that, Your Honor.

17      THE COURT:  -- she's just making sure -- sounds to me

18  as though she was just making sure he deployed the cover story

19  for her so she got out of this unscathed.

20      MR. BECK:  Or she could be just letting him know she

21  was deploying the cover story which, again, I think is the

22  obvious --

23      THE COURT:  Well, if she was doing it on her own, she

24  wouldn't have said, "Tell the truth."

25      MR. BECK:  Which, again --

```
 1            THE COURT:  Which wasn't the truth.
 2            MR. BECK:  No.  And he knew it wasn't the truth so
 3   why -- you know, if it was a pure threat or an intimidation or
 4   intent --
 5            THE COURT:  I think it's pressure.  I don't see it as
 6   a threat.  It's pressure.  She's pressuring him.  It sucks in
 7   here.  I'm scared.  Do it for the children.  This is horrible.
 8   I love you.
 9            MR. BECK:  Well, Your Honor --
10            THE COURT:  We once had a note passed right up here
11   during the course of jury selection.  I think that may have
12   been one of Mr. Compton's cases where we had --
13      Mr. Moss is raising a hand.  He's taking -- he's not taking
14   credit for that.  That was his case where the defendant slipped
15   it right to his codefendant, his baby mama, and it was
16   basically you -- I'm watching -- basically, I'm watching you.
17   You better tell the truth which wasn't the truth at all but
18   that happens --
19            MR. BECK:  I know it happens, Your Honor.
20            THE COURT:  -- right here in plain view.
21            MR. BECK:  I just -- at least this is my experience.
22   The first time that I've ever had a case where the parties had
23   this plan before they ever got arrested.
24            THE COURT:  This is the first time you'd had clients
25   that are confessed traitors; that they had covert operations;
```

```
1  that the whole offense was based in deceit and looking out for
2  their own selves -- if you believe the further story, their
3  family -- in committing these horrible acts against this
4  nation.  But it's the first case because you never had clients
5  in a case such as this who were smarter than your average bear.
6  Well, actually, for all practical purposes, thought they were
7  smarter than your average bear but were not, and this is how
8  they do things:  hide, deception, covert, hide the thumb drive
9  in the peanut butter sandwich, hide the note in the laundry
10 basket with a sock tied around it.  It's -- yes, it's unusual.
11 This is an exceptional story.  It's kind of one right out of
12 the movies.  But it happened, and this is obstruction just like
13 your basic drug dealer who slips his baby mama a note that says
14 you'd better be telling the truth.
15      MR. BECK:  Well, Your Honor, I think I've exhausted
16 all my arguments.  I'll just make the final point, Your Honor.
17 The consequence of this, given that the letters were
18 preconceived, in my opinion, they weren't attempting to
19 influence him because he knew they were lies.  He knew they
20 were lies.  And it was her most likely telling her she was
21 going -- him he was going off the plan.  They were sent early
22 on at a time when Mrs. Toebbe was --
23      THE COURT:  Someplace she'd never been before.
24      MR. BECK:  In hell to use her words.  And I will tell
25 you to the Court that we had a heck of a time getting her on
```

1  the proper medications so that she could maintain her

2  psychological stability.  She had been threatened, as she put

3  in the letter, by another inmate.  And the letters were never

4  received by her husband, and they had no impact whatsoever on

5  the prosecution of this case.

6      THE COURT:  But they impact -- they impact the

7  prosecution of the case if you look at it not in the long run

8  but in the middle because they had this plan to obstruct that

9  would have put the government off the trail of Mrs. Toebbe and

10 totally on the trail of Mr. Toebbe in the investigation and

11 perhaps even in preparation for the trial.  Right?

12     MR. BECK:  It was -- that was the plan, Your Honor,

13 but looking -- you know, this goes back to Application No. --

14 Note No. 1 where we're talking about these preconceived plans.

15 One of the elements in order for that to be considered

16 obstruction is that it be likely to thwart the prosecution.

17 Now, thwart, I don't know the exact definition of that, but

18 when I use it, it means likely to stop it.  These folks weren't

19 going to stop this by this half-baked, cockamamie story that

20 they had created.  The idea that the government was not going

21 to get Mrs. Toebbe or Mr. Toebbe because they came up with this

22 story.  I know the government would have gotten them.

23    So just to finalize my point, Your Honor, it just seems to

24 me that in this case, because of the circumstances I've talked

25 about, enhancing her sentence by three levels, which in effect

1   adds three years –– or two levels –– adds three years to her

2   guideline –– minimum guideline range, just doesn't seem

3   appropriate.  But that's all I have to say about it, Your

4   Honor.

5          THE COURT:  Thank you, Mr. Beck.

6      Mr. Douglas, any response?

7          MR. DOUGLAS:  No, Your Honor.

8          THE COURT:  To this Court and I find that the

9   intention of these parties to establish a false narrative of

10  plausible deniability from Mrs. Toebbe was plainly calculated

11  to frustrate the investigation and prosecution of the offense

12  of conviction.  Further, Ms. Toebbe's actions to prod

13  Mr. Toebbe to deploy their cover story while she was in jail,

14  her attempts at correspondence, they were all taken well after

15  the arrest and detention in this case.

16     She in her letter is basically encouraging him to deploy

17  the story, and she is basically telling him to lie.  She says,

18  "Tell the truth," but we know it's not the truth.  So basically

19  what she's saying is lie.  Lie.  Roll this lie out to save my

20  rear.

21     She made several attempts –– two that we know of –– to

22  induce Mr. Toebbe to plead guilty and provide statements to

23  authorities confirming her ignorance of his criminal scheme

24  which we know, because she's pled guilty now, was not his

25  criminal scheme.  It was their criminal scheme.  She made

1    repeated references to the children.  The potential for her to

2    care for them.  And she provided to Mr. Toebbe basically in

3    these letters that if he pled guilty, she basically would get a

4    lesser sentence.  She encouraged him to plead guilty so he

5    could be called as a witness in support of her efforts to

6    secure her own release from custody.

7         And nothing is clearer than in this letter where she knows

8    not -- knowing full well that it's not the truth where she

9    says, "Plead guilty.  Tell them the truth."  And she says

10   before that -- this is the whole sentence.  And this is in the

11   initial December 21, '21 letter.  "I may rot in here unless you

12   do what you are probably trying to avoid doing.  Plead guilty.

13   Tell them the truth.  I didn't know anything about any of

14   this."

15        So she feels as though maybe now he's incarcerated that

16   he's going to be backing out of the cover story, and she tries

17   to guilt him into staying with the cover story and deploying

18   that plan.  That's obstruction plain and simple.  It's a

19   different type of obstruction that we see in most of our normal

20   run-of-the-mill, for example, drug cases, but it's no different

21   really when you boil it down to it.  It's encouraging a

22   codefendant to lie to save the other codefendant's rear.

23        And, therefore, I'm going to overrule the objection.  The

24   presentence report will not be amended, but I'll note the

25   exception of the defendant to the Court's ruling here today.

1    Now, having this issue of obstruction come up in the

2    guideline calculations, counsel, in Mrs. Toebbe's case opened a

3    can of worms I'm afraid in this case with regard to the

4    guideline calculations and further calculation.

5    I'm going to give you the opportunity, Mr. Douglas, and

6    especially you, Mr. Beck, to present to the Court arguments on

7    why Mrs. Toebbe, based on this obstruction, shouldn't lose her

8    acceptance of responsibility.  As I see it, she violated the

9    rules of the jail so that's nothing more than the

10   run-of-the-mill drug dealer in jail who is making the hooch in

11   the ceiling or selling drugs in the jail.  Same as the -- or in

12   the same vein as an original offense that got them in there.

13   She's continuing these covert operations in the jail, and it

14   was obstructing.  Why shouldn't she lose her acceptance of

15   responsibility for that?

16   Mr. Beck.

17        MR. BECK:  Your Honor, the reason is, in my opinion

18   and our opinion, is that, again, those efforts occurred early

19   on in the case, they were ill-conceived, agreed, and after

20   that, Mrs. Toebbe told the truth.  She accepted responsibility.

21   She has cooperated extensively.  And she has left nothing on

22   the table as far as what her involvement in this offense was.

23   Should she have done what she did?  No.  But it has not in any

24   way impaired the prosecution of this case.  In fact, she's done

25   everything she could to make the prosecution easier since doing

```
1    these things.  So -- and I don't have the guideline section in
2    front of me, but -- well, under the --
3              THE COURT:  3E1.1.
4              MR. BECK:  Yes.  Under the objection 3C -- under the
5    Section 3C1.1, it does specifically talk about, Your Honor,
6    that there are cases where one could obstruct justice as this
7    Court has found but also accept responsibility and get credit
8    for that.  And this seems to be the classic case where that
9    would fit.  I mean, she did these things that she shouldn't
10   have done.  Again, we -- you know, the Court does not accept
11   our explanation of why she did it, but she did them, and
12   subsequent to that, she did everything she could to accept
13   responsibility, Your Honor.  So I don't -- it just seems this
14   is the classic case where you can have an obstruction and also
15   an acceptance of responsibility.
16             THE COURT:  But in Application Note 4, which touches
17   on 3E1.1, it states there may be extraordinary cases in which
18   adjustments under both 3C1.1 and 3E1.1 may apply.  What's
19   extraordinary about this?
20             MR. BECK:  Well, I think it's extraordinary -- well,
21   two things.  One, Your Honor, the conduct itself, albeit wrong,
22   had no impact on the case.  So what is extraordinary in those
23   circumstances I think is subject to different definitions.  But
24   after she did it, again, she pled guilty and extensively
25   cooperated.  As the Court knows from our previous filings, this
```

```
1   is a case where, you know, everyone after fighting -- and in
2   her case, sending these letters where she didn't tell the
3   truth -- made an agreement and left the field shaking hands,
4   and at that point, she's done nothing but accept
5   responsibility.  And it just seems -- you know, as the Court is
6   determined, she's going to get a two-level enhancement for
7   obstructing justice.  If the Court were -- just thinking ahead,
8   if the Court were to rule that way, it might be a disincentive
9   for a lot of people not to plead because, you know, there are
10  people out there -- you know, I'm sure there are other cases --
11  maybe not quite as elaborate as this one -- where people do
12  things in the beginning of the case they should have done, but
13  then they enter a plea, and they get the credit for acceptance
14  of responsibility.  So I just think this is a case where both
15  sections should apply.
16          THE COURT:  Thank you, Mr. Beck.
17      Mr. Douglas.
18          MR. DOUGLAS:  Your Honor, the government doesn't
19  believe and the government is not asking the Court to take
20  Diana Toebbe's acceptance of responsibility for some of the
21  same reasons that Mr. Beck has outlined.
22      Her conduct was early on in the case.  She has pled guilty
23  twice -- twice in a timely manner that avoided any trial
24  preparation and, in fact, allowed us to focus on Mr. Toebbe's
25  cooperation which again -- I don't think it's a small matter --
```

the Department of Navy highly valued and allowed us to not

think, oh, she's still out there; we've got to focus on her and

getting her to plead guilty --

THE COURT:  But that was --

MR. DOUGLAS:  -- and not be able to go into him.

THE COURT:  But that would support the government's

motion under 3E1.1(b) that can only be made if the Court gives

the defendant acceptance of responsibility under 3E1.1(a) in

the first place.

MR. DOUGLAS:  Correct.  Just --

THE COURT:  So let's deal with in the first place.

MR. DOUGLAS:  Okay.  The prosecution is the victim of

this obstruction of justice -- right? -- because we're talking

about affecting the prosecution.  So I'm trying to give the

Court the perspective that the prosecution had in this case and

how it actually worked.

THE COURT:  Okay.

MR. DOUGLAS:  She pled guilty and accepted

responsibility so we could then focus on him.  Get his

cooperation which was very valuable to the Department of Navy.

Then she even did more than that by supplementing his

cooperation because there was a piece of information that he

said she had, and she gave us immediately, and it was extremely

helpful in assessing the scope of his conduct and any further

potential damage.  So --

1            THE COURT:  It just corroborated what he told you.

2            MR. DOUGLAS:  No.  I'm referring to the

3    cryptocurrency wallet passphrase that he said she had.

4            THE COURT:  Uh-huh.  But he said there's nothing in

5    that wallet; right?

6            MR. DOUGLAS:  He did say there was nothing in that

7    wallet but --

8            THE COURT:  And when she gave you the passphrase, he

9    was right.

10           MR. DOUGLAS:  Yes, he -- yes, he was, Your Honor.

11   But if he says I don't have the passphrase, she has the

12   passphrase, and we never get the passphrase, we can never look

13   into the wallet and see if there's actually money in there.

14   And maybe he's lying to us, which is what we're trying to do is

15   corroborate what someone is telling us, and we're trying to get

16   into encrypted cryptocurrency wallets which we cannot otherwise

17   get into.

18      So the government does believe it's somewhat of an

19   extraordinary case where you do have this obstruction early on.

20   And, look, I've been a prosecutor for ten years.  Right?

21   Prosecuted drug defendants.  Okay.  Then later moved on to

22   white collar, public corruption, civil rights.  And those

23   aren't your typical hardened criminals; right?  They do weird

24   things at the beginning.  They have a lot harder time accepting

25   that they committed a crime.

1          THE COURT:  Or accepting that it's going to stick.

2          MR. DOUGLAS:  Accepting that it's going to stick.

3    I'm going to get out of this somehow.  Okay.  So this isn't

4    your typical drug case where you have a hardened criminal that

5    is engaging in this conduct.  And that's just from my

6    perspective.  Again, because we're talking about obstructing

7    the prosecution, I'm only trying to give the Court a full

8    picture from our point of view.  And so for all those reasons,

9    we don't believe the Court should take her acceptance of

10   responsibility.  Thank you, Your Honor.

11         THE COURT:  Thank you, Mr. Douglas.

12      Looking at 3E1.1(a) of the guidelines, it states if the

13   defendant clearly demonstrates acceptance of responsibility for

14   his -- or in this case her -- offense, decrease the level --

15   the offense level by two levels.  I don't find there was a

16   clear demonstrable acceptance of responsibility in this case

17   based on this defendant's actions.

18      And the application notes -- reviewing the application

19   notes which gives some guidance to this Court, those

20   application notes further support my finding.  In looking at

21   number one, Application No. 1(a), it states in part, "A

22   defendant who falsely denies relevant conduct that the Court

23   determines to be true has acted in a manner inconsistent with

24   acceptance of responsibility."

25      She falsely denied her cooperation, her part of the

1  conspiracy in these letters, and she leaned on Mr. Toebbe to

2  roll that false story out.  She also, when looking at

3  Application Note 1(b), kind of falls to the contrary of that.

4  We see for acceptance of responsibility, there must be a

5  voluntary termination or withdraw from criminal conduct or

6  associations.  So she's still not withdrawn but trying to fan

7  this cover story through these letters to Mr. Toebbe.

8       And in addition to that, in addition to trying to roll out

9  part B of the conspiracy, the cover story, she's also

10  committing violations at the jail by secreting this

11  correspondence that she's not supposed to give to Mr. -- not

12  supposed to be sending to Mr. Toebbe, and she knows that

13  because the beginning of the first letter says, "Flush this

14  when you get it."

15       Application Note 3 notes at the bottom, "A defendant who

16  enters a guilty plea is not entitled to an adjustment for

17  acceptance of responsibility under this section as a matter of

18  right."  It notes that this evidence of acceptance of

19  responsibility basically may be outweighed by conduct of the

20  defendant that is inconsistent with such acceptance of

21  responsibility.  And this certainly was.

22       And it also notes in Application Note 4, "Conduct resulting

23  in an enhancement under 3C1.1" -- the obstructing, which I've

24  already found -- "ordinarily indicates that the defendant has

25  not accepted responsibility for his criminal conduct."

1    Now, it does go on to say there may be extraordinary cases
2    in which adjustments under both obstructing and acceptance of
3    responsibility may apply, but this is not the case.  And,
4    therefore, when I review the guideline calculations, I am not
5    going to give Ms. Toebbe a reduction for acceptance of
6    responsibility.  I'll note the exception of the defendant and
7    the government to the Court's ruling in that regard.
8        I think we've reviewed all of the objections to the
9    presentence report.  I have given counsel the opportunity to
10   argue with regard to the Court's position that the defendant
11   doesn't qualify for an acceptance of responsibility under
12   Guideline 3E1.1(a) which then does not give the government the
13   opportunity to request another one-level reduction under
14   3E1.1(b).
15       And I don't think that leaves anything further before we
16   get to the guideline calculations, does it, Mr. Douglas?
17           MR. DOUGLAS:  No, Your Honor.
18           THE COURT:  Mr. Beck?
19           MR. BECK:  No, Your Honor.
20           THE COURT:  The presentence report is going to be
21   accepted and ordered filed and made a part of the record
22   herein.  It will be placed in the record under seal.  In the
23   event of an appeal of the sentence imposed herein, counsel on
24   appeal will be permitted access to the sealed report, but not,
25   however, to the recommendation section from probation.

```
 1      I will note for the record in this case that, to back up,
 2  on September 27, 2022, this defendant appeared in the United
 3  States Magistrate Court for the Northern District of
 4  West Virginia sitting in Martinsburg.  And at that time, she
 5  tendered a plea of guilty by a written plea agreement to
 6  Count 1 of the indictment charging conspiracy to communicate
 7  restricted data.  After consideration, the Court accepted the
 8  defendant's plea of guilty to the crime charged in Count 1 and
 9  deferred acceptance of the plea agreement and adjudging the
10  defendant guilty.
11      Subsequent to acceptance of the guilty plea, a presentence
12  investigation report was ordered.  Having now received and
13  reviewed that report and ruled upon any factual and legal
14  issues raised thereby, I find the charge to which Ms. Toebbe is
15  pleading adequately reflects the seriousness of the offense
16  behavior.  I also find that acceptance of her plea agreement
17  will not undermine the statutory purposes of sentencing which
18  are deterrence, incapacitation, just punishment, and
19  rehabilitation.
20      So at this time, Ms. Toebbe, I accept your plea agreement
21  and your plea of guilty, and you now stand convicted of the
22  offense to which you pled guilty under your agreement with the
23  government.
24      I'll now announce my tentative findings as to the
25  applicable guidelines.  We start in this case with a base
```

1  offense level of 37 pursuant to Guideline 2M3.1(a)(2).  Then,

2  as we've discussed upon the record, pursuant to Guideline

3  3C1.1, two levels are added for obstructing or impeding the

4  administration of justice.  Here the Court considered it as

5  obstructing.  That brings us to an adjusted offense level of

6  39.

7      Defendant has a criminal history category of one based upon

8  zero points.  With a criminal history category of 1 and a total

9  offense level of 39, the guidelines recommend imprisonment in

10  the range of 262 to 327 months.  I'll note that the binding

11  plea in this case, which the Court has accepted, has a binding

12  term that the defendant cannot be sentenced any higher than the

13  bottom or the lowest number of the applicable guideline range.

14  So we're at 262 max on this.

15      The guidelines also recommend supervised release in the

16  range of two to five years; indicate defendant is ineligible

17  for probation; a fine in the range of 40,000 to $100,000.  And

18  there is a special assessment fee in the amount of $100 owed on

19  that one felony count of conviction.  The cost of imprisonment

20  is $3,688 per month, the cost of community confinement is

21  $2,980 per month, and the cost of supervision is $371 per

22  month.

23      Other than the objections we reviewed at the -- at an

24  earlier time in this proceeding, are there any objections to

25  the tentative guideline findings, counsel?

```
1              MR. DOUGLAS:  No, Your Honor.

2              MR. BECK:  No, Your Honor.

3         THE COURT:  Then the guidelines as announced will be

4    the advisory guidelines applicable to sentencing in this

5    matter.

6       Mr. DeHaven?

7              MR. DEHAVEN:  Your Honor, I believe the applicable

8    guideline fine for offense level 39 would be $50,000.

9         THE COURT:  Oh, thank you.  So I stand corrected.

10   Then the applicable guideline fine is in the range of 50,000 to

11   $100,000.

12      Any objection to that, counsel?

13             MR. DOUGLAS:  No, Your Honor.

14             MR. BECK:  No, Your Honor.

15        THE COURT:  Okay.  Mr. Beck, I will recognize you for

16   argument on your motion for a variant sentence and also any

17   other additional factors that which you believe I should

18   consider today in my decision on what sentence should be

19   imposed.

20             MR. BECK:  Thank you, Your Honor.

21      Your Honor, the sentence that Mrs. Toebbe would receive

22   under this plea agreement if the Court were to follow the

23   guidelines or at least the low end of the guidelines is now 262

24   months.  Of course, the guidelines are not the only factor that

25   the Court must consider in determining what her sentence should
```

1  be.

2      The number one factor listed under the statute is the

3  nature of the offense and the seriousness of the offense and

4  then the characteristics of the defendant.  Obviously, this is

5  a serious offense.  The Court has made that very clear.  And

6  they need to be made clear because everyone understands it was

7  a serious offense, and I understand why the Court made that

8  statement.  But what I think the Court should also take into

9  consideration with regard to Mrs. Toebbe is that this was not a

10  crime that she committed at her insistence.  It was one that

11  was initiated by her husband.  Her husband was the principal

12  actor here.  He's the one that had the position with the United

13  States government where he could get access to the information,

14  understood its significance and remove it, and then know how to

15  market it, so to speak, to the people who might be interested.

16      Mrs. Toebbe was a housewife, a teacher with a liberal arts

17  degree, and had no knowledge of what this stuff meant.

18  Obviously, she knew it was something that she shouldn't have

19  been involved in trying to transmit.  But she did not steal it,

20  nor did she abuse the position of trust with the government,

21  nor did she communicate with any foreign government.

22      My point, Your Honor, is that all of the essential elements

23  of this offense, ones that were absolutely critical to it being

24  committed, were done by her husband.

25          THE COURT:  Couldn't you look at it as though she had

1    the plan, and he had the access?

2          MR. BECK:  I'm sorry, Your Honor?

3          THE COURT:  Couldn't you also -- an alternative view

4    of that is she had the plan or was 50/50 part of the plan, and

5    he just had the access?

6          MR. BECK:  I don't think that's what the -- and I

7    don't want to get out of line here as far as classified, but I

8    don't think that there's been any evidence that this was a plan

9    that originated from anyone other than Mr. Toebbe.

10         THE COURT:  Well, in the end, does it really matter?

11   Because she's a principal in the first degree as well.  In for

12   a penny, in for a pound.

13         MR. BECK:  I think it matters to the extent of, Your

14   Honor, when you talk about her culpability.  These would be

15   Mr. Toebbe and her role in the offense.  She is more of an

16   accomplice than a principal in my mind.  She did help him.  She

17   went on three of these dead drops.  But, again, none of this

18   would have happened without her husband being in the position

19   he was, and I believe, from what I've heard, come up with the

20   idea to do this.

21      Now, secondly, Your Honor, the Court has to consider under

22   the statute the histories and characteristics of Mrs. Toebbe.

23   Those are important factors.  As you point out, she has no

24   criminal history.  She has no history other than having been a

25   school teacher, an educated person, a housewife, a mother, and

1  had never been in any kind of criminal involvement her entire
2  life.
3      What the Court also knows by virtue of our filings is that
4  she is someone who for many years, up to 25 years I think, has
5  suffered from serious mental illnesses.  And that's documented
6  by the report we submitted from her -- well, not report, but
7  from the notes we submitted from her treating physicians that
8  were contemporaneous to her seeking help for her problems and
9  also from the psychological evaluation that we obtained in
10 connection with this case.
11          THE COURT:  But there was no mental defense to
12 this --
13          MR. BECK:  No, there is no defense, Your Honor.  I'm
14 not suggesting in any way that she had the inability to
15 understand the wrongfulness of her conduct.
16     However, what I do think is important to note is -- and
17 this is documented in all the records we submitted -- that the
18 scheme to do what they did, culminated or originated or came to
19 fruition at or about the time these psychological problems were
20 at an apex for Mrs. Toebbe.  There are records indicating that
21 at around 2016, 2017, when I think this scheme began, she was
22 suicidal, had to be taken to the hospital on multiple occasions
23 for suicide risk, and was in a deep, deep dark depression.  And
24 that depression and that anxiety, albeit not something that
25 would amount to a defense to her crime, one cannot help but

1    think that it clouded her judgment here in a way that is -- it

2    had an effect on her in a way that it would not -- a normal

3    person without those problems would not have had.  A normal

4    person without those problems hopefully would have been able to

5    react differently.

6        And the other thing I would point out, Your Honor, because

7    it's been discussed that, yes, the issue here was greed.  There

8    was an effort to get money which is the definition of greed.

9    And looking at these previous espionage cases that have

10   occurred in other jurisdictions, it appears to me that that

11   greed really amounts or arises from the traditional purposes of

12   someone being greedy.  Trying to buy a big house.  Trying to

13   have lots of money and have cars and so forth.  Here there was

14   a desire to get money, but going back to what the Court said,

15   if you look at those emails that were captured by the

16   government between Mrs. Toebbe and her husband, she genuinely

17   had a tremendous amount of emotional, psychological distress,

18   and she was unwell because of her -- you know, some might

19   say -- some people might disagree with this.  Some would say

20   maybe it was genuine or maybe it was something she should have

21   had, but she thought the country was going down the tubes.  And

22   you look at those emails, there is no question that that's what

23   she thought.  She was --

24           THE COURT:  So she was going to further send it down

25   the tubes by --

```
 1              MR. BECK:  Well --
 2              THE COURT:  -- helping her husband share secrets that
 3    go to the very heart of this country much less our allies'
 4    defense?
 5              MR. BECK:  Well, that's how -- that's how --
 6              THE COURT:  So she wanted to put the final torpedo in
 7    it?
 8              MR. BECK:  Well, no.  I think her goal was to get
 9    out.  And I think that -- you know --
10              THE COURT:  But burn the whole place down in the
11    process?
12              MR. BECK:  Well, it wasn't a rational decision, Your
13    Honor.  I guess that's my point, Your Honor, is she was so
14    obsessed with this.  She was also clearly operating under a
15    significant mental illness that caused her to be at a point of
16    suicide before -- you know, before this stuff even happened.
17       And as I pointed out in one of our memos, there were other
18    reasons.  Her family was in kind of a falling apart situation.
19    So it was just the perfect storm it seems to me where she made
20    a bad decision that she may not have made had she not been
21    suffering from all these problems.
22       Moving on, Your Honor, one of the other factors the Court
23    has to consider is the risk of recidivism.  Mrs. Toebbe, again,
24    never committed a crime that we know of before this.  She
25    doesn't have any kind of knowledge regarding nuclear submarines
```

1   or anything else that would allow her to get out of jail one

2   day and suddenly become an agent for a foreign government.

3       The government has extensively researched the prospect that

4   there may be other monies or information out there that

5   Mr. Toebbe and Mrs. Toebbe had, and they've come to the

6   conclusion with high confidence that there's nothing else out

7   there that she could ever get her hands on even if she knew

8   where it was.  So there's little, if any, harm that she will

9   ever do anything, much less something like this again.

10              THE COURT:  How do we know that if they had the

11  Plan B cover story, there is not a Plan C where something else

12  is secreted for when they get out that they can share and make

13  money from?

14              MR. BECK:  All I can say, Your Honor, is --

15              THE COURT:  They're not trustworthy based upon the

16  offenses they committed and their covert actions both outside

17  for both of them and then in the jail for Ms. Toebbe.  So how

18  can the Court be assured there's not a Plan C, the get-up plan

19  for when they're released from incarceration?

20              MR. BECK:  I think the way the Court can be assured

21  is what the government has done.  They have --

22              THE COURT:  Take them at their word?

23              MR. BECK:  Well, and I think they have done

24  everything they know how to do to confirm that there is no

25  further information out there.  And I would also suggest to the

1  Court that Mrs. Toebbe because of her lack of knowledge about
2  this, she wouldn't know what to do with it if it were.
3          THE COURT:  But she may know where it's buried.
4          MR. BECK:  Pardon me?
5          THE COURT:  She may know where it's buried,
6  figuratively.
7          MR. BECK:  If it were, but there isn't -- at least
8  according to the government, they have a high degree of
9  confidence there's not.
10     The last thing, Your Honor, with -- or not last thing but
11  one other point I want to make with regard to the guidelines,
12  Your Honor, which you've calculated, is if you look at
13  Guideline 2M3.1, which is the relevant guideline that we're
14  dealing with here, as you know, it really has two levels -- and
15  if the Court will bear with me a second, I left something over
16  here.  It has the level that if you are involved in espionage
17  involving top secret information, which doesn't apply in this
18  case, and it has the level 37, which is 5 levels lower than the
19  top secret if it's other information.
20     And what I find hard to understand, Your Honor, in the
21  guideline is, as the Court knows, the government uses in
22  general three levels of classification:  top secret, secret,
23  and confidential.  And the guideline says that the level of the
24  guideline is geared towards the significance of harm that would
25  be caused if the information is not kept confidential or is

1    disclosed, but it only distinguishes between top secret and
2    other.  And the reason I find that hard to understand, Your
3    Honor, if you look at -- and I think this is the accepted
4    definition across the government as to what constitutes
5    classified information.  Top secret is defined as information
6    that would be reasonably expected to cause exceptionally grave
7    damage to the national security.  And I'm reading from 18 CFR
8    § 3a.11.  Secret information is information that reasonably be
9    expected to cause serious damage to the national security.  And
10   then confidential information is defined as could reasonably be
11   expected to cause damage.
12       So then clearly, at least in the government regulations and
13   under the government definitions of concerned classification,
14   there's a major distinction between those three categories.
15   Yet, the guideline, itself, makes no distinction between secret
16   and confidential.  In other words, there's no five-level drop
17   down from secret to confidential.  And the reason that's
18   important in this case, Your Honor, is that all of the
19   information that Mr. Toebbe secreted from his place of work and
20   all the information that they attempted to transmit, neither
21   fell into the top secret or secret category.  It was all
22   confidential.
23       So it just seems to me that the Court in measuring
24   whether -- what the appropriate sentence is here, it should
25   consider that this guideline totally ignores that distinction.

1   Even though in the guideline itself, Your Honor, again, it says

2   that the guideline is based on what harm would be caused by the

3   release of the information.

4        Moving on, Your Honor --

5            THE COURT:  Well, doesn't -- remember the first

6   letter we had from Admiral Houston?  A six-page letter and no

7   matter what you call it, this -- your client put this country

8   in grave danger.  Just looking at a couple of the many things I

9   highlighted in this letter in preparation for my consideration

10  of whether to accept the original plea agreement, this admiral

11  concluded that Mr. Toebbe's actions continue to have a lasting

12  and serious impact on our national defense.  He captured some

13  of most secure and sensitive information about our

14  nuclear-powered fleet.  A critical component of national

15  defense has been irreparably compromised in the admiral's

16  words.

17      He stated that the Toebbes' illegal conduct now threatens

18  critical military advantages because the nation spent billions

19  of dollars developing naval nuclear compulsion technology and

20  now the integrity of this protected information was

21  compromised, undercutting the military advantage afforded by

22  decades of research and development.  That information provided

23  could provide foreign navies the opportunity to close the gap

24  in capabilities which would require an extraordinary effort and

25  resources to restore.  The Navy must operate on the assumption

1  Mr. Toebbe's actions resulted in information falling into the

2  possession of other entities and persons who wish to use it to

3  damage the U.S.

4      So no matter what you call it -- top secret, restricted --

5  the harm to this nation is grave, and these are scary times we

6  live in.

7          MR. BECK:  And I'm not arguing that, Your Honor.  I'm

8  just saying that it wasn't top secret which, again, designates

9  something that even would cause extreme -- I mean under their

10 own definitions, it would cause extreme danger versus secret

11 that's likely to cause grave danger and confidential which is

12 likely to cause danger.

13     Regardless of what the admiral said, and I certainly don't

14 disagree with him, this information fell into neither one of

15 those more serious categories.  It fell into a serious

16 category, but one that's not taken into account under this

17 guideline.  And that's the part I don't understand, Your Honor.

18 It seems to me that if a guideline is going to be based on the

19 danger that's caused by the release of this information, there

20 should be some distinction between class -- confidential versus

21 secret.  That's my point, Your Honor.  I'm not saying that it

22 wasn't harmful information that should have -- that could cause

23 harm to the U.S.

24     Your Honor, the final point that I would like to make is

25 that ultimately the Court has to decide what is a reasonable

1  sentence in this case because that's what the law requires.

2  And this goes back to what we talked about early on in this

3  hearing is we have tried to provide the Court with a greater

4  perspective on what is considered reasonable in these kind of

5  cases, Your Honor.

6     Ms. Carmichael and I have listed a number of cases that

7  have come in the past -- that occurred in the past where people

8  were accused of espionage.  They weren't accused of the

9  specific offense in this case which is under the nuclear

10  statute, but they were all engaged in the same kind of

11  activity, and that is trying to sell secrets they shouldn't

12  have been selling.

13     The list of cases that we provided, Your Honor, indicate

14  that even principals -- people that were what we would say like

15  Mr. Toebbe, ones who were connected to the government and got

16  the information -- rarely receive sentences that would be

17  within this guideline range that the Court has adopted.

18     The other point we would make, Your Honor, is that with

19  regard to the accomplices, which we would characterize

20  Mrs. Toebbe, there are a number of people who have received

21  lesser sentences than what we had originally asked for when we

22  came before the Court.

23     The point being, Your Honor -- and one I just want to bring

24  to the Court's attention because I think it really highlights

25  the point I'm trying to make or we're trying to make is if you

1  -- there's a fellow named Ron Rockwell who was prosecuted in

2  Utah back in '06, pled in 2019.  He was an army officer who

3  spoke Chinese and Russian.  He went to -- retired and then went

4  to work for a defense intelligence agency.  And he started

5  selling Chinese folks, intelligence agents, classified

6  information.  He was arrested while he was trying to go to

7  China to sell some, and he received a sentence of 120 months.

8      Mrs. Toebbe, again, is nothing like that.  She was an --

9          THE COURT:  What type of classified information was

10 it?

11         MR. BECK:  I'm sorry, Your Honor?

12         THE COURT:  What type of classified information was

13 it?

14         MR. BECK:  I do not know, Your Honor.

15         THE COURT:  Please continue.

16         MR. BECK:  The other point I want to make, Your

17 Honor, is this.  Well, going back to the accomplices.  The ones

18 that we were able to find that we presented to the Court, their

19 sentences ranged anywhere from 63 to 41 to 12 -- these are the

20 sentences -- to 81 and 60 months.  In each one of those cases,

21 one could make the argument that the conduct of those

22 accomplices was even more egregious than Mrs. Toebbe's conduct,

23 yet they received sentences that are far below what the

24 projected guideline is in this case.

25      And then lastly, Your Honor, I think it's significant that

1  there is actually a DOD study out there that we found that
2  looked at prosecution of espionage cases over the years.
3  That's Table 8 in our memo.  And it looked at all kinds of
4  espionage, but the bulk of it, as we understand it, are the
5  classic espionage cases.  Not the kind where people leak to a
6  newspaper to get some -- it's a classic espionage like here.
7  And if you look at the prosecutions in the last -- well, from
8  1990 to 2015, most of those people, 42 percent of them,
9  received a sentence of below 5 years.  From 1.1 years to 4.9
10 years.  And then if you even -- if you look at people that
11 received less than 10 years, it's actually 66 percent of the
12 people received less than 10 years for this crime.
13     So we just ask the Court to consider that in context of the
14 requirement that the Court take into consideration disparity of
15 sentencing as part of the equation here along with all the
16 other factors of course.  That a sentence of -- in the
17 guidelines would be far in excess of what apparently is the
18 usual sentence in these cases and a sentence that's far in
19 excess of sentences that are imposed for people that do far
20 more than Mrs. Toebbe did, even principals.
21     So for all those reasons, Your Honor, we would respectfully
22 request that the Court impose a sentence consistent with the
23 bulk of sentences that have been imposed in these cases in the
24 last -- or at least between 1990 and 2015, and that would put
25 us in the range of 3 to 4.9 years.  Thank you, Your Honor.

```
1              THE COURT:  Thank you, Mr. Beck.

2       Mrs. Toebbe, you have the right to make a statement before

3   you're sentenced.  Do you desire to make a statement?

4              DEFENDANT DIANA TOEBBE:  Yes, I do.

5              THE COURT:  All right.  If you'll come on up to the

6   podium, please.

7              DEFENDANT DIANA TOEBBE:  I made a catastrophic

8   decision.  Initially, I should have followed my instinct and

9   tried harder to talk my husband out of this plan, but then my

10  family's difficulties continued, my depression was at an

11  all-time high, and I felt like the country's political

12  situation was dire.

13      I didn't just fail to talk him out of it.  I actually

14  participated in helping him, and I wanted him to succeed.  At

15  the time, I absurdly thought it was a way out of these

16  struggles, but this is inexcusable no matter what my family and

17  my country or I were going through at the time, and I deeply

18  regret every minute of it.

19      There are so many things I didn't think of then, but I'm

20  acutely aware of now.  I didn't think through what the impact

21  of my actions might have been on our servicemen and women.  I

22  was enticed by financial gain and the freedom that might have

23  come with it, and I ignored the very real harm that I might

24  have caused to those who fight for the freedom I have or had.

25      I didn't think of my mother and father who did not raise me
```

1  to act this way, who both taught and fostered my independence

2  while at the same time, instilling principals in me that I

3  betrayed.  After having spent decades of their lives raising

4  their children, they're now spending their retirement years

5  raising a grandchild.  I didn't think of my brother and

6  sister-in-law who, though money is tight, have bent over

7  backwards to take in my younger son.  I am beyond grateful to

8  all of them and so ashamed that I have made their lives so much

9  more complicated.

10      I didn't think of my children who have suffered the most in

11  this situation of my making.  I am now unable to provide the

12  support they need, and however well cared for they are now,

13  they deserve their mom and dad.  Their lives will be forever

14  marked by the decision I made.  There isn't a word for the

15  regret I feel.

16      My path forward will be rededicated to living life as I

17  know it should have been lived, to being an honest, hardworking

18  member of my community, and to being a mother and daughter.  I

19  will continue to seek mental help -- mental health support

20  through my professionals.  I plan to pursue a nursing career

21  after my period of incarceration as a way of providing --

22  contributing positively to others in my community.  I ask for

23  the chance to be able to go back to the person I once was and

24  the person I know I can be again.

25          THE COURT:  Thank you, Mrs. Toebbe.

1    Mr. Douglas.

2         MR. DOUGLAS:  Thank you, Your Honor.

3    Your Honor, in considering the 3553(a) factors, first of

4    all, starting with the seriousness of the offense.  It's

5    universally accepted that the person with access, the person

6    who is trusted, the person who has the specialized knowledge of

7    the classified information should be punished more severely

8    than someone who might have helped in some way.  For example,

9    as a lookout.

10        Secondly, as Mr. Beck started to allude to, this will be a

11   disparity.  If the Court sentences Mrs. Toebbe to the low end

12   of this range or even half the low end of this range, it will

13   be a disparity so the question becomes is there a basis for

14   such a disparity?

15        THE COURT:  Let's back up.

16        MR. DOUGLAS:  Yeah.

17        THE COURT:  First of all, the lookout.

18        MR. DOUGLAS:  Yeah.

19        THE COURT:  If you had a defendant who was a lookout

20   let's say at a bank robbery -- let's say something that's

21   really bad inside, and there's a real danger to the folks

22   inside because someone is shot or folks are killed.  That

23   lookout would -- should get a lesser sentence than the person

24   who went into the bank armed just because a lookout was sitting

25   in the car waiting for the robber with the gun to come out with

1   the bag of money?

2           MR. DOUGLAS:  Completely different situation.  This

3   isn't a drug case.  This isn't a bank robbery.  This isn't a

4   murder for hire.  This is an espionage case.  And so --

5           THE COURT:  That put the -- that put this country in

6   grave danger.

7           MR. DOUGLAS:  Correct.  However, the point is, as has

8   been accepted by several courts across this land, acts as

9   should be punished more severely, period.  And it's logical.

10  The person who had -- it couldn't have been committed without

11  him.

12          THE COURT:  It would have -- his guidelines would

13  have been more severe or higher than hers had she not

14  obstructed and not accept -- and failed to accept

15  responsibility.

16          MR. DOUGLAS:  Under the --

17          THE COURT:  Right?

18          MR. DOUGLAS:  Under the application of the

19  guidelines, yes.

20          THE COURT:  Correct.

21          MR. DOUGLAS:  Still, in the government's opinion, she

22  accepted responsibility and she cooperated.  And now she's

23  facing ten more years for two letters that --

24          THE COURT:  You find that laughable?

25          MR. DOUGLAS:  -- did not -- did not make it to the

1  defendant --

2         THE COURT:  You find that laughable, Mr. Douglas?

3         MR. DOUGLAS:  It had no effect.

4         THE COURT:  No, my question is, do you find that

5  laughable?

6         MR. DOUGLAS:  I find it to be under the application

7  of the 3553 factors excessive to go ten years on top of a

8  sentence for two letters that did not make it to the recipient

9  and had no effect on the case.

10     There's also a disparity, Your Honor, from some of the

11  worst cases.  The worst cases are human asset, human

12  intelligence cases where you're literally naming people out

13  there that are supposed to remain secret and putting their

14  lives specifically at risk.  In fact, Peter Debbins, who got

15  188 months in such a case; Mariam Thompson recently, 276

16  months; Jerry Lee, 228 months.  These are people who had

17  access, had been trusted, broke that trust in the worst way in

18  giving HUMINT assets and putting them at risk.

19     We ask the Court to consider --

20         THE COURT:  But that's not the guideline range on the

21  plea that you've given Mr. Toebbe; right?

22         MR. DOUGLAS:  Your Honor, I'm attempting to contrast

23  what Mrs. Toebbe is facing, the 262 months at the low end --

24         THE COURT:  Okay.  So not exactly as opposed to her

25  husband but as opposed to these other defendants who have been

1   sentenced --

2           MR. DOUGLAS:  Correct, Your Honor.

3           THE COURT:  -- in other courts?

4           MR. DOUGLAS:  As opposed to others who had access in

5   these cases with human intelligence.

6       We ask the Court to consider, again, the cooperation of

7   this defendant which we've asked multiple times for the Court

8   to consider.  The FBI and the Department of Navy are uniquely

9   positioned to assess this cooperation, and they're the ones who

10  benefit from incentivizing cooperation.

11      Your Honor, there is no evidence of a Plan C, full stop.

12  This was not a fly-by-night investigation conducted by

13  amateurs.  This was the Federal Bureau of Investigation.  We're

14  talking about an entire squad from the FBI Field Office in

15  Pittsburgh comprised of numerous agents and analysts.  They

16  received support from several field offices across the entire

17  country, including the Baltimore Field Office, the Washington

18  Field Office, headquarter support, support from Quantico.  They

19  also had support from the NCIS in this case.

20      It was an extensive investigation.  It included three dozen

21  search warrants across multiple districts.  We searched

22  electronic devices, electronic accounts.  We searched their

23  residence.  We searched their vehicles.  We searched his Naval

24  Reactors office.  We searched his satellite office on the

25  campus of the Naval Academy.  We also obtained search warrants

1  for location information on their cell phones.  We also

2  obtained a search warrant to place a tracking device on

3  Mr. Toebbe's vehicle they traveled to and from work.  We had

4  the GPS information on their phones for several months.  We had

5  the tracker on his car for several -- for a couple of weeks.

6  And there just is no evidence that there was some other

7  location that he was -- could be storing something.

8      Then we meet with him for over 20 hours, and he gives us

9  access to his heavily-encrypted laptop.  And it's clear from

10  the review of the laptop, it was the universal laptop that

11  contained all of the restricted data that he had been

12  referencing in the letters that he was dropping at the sites.

13  So there is no evidence that there is some type of Plan C.  In

14  fact, all of the evidence goes against such a conclusion.

15          THE COURT:  So are you saying all this not to

16  complain about the Court's calculation of the guidelines again

17  but to tell me that you in some way agree with the motion for

18  variant sentence?  Is that where this is going?

19          MR. DOUGLAS:  The way I see it, Your Honor, is that I

20  should make sure the Court hears from the government when it

21  states its concern about there being a Plan C on I think now

22  the third occasion.  That I should speak to that and because it

23  does go to -- if the Court is mentioning it multiple times, it

24  must be considering it important.

25          THE COURT:  Yes.

```
1              MR. DOUGLAS:  And I'm just trying to --
2              THE COURT:  So you're giving me a full disclosure on
3    what you believe the facts are?
4              MR. DOUGLAS:  Yes, Your Honor.
5              THE COURT:  Okay.  I appreciate that.
6              MR. DOUGLAS:  So that the concern should not be as
7    high as the Court has stated in considering the 3553(a)
8    factors.
9         Ultimately, Your Honor, the government is not going to give
10   a new recommendation.  It stands by its previous
11   recommendation, but it does believe that this should not --
12   this is not a case for such a disparity.
13             THE COURT:  So the government is opposing the motion
14   for variant sentence --
15             MR. DOUGLAS:  No.
16             THE COURT:  -- and asking me to sentence this
17   defendant to the low -- to the low end of the applicable
18   guideline which is the heart of the plea agreement in this --
19   is we start at the low end of the guideline, 262, because the
20   agreement was no higher than the applicable low end.  So I'm
21   not certain I understand what you're saying.  Are you saying
22   that you're asking the Court to impose a sentence of 262 or are
23   you asking the Court in joining in the defendant's motion for
24   variant sentence that you suggest a different number?
25             MR. DOUGLAS:  The government is taking no further
```

1  position than it did in the August 16th sentencing hearing

2  where the three years was on the table.

3  THE COURT:  So the government is asking me to grant

4  the motion for variant sentence and not sentence this defendant

5  to any more than 36 months, 3 years?

6  MR. DOUGLAS:  Yes, Your Honor.

7  THE COURT:  Why would I do that when that's the very

8  heart of the basis for why I rejected the plea agreement

9  itself, the original plea agreement, in Ms. Toebbe's case?

10  MR. DOUGLAS:  For all the reasons we've previously

11  stated, Your Honor.

12  THE COURT:  Okay.  Recite them again.

13  MR. DOUGLAS:  The seriousness of the offense.  She is

14  not the person with access.  The disparity that this would

15  create for someone who was simply a lookout on two or three

16  occasions, because of her cooperation, because there is no

17  concern about there being a Plan C.  And for all those reasons

18  under 3553(a), this should not be a sentence anywhere near 262

19  months.

20  THE COURT:  And you're asking me to sentence her to 3

21  years, 36 months?

22  MR. DOUGLAS:  Yes, Your Honor.

23  THE COURT:  Thank you, Mr. Douglas.

24  MR. DOUGLAS:  Thank you, Your Honor.

25  THE COURT:  We're going to take a break while I

1    further consider the arguments I've heard at disposition, and

2    then we'll get back here as soon as I have reached a decision,

3    counsel, to place the ruling upon the record and impose

4    sentence.

5         (Recess 1:00 P.M. – 1:45 P.M.)

6         THE COURT:  Please be seated, everyone.  We're back

7    on the record.  The defendants and their counsel are here

8    present.

9    Counsel, anything further for me to consider before I

10   impose sentence?

11        MR. DOUGLAS:  Not by the government, Your Honor.

12        MR. BECK:  Not from Mrs. Toebbe, Your Honor.

13        THE COURT:  All right.  Ms. Toebbe, please stand.

14   Pursuant to the Sentencing Reform Act of 1984, it's the

15   judgment of this Court that the defendant, Diana Toebbe, is

16   hereby committed to the custody of the Bureau of Prisons to be

17   imprisoned for a term of 262 months.  You may have a seat.

18   The Court makes the following recommendations to the Bureau

19   of Prisons:  That the defendant be incarcerated at an FCI or

20   facility as close to San Diego, California, as possible; that

21   she be incarcerated at a facility where she can participate in

22   substance abuse treatment as determined by the Bureau of

23   Prisons; that she be incarcerated at a facility where she can

24   participate in the 500-Hour Residential Drug Abuse Treatment

25   Program; that she be incarcerated at a facility where she can

1  participate in mental health treatment as determined by the
2  Bureau of Prisons; that the defendant be given credit for time
3  served since October 9, 2021.
4     Pursuant to 42 U.S.C. § 14135a, the defendant shall submit
5  to DNA collection while incarcerated in the Bureau of Prisons
6  or at the direction of the probation officer.  Upon release
7  from imprisonment, Ms. Toebbe, you shall be placed on
8  supervised release for a term of three years.
9     You must comply with the standard conditions that have been
10  adopted by this Court in its November 29, 2016, standing order
11  as well as the following special conditions:  You must
12  participate in a mental health treatment program and follow the
13  rules and regulations of that program.  The probation officer
14  in consultation with the treatment provider will supervise your
15  participation in the program.  That includes the provider, the
16  location, the modality, the duration, the intensity, et cetera.
17     You must participate in a substance abuse treatment
18  program.  The probation officer will supervise your
19  participation in that program, meaning supervising the
20  provider, the location, the modality, the duration, and the
21  intensity.  You must submit to substance abuse testing to
22  determine if you used a prohibited substance, and you must not
23  attempt to obstruct or tamper with the testing methods.  All of
24  these conditions assist probation in identifying treatment
25  needs, providing rehabilitation services, reducing the risk of

1   recidivism, and provide for protection of the community.

2        You must not use or possess alcohol.  This condition

3   assists probation in reducing the risk of recidivism and

4   provides for protection of the community.

5        You must provide the probation officer with access to any

6   requested financial information and authorize the release of

7   any financial information.  The probation officer may share

8   financial information with the U.S. Attorney's Office.  This

9   condition assists the probation office in legitimizing

10  defendant's employment and/or income, provides protection for

11  the community, and aids in the maximum collection of financial

12  penalties.

13       You must not engage in an occupation, business, profession,

14  or volunteer activity that would require or enable you to have

15  access to classified government information without prior

16  approval of the Court.  Unless excused for legitimate reasons,

17  if not in compliance with the condition of supervision

18  requiring full-time employment at a lawful occupation, you may

19  be required to perform up to 20 hours of community service per

20  week until employed as approved or directed by the probation

21  officer.  This condition assists probation in reducing the risk

22  of recidivism and provides for protection of the community.

23       You must consent to a third-party disclosure to your

24  employer in regard to your convictions.  This condition will

25  assist probation in monitoring defendant's compliance with the

1    conditions of supervision, providing for protection of the

2    community, and reducing the risk of recidivism.

3        It's further ordered you pay the United States a $100

4    special assessment fee as to Count 1 which I note has been paid

5    in full.  It's further ordered that you shall pay a fine in the

6    amount of $50,000.  This takes into account the fact that the

7    Court cannot order restitution to recover the remaining

8    basically $45,700 of earnest money that had not been recovered

9    by the government.

10       Additionally, the defendant agrees to forfeit and abandon

11   to the United States all of her right, title, and interest in

12   the following items that the defendant agrees constitute money,

13   property, and/or assets derived from or obtained by the

14   defendant as a result of or used to facilitate the commission

15   of her illegal activities.  Those are all papers, digital

16   media, electronic devices seized from her residence, her

17   vehicles, and Mr. Toebbe's Naval Reactor's offices in

18   October 2021.

19       Before I get into the specifics for the reasons for this

20   sentence imposed -- and I will say in imposing this sentence,

21   in determining what the proper sentence to be imposed was, I

22   did consider all those factors set forth in 18 U.S.C.

23   § 3553(a).

24       I did consider the arguments of defense counsel and the

25   government to support the defendant's motion for variant

1   sentence in this case.  The defendant asking for the Court to

2   vary downward to a sentence of 3 to 4.9 years and the

3   government asking the Court to vary downward to a sentence of

4   3 years.

5       Now, while the factors listed in mitigation by the

6   government and the defendant do impact the Court's sentencing

7   and did impact the Court's sentence in imposing the low end of

8   the applicable guideline range, the 262 months, and it also

9   factored in, in part, to my consideration of whether to accept

10  the plea -- the binding plea agreement in the first place, I

11  find these factors do not support a variant sentence for the

12  reasons that I'm going to place upon the record for this

13  sentence I imposed.

14      I also in denying the motion for variant sentence point out

15  that the 36 months is a big part of why I denied and did not

16  accept the original binding plea to 36 months in Ms. Toebbe's

17  case, and I incorporate all of my prior rulings at that

18  proceeding -- the one where I rejected the original binding

19  plea -- as further support and reasoning for rejecting and

20  denying the motion for variant sentence that was made today by

21  the government and the defendant.

22      I'll point out that this is not your usual case.  Everyone

23  has recognized this.  These are not your usual defendants.  And

24  this type of case is certainly not the usual nature of cases we

25  see in this courtroom in the Northern District of

1    West Virginia.  I look at every defendant in every case from

2    the smallest crime to the largest crime which I think with this

3    crime has hit the top of those we've seen in this courtroom or

4    at least I've seen.  I view the cases as unique, the offenses

5    as to these defendants unique, and the defendant's unique

6    characteristics and all those other considerations I must

7    consider under 18 U.S.C. § 3553(a).

8        In looking at parity or disparity between other espionage

9    cases where defendants were sentenced and this case, I'll note

10   there aren't a lot of them.  And each -- the facts of each of

11   those cases are very different, and the defendants are very

12   different as well.  For example, it wasn't in the table that

13   was provided by defense counsel, but Mr. Beck mentioned Ron

14   Hansen.  So we took a look in the back.  There was a DOJ press

15   release on that case, and this is the information I believe in

16   that press release that sets that case apart from this case.

17   This is a defendant from Utah.  He was 60 years old at the time

18   he was sentenced.  He admitted he solicited national security

19   information from an intelligence case officer working for the

20   DIA.  The documents he received were classified.  Those

21   documents included national security information related to

22   U.S. military readiness in a particular region.

23       What the information that Mr. Toebbe wanted to provide was

24   related to military readiness anywhere in the world where those

25   submarines would be.  This was information closely held by the

1   federal government in Mr. Hanson's case as well though.  Hanson

2   did not pose a security clearance -- did not possess a security

3   clearance, and he didn't possess the need to know the

4   information contained in his materials.

5       I also looked at Table 8, and I appreciate it.  It was

6   helpful to look at those cases.  I looked at Table 8 that

7   Mr. Beck referenced, and I did see the initial prison sentences

8   and years that were set forth and the number of individuals

9   that -- granted, and we all agree, there aren't a lot of these

10  espionage cases.  But I went to the low end, but also on the

11  high end, there were 21 cases according to my math that

12  resulted in life sentences.  So, obviously, some judges did

13  deem the sentences that needed to be imposed in those cases

14  even higher than what was before the Court in this case.

15      As we noted, every case is unique before the Court and

16  every defendant is unique, and I considered that, but they do

17  share some similarities.  For example, when we look at whether

18  lookouts are less culpable than the principal in the case, and

19  we look at that in the context of an offense that charges

20  conduct that had the potential for harm, physical harm to come

21  to individuals.  We often see a robbery case, for example, an

22  armed robbery, where the armed robber goes into the bank, and

23  there are individuals who are placed at risk, risk of their

24  lives or at least risk of injury, and we've got a lookout

25  outside.  That's a limited number of people in that bank.  If

1   we zoom out from that small view in a bank during an armed

2   robbery to the lookout situation in this case where we had the

3   potential for harm to U.S. soldiers, the military, civilians --

4   not in one location, not a small number of people, but in this

5   country, across the world, that's a huge lens, and that's the

6   lens that I used to, in part, impose a sentence that I impose

7   today.

8       In looking at the specific reasons for the sentence imposed

9   here today, aside from what I've already mentioned, the

10  defendant's conduct in this case was very serious in nature as

11  evidenced by the substantial penalties associated with her

12  conviction.  Her actions posed a legitimate concern for the

13  national security interests of this country.

14      Her activities had the potential to undermine countless

15  hours of effort made by an untold number of individuals and

16  service to the U.S. and could have endangered military service

17  personnel and compromised the security of military assets.

18  This conduct at a minimum spanned a period of many months.  The

19  scheme required substantial preplanning and considerable

20  efforts were undertaken to avoid detection and disruption.  The

21  defendant was an acknowledged co-conspirator and committed

22  partner to this endeavor.  She was not a minor participant.

23      She, by her own acknowledgement, knew of the scope of the

24  conspiracy.  She was aware of the special relationship her

25  husband had established with an entity he believed to be a

1    foreign government.  She was positioned to benefit jointly in

2    the illicit proceeds of the unauthorized distribution of the

3    restricted data.  While the defendant didn't have access to the

4    restricted data at its source within the United States Navy,

5    she did have access to it after it was removed from its proper

6    place by her husband.

7        Indeed the defendant participated directly in the

8    distribution by accompanying her husband to drop deads -- dead

9    drops in order to transfer the restricted data and by acting as

10   a lookout.

11       The defendant's involvement in the offense conduct appears

12   to have been motivated largely by greed, financial gain.  She

13   was not coerced into engaging in this conduct.  And, quite

14   frankly, in looking at the communication between the

15   codefendants in this case when I was preparing to rule upon

16   Ms. Toebbe's appeal of the MJ -- the magistrate judge's bond

17   decision in this case and the intercepted communication between

18   Mr. Toebbe at the jail -- well, actually not between the

19   intercepted communication that Mrs. Toebbe was trying to get to

20   Mr. Toebbe at the jail, pretending to spin that cover story,

21   trying to get him to perjure himself, to say she wasn't

22   culpable, to indicate that he was the one that was driving the

23   bus, and she was basically a bystander or innocent, it's clear

24   to this Court that it was most probably Mrs. Toebbe that was

25   driving the bus.  While Mr. Toebbe had the access to the

1  information, she was a big part of the plan.  Not only in

2  carrying out the plan but also in the coverup story.

3      She was directing the furtherance of this conspiracy

4  through those letters that were intercepted.  She was telling

5  Mr. Toebbe in those letters basically to deploy the plan.  To

6  tell the truth is what she called it; but even she knew, and he

7  certainly knew, that she didn't want him to tell the truth.

8  She wanted him to lie.

9      At the time of the offense, Mrs. Toebbe had positive family

10 ties.  She possessed an advanced education.  I think she's kind

11 of referred to here in court today by counsel as, you know,

12 housewife, teacher, but she had an advanced education, and she

13 was gainfully employed.

14     The defendant made a deliberate and calculated choice to

15 act in pursuit of her own interests.  She disregarded the risks

16 to her family, her children, and her nation in doing so.  And

17 she's now confronted with the consequences unfortunately of

18 those choices.  In considering even at a basic level whether to

19 accept the binding plea in this case, I compared the

20 defendant's exposure, worst case scenario if she went to trial

21 and was convicted on all three counts, to the guideline

22 calculations pursuant to the plea agreement.  Because the

23 counts would be grouped for guideline calculations and the

24 Court would run them, as I would -- as is suggested in the

25 guidelines, concurrently, unless there's some exceptional

1    circumstance, there is no difference between the guideline
2    calculations if Mrs. Toebbe had gone to trial and been
3    convicted on all three counts and if the Court accepted the
4    binding plea under the guideline calculations, which I found to
5    be appropriate and applicable in this case.
6        But aside from that, I also considered the following:  The
7    uncertainty of obtaining a conviction at trial; whether the
8    government's hard sell on the variance in this case here today
9    and the first binding plea may be an indication of perhaps a
10   hesitancy to try this case because perhaps there's some defect
11   in this case that we're unaware of; the costs and time of a
12   trial to the government and the defense; the lengthy sentences
13   and length of sentences imposed in other espionage cases as
14   I've previously commented on, both those at the low end and
15   those at the high end; the potential of leaks that could come
16   from a trial and further harm our nation's security; and the
17   time and distance between the sentence imposed today and the
18   time the defendant would potentially be able to distribute any
19   information she or her husband held onto when she was released
20   from incarceration.
21       Looking at the length of this sentence and given likely
22   technological and military advances, by the time this defendant
23   is released from imprisonment, any information she has would
24   most certainly be outdated, stale, and worthless to any nation
25   who would want to cause us harm.

1    Finally, I considered the -- not only the original letter

2  from Admiral Houston that was the victim impact statement but

3  the one that I received after the second plea agreement was

4  made.  It was a supplemental victim impact statement, and he

5  told me that on behalf of the Navy, the Navy supported both

6  plea agreements in this case.  He stated that the plea

7  agreement further accomplishes final resolution of the cases

8  with -- and this was important to me -- with no further risks

9  to national security.

10    But he made a point to add in that supplemental victim

11  impact statement, as explained in Reference A, meaning the

12  original victim impact statement, the betrayal by the Toebbes

13  has had far-reaching consequences for the United States and the

14  sailors and the families who serve the United States Navy.

15    Based on defendant's involvement in the instant offense,

16  her personal history and characteristics, her lack of prior

17  criminal history, her conduct in this case both during the

18  course of the offense before she was incarcerated and

19  throughout her incarceration at the jail, and considering the

20  great impact her actions have had on this nation's security

21  and, in fact, the security of the world in these times that we

22  sit in today most especially, the defendant received a sentence

23  of 262 months' imprisonment.  This term of incarceration

24  reflects the very serious nature of this offense and will hold

25  the defendant accountable for her actions.

1    Overall, this sentence meets the sentencing objectives of

2    punishment, general deterrence, incapacitation, and

3    rehabilitation.  The three-year term of supervised release will

4    allow the probation office to monitor defendant's conduct in

5    the community following her release from incarceration and

6    hopefully assist her in returning to a law-abiding lifestyle.

7        I'll dismiss the remaining counts of the indictment upon

8    motion of the government which should be two and three.

9            MR. DOUGLAS:  So moved, Your Honor.

10           THE COURT:  Granted.  And I ask the probation officer

11   to prepare the judgment and commitment order.

12       Mrs. Toebbe, although a defendant who has pled guilty has

13   the right to appeal from the judgment of this Court, a

14   defendant who has pled guilty may waive that right as part of a

15   plea agreement.  You entered into a plea agreement which waived

16   in whole or in part your right to appeal your sentence.  Those

17   types of waivers are generally enforceable, and it appears as

18   though it's enforceable in your case.  However, if you believe

19   the waiver in your plea agreement is somehow unenforceable, or

20   you believe your guilty plea was somehow unlawful or

21   involuntary, or you believe there's some other defect in these

22   proceedings you didn't waive by your guilty plea, then you can

23   present that theory to the appellate court.

24       However, if you decide to appeal, you must file a notice of

25   appeal within 14 days following entry of the judgment and

1   commitment order.  If you request, the clerk of court will

2   forthwith file a notice of appeal on your behalf.  And if you

3   desire counsel on appeal, and you can't afford a lawyer, the

4   appropriate court will review your financial affidavit to

5   determine your eligibility for court-appointed counsel.

6       Anything further on behalf of the government?

7              MR. DOUGLAS:  No, Your Honor.  Thank you.

8              THE COURT:  Anything further on behalf of your

9   client, Mr. Beck?

10             MR. BECK:  No, Your Honor.

11             THE COURT:  All right.  Does your client wish to be

12  remanded to the custody of the marshals now and go back to

13  holding or would she prefer to stay here for Mr. Toebbe's

14  proceeding?

15             MR. BECK:  She would like to stay if that's an

16  option, Your Honor.

17             THE COURT:  That's an option.

18             MR. BECK:  She would like to stay.

19             THE COURT:  All right.  Counsel, do you need a break

20  before we go into Mr. Toebbe's case or should we keep on going?

21             MR. COMPTON:  I'm fine to proceed, Your Honor, as is

22  the defendant.

23             THE COURT:  Okay.  No one needs a comfort break?  I'm

24  sorry, Mr. Douglas.  I cut you off.

25             MR. DOUGLAS:  No, the government is prepared to

1    proceed as well.

2              THE COURT:  Okay.  We already have Mr. Toebbe under

3    oath; correct?

4              THE CLERK:  Correct.

5              THE COURT:  All right.  Mr. Compton, I'll turn to you

6    then.  Have you received the presentence investigation report

7    and gone over it with your client?

8              MR. COMPTON:  Yes, Your Honor.

9              THE COURT:  And, Mr. Toebbe, most importantly, have

10   you received that revised presentence investigation report and

11   reviewed it to your satisfaction with your lawyer?

12             DEFENDANT JONATHAN TOEBBE:  Yes, Your Honor.

13             THE COURT:  Mr. Douglas, has the government received

14   and reviewed it?

15             MR. DOUGLAS:  Yes, Your Honor.

16             THE COURT:  All right.  I think we have to take a

17   look at the objections, do we not, counsel?

18             MR. COMPTON:  Your Honor, I can hopefully speed this

19   along.  Objections 1, 2, 3, 4 have been resolved to our

20   satisfaction and --

21             THE COURT:  Is six moot now because of the nature of

22   the binding plea or not?  I skipped over five.

23             MR. COMPTON:  It is, Your Honor.  That was my very

24   next statement --

25             THE COURT:  Okay.  I'm sorry.  I cut you off.

```
1              MR. COMPTON:  No.  No, Your Honor --
2              THE COURT:  Okay.
3              MR. COMPTON:  My very next statement, Objection 6 is
4    also moot and withdrawn because of the binding term of the
5    plea, and we are not asking for a variant sentence.  That just
6    leaves us with Objection No. 5.  It's very minor, and it's
7    really only half of Objection 5.
8              THE COURT:  The first paragraph is gone of your
9    objection -- right? -- and we're only dealing with the terms of
10   the supervised release?
11             MR. COMPTON:  Yes, Your Honor, and it's --
12             THE COURT:  Okay.
13             MR. COMPTON:  Again, it's just a very minor -- and I
14   noted that the Court imposed the exact same condition when
15   sentencing Mrs. Toebbe.  I just had a concern about the
16   condition at paragraph 224 where it says --
17             THE COURT:  Let me turn to that real quick --
18             MR. COMPTON:  Yes, ma'am.
19             THE COURT:  -- because I had made some notes.  Hold
20   on.  Okay.  I'm with you.  As it reads now, "You must not
21   engage in any occupation, business, profession, or volunteer
22   activity that would require or enable you to have access to
23   classified government information without the prior approval of
24   the Court."
25        And you suggest a tweak to that?
```

```
1              MR. COMPTON:  Well, I'm just not sure it's necessary,
2    Your Honor.  I don't know -- the access to classified
3    information is determined and granted by the executive branch.
4    Mr. Toebbe is about to be convicted of a felony offense which I
5    believe by its terms disqualifies him from having access to
6    classified information.  And so I don't know of a scenario in
7    which the defendant would be in a position to have access to
8    classified information or where the Court would be in a
9    position to approve or disapprove of the defendant having
10   access to classified information.  It seems to be a -- sort of
11   a -- an over -- I don't want -- it's not -- overreach is not
12   the right word, but it's -- and neither is piling on, but it's
13   more of a -- it's just not necessary.  It's --
14              THE COURT:  Well, how would it hinder him in any
15   future employment once he's released from incarceration?
16              MR. COMPTON:  I don't think it would injure him, Your
17   Honor, but I --
18              THE COURT:  Or hinder him I think was my word.
19              MR. COMPTON:  I'm sorry?
20              THE COURT:  How would it hinder him?  H-I-N-D-E-R.
21              MR. COMPTON:  Oh, hinder.  Well, I don't think it
22   would, Your Honor, but I don't think that that is the analysis
23   when we're looking at what conditions are to be imposed on
24   supervised release.
25              THE COURT:  I agree.  But here's the way I look at
```

1  it, and I'm not terribly tech savvy, but let's -- I know he's
2  forever foreclosed based upon his conviction and his actions
3  from working in the capacity he had been working for the
4  government and to officially have access to any sort of
5  classified information.  But I can't think of, specifically,
6  the situation in which it would arise, but let's say he's
7  working for the IT department somewhere, and he somehow is able
8  to gain access to classified information.  I just -- I just
9  would like to err on the side of caution as opposed to just
10 removing this totally.
11         MR. COMPTON:  Perhaps sort of in the vein of -- was
12 it Henshaw where we were tweaking the condition that -- I
13 believe it started out by saying the defendant shall not, and I
14 think we tweaked it to say that the defendant -- the
15 employment -- the defendant can, you know, seek employment
16 subject to the approval of the probation office.  The probation
17 office shall approve employment unless it appears to the
18 probation office that there is some impact to national security
19 or some association with classified information.
20    I don't -- I'm a little -- I'm having a little trouble
21 trying to say how to phrase it because I just don't -- I don't
22 think that -- I don't think there's a scenario where it would
23 come up where the defendant -- again, not like the scenario
24 where we're talking about someone involved in perhaps a child
25 exploitation who might, you know, be in a position where they

1   could get a job as a delivery person which might raise some

2   questions with the probation office.  I just don't think

3   there's a scenario here where Mr. Toebbe would come to the

4   probation office and say, hey, I just got a job at the nuclear

5   lab down in Oak Ridge.  Can you -- what do you -- is it okay?

6   I don't see that as being a scenario so I'm having a little

7   trouble trying to phrase it.

8           THE COURT:  So basically what you suggest in trying

9   to think of how to rephrase it is to modify this to state that

10  the defendant must seek approval of probation before he begins

11  any new employment and that probation must approve the

12  employment unless it would require or enable the defendant to

13  have access to classified government information.

14          MR. COMPTON:  I would be satisfied with that, Your

15  Honor.  I think that the -- I think the probation office is

16  required to approve employment by standard conditions.  That

17  provides the probation office or that directs the probation

18  office to approve employment unless it would have some impact

19  on national security issues or classified information issues.

20  If it does and there's no approval, I think that would, at that

21  point, trigger Mr. Toebbe to be able to come to the Court and

22  seek approval through the Court if he wishes to continue down

23  that line.

24          THE COURT:  Okay.  Mr. Douglas?

25          MR. DOUGLAS:  No objection, Your Honor.

```
 1              THE COURT:  All right.  What's fair to Mr. Toebbe is
 2    fair to Mrs. Toebbe so I'm -- while we have her and her counsel
 3    here, I'm going to make a change to those conditions in her
 4    case, and it will be consistent with what my ruling is going to
 5    be on this objection.  That the defendant -- and this is how it
 6    will be in Mr. Toebbe's case as well.  The defendant must seek
 7    approval -- well, let's back up.  The defendant must advise
 8    probation before beginning any occupation, business,
 9    profession, or volunteer activity as to what that occupation,
10    business, profession, or volunteer activity is; and probation
11    must approve the occupation, business, profession, or volunteer
12    activity unless it would require or enable the defendant to
13    have access to classified government information.  How is that?
14              MR. COMPTON:  No objection, Your Honor.
15              MR. DOUGLAS:  No objection, Your Honor.
16              THE COURT:  All right.  Mr. Beck?
17              MR. BECK:  Your Honor, no objection.  And may I just
18    make one other point?  Ms. Toebbe brought up to me after you
19    imposed the sentence that because of the location of one of her
20    children, if the Court could make a recommendation that the BOP
21    place her as close as possible to Annapolis.  Not San Diego.
22              THE COURT:  Where are her children?
23              MR. BECK:  Her oldest child is in school near
24    Annapolis, Your Honor, and she believes that being closer to
25    that child would be best for their family.  If the Court would
```

1   be agreeable to recommend that instead of San Diego, she would

2   ask the Court to do that as well.

3           THE COURT:  So the oldest one right now is how old?

4           MR. BECK:  Sixteen, Your Honor.

5           THE COURT:  And that child is in Annapolis.  How much

6   further to go in school?

7           MR. BECK:  Two more years of high school, Your Honor,

8   and then I --

9           THE COURT:  Okay.  And then college is up in the air.

10  Right.  And then the younger child is in San Diego?

11          MR. BECK:  Santa Cruz with --

12          THE COURT:  Santa Cruz.

13          MR. BECK:  Santa Cruz with her brother, Your Honor.

14          THE COURT:  And how old is that child?

15          MR. BECK:  Twelve, Your Honor.

16          THE COURT:  Twelve.  And it's your preference,

17  Ms. Toebbe, for me to make a recommendation to the Bureau of

18  Prisons that you be here -- well, you be housed in a federal

19  facility as close to Annapolis, Maryland, as possible to be

20  closer to your older 16 year old?

21          DEFENDANT DIANA TOEBBE:  Yes, ma'am.

22          THE COURT:  Okay.  Then I'm going to change the

23  recommendation I made in that case to the Bureau of Prisons,

24  and it's my recommendation that Ms. Toebbe be housed at a

25  federal facility as close to Annapolis, Maryland, as possible.

```
1            MR. BECK:  Thank you, Your Honor.

2            THE COURT:  Does that satisfy your request?

3            MR. BECK:  Yes, Your Honor.  Thank you.

4            THE COURT:  Sorry, Mr. Compton.  I think that

5     concludes any objections you had to the PSR?

6            MR. COMPTON:  That's correct, Your Honor.

7            THE COURT:  All right.  Nothing from the

8     government?

9            MR. DOUGLAS:  No, Your Honor.

10           THE COURT:  Okay.  Then with the change made to the

11    employment condition, the PSR is accepted and ordered filed,

12    and made a part of the record herein.  With that minor

13    revision, it'll be placed in the record under seal.

14       I will note for the record that on September 27, 2022, this

15    defendant appeared in the United States Magistrate Court for

16    the Northern District of West Virginia sitting in Martinsburg.

17    And at that time, he tendered a plea of guilty by a written

18    plea agreement to Count 1 of the indictment charging conspiracy

19    to communicate restricted data.  After consideration, the Court

20    accepted the defendant's plea of guilty to the crime charged in

21    Count 1 and deferred acceptance of the plea agreement and

22    adjudging the defendant guilty.

23       Subsequent to acceptance of the guilty plea, a presentence

24    investigation report was ordered.  Having now received that

25    report and ruled upon any factual and legal issues raised
```

1    thereby, I find the charge to which Mr. Toebbe is pleading
2    adequately reflects the seriousness of the offense behavior.  I
3    also find acceptance of the plea agreement won't undermine the
4    statutory purposes of sentencing which are deterrence,
5    incapacitation, just punishment, and rehabilitation.
6         So at this time, Mr. Toebbe, I accept your plea agreement
7    and your plea of guilty, and you now stand convicted of the
8    offense to which you agreed to plead guilty under your
9    agreement with the government.
10        I'll now announce my tentative findings as to the
11   applicable guidelines.  We start in this case with a base
12   offense level of 37 pursuant to Guideline 2M3.1(a)(2) because
13   the offense involved the communication of restricted data that
14   was classified at the confidential level.  Then there's a
15   two-level adjustment for offense in the role.  The defendant
16   abused a position of public trust and used a special skill in a
17   manner that significantly facilitated the condition or
18   concealment of the offense.  Therefore, the offense level is
19   increased by two levels pursuant to Guideline 3B1.3.  That
20   brings us to an adjusted offense level of 39.
21        Following that, there's a two-level reduction for
22   acceptance of responsibility under Guideline 3E1.1(a), and upon
23   motion of the government, there will be an additional one-level
24   reduction under Guideline 3E1.1(b).
25             MR. DOUGLAS:  So moved, Your Honor.

1              THE COURT:  Granted.  We arrive then at a total

2    offense level of 36.  Defendant has a criminal history category

3    of one based upon zero points.  With a total offense level of

4    36 and a criminal history category of 1, the guidelines

5    recommend imprisonment in the range of 188 to 235 months.  The

6    guidelines indicate that probation is -- the defendant is not

7    eligible for probation.  The guidelines recommend two to five

8    years of supervised release, a fine in the range of 40,000 to

9    $100,000, and there's a special assessment fee in the amount of

10   $100 owed on that one felony count of conviction.

11       The cost of imprisonment is $3,688 per month, the cost of

12   community confinement is $2,980 per month, and the cost of

13   supervision is $371 per month.

14       Are there any legal objections to the tentative guideline

15   findings, counsel?

16              MR. DOUGLAS:  Not by the government, Your Honor.

17              MR. COMPTON:  No, Your Honor.

18              THE COURT:  Then the guidelines as announced will be

19   the advisory guidelines applicable to sentencing in this

20   matter.

21       Mr. Compton, I will hear from you now for a statement on

22   your client's behalf.  I will tell you I've reviewed the

23   sentencing memorandum and its supplemental sentencing

24   memorandum in particular.

25              MR. COMPTON:  Thank you, Your Honor.  Your Honor, I

```
 1   also have received this after I filed those, a letter written
 2   on Mr. Toebbe's behalf by -- it's actually by an inmate of the
 3   Eastern Regional Jail who is in protective custody with
 4   Mr. Toebbe.  I have marked it as Defendant's Exhibit 1 for
 5   identification.  I provided a copy to Mr. Douglas.  I would ask
 6   that this be admitted for the Court's consideration.  It's one
 7   page and a couple of lines on the top.
 8               THE COURT:  A lot of firsts for the Court today.  The
 9   government recommending a variant sentence lower than that
10   requested by the defendant, an inmate with a character
11   reference for the defendant --
12               MR. COMPTON:  Well, I would like the Court to read
13   the letter, and then perhaps we can discuss it because I think
14   it -- I think it maybe talks more about Mr. Toebbe than --
15               THE COURT:  Okay.  And you've seen it, Mr. Douglas?
16               MR. DOUGLAS:  Yes, Your Honor, I have.
17               THE COURT:  Any objection to my reviewing it?
18               MR. DOUGLAS:  No, Your Honor.
19               THE COURT:  Okay.  Give me a moment.
20      So is this Stacey Taylor a male or a female?
21               MR. COMPTON:  It's a male, Your Honor.
22               THE COURT:  Okay.  All right.  I reviewed it.  We
23   will file it as part of the record in today's proceeding, but
24   I'm going to hang onto this, Chad.  I may refer to it during
25   sentencing but make sure I get it back to you.
```

1          MR. COMPTON:  Thank you, Your Honor, and good

2     afternoon.  I know a lot has been said already today in this

3     case.  Since I gave the Court this letter, I might as well just

4     start with it.  You know, Mr. Toebbe is in protective custody

5     because of the nature of the charges and what's, you know,

6     taken place over the course of the case.  So he presented this

7     letter to me, and it was from this Stacey Taylor, who I don't

8     know anything about, but I do know that he's in the same

9     protective custody as Mr. Toebbe so that prompted me to ask,

10    well, what is Stacey Taylor in protective custody for?

11          THE COURT:  Did you ask the jail or did you ask your

12    client because --

13          MR. COMPTON:  I --

14          THE COURT:  -- sometimes they're not honest.  Not

15    meaning your client but folks who are in protective custody.

16          MR. COMPTON:  Well, I did ask.  I asked my client,

17    Your Honor, and he was honest with me because he could have

18    told me something that was more palatable than being in there

19    for child exploitation which is what Mr. Taylor is in there

20    for.  And not a good thing.  Awful.  And Mr. Taylor, whether

21    he's, you know, guilty or not, I don't -- I believe he's

22    awaiting trial in this case.  It's a person nonetheless, as is

23    Mr. Toebbe, who over the course of this case and in the media

24    and by lots of folks has been, you know, hit with that traitor

25    label which is never anything that you want to go around

1   through life with.  But I thought this letter was interesting

2   and helpful to me because what it shows to me at least is we

3   got somebody like Mr. Taylor, guilty or not -- but let's

4   presume he is guilty of the worst kind of crime -- down at the

5   Eastern Regional Jail.  He's doing his time, whatever, and he

6   comes across somebody like Mr. Toebbe.  And Mr. Toebbe, maybe

7   because he's in the same type of situation, maybe because he --

8   I don't know what reason, but I tend to think that it's because

9   of the kind of person that Mr. Toebbe is.  Is that he doesn't

10  sit there and look at Mr. Taylor and say, "You're some kind of

11  child molester.  Stay away from me.  Get away from me.  You're

12  not even worth me hanging around."

13      Mr. Toebbe has done what he could because he has the

14  education, because he has the smarts, because he's not like the

15  typical inmate at the ERJ.  To do what he can to help this man.

16  Now, he's not trying to help him, you know, get out of whatever

17  trouble he's in.  He's not trying to help him, you know, beat

18  the rap.

19          THE COURT:  He's not doing his legal work for him.

20          MR. COMPTON:  He's not doing his legal work for him.

21  I don't think Mr. Toebbe -- Mr. Toebbe is a physicist, but he's

22  not a lawyer.  I don't know that Mr. Toebbe could do my job,

23  and I certainly, certainly couldn't do his.  What he is doing

24  is helping Mr. Taylor where he can.  GED classes, math

25  homework, being a human being to somebody who maybe doesn't

1  have a lot of human beings around him so to speak.

2      So I just wanted to bring that to this Court's attention,

3  and I think that sort of folds into the first thing I wanted to

4  mention which has been mentioned a lot I think today and all of

5  the filings that we made with the Court.  And that's what I

6  will refer to as Mr. Toebbe's post-offense rehabilitative

7  conduct.  His compliance with paragraph 7 of his plea

8  agreement.  It's been nothing but phenomenal.  I don't know how

9  else to describe it.

10      I think the government has described it in similar terms.

11  He has done everything that he can to -- in any way that he

12  can -- try and make right or atone in some small way for what

13  he has done.  Not only with regard to his -- the specific case

14  that we are here for today but with regard to information that

15  the government didn't even know about.  He has done phenomenal,

16  phenomenal work in trying to atone for what he has done.  And I

17  think -- I don't know how more to express how much I think the

18  Court should give weight to that.

19      I know the government has multiple times here today and I

20  know the vice admiral has in their letter talked about how much

21  Mr. Toebbe has done.  He's done that for several reasons.  He's

22  done it to atone for what he has done.  He's truly sorry.  He

23  is truly sorry.  And he's done it because -- and I -- and I've

24  spent now over a year with Mr. Toebbe.  Despite what he did, I

25  believe -- and I feel confident standing before the Court in

1  saying this -- that I believe Mr. Toebbe truly loves his
2  country.  I believe that.  And I've spent, as I say, over a
3  year with him.  And I think to his core, to his core, he
4  regrets what he has done.  And I say that in context -- I know
5  the Court in sentencing Mrs. Toebbe -- and this is why I want
6  to just briefly put this in here.  I know this Court looks at
7  every case separately.  And every case is different, and every
8  case has different facts.
9     I cited one specific case for the Court which I thought had
10 facts sort of similar to this case.  But one of the things that
11 stuck out to me that was different about that case -- and I
12 mentioned it in the thing -- is that that defendant who got a
13 lower sentence than Mr. Toebbe is looking at here, that
14 defendant had expressed, expressed to the agents that he was
15 dealing with, a hatred for this country.  By the way, a country
16 that had taken him in.  He was an immigrant.  He expressed
17 hatred for this country and expressed a desire to -- and
18 expressed a plan to perhaps physically harm citizens within
19 this country.
20          THE COURT:  So what's the difference really between a
21 hatred for the country and a disregard for the safety of the
22 country?
23          MR. COMPTON:  Well, I don't know that there is a
24 difference, Your Honor.  I think the two probably can go hand
25 in hand, but I think there's a -- what we have here, the

```
 1   difference I see here is I believe that at the time or during
 2   the period of time -- which this occurred over a period of
 3   time.  At the period of time that this was taking place,
 4   Mr. Toebbe was experiencing a great deal of stress, a great
 5   deal of tumult in his life.  We talked about the issues that he
 6   was having with his son.
 7       Mr. Beck told the Court that Mrs. Toebbe at the time this
 8   was going on was at the apex of the psychological problems that
 9   she was dealing with.  Mr. Toebbe was having stress issues at
10   work related to his employment, what he was being asked to do
11   at work, and then we add on top of this -- and this is not --
12   I'm not trying to say that this is -- had -- is the be all end
13   all or this has, you know, the major factor, but you add on top
14   of all of that this business about, you know, the direction of
15   the country and what was going on.  You add all that together
16   and Mr. Toebbe, who was a -- who has been a physicist, who was
17   an active member of the United States military, honorably
18   discharged, why would he -- where does this come from?  Why
19   does somebody all of a sudden decide, well, that's the reason
20   why?  Not because he hates the United States.  Not because he
21   wanted to see sailors dead.  Not because this country was so
22   repugnant to him that he wanted to do everything he can to put
23   it down unlike Mr. Mascheroni in the case that I cited who had
24   a hatred.  A hatred for his employer.  A hatred for the
25   country.
```

1    Mr. Toebbe found himself in a situation where he -- I think
2    he almost felt hopeless in terms of how to proceed.  And I
3    don't understand it.  I don't know how to explain how somebody
4    then goes from, you know, my life is, you know, in the ditch --
5    how do I -- you know, what do I do, and then you go to start
6    with the secrets.  I don't understand it.  I don't know that I
7    can explain it to the Court.  I don't know that Mr. Toebbe
8    expects the Court to understand it.  But he made a decision,
9    and it was the worst decision of his life.  It was the worst
10   decision that he could have come up with.  And to his core and
11   for the rest of his life, he will regret taking that action.
12   That doesn't mean that he hates this country.  I don't think he
13   does.  I think he loves this country, and I think everything
14   that he has done since the moment those agents approached him
15   in Harpers Ferry to take him into custody, everything that he
16   has done since then has been in an effort to atone for the
17   absolute poor, poor decision-making that he's made over the
18   last few years.
19       And I don't say -- again, I'm not -- he has offered I think
20   a heartfelt and a thorough defendant's version statement to try
21   to explain to the Court where he is.  I don't -- I don't think
22   he's trying to lay the blame for his decision-making at, you
23   know, the feet of his kids or the feet of his wife.  He knows
24   what he did.  He did it.  Nobody was holding a gun to his head.
25   He had access to the information.  And whether Mrs. Toebbe was

1  driving the train or not, he was the one that had access to the
2  information, and he was the one that could decide to take it or
3  leave it.  And he made a decision.
4      But we offer that and he offers that not as an excuse.  Not
5  as a, you know, get out of jail free.  This is where his
6  mindset was.  This is where he was.  This is why somebody with
7  honorable military service and no criminal history all of a
8  sudden decides to haul themselves to Harpers Ferry and
9  Gettysburg for misconduct.  I think the Court can see some of
10 that in something that I thought, you know, is a little -- is a
11 little unusual until you think about it for a little bit.
12     Mr. Toebbe has no criminal history, no real serious, you
13 know, physical health issues.  Clearly, there were some -- you
14 know, he was struggling with some -- I think some mental health
15 issues at the time -- but substance abuse.  And we're not
16 talking about marijuana.  We're not talking about crack.  We're
17 not talking about, you know, he wasn't -- he wasn't out on the
18 street corner.  What are we talking about?  Something that we
19 skip over a lot of the times in this courtroom.  Not because
20 it's not important.  Just because we're dealing with more
21 harder stuff than alcohol.  And doesn't that -- doesn't that
22 really express, you know, where he was in his mindset?
23     Mr. and Mrs. Toebbe were suburbanites.  You know, educated.
24 You know, you come home from a long day of work, you have a
25 glass of wine.  Well, that's fine until, you know, you're

1  trying to, you know, deal with your child's very serious mental

2  health issues.  You're trying to deal with your wife's very

3  serious mental health issues.  You're trying to deal with the

4  issues at work.  And the one glass of wine turns into two

5  glasses of wine, turns into three, turns into four, and all of

6  a sudden, you're drinking a lot at home.

7      I think that also incapsulates where his mindset was.

8  Where -- what was going on with him.  And the fact that this

9  was not some, you know, I hate this country.  How can I get --

10  how can I get back at this country?  How can I do this?  This

11  was a mindset that he had found himself in.  And sort of like

12  what Mr. Beck was saying too -- and I think it's important.

13  Yes, this was an offense motivated by money.  Is that the

14  definition of greed?  Probably a generic definition, yes.  But

15  I think -- I agree with Mr. Beck that this was not greed in the

16  sense that the Toebbes, you know, didn't like their house.  It

17  was -- they thought it was, you know, too plain or, you know,

18  the mini or whatever it was that they were driving wasn't fancy

19  enough.  That they wanted something more showy or classy for

20  the, you know, the private school set.  That's not what we were

21  talking about here.  The decision had been made as to how to

22  proceed and because that entailed going abroad that required

23  money.

24          THE COURT:  Like in the amount that they were

25  seeking?  Why didn't they just seek an amount, if that was the

1  case, that would pay off their debt and give them a little nest

2  egg to start over?

3              MR. COMPTON:  Well, I think --

4              THE COURT:  That's where it drops into greed; right?

5              MR. COMPTON:  Well, I think if the Court -- if the

6  Court wants to -- if you want to look at their debt that's one

7  thing.  I don't know that -- I think they had some debt and so

8  I don't know that that would necessarily be a lot.  But also --

9  and I think as the Court in questioning Mr. Douglas, for

10 whatever reason -- I think probably because of security, you

11 know, security issues, they were dealing -- Mr. Toebbe was

12 dealing in cryptocurrency which, you know, one day is $100,000

13 and the next day it's $50,000.  So, you know, I'm not -- I

14 don't know how secure that was.

15     The point though was -- I guess what I was trying to say

16 inartfully was -- is that in perhaps a lot of those cases that

17 have been cited, you know, we're not talking about $100,000.

18 We're talking about a million dollars, a hundred million

19 dollars, or tens of millions of dollars.  Because, again, the

20 folks aren't looking to -- you know, we're not looking just to

21 go to another country to get out of here or to leave our

22 problems behind.  We're looking to, you know, live the high

23 life in some other country or to live the high life in Loudoun

24 County or, you know, to do whatever we want to do to make -- to

25 be powerful and wealthy.  And I don't think that's the

1  situation that we have here.

2      The Court is well aware that Mr. Toebbe is highly educated.

3  He's highly employable.  So after the period of his

4  incarceration, he is going to be, as he has been except for

5  this period of time, a model citizen.  Again, I've mentioned

6  his military service to the Court.  I had a note about

7  disparity and deterrence, and I think the Court addressed those

8  issues when sentencing Mr. -- Mrs. Toebbe, but just for the

9  record here, Mr. Toebbe has no -- there -- has no Plan C or

10 Plan D.  He has no other information out there.

11     I think the Court correctly concluded in the previous

12 sentencing that by the -- given the guideline range and the

13 binding term, by the time that Mr. Toebbe would get out of

14 jail, the, you know, universe of technology will have passed --

15 any information that he had would pass them by.  And the Court

16 read it out loud, the statement from the vice admiral.  Final

17 resolution of the cases with no further risk to national

18 security.

19     Mr. Toebbe is not going to be able to get a security

20 clearance again.  He's not going to be able to do this type of

21 work again.  Any institutional knowledge that he may retain in

22 his mind and in his memory is going to be -- is -- I believe is

23 outdated now based on the admiral's statement, but certainly in

24 15 years, it's going to be worthless.  And I can tell the

25 Court, because Mr. Toebbe has told me and because I know that

1    the government has done an extensive amount of investigation

2    into this case, again, based on -- because that's what they do

3    and also based on Mr. Toebbe's post-offense rehabilitative

4    conduct that there is nothing else that I believe that the

5    Court needs to be worried about.

6        And so I believe that this Court can feel comfortable in

7    sentencing Mr. Toebbe to the low end of the binding term, the

8    low end of the guideline range, 188 months.  I believe that

9    takes into account and punishes him for the seriousness of his

10   misconduct, but it takes into account those 3553(a) factors

11   that we've presented to the Court both here and in our various

12   memoranda.  And most importantly, it takes into account that

13   phenomenal post-offense rehabilitative conduct that I believe

14   Mr. Toebbe wanted to do, needed to do, and was right in doing

15   to begin to atone for what he's done.

16            THE COURT:  Thank you, Mr. Compton.

17       Mr. Toebbe, you have the right to make a statement before

18   you're sentenced.  Do you desire to address the Court, sir?

19            DEFENDANT JONATHAN TOEBBE:  Yes, Your Honor.

20            THE COURT:  All right.  Come on up to the podium.

21            DEFENDANT JONATHAN TOEBBE:  Your Honor, 13 months in

22   jail has afforded me a lot of time to think about what I have

23   done, about the enormity of my crimes, and about the people

24   that I have impacted.  I failed in my responsibility to the

25   American people to preserve the secrets that were entrusted

1    with me.  I've let down my respected colleagues at the

2    National Laboratories and at Naval Reactors.  I failed my

3    family.  I brought shame to them and trauma to my children and

4    to my wife.

5        I come before you deeply ashamed of what I have done.  I

6    won't reiterate everything that I said in my written statement

7    in the presentence investigation out of respect for the medical

8    privacy of my children and for my wife, but I do want in some

9    way to explain my mindset as I carried out my crimes.  Not to

10   shirk responsibility but to provide you some insight into

11   myself as a person.  Hopefully to persuade you that I persuade

12   -- I pose no risk of recidivism.  And also I pray that other

13   individuals in the government who may be at risk of becoming an

14   insider threat will become aware of this testimony and will

15   perhaps take heed and listen and recognize in themself the

16   danger signs of a mental breakdown and seek help before taking

17   critical action before making the mistake that I did.

18       My family is everything to me.  And the confluence of their

19   mental health problems and the added stress at work of taking

20   on my supervisor's responsibilities to free him up day to day

21   to take on a special project on behalf of the admiral added

22   tremendously to my workload and to my operational stress.  The

23   COVID pandemic and the difficulties of managing government

24   remotely and appropriately handling classified information

25   ironically enough added to the stress that I was under, and

1   I began self-medicating with alcohol.  And it got out of
2   hand.
3       And I believed that my family was in dire threat.  That
4   democracy itself was on the verge of collapse, and that sort of
5   catastrophic thinking overwhelmed me, and I believed that I
6   must take -- must have taken precipitous action to try to save
7   them from grave harm.  I recognize now that I was in the midst
8   of a nervous breakdown over a period of perhaps 18 months and
9   failed to recognize the warning signs.  Failed to take
10  advantage of the resources that were available to me through
11  the Department of the Navy to help manage my operational
12  stress.
13      I should have known better.  I should have done better.
14  And as a result, I endangered the men and women of the United
15  States Navy whose uniform I was so proud to wear.  I betrayed
16  my colleagues at Naval Reactors and the National Laboratories
17  serving honorably in a job that I was so proud to share with
18  them.  And I brought shame to my family.  I have destroyed my
19  children's lives.
20      I can't take back what I have done.  I can't fix it.  I
21  can't put the toothpaste back in the tube.  But by god, Your
22  Honor, I've tried.
23      In addition to my post-arrest rehabilitation that
24  Mr. Compton has referred to already, part of my interrogation
25  and debriefing was with the FBI's Behavioral Analysis Unit, the

1   Mindhunters.  Again, attempting to help them come up with a
2   better profile for people like me in the hopes that they might
3   be able to intervene sooner and prevent the next threat from
4   happening.  Not just for the protection of the country but to
5   save that lost soul.
6       I am in anguish over what I have done, and I know I will
7   never be able to make it right.  In the ways that I am able, in
8   the ERJ, I've tried to reach out to fellow inmates to tutor
9   them in math.  To help Mr. Taylor with his grammar.  He has an
10  ambition to open a small business himself one day and wanted to
11  be able to speak properly when applying for a small business
12  loan.
13      My ambition while incarcerated is to continue to use those
14  skills and the blessings of my education to help other inmates
15  complete theirs in the hopes that that will put them on a
16  better path and reduce the risks that they will have to fall
17  back into that cycle of poverty and crime that so many inmates
18  face.
19      I beg Your Honor for lenience in sentencing to the bottom
20  end of the guidelines.  I know what I did is wrong.  I need to
21  be punished.  But I beg you to give me the opportunity to be a
22  solid citizen again one day, to be involved in my children's
23  lives, to help them grow up and to take on the burdens of being
24  the good young men that I know they are.  And I also ask for
25  the opportunity for my parents, my elderly parents, to live

1   long enough to see their prodigal son redeem himself in some

2   way.  I hope that they will live long enough to see me a free

3   man once again.  Thank you.

4         THE COURT:  Thank you, sir.

5     Mr. Douglas.

6         MR. DOUGLAS:  Your Honor, the government relies on

7   its written filings to continue to recommend a sentence of 210

8   months for this defendant.  Specifically, the basis, if not the

9   primary -- if not the sole basis, is the post-offense

10   rehabilitative conduct which is most specifically and

11   thoroughly described in the government's classified filings.

12   Thank you, Your Honor.

13         THE COURT:  Thank you, sir.

14         MR. COMPTON:  Your Honor, I neglected to mention

15   Mr. Toebbe would ask that the Court recommend that he be housed

16   at the federal facility in Petersburg, Virginia, the Low.

17   Petersburg offers programming which I think will benefit the

18   defendant.  I also think it will enable him to participate

19   perhaps on the teaching side of that programming for some of

20   the other inmates down there.  Petersburg also offers I think

21   protective custody levels that may benefit this defendant given

22   the nature of the case.

23     And, lastly, Petersburg -- I think what the Court had heard

24   from Mr. Beck, the oldest son will be on the Eastern Seaboard.

25   His parents -- Mr. Toebbe's parents are in the Louisville area

1  and so it's sort of a centralized location.

2          THE COURT:  Okay.  So the federal facility in

3  Petersburg.

4          MR. COMPTON:  Specifically, the Low.  I understand

5  and Mr. Toebbe does that the Bureau of Prisons ultimately makes

6  those decisions.

7          THE COURT:  Will make the classification.  Right.

8          MR. COMPTON:  Yes, ma'am.

9          THE COURT:  Okay.  I'll make that recommendation.

10     All right, counsel, we're going to take a brief break, and

11  then we'll get back out here on the record.

12     (Recess 2:55 P.M. – 3:30 P.M.)

13          THE COURT:  Please be seated, everyone.

14     Anything further, counsel, before I impose sentence?

15          MR. DOUGLAS:  Not by the government, Your Honor.

16          MR. COMPTON:  Your Honor, I -- it just occurred to

17  me, if the Court imposes a fine in this case -- just thinking

18  as to the previous sentence -- we would ask that the Court

19  impose a schedule of payments on that.  I don't know what the

20  defendant's ability is going to be to make payments while he's

21  incarcerated.  I understand -- I'm sure he'll be working at

22  some point and making money.  I know as the presentence report

23  indicates that there are some financial arrangements that can

24  be done.  But to the extent that he may still owe some money

25  when he gets out, I would hate for him to be set up for failure

1    immediately upon walking out.  If we can make a schedule of

2    payments for any fine in the amount of $100 per month beginning

3    the 5th of the month following his release.

4           THE COURT:  All right.  This is what I'll do in

5    imposing a fine.  I will order that the defendant pay $100 a

6    month beginning the 5th of each month beginning 6 months

7    following his release from incarceration, and I'll change, with

8    regard to Ms. Toebbe's fine as well, the schedule of payments

9    so we don't set anybody up for failure here.

10          MR. COMPTON:  Thank you, Your Honor.

11          THE COURT:  Okay.  Will the defendant please stand.

12      Pursuant to the Sentencing Reform Act of 1984, it's the

13   judgment of the Court that the defendant, Jonathan Toebbe, is

14   hereby committed to the custody of the Bureau of Prisons to be

15   imprisoned for a term of 232 months.  This sentence of

16   imprisonment is at the higher end of the advisory guideline

17   range and the higher end of the binding term of imprisonment

18   contained in the plea agreement.  You may have a seat,

19   gentlemen.

20      I make the following recommendations to the Bureau of

21   Prisons:  That the defendant be incarcerated at the federal

22   facility in Petersburg, the Low; that the defendant be allowed

23   to participate in substance abuse treatment, including the

24   500-Hour Residential Drug Abuse Treatment Program as determined

25   by the Bureau of Prisons; and that he be given credit for time

1  served since October 9, 2021.

2      Upon release from imprisonment, Mr. Toebbe, you shall be

3  placed on supervised release for a term of five years.  While

4  on supervised release, you must comply with the following

5  mandatory conditions:  You must not commit another federal,

6  state, or local crime.  You must not unlawfully possess a

7  controlled substance.  You must refrain from any unlawful use

8  of a controlled substance.  You must submit to one drug test

9  within 15 days of release from imprisonment and at least two

10 periodic drug tests thereafter as determined by the Court.  And

11 you must cooperate in the collection of DNA as directed by the

12 probation officer.

13     You must also comply with the standard conditions that have

14 been adopted by this Court in its November 29, 2016, standing

15 order as well as the following special conditions:  You must

16 submit to substance abuse testing to determine if you used a

17 prohibited substance and must not attempt to obstruct or tamper

18 with the testing methods.  This condition assists the probation

19 officer in identifying treatment needs, providing rehab

20 services, reducing the risk of recidivism, and provides for

21 protection of the community.

22     You must not use or possess any controlled substances

23 without a valid prescription.  If you do have a valid

24 prescription, you must disclose the prescription information to

25 your probation officer and follow the instructions on the

1  prescription.  This condition assists probation in reducing the

2  risk of recidivism and provides for protection of the

3  community.

4      You must provide the probation officer with access to any

5  requested financial information and authorize the release of

6  financial information.  The probation officer may share that

7  financial information with the U.S. Attorney's Office.  This

8  condition assists the probation officer in legitimizing

9  defendant's employment and/or income, provides protection for

10  the community, and aids in the maximum collection of financial

11  penalties.

12      You must not engage in -- well, let's put it this way.  We

13  reworded that section as far as the employment.  You're

14  required to advise your probation officer of any new

15  occupation, business, profession, or volunteer activity before

16  you start, and the probation office must approve employment

17  unless that occupation, business, profession, or volunteer

18  activity requires or enables Mr. Toebbe to have access to

19  classified government information.

20      Unless excused for legitimate reasons, if not in compliance

21  with the condition of supervision requiring full-time

22  employment at a lawful occupation, you may be required to

23  perform up to 20 hours of community service per week until

24  employed as approved or directed by your probation officer.

25  This condition assists probation in reducing the risk of

1  recidivism and provides for protection of the community.

2      It's further ordered the defendant shall pay the United

3  States a special assessment fee in the amount of $100.

4      And, Chad, was that paid or not?

5          THE CLERK:  It was paid, yes.

6          THE COURT:  It was paid.  I'll note it has been paid

7  in full.

8      It's further ordered the defendant pay a fine in the amount

9  of $45,700. I take that amount into consideration because

10 that's the amount that -- of the money, the earnest money that

11 was not recovered.  I don't find that the defendant or his wife

12 should profit because of a loophole in the guidelines or the

13 sentencing parameters in this case.

14     Additionally, defendant has agreed to forfeit to the United

15 States all right, title, and interest in the following items

16 that the defendant agrees constitute money, property, and/or

17 assets derived from or obtained by the defendant as a result of

18 his illegal activities:  All papers, digital media, and

19 electronic devices seized from his residence, his vehicles, and

20 his Naval Reactors offices in October 2021.

21     In reaching my decision as to the proper sentence to be

22 imposed, I did consider all those factors set forth in

23 18 U.S.C. § 3553(a).  Specifically, the reasons for the

24 sentence imposed here today are as follows:  The defendant

25 before this Court turned 44 years old today.  He is a son, a

1  husband, and a father.  He has no prior criminal record.  By

2  all counts, he was raised by successful and supportive parents,

3  who served as role models, who financially supported him

4  through his various educational endeavors, and who encouraged

5  him to set and achieve his goals.

6     His personal history and list of accomplishments reads of

7  one that many strive for but few achieve.  He holds multiple

8  college and advanced degrees.  He was an educator.  He served

9  in the U.S. Navy, and he entered an elite career field that

10  someone can only achieve through hard work, dedication, and

11  trust.

12     The Court has reviewed the circumstances of the instant

13  offense.  It's very clear that defendant's actions were

14  calculated and required advance planning over several years to

15  avoid possible detection.  In a manner that reads like a crime

16  novel or a movie script, the defendant abused his position of

17  trust and his skill as a nuclear engineer in the Naval Nuclear

18  Propulsion Program to threaten national security.  The

19  defendant's actions and greedy self-serving intentions placed

20  military service members at sea and every citizen of this

21  country in a vulnerable position and at risk of harm from

22  adversaries.

23     In his own words, the defendant's family, and I quote, "has

24  always been of primary importance," end of quote, in his life.

25  In seemingly searching for a palatable excuse for his actions,

1  the defendant suggests that he was devoted to protecting his
2  family so he made the decision to steal restricted data to help
3  them escape, quote, "the collapse of American democracy," end
4  of quote.  Those are his words.  He minimizes his actions,
5  placing the protected information he stole into categories of
6  "what," and then he opted not to steal the "hows" and the
7  "whys."  He justified his actions by stating he was trying to
8  limit the damage to the U.S., a country he was proud to serve
9  and swore an oath to protect.
10      The defendant was keenly aware of the consequences that he
11  could face by his misconduct.  He acknowledged to his wife in
12  communications that another country may not honor the skills
13  that he has to offer.  When the defendant took an oath, he was
14  made aware of the legal consequences of violating the terms of
15  his employment with the United States.  The defendant comes
16  face to face with these consequences today.
17      The unintended consequences of the defendant's activity
18  unfortunately are equally significant.  First, his children
19  lost critical time with their father while he was planning and
20  acting on his crime.  This was a time he could have spent
21  focusing on their immediate needs.
22      Secondly, the defendant will serve a term of imprisonment
23  that will not be present -- and will not be present to protect
24  and guide his children as a father should when they face life's
25  challenges.

1      Third, the defendant may have already spent his last time

2  with his parents prior to his incarceration which is a scenario

3  that he created for his own mother and father.

4      Lastly, the United States, defendant's mentees and former

5  coworkers and friends can no longer trust the defendant.  The

6  cumulative impact of the defendant's crime remains to be seen.

7      Based on defendant's involvement in the instant offense,

8  his personal history and characteristics, and his lack of

9  criminal history, the sentence imposed here today is warranted.

10 It's sufficient but not greater than necessary.  The sentence

11 incorporates the binding term agreed on by the parties in the

12 plea agreement, reflects the serious nature of the offense, and

13 takes into consideration the risk to national security, the

14 position of the Navy, but most importantly, the risk to

15 national security created because of the defendant's own

16 actions.  This sentence will also provide defendant with an

17 opportunity to address his substance abuse issues and explore

18 long-term career options.

19     In a recent -- speaking of the position of the Navy, in a

20 recent supplemental victims impact statement, Admiral Houston

21 reported to the Court that the Navy agreed to both of the plea

22 agreements in this case, and I gave that weight in determining

23 whether to accept this plea and how to sentence the defendant.

24 I also gave weight to what the vice admiral went on to say.  He

25 went on to say, "Not only that the plea agreement further

1   accomplished final resolution of the case with no further risks
2   to the national security," but he also said, "As explained in
3   Reference A" -- meaning the original victim's impact statement
4   -- "the betrayal by the Toebbes has had far-reaching
5   consequences for the United States and the sailors and families
6   who serve the United States Navy."
7        Also, I compared the defendant's worst case scenario
8   exposure if he was convicted of all three counts in this
9   indictment at trial under the guidelines which would require me
10  to group those three counts for calculation purposes and also
11  to, most importantly, consider without exceptional
12  circumstances, have those counts run concurrently.
13       Worst case scenario if this defendant went to trial, the
14  range of imprisonment under the advisory guidelines would be
15  262 to 327 months.  That's 21 1/2 years to 27 1/4 years based
16  on my math.  With acceptance of this binding plea, which the
17  Navy supported, the guidelines recommended, as I stated at the
18  beginning during my calculation, 188 to 235 months.  That's
19  15.6 to 19.5 years.
20       I also had further considerations in support of the
21  sentence imposed, and they're as follows:  I considered the
22  intangibles and nuances of trying this case and the fact, as we
23  all know, that going to trial doesn't guarantee a conviction of
24  any or all counts.  I considered the trial costs associated
25  with trial, the potential for leaks that could further harm

1    this country's security during the course of trial, the length

2    of sentences imposed in other cases but also the specifics of

3    those cases, which are all different than that case that's

4    before me.  I considered the time and distance that this

5    sentence places between the defendant now and the defendant

6    when he's finally released from incarceration in the light that

7    hopefully technology and military advances will have advanced

8    to the point where any information he may have retained for

9    redistribution will be stale or worthless.

10       I also considered the defendant's role in the cover story

11   that was concocted before he was arrested in this case, but I

12   also considered some other mitigating factors.  I considered

13   his post-offense rehabilitative conduct which the government

14   agreed with the defendant about.  I considered in contrast to

15   Mrs. Toebbe that this defendant made productive use of his time

16   in the jail.  Not only with the rehabilitative conduct but also

17   even helping to improve those of lesser station, who would be

18   considered of lesser station considering the charges that

19   Mr. Taylor is facing in the jail.

20       Nonetheless, even though Mr. Toebbe and Mr. Taylor's worlds

21   collided there in the jail, Mr. Toebbe acknowledged that

22   Mr. Taylor was an individual just as himself, he was a human

23   being, and put Mr. Taylor's charges and alleged conduct aside

24   and helped him with his GED studies.  I think Mr. Compton

25   mentioned he helped him with his math.  Mr. Toebbe indicated he

1   was helping others to improve upon their education in the jail

2   as well.  In fact, he even helped Mr. Taylor, according to what

3   Mr. Taylor reports to the Court, learn how to play chess which

4   is not easy, but that gave him something else to focus on to

5   help him productively pass his time.  So Mr. Toebbe deserves

6   some credit for productive use of his time in jail.

7       Also in contrast to Mrs. Toebbe, both in writing in the

8   statement from the defendant in the PSR as well as his

9   presentation here in court, I found that his remorse that he

10  expressed to the Court was genuine.  I think he was -- is truly

11  ashamed and sorry for his actions, and I took that into account

12  as well.

13      Overall, this sentence of imprisonment meets the sentencing

14  objectives of punishment, general deterrence, incapacitation,

15  and rehabilitation, and it will promote respect for the law.

16  This sentence also reflects a commitment to protect our

17  nation's security as a whole and to serve as a warning to

18  those who are entrusted with valuable government secrets that

19  if you break the law and you're caught, you can and will be

20  punished.

21      A term of supervised release is required.  In this case, a

22  five-year term of supervised release was imposed and that will

23  allow the probation office to monitor defendant's conduct in

24  the community and will assist him in leading a law-abiding

25  lifestyle when he is released from incarceration.  This term of

1  supervised release will also assist the probation office with

2  monitoring the defendant's financial resources, his substance

3  abuse tendencies, and will provide the defendant with

4  additional guidance, support, and resources for obtaining

5  gainful employment to meet his family responsibilities.

6      I'll grant the motion of the government and dismiss the

7  remaining counts of the indictment which are two and three,

8  Mr. Douglas?

9          MR. DOUGLAS:  So moved, Your Honor.

10          THE COURT:  Granted.  And I ask probation to prepare

11  the judgment and commitment order.

12      Mr. Toebbe, although a defendant who has pled guilty has

13  the right to appeal from the judgment of this Court, a

14  defendant who has pled guilty may waive that right as part of a

15  plea agreement.  You entered into a plea agreement which waived

16  in whole or in part your right to appeal your sentence.  Those

17  types of sentences are generally enforceable, and it appears as

18  though it's enforceable in your case.  However, if you believe

19  the waiver in your plea agreement is unenforceable for some

20  reason, or you believe your guilty plea was somehow unlawful or

21  involuntary, or you believe there's some other defect in these

22  proceedings you didn't waive by your guilty plea, you can

23  present that theory to the appellate court.

24      However, if you decide to appeal, you must file a notice of

25  appeal with the clerk of this court within 14 days following

```
 1  entry of the judgment and commitment order.  If you request,
 2  the clerk of court will enter a notice of appeal for you.  And
 3  if you desire counsel on appeal, and you can't afford a lawyer,
 4  the appropriate court will review your financial affidavit to
 5  determine your eligibility for court-appointed counsel.
 6       Anything further on behalf of the government, Mr. Douglas?
 7            MR. DOUGLAS:  No, Your Honor.
 8            THE COURT:  Anything further on behalf of your
 9  client, Mr. Compton?
10            MR. COMPTON:  No, Your Honor.  Thank you.
11            THE COURT:  All right.  Both defendants are remanded
12  to custody.
13            MR. DEHAVEN:  Your Honor --
14            THE COURT:  Yes, sir.
15            MR. DEHAVEN:  -- the Court did not mention anything
16  about potential waiver of the interest requirement on the fine
17  for either defendant.
18            THE COURT:  Oh, I'm sorry.  I'm going to waive the
19  interest requirement on those fines in both cases.  I think
20  that the fine is sufficient enough, and I don't find with the
21  size of that fine that the defendants are going to have the
22  resources to also pile on, for the amount of time they're
23  serving incarcerated, interest on those.
24       Thank you, Mr. DeHaven, for catching that.  Anything
25  further from anyone?
```

1              MR. DOUGLAS:  No, Your Honor.

2              THE COURT:  All right.  Defendants are remanded.

3

4                   (Hearing concluded at 3:55 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3           I, Kate A. Slayden, Registered Professional Reporter

 4   and Official Court Reporter of the United States District Court

 5   for the Northern District of West Virginia, do hereby certify

 6   that the foregoing is a true and correct transcript of the

 7   proceedings had in the above-styled action on November 9, 2022,

 8   as reported by me.

 9           I certify that the transcript fees and format comply

10   with those prescribed by the Court and the Judicial Conference

11   of the United States.

12           Given under my hand this 12th day of January 2023.

13

14                           /s/Kate A. Slayden

15

16                           Kate A. Slayden, RPR
                             Official Reporter, United States
17                           District Court for the Northern
                             District of West Virginia
18

19

20

21

22

23

24

25
```