**CASE NO. 22-4689**

═══════════════════════════════

## IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

───────────────────────

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

DIANA TOEBBE,

*Defendant - Appellant.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT MARTINSBURG

───────────────────────

### JOINT APPENDIX - VOLUME I OF II
### (Pages 1 - 355)

───────────────────────

Barry P. Beck, Esq.
POWER, BECK & MATZUREFF
308 West Burke Street
Martinsburg, WV 25401
304-264-8870

Jessica N. Carmichael
CARMICHAEL ELLIS &
BROCK, PLLC
108 North Alfred Street
1st Floor
Alexandria, VA 22314
703-684-7908

*Counsel for Appellant*

Jarod J. Douglas
OFFICE OF THE
UNITED STATES ATTORNEY
P. O. Box 591
Wheeling, WV 26003
304-234-0100

Danielle Tarin
U. S. DEPARTMENT OF JUSTICE
National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-532-4493

*Counsel for Appellee*

# **TABLE OF CONTENTS**

## **VOLUME I OF II**

<u>JA Page</u>

District Court Docket Sheet [3:21-cr-00049-GMG-RWT] ........................................ 1

Indictment
    Filed October 19, 2021 [ECF37] ....................................................................... 17

Transcript of Detention Hearing
Before the Honorable Robert W. Trumble
    On October 20, 2021 [ECF70].......................................................................... 28

Detention Order
    Entered October 21. 2021 [ECF57] ................................................................ 139

Order Denying Motion to Reopen Detention Hearing
    Entered December 20, 2021 [ECF82] ............................................................. 145

Order Affirming Order Denying Defendant's
Motion to Reopen Detention Hearing
    Entered February 15, 2022 [ECF94] .............................................................. 147

Plea Agreement
    Filed February 18, 2022 [ECF98]................................................................... 153

Transcript of Sentencing Hearing
Before the Honorable Gina M. Groh
    On August 16, 2022 [ECF124]........................................................................ 161

Plea Agreement
    Filed September 27, 2022 [ECF130] .............................................................. 200

Amended Supplemental Memorandum in
Support of Below-Guidelines Variant Sentence
    Filed October 31, 2022 [ECF143] .................................................................. 208

i

Sentencing Hearing Transcript
Before the Honorable Gina M. Groh
    On November 9, 2022 [ECF169]...................................................... 223

Judgment in a Criminal Case
    Entered November 17, 2022 [ECF154] ........................................... 346

Notice of Appeal
2022.11.29 [ECF156]........................................................................ 354

APPEAL

# U.S. District Court
## Northern District of West Virginia (Martinsburg)
## CRIMINAL DOCKET FOR CASE #: 3:21-cr-00049-GMG-RWT All Defendants

Case title: USA v. Toebbe et al

Magistrate judge case number: 3:21-mj-00138-RWT

Date Filed: 10/19/2021

Date Terminated: 11/17/2022

---

Assigned to: Chief Judge Gina M. Groh
Referred to: Magistrate Judge Robert W. Trumble

**Defendant (1)**

**Jonathan Toebbe**
*TERMINATED: 11/17/2022*

represented by **Nicholas J. Compton**
Federal Public Defender Office - Mtg
651 Foxcroft Ave
Suite 202
Martinsburg, WV 25401
(304) 260-9421
Fax: (304) 260-3716
Email: nicholas_compton@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Pending Counts**

COMMUNICATION OF RESTRICTED
DATA - SABOTAGE
(1)

**Disposition**

defendant to be incarcerated for a term of
232 months; supervised release for 5 years;
$100 special assessment fee; fine in the
amount of $45,700.00; forfeiture ordered;

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

COMMUNICATION OF RESTRICTED
DATA - SABOTAGE
(2-3)

**Disposition**

dismissed upon motion by USA

**Highest Offense Level (Terminated)**

Felony

**Complaints**

**Disposition**

**JA1**

42:2274A.F

---

Assigned to: Chief Judge Gina M. Groh
Referred to: Magistrate Judge Robert W. Trumble

Appeals court case number: 22-4689 Fourth Cir.

## Defendant (2)

**Diana Toebbe**
*TERMINATED: 11/17/2022*

represented by **Barry P. Beck**
Power, Beck & Matzureff Law Offices
308 West Burke Street
Martinsburg, WV 25401
304-264-8870
Fax: 304-264-8585
Email: bpbeck@frontier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jessica Carmichael**
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st Floor
Alexandria, VA 22314
(703) 684-7908
Email: jessica@carmichaellegal.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Edward B. MacMahon , Jr.**
Edward B. MacMahon, Jr., Esq.
107 East Washington Street
P.O. Box 25
Middleburg, VA 20118
(540) 687-3902
Fax: (540) 687-6366
Email: ebmjr@macmahon-law.com
*TERMINATED: 08/29/2022*
*PRO HAC VICE*
*Designation: CJA Appointment*

## Pending Counts

COMMUNICATION OF RESTRICTED
DATA - SABOTAGE
(1)

COMMUNICATION OF RESTRICTED
DATA - SABOTAGE
(2-3)

## Disposition

defendant to be incarcerated for a term of
262 months; supervised release for 3 years;
$100 special assessment fee; fine in the
amount of $50,000.00; forfeiture ordered

dismissed upon motion by USA

**JA2**

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                       **Disposition**

42:2274A.F

---

**Plaintiff**

**USA**                                 represented by  **Jarod J. Douglas**
U.S. Attorney's Office - Whg
PO Box 591
Wheeling, WV 26003
(304) 234-0100
Fax: (304) 234-0111
Email: jarod.j.douglas@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**Jessica Lieber Smolar**
U.S. Attorney's Office - Pittsburgh
700 Grant St.
Suite 4000
Pittsburgh, PA 15219
(412) 894-7419
Email: Jessica.Smolar@usdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**Matthew J. McKenzie**
U.S. Dept. of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-7845
Email: Matthew.Mckenzie@usdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**S. Derek Shugert**

**JA3**

U.S. Dept. of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 305-1629
Email: Shawn.Shugert@usdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/08/2021 | 1 | CRIMINAL COMPLAINT as to Jonathan Toebbe (1) and Diana Toebbe (2). (Attachment: # 1 Affidavit in Support of Criminal Complaint) (cwm) Copy to USA and USMS. [3:21-mj-00138-RWT] (Entered: 10/08/2021) |
| 10/08/2021 | 3 | **ORDER TO SEAL ss to Jonathan Toebbe (1) and Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/08/2021. (cwm) Copy to USA. [3:21-mj-00138-RWT] (Entered: 10/08/2021)** |
| 10/09/2021 | 6 | MOTION to Unseal Case by USA as to Jonathan Toebbe, Diana Toebbe. (cmd) [3:21-mj-00138-RWT] (Entered: 10/09/2021) |
| 10/09/2021 | | Arrest of Jonathan Toebbe, Diana Toebbe (cmd) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/10/2021 | 7 | **PAPERLESS ORDER as to Jonathan Toebbe and Diana Toebbe. For reasons appearing to the Court, the Government's MOTION 6 to Unseal Case is GRANTED. Accordingly, it is ORDERED that this case is unsealed. Signed by Magistrate Judge Robert W. Trumble on 10-10-2021. (dh) [3:21-mj-00138-RWT] (Entered: 10/10/2021)** |
| 10/10/2021 | 8 | **PAPERLESS ORDER as to Jonathan Toebbe and Diana Toebbe. Initial Appearances are set for TUESDAY, 10/12/2021, AT 11:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 10-10-2021. (dh) [3:21-mj-00138-RWT] (Entered: 10/10/2021)** |
| 10/11/2021 | 10 | MOTION for Detention by USA as to Diana Toebbe. (Douglas, Jarod) [3:21-mj-00138-RWT] (Entered: 10/11/2021) |
| 10/11/2021 | 11 | MOTION to Appear *Application for Admission Pro Hac Vice as to AUSA Jessica Smolar* Other Document filed by USA as to Jonathan Toebbe, Diana Toebbe (Attachments: # 1 Proposed Order)(Douglas, Jarod) Modified on 10/12/2021 Attorney used wrong event. Event has been corrected and NEF regen.(cmd). [3:21-mj-00138-RWT] (Entered: 10/11/2021) |
| 10/11/2021 | 9 | MOTION for Detention by USA as to Jonathan Toebbe. (Douglas, Jarod) [3:21-mj-00138-RWT] (Entered: 10/11/2021) |
| 10/12/2021 | 12 | **ORDER APPROVING DEPARTMENT OF JUSTICE ATTORNEY'S APPLICATION TO APPEAR PRO HAC VICE. Signed by Magistrate Judge Robert W. Trumble on 10/12/2021. (tlg) [3:21-mj-00138-RWT] (Entered: 10/12/2021)** |
| 10/12/2021 | 14 | MINUTE ENTRY: <br><br> ***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.* |

**JA4**

Proceedings held before Magistrate Judge Robert W. Trumble as to Diana Toebbe. Initial Appearance as to Diana Toebbe held on 10/12/2021. Detention Hearing set for 10/15/2021 11:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Preliminary Hearing set for 10/20/2021 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. (Court Reporter - FTR.) (tlg) [3:21-mj-00138-RWT] (Entered: 10/12/2021)

| | | |
|---|---|---|
| 10/12/2021 | 18 | ** SEALED ** CJA 23 Financial Affidavit by Diana Toebbe. Financial from 3:21mj138-2 ordered filed in this case by Judge Robert Trumble. Copy emailed to FPDO. (tlg) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 19 | **ORDER OF TEMPORARY DETENTION PENDING HEARING PURSUANT TO BAIL REFORM ACT as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/12/2021. Copy to USPO, USMS. (tlg)** Modified on 10/13/2021 (ag). [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 20 | **PAPERLESS ORDER as to Diana Toebbe. An initial appearance was held on this date. Defendant was REMANDED to the custody of the U.S. Marshals Service. Accordingly, it is ORDERED that the Detention Hearing is set for FRIDAY, 10/15/2021, AT 11:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble and the Preliminary Hearing is set for WEDNESDAY, 10/20/2021, AT 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 10-12-2021. (dh)** [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 23 | TRANSCRIPT of Proceedings held on 10-12-2021, before Judge Trumble. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (kas) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 24 | TRANSCRIPT PURCHASE ORDER for proceedings held on 10-12-2021 before Judge Trumble (kas) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 13 | MINUTE ENTRY: <br><br> ***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY. <br><br> Proceedings held before Magistrate Judge Robert W. Trumble as to Jonathan Toebbe. Initial Appearance as to Jonathan Toebbe held on 10/12/2021. Detention Hearing set for 10/15/2021 10:30 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Preliminary Hearing set for 10/20/2021 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. (Court Reporter - FTR.) (tlg) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 15 | ** SEALED ** CJA 23 Financial Affidavit by Jonathan Toebbe. Financial from 3:21mj138-1 ordered filed in this case by Judge Robert Trumble. Copy emailed to FPDO. (tlg) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 16 | **PAPERLESS ORDER as to Jonathan Toebbe. An initial appearance was held on this date. Defendant was REMANDED to the custody of the U.S. Marshals Service. Accordingly, it is ORDERED that the Detention Hearing is set for FRIDAY, 10/15/2021, AT 10:30 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor** |

**JA5**

| | | |
|---|---|---|
| | | before Magistrate Judge Robert W. Trumble and the Preliminary Hearing is set for **WEDNESDAY, 10/20/2021, AT 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 10-12-2021. (dh)** [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 17 | **ORDER OF TEMPORARY DETENTION PENDING HEARING PURSUANT TO BAIL REFORM ACT as to Jonathan Toebbe (1). Signed by Magistrate Judge Robert W. Trumble on 10/12/2021. Copy to USPO, USMS. (tlg)** [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 21 | **APPOINTMENT ORDER as to Jonathan Toebbe (1). Signed by Magistrate Judge Robert W. Trumble on 10/12/2021. Copy to Deft, FPDO, USMS, USPO. (tlg)** [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/12/2021 | 22 | TRANSCRIPT of Proceedings held on 10-12-2021, before Judge Trumble. as to Jonathan Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (kas) [3:21-mj-00138-RWT] (Entered: 10/12/2021) |
| 10/13/2021 | 25 | **ORDER APPOINTING CJA PANEL ATTORNEY AS COUNSEL as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/13/2021. Copy to Deft, FPDO, USMS, USPO. (tlg)** [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 26 | **ORDER APPOINTING CJA PANEL ATTORNEY AS LOCAL COUNSEL as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/13/2021. Copy to deft, FPDO, USMS, USPO. (tlg)** (Main Document 26 replaced on 10/13/2021) (cmd). Modified on 10/13/2021 Document replaced to attached corrected Order, NEF Regen. (cmd). [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 27 | MOTION for Leave to Appear Pro Hac Vice Attorney: Edward B. MacMahon, Jr.. by Diana Toebbe. (Beck, Barry) [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 28 | MOTION Waive Pro Hac Vice Admisssion Fees re 27 MOTION for Leave to Appear Pro Hac Vice Attorney: Edward B. MacMahon, Jr.. by Diana Toebbe. (Beck, Barry) [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 29 | Proposed Order *Approving Pro Hac Vice Application and Granting Motion to Waive Pro Hac Vice Admission Fees* by Diana Toebbe re 27 MOTION for Leave to Appear Pro Hac Vice Attorney: Edward B. MacMahon, Jr.., 28 MOTION Waive Pro Hac Vice Admisssion Fees re 27 MOTION for Leave to Appear Pro Hac Vice Attorney: Edward B. MacMahon, Jr.. (Beck, Barry) [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 30 | **ORDER APPROVING PRO HAC VICE APPLICATION AND GRANTING MOTION TO WAIVE PRO HAC VICE ADMISSION FEES as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/13/2021. (tlg)** [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/13/2021 | 31 | MOTION to Continue *Detention Hearing* by Diana Toebbe. (Beck, Barry) [3:21-mj-00138-RWT] (Entered: 10/13/2021) |
| 10/14/2021 | 32 | **PAPERLESS ORDER as to Diana Toebbe. For good cause shown, the Court GRANTS, Defendant's MOTION [ECF NO. 31] to Continue *Detention Hearing*. It is accordingly, ORDERED that the Detention Hearing is CONTINUTED to WEDNESDAY, 10/20/2021, AT 01:00 PM in Martinsburg Magistrate Judge** |

|  |  | Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 10-14-2021. (dh) [3:21-mj-00138-RWT] (Entered: 10/14/2021) |
| --- | --- | --- |
| 10/14/2021 | 33 | MOTION to Continue *Detention Hearing* by Jonathan Toebbe. (Compton, Nicholas) [3:21-mj-00138-RWT] (Entered: 10/14/2021) |
| 10/14/2021 | 34 | **PAPERLESS ORDER as to Jonathan Toebbe. For good cause shown, the Court GRANTS Defendant's MOTION [ECF No. 33] to Continue *Detention Hearing*. Accordingly, it is ORDERED that the Detention Hearing is CONTINUED to 10/20/2021, at 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 10-14-2021. (dh) [3:21-mj-00138-RWT] (Entered: 10/14/2021)** |
| 10/19/2021 | 37 | INDICTMENT as to Jonathan Toebbe (1) counts 1-3, Diana Toebbe (2) counts 1-3. (cmd) (Main Document 37 replaced on 10/20/2021) (cmd). Modified on 10/20/2021 correct typo in case number on document NEF regen (cmd). (Entered: 10/20/2021) |
| 10/19/2021 | 38 | *SEALED* Indictment - Unredacted, re 37 Indictment as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Grand Jury Cover Sheet) (cmd) (Entered: 10/20/2021) |
| 10/20/2021 | 39 | MOTION for Leave to Appear Pro Hac Vice Attorney: S. Derek Shugert. by USA as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Proposed Order)(Douglas, Jarod) (Entered: 10/20/2021) |
| 10/20/2021 | 40 | **PAPERLESS ORDER as to Jonathan Toebbe. Initial Appearance, Arraignment, and Detention Hearings are set for WEDNESDAY, 10/20/2021, AT 01:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. The Preliminary Hearing previously scheduled for this date is CANCELLED. Signed by Magistrate Judge Robert W. Trumble on 10-20-2021. (dh) (Entered: 10/20/2021)** |
| 10/20/2021 | 41 | **ORDER APPROVING 39 DEPARTMENT OF JUSTICE ATTORNEYS APPLICATION TO APPEAR PRO HAC VICE as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. (cmd) (Entered: 10/20/2021)** |
| 10/20/2021 | 42 | **PAPERLESS ORDER as to Diana Toebbe. Initial Appearance, Arraignment, and Detention Hearing are set for WEDNESDAY, 10/20/2021, AT 01:15 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. The Preliminary Hearing previously scheduled for this date is CANCELLED. Signed by Magistrate Judge Robert W. Trumble on 10-20-2021. (dh) (Entered: 10/20/2021)** |
| 10/20/2021 | 43 | MOTION for Leave to Appear Pro Hac Vice Attorney: Matthew J. McKenzie. by USA as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Proposed Order)(Douglas, Jarod) (Entered: 10/20/2021) |
| 10/20/2021 | 44 | MEMORANDUM *of Law Regarding Statutory Procedures for Handling of Classified Information* by USA as to Jonathan Toebbe, Diana Toebbe (Douglas, Jarod) (Entered: 10/20/2021) |
| 10/20/2021 | 45 | MOTION to Designate a Classified Information Security Officer by USA as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Proposed Order)(Douglas, Jarod) (Entered: 10/20/2021) |
| 10/20/2021 | 46 | MINUTE ENTRY: |

| | | |
|---|---|---|
| | | ***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.*<br><br>Proceedings held before Magistrate Judge Robert W. Trumble as to Jonathan Toebbe. Initial Appearance, Arraignment as to Jonathan Toebbe (1) Counts 1-3 held on 10/20/2021, Detention Hearing as to Jonathan Toebbe held on 10/20/2021. Jury Selection and Jury Trial set for 12/14/2021 09:00 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge Gina M. Groh. Pretrial Conference set for 12/9/2021 09:30 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge Gina M. Groh. (Court Reporter - FTR.) (tlg) (Entered: 10/20/2021) |
| 10/20/2021 | 47 | WAIVER of Detention Hearing by Jonathan Toebbe. (tlg) (Entered: 10/20/2021) |
| 10/20/2021 | 48 | **ORDER APPROVING 43 DEPARTMENT OF JUSTICE ATTORNEYS APPLICATION TO APPEAR PRO HAC VICE as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. (cmd)** (Entered: 10/20/2021) |
| 10/20/2021 | 49 | **DUE PROCESS PROTECTIONS ACT ORDER TO ALL COUNSEL REGARDING BRADY OBLIGATIONS as to Jonathan Toebbe (1). Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. (tlg)** (Entered: 10/20/2021) |
| 10/20/2021 | 50 | MOTION for Complex Case Designation by USA as to Jonathan Toebbe, Diana Toebbe. (Douglas, Jarod) (Entered: 10/20/2021) |
| 10/20/2021 | 51 | MINUTE ENTRY:<br><br>***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.*<br><br>Proceedings held before Magistrate Judge Robert W. Trumble as to Diana Toebbe. Initial Appearance, Arraignment as to Diana Toebbe (2) Counts 1-3 held on 10/20/2021, Detention Hearing as to Diana Toebbe held on 10/20/2021. Jury Selection and Jury Trial set for 12/14/2021 09:00 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge Gina M. Groh. Pretrial Conference set for 12/9/2021 09:30 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge Gina M. Groh. (Court Reporter - FTR.) (tlg) (Entered: 10/20/2021) |
| 10/20/2021 | 52 | **DUE PROCESS PROTECTIONS ACT ORDER TO ALL COUNSEL REGARDING BRADY OBLIGATIONS as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. (tlg)** (Entered: 10/20/2021) |
| 10/20/2021 | 53 | **VACATED PER 58 ORDER entered on 10/21/2021 INITIAL SCHEDULING ORDER as to Jonathan Toebbe, Diana Toebbe.**<br><br>***NOTICE TO ATTORNEYS*** : *Pursuant to Rule 12.4(a)(1) of the Federal Rules of Criminal Procedure, ALL Non-governmental CORPORATE PARTIES must file a DISCLOSURE STATEMENT with the Court. Additionally, per Rule 12.4(a)(2) of the Federal Rules of Criminal Procedure, the GOVERNMENT must file a statement identifying all organizational victims. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm*<br><br>**Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. Copy to USM. (cmd)** Modified on 10/21/2021 (cmd). (Entered: 10/20/2021) |
| 10/20/2021 | 54 | **DETENTION ORDER as to Jonathan Toebbe (1). Signed by Magistrate Judge Robert W. Trumble on 10/20/2021. Copy to USM. (cmd)** (Entered: 10/20/2021) |

| 10/20/2021 | 55 | CLERK'S EXHIBIT/WITNESS LIST as to Diana Toebbe hearing held 10/20/2021. (Attachments: # 1 Exhibit 1, photograph, # 2 Exhibit 2, photograph, # 3 Exhibit 3, photograph, # 4 Exhibit 4, photograph, # 5 Exhibit 5, placeholder for video, # 6 Exhibit 6, photograph, # 7 Exhibit 7, photograph, # 8 Exhibit 8, photograph, # 9 Exhibit 9, photograph, # 10 Exhibit 10, photograph, # 11 Exhibit 11, photograph, # 12 Exhibit 12, photograph, # 13 Exhibit 13, photograph, # 14 Exhibit 14, 25, photographs, # 15 Exhibit 26, excerpt).(tlg) (Entered: 10/20/2021) |
| 10/21/2021 | 56 | *Defendant's Supplemental Proffer for Detention Hearing* Other Document filed by Diana Toebbe (Beck, Barry) (Entered: 10/21/2021) |
| 10/21/2021 | 57 | **DETENTION ORDER as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 10/21/2021. Copy to USM. (cmd)** (Entered: 10/21/2021) |
| 10/21/2021 | 58 | **ORDER GRANTING 50 UNOPPOSED MOTION FOR COMPLEX CASE DESIGNATION as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Chief Judge Gina M. Groh on 10/21/2021. Copy to USP and USM. (cmd)** (Entered: 10/21/2021) |
| 10/21/2021 | 59 | **ORDER APPOINTING CLASSIFIED INFORMATION SECURITY OFFICER as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Chief Judge Gina M. Groh on 10/21/2021. Copy to CISO. (cmd)** (Entered: 10/21/2021) |
| 10/27/2021 | 60 | Proposed *Complex Case Schedule* Order by USA as to Jonathan Toebbe, Diana Toebbe (Douglas, Jarod) (Entered: 10/27/2021) |
| 10/27/2021 | 61 | MOTION for Protective Order *Regarding Unclassified Discovery* by USA as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Proposed Order)(Douglas, Jarod) (Entered: 10/27/2021) |
| 10/28/2021 | 62 | **PROTECTIVE ORDER REGARDING UNCLASSIFIED DISCOVERY as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Chief Judge Gina M. Groh on 10/28/2021. Copy to CISO. (cmd)** (Entered: 10/28/2021) |
| 10/29/2021 | 63 | **ORDER OF COMPLEX CASE SCHEDULE as to Jonathan Toebbe, Diana Toebbe. Signed by Chief Judge Gina M. Groh on 10/29/2021. Copy to USM and CISO. (cmd)** (Entered: 10/29/2021) |
| 11/04/2021 | 64 | MOTION for Protective Order *Pursuant to Section 3 of the Classified Information Procedures Act* by USA as to Jonathan Toebbe, Diana Toebbe. (Attachments: # 1 Proposed Protective Order Pertaining to Classified Information)(Douglas, Jarod) (Entered: 11/04/2021) |
| 11/05/2021 | 65 | NOTICE *of First Rule 16 Disclosure* by USA as to Jonathan Toebbe, Diana Toebbe (Douglas, Jarod) (Entered: 11/05/2021) |
| 11/08/2021 | 66 | **PROTECTIVE ORDER PERTAINING TO CLASSIFIED INFORMATION as to Jonathan Toebbe (1), Diana Toebbe (2). Signed by Chief Judge Gina M. Groh on 11/8/2021. Copy to CISO. (cmd)** (Entered: 11/08/2021) |
| 11/10/2021 | 67 | NOTICE REGARDING UNITED STATES PASSPORT FOR CRIMINAL DEFENDANT as to Jonathan Toebbe. (Attachments: # 1 Unredacted Notice)(cmd) (Entered: 11/10/2021) |
| 11/10/2021 | 68 | MEMORANDUM *of Understanding Regarding Receipt of Classified Information* by Jonathan Toebbe re 66 Order on Motion for Protective Order, (Compton, Nicholas) (Entered: 11/10/2021) |

**JA9**

| | | |
|---|---|---|
| 11/15/2021 | 69 | TRANSCRIPT - Excerpt of Proceedings held on 10/20/2021, before Judge Trumble. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 12/6/2021. Redacted Transcript Deadline set for 12/16/2021. Release of Transcript Restriction set for 2/14/2022. (kas) (Main Document 69 replaced on 12/3/2021 to correct typo - the corrected transcript has been provided to counsel) (kac). (Main Document 69 replaced on 5/17/2022) (kac). (Entered: 11/15/2021) |
| 12/02/2021 | 70 | TRANSCRIPT of Proceedings held on 10/20/2021, before Judge Trumble. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 12/23/2021. Redacted Transcript Deadline set for 1/3/2022. Release of Transcript Restriction set for 3/2/2022. (kas) (Entered: 12/02/2021) |
| 12/02/2021 | 71 | AMENDED CLERK'S WITNESS AND EXHIBIT LIST from hearing held on 10/20/2021 Diana Toebbe. (cmd) (Entered: 12/02/2021) |
| 12/02/2021 | 72 | NOTICE OF DOCKET CORRECTION re 55 Exhibit List. ERROR: Exhibit 8 listed on 55 Clerk's Witness and Exhibit List was marked as being admitted. CORRECTION: Exhibit 8 was not admitted by the Court during the hearing. Amended Clerk's Witness and Exhibit list was filed. (cmd) (Entered: 12/02/2021) |
| 12/02/2021 | 73 | TRANSCRIPT PURCHASE ORDER for proceedings held on 10-20-2021 before Judge Trumble (kas) (Entered: 12/02/2021) |
| 12/08/2021 | 75 | MOTION Reopen Detention Hearing by Diana Toebbe. (Attachments: # 1 Exhibit Text Messages, # 2 Exhibit Letter)(Beck, Barry) (Entered: 12/08/2021) |
| 12/08/2021 | 76 | **\*\*\*SEALED\*\*\* EXPARTE ORDER as to Diana Toebbe (2). Copy sent as directed. Signed by Chief Judge Gina M. Groh on 12/8/2021. (cmd)** (Entered: 12/08/2021) |
| 12/08/2021 | 78 | **PAPERLESS ORDER as to Diana Toebbe. The Government's Response to Defendant Diana Toebbe's Motion 75 to Reopen Detention Hearing shall be filed by 12/22/2021. Any Reply to this Response shall be filed by 12/29/2021. If a hearing is necessary, it will be set by separate order. Signed by Magistrate Judge Robert W. Trumble on 12-8-2021. (dh)** (Entered: 12/08/2021) |
| 12/09/2021 | 79 | RESPONSE in Opposition by USA as to Diana Toebbe re 75 MOTION Reopen Detention Hearing (Douglas, Jarod) (Entered: 12/09/2021) |
| 12/16/2021 | 81 | REPLY TO RESPONSE to Motion by Diana Toebbe re 79 Response in Opposition to Motion, 75 MOTION Reopen Detention Hearing (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Beck, Barry) (Entered: 12/16/2021) |
| 12/20/2021 | 82 | **ORDER DENYING DEFENDANT'S MOTION [ECF No. 75] TO REOPEN DETENTION HEARING as to Diana Toebbe (2). Signed by Magistrate Judge Robert W. Trumble on 12/20/2021. (cwm)** (Entered: 12/20/2021) |
| 01/10/2022 | 83 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Diana Toebbe re 82 Order on Motion for Miscellaneous Relief, (Beck, Barry) (Entered: 01/10/2022) |
| 01/11/2022 | 84 | **PAPERLESS ORDER as to Diana Toebbe: On January 10, 2022, the Defendant filed an 83 Appeal of Magistrate Judge Trumble's Order Denying Motion to Reopen Detention Hearing. The Government's Response is due on or before January 24,** |

| | | |
|---|---|---|
| | | **2022. If the Defendant wishes to file a Reply, it shall be due by January 31, 2022, or seven days from the date the Government files its Response, whichever date is earlier. Signed by Chief Judge Gina M. Groh on January 11, 2022. (wlb)** (Entered: 01/11/2022) |
| 01/14/2022 | 85 | RESPONSE in Opposition by USA as to Diana Toebbe re 83 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Diana Toebbe (Douglas, Jarod) Modified on 1/14/2022 Atty linked to wrong document, Deputy Clerk corrected link and regen NEF. (cmd). (Entered: 01/14/2022) |
| 01/18/2022 | 86 | NOTICE *of Second Rule 16 Disclosure* by USA as to Jonathan Toebbe, Diana Toebbe (Douglas, Jarod) (Entered: 01/18/2022) |
| 01/21/2022 | 87 | MEMORANDUM *of Understanding Regarding Receipt of Classified Information* by Diana Toebbe (Beck, Barry) (Entered: 01/21/2022) |
| 01/21/2022 | 88 | REPLY to 83 Appeal of Magistrate Judge Decision to District Court, 85 Response in Opposition to Motion, (Beck, Barry) (Entered: 01/21/2022) |
| 02/11/2022 | 89 | **PAPERLESS ORDER as to Jonathan Toebbe. Plea Hearing is set for Monday, 2/14/2022 at 03:00 PM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 2/11/2022. (pjc)** (Entered: 02/11/2022) |
| 02/14/2022 | 90 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE US MAGISTRATE JUDGE by Jonathan Toebbe (1). (cwm) (Entered: 02/14/2022) |
| 02/14/2022 | 91 | PLEA AGREEMENT as to Jonathan Toebbe (1). (cwm) (Entered: 02/14/2022) |
| 02/14/2022 | 92 | MINUTE ENTRY:<br><br>***_NOTICE_*** **_THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY._**<br><br>Proceedings held before Magistrate Judge Robert W. Trumble: Plea Hearing and Plea entered by Jonathan Toebbe (1): Guilty Count 1. (Court Reporter: FTR) (cwm) (Entered: 02/14/2022) |
| 02/14/2022 | 93 | **CHANGE OF PLEA ORDER as to Jonathan Toebbe (1). Signed by Magistrate Judge Robert W. Trumble on 02/14/2022. (cwm)** Copy to USMS and USPO. (Entered: 02/14/2022) |
| 02/15/2022 | 94 | **ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO REOPEN DETENTION HEARING as to Diana Toebbe. Signed by Chief Judge Gina M. Groh on 2/15/2022. Copy to USP. (cmd)** (Entered: 02/15/2022) |
| 02/15/2022 | 95 | NOTICE *of Third Rule 16 Disclosure* by USA as to Diana Toebbe (Douglas, Jarod) (Entered: 02/15/2022) |
| 02/16/2022 | 96 | **PAPERLESS ORDER as to Diana Toebbe. Change of Plea Hearing is set for FRIDAY, 2/18/2022, AT 11:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 2-16-2022. (dh)** (Entered: 02/16/2022) |
| 02/18/2022 | 97 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE US MAGISTRATE JUDGE by Diana Toebbe (2). (cwm) (Entered: 02/18/2022) |

| 02/18/2022 | 98 | PLEA AGREEMENT as to Diana Toebbe (2). (cwm) (Entered: 02/18/2022) |
|---|---|---|
| 02/18/2022 | 99 | MINUTE ENTRY: ***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY. Proceedings held before Magistrate Judge Robert W. Trumble: Change of Plea Hearing and Plea entered by Diana Toebbe (2): Guilty Count 1. (Court Reporter: FTR) (cwm) (Entered: 02/18/2022) |
| 02/18/2022 | 100 | **CHANGE OF PLEA ORDER as to Diana Toebbe. Signed by Magistrate Judge Robert W. Trumble on 2/18/2022. (cmd)** (Entered: 02/18/2022) |
| 02/24/2022 | 101 | **ORDER SCHEDULING SENTENCING HEARINGS as to Jonathan Toebbe, Diana Toebbe. Signed by Chief Judge Gina M. Groh on 2/24/2022. Copy to USP and USM. (cmd)** (Entered: 02/24/2022) |
| 07/26/2022 | 102 | Special Assessment Fee Paid in the amount of $100.00 by Diana Toebbe (2) - RECEIPT #: WVNM002101. (cwm) (Entered: 07/26/2022) |
| 08/01/2022 | 103 | SENTENCING MEMORANDUM (Beck, Barry) (Entered: 08/01/2022) |
| 08/02/2022 | 104 | SENTENCING MEMORANDUM by USA as to Jonathan Toebbe (Attachments: # 1 Attachment A- Victim Impact Statement)(Douglas, Jarod) (Entered: 08/02/2022) |
| 08/02/2022 | 105 | SENTENCING MEMORANDUM by USA as to Diana Toebbe (Douglas, Jarod) (Entered: 08/02/2022) |
| 08/02/2022 | 106 | NOTICE *of Classified Filing* by USA as to Jonathan Toebbe (Douglas, Jarod) (Entered: 08/02/2022) |
| 08/02/2022 | 107 | NOTICE *of Classified Filing* by Jonathan Toebbe (Compton, Nicholas) (Entered: 08/02/2022) |
| 08/11/2022 | 108 | **ORDER PROVIDING ZOOM ACCESS TO SENTENCING HEARINGS as to Jonathan Toebbe, Diana Toebbe. Signed by District Judge Gina M Groh on 8/11/2022. (cmd)** (Entered: 08/11/2022) |
| 08/12/2022 | 109 | Special Assessment Fee Paid in the amount of $100.00 by Jonathan Toebbe (1) - RECEIPT #: WVNM002109. (cwm) (Entered: 08/12/2022) |
| 08/16/2022 | 110 | MINUTE ENTRY: ***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY. Proceedings held before District Judge Gina M Groh: as to Jonathan Toebbe and Diana Toebbe sentencing hearing. (Court Reporter: K. Slayden) (cwm) (Entered: 08/16/2022) |
| 08/16/2022 | 111 | Guideline Range Options as to Jonathan Toebbe (1). (cwm) (Entered: 08/16/2022) |
| 08/16/2022 | 112 | Guideline Range Options as to Diana Toebbe (2). (cwm) (Entered: 08/16/2022) |
| 08/18/2022 | 113 | **ORDER REJECTING PLEA AGREEMENTS, PERMITTING DEFENDANTS TO WITHDRAW GUILTY PLEAS AND SETTING TRIAL DATES as to Jonathan Toebbe, Diana Toebbe. Signed by District Judge Gina M Groh on 8/18/2022. Copy to USP, USM. (cmd)** (Entered: 08/18/2022) |

**JA12**

| 08/29/2022 | 114 | MOTION to Withdraw as Attorney by Edward B. MacMahon, Jr.. by Diana Toebbe. (Beck, Barry) (Entered: 08/29/2022) |
|---|---|---|
| 08/29/2022 | 115 | **PAPERLESS ORDER: Upon review and consideration of 114 Motion to Withdraw, the Court finds good cause to and does hereby GRANT the same. Accordingly, Attorney Edward B. MacMahon may withdraw from representation in this matter. Signed by District Judge Gina M. Groh on August 29, 2022. (wlb)** (Entered: 08/29/2022) |
| 08/29/2022 | 116 | **ORDER APPOINTING CJA PANEL ATTORNEY AS COUNSEL as to Diana Toebbee (2). Signed by District Judge Gina M Groh on 8/29/2022. Copy to USM. (cmd)** (Entered: 08/29/2022) |
| 08/30/2022 | 117 | MOTION for Leave to Appear Pro Hac Vice Attorney: Jessica Carmichael. by Diana Toebbe. (Beck, Barry) (Entered: 08/30/2022) |
| 08/30/2022 | 118 | MOTION Waive Pro Hac Vice Admission Fees re 117 MOTION for Leave to Appear Pro Hac Vice Attorney: Jessica Carmichael. by Diana Toebbe. (Beck, Barry) (Entered: 08/30/2022) |
| 08/30/2022 | 119 | Proposed Order *Approving Pro Hac Vice Application and Granting Motion to Waive Pro Hac Vice Admission Fees* by Diana Toebbe re 117 MOTION for Leave to Appear Pro Hac Vice Attorney: Jessica Carmichael., 118 MOTION Waive Pro Hac Vice Admission Fees re 117 MOTION for Leave to Appear Pro Hac Vice Attorney: Jessica Carmichael. (Beck, Barry) (Entered: 08/30/2022) |
| 08/31/2022 | 120 | **ORDER APPROVING 117 PRO HAC VICE APPLICATION AND GRANTING 118 MOTION TO WAIVE PRO HAC VICE ADMISSION FEES as to Diana Toebbe (2). Signed by District Judge Gina M Groh on 8/31/2022. (cmd)** (Entered: 08/31/2022) |
| 09/12/2022 | 121 | MEMORANDUM *of Understanding Regarding Receipt of Classified Information* by Diana Toebbe (Beck, Barry) (Entered: 09/12/2022) |
| 09/21/2022 | 122 | **PAPERLESS ORDER as to Jonathan Toebbe. Change of Plea Hearing is set for TUESDAY, 9/27/2022, AT 10:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 9-21-2022. (dh)** (Entered: 09/21/2022) |
| 09/22/2022 | 123 | **ORDER PROVIDING ZOOM ACCESS TO CHANGE OF PLEA HEARING as to Jonathan Toebbe. Signed by Magistrate Judge Robert W. Trumble on 9/22/2022. (cmd)** (Entered: 09/22/2022) |
| 09/23/2022 | 124 | TRANSCRIPT of Sentencing Hearing held on 8/16/2022, before Judge Groh. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. (kas) (Entered: 09/23/2022) |
| 09/26/2022 | 125 | **PAPERLESS ORDER as to Diana Toebbe. Change of Plea Hearing is set for TUESDAY, 9/27/2022, AT 09:00 AM in Martinsburg Magistrate Judge Courtroom, 1st Floor before Magistrate Judge Robert W. Trumble. Signed by Magistrate Judge Robert W. Trumble on 9-26-2022. (dh)** (Entered: 09/26/2022) |
| 09/26/2022 | 126 | **ORDER PROVIDING ZOOM ACCESS TO CHANGE OF PLEA HEARING as to Diana Toebbe. Signed by Magistrate Judge Robert W. Trumble on 9/26/2022. (cmd)** (Entered: 09/26/2022) |
| 09/26/2022 | 127 | Modified on 9/26/2022 to removed document as it was filed in the incorrect case (kac). (Entered: 09/26/2022) |

**JA13**

| | | |
|---|---|---|
| 09/27/2022 | 128 | TRANSCRIPT PURCHASE ORDER by USA for proceedings held on 8/16/2022 before Judge Groh (kas) (Entered: 09/27/2022) |
| 09/27/2022 | 129 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE US MAGISTRATE JUDGE by Diana Toebbe (2). (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 130 | PLEA AGREEMENT as to Diana Toebbe (2). (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 131 | MINUTE ENTRY: <br><br> ***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY. <br><br> Proceedings held before Magistrate Judge Robert W. Trumble: Change of Plea Hearing held on 9/27/2022. Plea entered by Diana Toebbe (2): Guilty - Count 1. (Court Reporter: FTR) (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 132 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE US MAGISTRATE JUDGE by Jonathan Toebbe (1). (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 133 | PLEA AGREEMENT as to Jonathan Toebbe (1). (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 134 | MINUTE ENTRY: <br><br> ***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY. <br><br> Proceedings held before Magistrate Judge Robert W. Trumble: Change of Plea Hearing held on 9/27/2022. Plea entered by Jonathan Toebbe (1): Guilty - Count 1. (Court Reporter: FTR) (cwm) (Entered: 09/27/2022) |
| 09/27/2022 | 135 | **CHANGE OF PLEA ORDER as to Diana Toebbe. Signed by Magistrate Judge Robert W. Trumble on 9/27/2022. (cmd)** (Entered: 09/27/2022) |
| 09/27/2022 | 136 | **CHANGE OF PLEA ORDER as to Jonathan Toebbe. Signed by Magistrate Judge Robert W. Trumble on 9/27/2022. (cmd)** (Entered: 09/27/2022) |
| 09/29/2022 | 137 | **PAPERLESS ORDER as to Jonathan Toebbe, Diana Toebbe: The Court has scheduled a Sentencing Hearing for 11/9/2022 at 10:30 AM in Martinsburg District Judge Courtroom, 2nd Floor before District Judge Gina M Groh. Pursuant to the Courts April 4, 2020 Memorandum, sentencing memoranda must be filed no less than fourteen (14) days prior to the sentencing hearing. This fourteen (14) day time period shall include holidays and weekends. Replies to memoranda are due no less than seven (7) days before the hearing. Additionally, counsel seeking an outside the guidelines sentence must file a motion. Motions for departure or variance must be filed at least fourteen (14) days before the sentencing hearing and must state the requested degree of relief and the reason for the requested relief. If a party requests both a departure and variance, it shall file a separate motion for each. Written responses must be filed at least seven (7) days before sentencing and state all bases for any objections to the requested relief. Pursuant to LR Cr P 32.01(d), within fourteen (14) days after receiving the presentence report, counsel shall provide any written objections to the PSR to the probation officer and opposing counsel. Signed by District Judge Gina M Groh on 9/29/2022. (jlo)** (Entered: 09/29/2022) |
| 10/11/2022 | 138 | **ORDER: ***SEALED*** as to Diana Toebbe. Signed by District Judge Gina M Groh on 10/11/2022. Copy to Dft's counsel, AUSA, CISO, USM, USP. (cmd)** (Entered: |

| | | 10/11/2022) |
|---|---|---|
| 10/21/2022 | 139 | NOTICE *OF CLASSIFIED FILING* by USA as to Jonathan Toebbe (Douglas, Jarod) (Entered: 10/21/2022) |
| 10/26/2022 | 140 | SENTENCING MEMORANDUM (Attachments: # 1 Exhibit Psychological Report) (Beck, Barry) (Entered: 10/26/2022) |
| 10/26/2022 | 141 | MEMORANDUM *in Support of Below-Guidelines, Variant Sentence* by Diana Toebbe (Beck, Barry) (Entered: 10/26/2022) |
| 10/26/2022 | 142 | SENTENCING MEMORANDUM (Compton, Nicholas) (Entered: 10/26/2022) |
| 10/31/2022 | 143 | Other Document *Amended Supplemental Memorandum in Support of Below-Guidelines, Variant Sentence* filed by Diana Toebbe (Beck, Barry) (Entered: 10/31/2022) |
| 11/08/2022 | 147 | **\*\*\*SEALED\*\*\* ORDER: as to Jonathan Toebbe (1) and Diana Toebbe (2). Signed by District Judge Gina M Groh on 11/8/2022. Copy to AUSA, Counsel for Defendants. (cmd)** (Entered: 11/08/2022) |
| 11/09/2022 | 148 | MINUTE ENTRY: <br><br> ***NOTICE\*\*\* THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.* <br><br> Proceedings held before District Judge Gina M Groh: Sentencing held on 11/9/2022 for Jonathan Toebbe (1): Count 1, defendant to be incarcerated for a term of 232 months; supervised release for 5 years; $100 special assessment fee; fine in the amount of $45,700.00; forfeiture ordered; Counts 2-3, dismissed upon motion by USA; Diana Toebbe (2): Count 1, defendant to be incarcerated for a term of 262 months; supervised release for 3 years; $100 special assessment fee; fine in the amount of $50,000.00; forfeiture ordered; Counts 2-3, dismissed upon motion by USA. (Court Reporter: K. Slayden) (cwm) (Entered: 11/09/2022) |
| 11/10/2022 | 150 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Jonathan Toebbe (1). (cwm) (Entered: 11/10/2022) |
| 11/14/2022 | 151 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Diana Toebbe. (cmd) (Entered: 11/14/2022) |
| 11/17/2022 | 152 | **JUDGMENT as to Jonathan Toebbe (1). Signed by District Judge Gina M Groh on 11/17/2022. (cmd)** (Entered: 11/17/2022) |
| 11/17/2022 | 153 | **\*SEALED\* STATEMENT OF REASONS as to Jonathan Toebbe. Signed by District Judge Gina M Groh on 11/17/2022. Copy to Counsel. (cmd)** (Entered: 11/17/2022) |
| 11/17/2022 | 154 | **JUDGMENT as to Diana Toebbe (2). Signed by District Judge Gina M Groh on 11/17/2022. (cmd)** (Entered: 11/17/2022) |
| 11/17/2022 | 155 | **\*SEALED\* STATEMENT OF REASONS as to Diana Toebbe. Signed by District Judge Gina M Groh on 11/17/2022. Copy to counsel. (cmd)** (Entered: 11/17/2022) |
| 11/29/2022 | 156 | NOTICE OF APPEAL by Diana Toebbe re 154 Judgment (Beck, Barry) (Entered: 11/29/2022) |
| 11/30/2022 | 157 | Transmission of Notice of Appeal and Docket Sheet as to Diana Toebbe to US Court of Appeals re 156 Notice of Appeal - Final Judgment. (cmd) (Entered: 11/30/2022) |
| 12/01/2022 | 158 | USCA NOTICE OF APPELLATE CASE OPENING: as to Diana Toebbe for 156 Notice of Appeal - Final Judgment filed by Diana Toebbe. Case Number: 22-4689 Case |

| | | |
|---|---|---|
| | | Manager: T. Barton. (cmd) (Entered: 12/01/2022) |
| 12/05/2022 | 159 | ORDER of USCA as to Diana Toebbe re 156 Notice of Appeal - Final Judgment (cmd) (Entered: 12/05/2022) |
| 12/07/2022 | 160 | TRANSCRIPT of Proceedings held on 2/18/2022, before Judge Trumble. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 12/28/2022. Redacted Transcript Deadline set for 1/9/2023. Release of Transcript Restriction set for 3/7/2023. (kas) (Entered: 12/07/2022) |
| 12/07/2022 | 161 | TRANSCRIPT of Proceedings held on 9/27/2022, before Judge Trumble. as to Diana Toebbe Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 12/28/2022. Redacted Transcript Deadline set for 1/9/2023. Release of Transcript Restriction set for 3/7/2023. (kas) (Entered: 12/07/2022) |
| 12/07/2022 | 162 | TRANSCRIPT PURCHASE ORDER by USA for proceedings held on 2-8-2022 and 9-27-2022 before Judge Trumble (kas) (Entered: 12/07/2022) |
| 12/14/2022 | 163 | ORDER of USCA appointing Jessica N. Carmichael to represent Diana Toebbe (2) re: 156 Notice of Appeal - Final Judgment. (cwm) (Entered: 12/14/2022) |
| 12/14/2022 | 164 | Judgment Returned Executed as to Diana Toebbe (2) on 12/12/2022. (cwm) (Entered: 12/14/2022) |
| 12/16/2022 | 165 | TRANSCRIPT PURCHASE ORDER by Diana Toebbe for proceedings held on 11/7/2022; 11/9/2022 before Judge Judge Groh, re 156 Notice of Appeal - Final Judgment. Transcript due by 1/23/2023. (cmd) (Entered: 12/16/2022) |
| 12/21/2022 | 166 | Judgment Returned Executed as to Jonathan Toebbe (1) on 12/19/2022. (cwm) (Entered: 12/21/2022) |
| 12/29/2022 | 167 | Judgment Returned Executed as to Jonathan Toebbe on 12/19/2022. (cmd) (Entered: 12/29/2022) |
| 01/13/2023 | 168 | *SEALED* Transcript of Sealed Hearing for dates of 11/7/2022, before Judge Groh, as to Diana Toebbe re 156 Notice of Appeal - Final Judgment Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. *Does this satisfy all appellate orders for this reporter? No*<br><br>(kas) (Entered: 01/13/2023) |
| 01/13/2023 | 169 | Transcript of Sentencing Hearing for dates of 11/9/2022, before Judge Groh, as to Diana Toebbe re 156 Notice of Appeal - Final Judgment Court Reporter/Transcriber Kate Slayden, Telephone number 304-267-5688. *Does this satisfy all appellate orders for this reporter? Yes*<br><br>(kas) (Entered: 01/13/2023) |

| PACER Service Center |
|---|
| Transaction Receipt |

**JA16**

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**



FILED

OCT 1 9 2021

U.S. DISTRICT COURT
ELKINS WV 26241

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| | |
| | |
| **v.** | Criminal No.  3:21cr48 |
| | |
| **JONATHAN TOEBBE and
DIANA TOEBBE,** | Violations:   42 U.S.C. § 2274(a)
18 U.S.C. § 2(a)
(Counts 1, 2, and 3) |
| **Defendants.** | |

## **INDICTMENT**

The Grand Jury charges that:

### **Introduction**

At all times relevant to this Indictment:

#### **Parties and Entities**

1.     Defendant **JONATHAN TOEBBE** was employed by the Department of the Navy as a nuclear engineer and was assigned to the Reactor Engineering Division of the Naval Nuclear Propulsion Program, also known as Naval Reactors.

2.     Defendant **JONATHAN TOEBBE** was married to Defendant **DIANA TOEBBE**.

3.     The mission of Naval Reactors was to provide militarily effective nuclear propulsion plants and to ensure their safe, reliable, and long-lived operation.  Naval Reactors was responsible for all aspects of the U.S. Navy's nuclear propulsion, including research, design,

**JA17**

construction, testing, operation, maintenance, and ultimate disposition of naval nuclear propulsion plants, including Virginia-class submarines.

4.      Virginia-class submarines are nuclear-powered warships, which incorporate the latest in stealth, intelligence gathering, and weapons systems technology.

5.      Virginia-class submarines, with a per unit cost of approximately $3 billion, are currently in service with the United States Navy and are expected to remain in service until at least 2060.

6.      Defendant **JONATHAN TOEBBE** held an active TOP SECRET security clearance through the United States Department of Defense and an active Q clearance through the United States Department of Energy, which granted him to access to information involving or incorporating "Restricted Data" within the meaning of the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq.

7.      Defendant **JONATHAN TOEBBE** worked with and had access to information concerning the Virginia-class submarine, including but not limited to, information relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine reactors, which constitutes information involving or incorporating Restricted Data within the meaning of the Atomic Energy Act.

<u>**The Atomic Energy Act**</u>

8.      The Atomic Energy Act prohibits communicating, transmitting, or disclosing information involving or incorporating Restricted Data to any individual or person, or attempting or conspiring to do so, with the intent to injure the United States or to secure an advantage to any foreign nation.  42 U.S.C. § 2274(a).

**JA18**

9.     Pursuant to the Atomic Energy Act, "Restricted Data" consists of "all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy," but does not include data that has been declassified or removed from the Restricted Data category. 42 U.S.C. § 2014(y).

## COUNT ONE

(Conspiracy to Communicate Restricted Data)

10.     From an unknown date but no later than on or about April 1, 2020, through on or about October 9, 2021, in Jefferson County, West Virginia, within the Northern District of West Virginia, and elsewhere, the defendants, **JONATHAN TOEBBE** and **DIANA TOEBBE**, lawfully and unlawfully having possession of, access to, control over, and being entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data within the meaning of the Atomic Energy Act, specifically 42 U.S.C. § 2014(y), did combine, conspire, confederate, agree and have a tacit understanding with each other to communicate, transmit, and disclose the same to another person with the intent to injure the United States and to secure an advantage to a foreign nation.

## OBJECT OF CONSPIRACY

11.     It was a purpose and object of the conspiracy for the defendants to enrich themselves by demanding and accepting payment in return for communicating, transmitting, or disclosing to a foreign nation information involving or incorporating Restricted Data.

3

**JA19**

## MANNER AND MEANS

It was part of the conspiracy that:

12.     Over a period of years, defendant **JONATHAN TOEBBE** unlawfully and surreptitiously removed from his United States Navy workplace information involving or incorporating Restricted Data.

13.     Defendant **JONATHAN TOEBBE** sent a package to a foreign government, hereinafter COUNTRY1, containing a sample of Restricted Data and instructions for establishing a covert relationship to purchase additional Restricted Data.

14.     Defendant **JONATHAN TOEBBE** communicated with an individual he believed to a representative of COUNTRY1 on an end-to-end encrypted email service to develop a plan to exchange Restricted Data for monetary payment.

15.     Defendant **JONATHAN TOEBBE** covertly disclosed Restricted Data to an individual he believed to be a representative of COUNTRY1 in return for monetary payment made via a decentralized cryptocurrency that uses a public distributed ledger with privacy-enhancing technologies that obfuscate transactions to achieve anonymity and fungibility.

16.     Defendant **JONATHAN TOEBBE** serviced locations known as "dead drops," which were identified to him by an individual he believed to be a representative of COUNTRY1. A dead drop is a means of covertly passing items from one person to another, in which one individual leaves such items in a prearranged concealed location, and another individual later retrieves the items from that concealed location.  Defendant **JONATHAN TOEBBE** serviced the dead drops by placing inside a designated container an encrypted SD card containing Restricted Data and/or a communication.

**JA20**

17.     Defendant **DIANA TOEBBE** provided cover and acted as a lookout while Defendant **JONATHAN TOEBBE** serviced the dead drop.

18.     Once the defendants received payment of the agreed-upon amount of cryptocurrency, Defendant **JONATHAN TOEBBE** sent an encrypted email, which contained the decryption key for the SD card, to an individual he believed to be a representative of COUNTRY1.

## <u>OVERT ACTS</u>

In furtherance of the conspiracy, and to effect the object thereof, a conspirator committed at least one of the following overt acts, and others, in the Northern District of West Virginia, and elsewhere:

19.     On or about April 1, 2020, Defendant **JONATHAN TOEBBE** sent and caused to be sent a package to COUNTRY1, which contained a sample of Restricted Data relating to U.S. Navy nuclear powered warships and instructions for establishing a covert relationship to purchase additional Restricted Data.  The instructions stated, in part: "I believe this information will be of great value to your nation.  This is not a hoax."

20.     On or about February 10, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1, stating, in part:  "Let us discuss how to proceed."

21.     On or about March 5, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1, proposing an electronic exchange of Restricted Data for a payment of $100,000 in cryptocurrency and stating, in part:  "[P]lease remember I am risking my life for your benefit and I have taken the first step."

**JA21**

22.     On or about April 9, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1, requesting "some physical signal" to verify the individual's identity as a representative of COUNTRY1.

23.     On or about May 29, 2021, Defendant **JONATHAN TOEBBE** traveled to the Washington, D.C. area and viewed the signal that had been placed at a location associated with COUNTRY1.

24.     On or about May 31, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1, requesting details for a physical dead drop of Restricted Data.

25.     On or about June 8, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1 and provided a cryptocurrency payment address for a good faith payment of $10,000 prior to the disclosure of any additional Restricted Data.

26.     On or about June 17, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1, acknowledging receipt of the good faith payment of $10,000 in cryptocurrency and inviting instructions for a physical dead drop of Restricted Data.

27.     On or about June 26, 2021, Defendant **JONATHAN TOEBBE** and Defendant **DIANA TOEBBE** traveled from Maryland to Jefferson County, West Virginia.

28.     On or about June 26, 2021, in Jefferson County, West Virginia, Defendant **JONATHAN TOEBBE** serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of

6

**JA22**

Virginia-class submarine reactors on an SD card, which was wrapped in plastic and concealed between two slices of bread on a half of a peanut butter sandwich. The SD card also contained a typed message that included statements, "I hope your experts are very happy with the sample provided," and "I want our relationship to be very successful for us both."

29.     On or about June 26, 2021, in Jefferson County, West Virginia, Defendant **DIANA TOEBBE** provided cover and acted as a lookout for Defendant **JONATHAN TOEBBE** while he serviced the dead drop.

30.     On or about June 28, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1 and provided a cryptocurrency payment address for a payment of $20,000 for the Restricted Data he left at the dead drop.

31.     On or about June 29, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1 and provided the decryption key for the SD card left at the dead drop.

32.     On or about July 31, 2021, Defendant **JONATHAN TOEBBE** and Defendant **DIANA TOEBBE** traveled from Maryland to south-central Pennsylvania.

33.     On or about July 31, 2021, in south-central Pennsylvania, Defendant **JONATHAN TOEBBE** serviced a dead drop by leaving behind a typed message, which proposed a plan for him to provide 51 packages over time in exchange for a total of $5 million paid in cryptocurrency. The message also included statements that the information "was slowly and carefully collected over several years" and "smuggled past security checkpoints a few pages at a time" and that one of the sets of information "reflects decades of U.S. Navy 'lessons learned' that will help keep your sailors safe."

7

**JA23**

34.    On or about July 31, 2021, in south-central Pennsylvania, Defendant **DIANA TOEBBE** provided cover and acted as a lookout for Defendant **JONATHAN TOEBBE** while he serviced the dead drop.

35.    On or about August 27, 2021, Defendant **JONATHAN TOEBBE** sent and caused to be sent an encrypted email to an individual he believed to be a representative of COUNTRY1 and provided a cryptocurrency payment address for a payment of $70,000 for the Restricted Data he would leave at a dead drop the next day.

36.    On or about August 28, 2021, Defendant **JONATHAN TOEBBE** traveled from Maryland to eastern Virginia.

37.    On or about August 28, 2021, in eastern Virginia, Defendant **JONATHAN TOEBBE** serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine nuclear reactors on an SD card, which was concealed in a chewing gum package. The SD card also contained a typed message, stating, in part: "There is only one other person I know is aware of our special relationship, and I trust that person absolutely"; "I was extremely careful to gather the files I possess slowly and naturally in the routine of my job, so nobody would suspect my plan"; "I do not believe any of my former colleagues would suspect me, if there is a future investigation"; and "We have cash and passports set aside for th[e] purpose" of having to flee the United States.

38.    On or about August 29, 2021, Defendant **JONATHAN TOEBBE**, after receiving a cryptocurrency payment in the amount of $70,000, sent and caused to be sent an encrypted email

8

**JA24**

to an individual he believed to be a representative of COUNTRY1 and provided the decryption key for the SD card left at the dead drop.

39.    On or about October 9, 2021, Defendant **JONATHAN TOEBBE** and Defendant **DIANA TOEBBE** traveled from Maryland to Jefferson County, West Virginia.

40.    On or about October 9, 2021, in Jefferson County, West Virginia, Defendant **JONATHAN TOEBBE** serviced a dead drop by leaving behind an SD card, which was concealed in a chewing gum package.

41.    On or about October 9, 2021, in Jefferson County, West Virginia, Defendant **DIANA TOEBBE** provided cover and acted as a lookout for Defendant **JONATHAN TOEBBE** while he serviced the dead drop.

In violation of Title 42, United States Code, Sections 2274(a) and 2014.

## COUNT TWO

(Communication of Restricted Data)

1.    Paragraphs 1 through 9 of the Introduction to this Indictment and paragraph 19 of Count One of this Indictment are incorporated by reference as though fully set forth herein.

2.    On or about April 1, 2020, having been arrested in and first brought to the Northern District of West Virginia, the defendants, **JONATHAN TOEBBE** and **DIANA TOEBBE**, having possession of, access to, and having been entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data within the meaning of the Atomic Energy Act, specifically 42 U.S.C. § 2014(y), to wit: militarily sensitive design elements, operating parameters, and performance characteristics of U.S. Navy nuclear warships, did communicate, transmit, and disclose the same to another person in COUNTRY1 with the intent to injure the United States and to secure an advantage to a foreign nation.

9

**JA25**

In violation of Title 42, United States Code, Sections 2274(a) and 2014, and Title 18, United States Codes, Section 2(a).

## COUNT THREE

(Communication of Restricted Data)

1.    Paragraphs 1 through 9 of the Introduction to this Indictment and paragraphs 27 through 31 of Count One of this Indictment are incorporated by reference as though fully set forth herein.

2.    On or about June 26, 2021, in Jefferson County, West Virginia, within the Northern District of West Virginia, the defendants, **JONATHAN TOEBBE** and **DIANA TOEBBE**, having possession of, access to, and having been entrusted with a document, writing, sketch, plan, note, and information involving and incorporating Restricted Data within the meaning of the Atomic Energy Act, specifically 42 U.S.C. § 2014(y), to wit: militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine nuclear reactors, did communicate, transmit, and disclose the same to another person with the intent to injure the United States and to secure an advantage to a foreign nation.

10

**JA26**

In violation of Title 42, United States Code, Sections 2274(a) and 2014, and Title 18, United States Codes, Section 2(a).

A true bill,

/s/ _____
Foreperson

/s/ _____
WILLIAM J. IHLENFELD, II
United States Attorney

Jarod J. Douglas
Assistant United States Attorney

Jessica Lieber Smolar
Special Assistant United States Attorney

Lara K. Omps-Botteicher
Assistant United States Attorney

Matthew J. McKenzie
Trial Attorney
National Security Division
U.S. Department of Justice

S. Derek Shugert
Trial Attorney
National Security Division
U.S. Department of Justice

11

**JA27**

```
1                    IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3

4    United States of America,

5                          Plaintiff,

6    vs.                         Criminal Action No. 3:21-cr-49-2

7    Diana Toebbe,

8                          Defendant.

9

10

11              Proceedings had in the Initial Hearing, Arraignment,

12   and Detention Hearing in the above-styled action on October 20,

13   2021, before the Honorable Robert W. Trumble, Magistrate Judge,

14   at Martinsburg, West Virginia.

15

16                              APPEARANCES

17   On behalf of the United States of America:

18              Jessica Lieber Smolar
                Assistant United States Attorney
19              United States Attorney's Office
                700 Grant Street, Ste. 4000
20              Pittsburgh, Pennsylvania 15219

21              S. Derek Shugert
                U.S. Department of Justice
22              950 Pennsylvania Avenue, NW, Suite 7700
                Washington, DC 20530

23

24   The defendant was present in person.

25   Proceedings reported by means of digital recording; transcript
     produced by official court reporter.
```

```
 1                    APPEARANCES (Continued)

 2

 3   On behalf of the Defendant:

 4           Edward B. MacMahon, Jr., Esq.
             107 East Washington Street
 5           P.O. Box 25
             Middleburg, Virginia 20118
 6

 7           Barry P. Beck, Esq.
             Power, Beck & Matzureff Law Office
 8           308 West Burke Street
             Martinsburg, West Virginia  25401
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA29**

```
 1                      INDEX TO WITNESSES

 2

 3                                              PAGE

 4   TESTIMONY OF PETER OLINITS

 5      Direct Examination by Ms. Smolar          12

 6      Cross Examination by Mr. MacMahon         61

 7      Redirect Examination by Ms. Smolar        76

 8      Recross Examination by Mr. MacMahon       79

 9   TESTIMONY OF MICHAEL DEHAVEN

10      Direct Examination by Ms. Smolar          82

11      Cross Examination by Mr. Beck             86

12      Redirect Examination by Ms. Smolar        98

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | EXHIBIT INDEX | |
|---|---|---|---|
| Government | | | |
| Exhibit No. | Admitted | Description | Page |
| 1 | X | Photograph | 22 |
| 2 | X | Photograph | 24 |
| 3 | X | Photograph | 26 |
| 4 | X | Photograph | 27 |
| 5 | X | Video | 28, 37, 49 |
| 6 | X | Photograph | 30 |
| 7 | X | Photograph | 36 |
| 8 | | Photograph | 36 |
| 9 | X | Photograph | 40 |
| 10 | X | Photograph | 46 |
| 11 | X | Photograph | 47 |
| 12 | X | Photograph | 48 |
| 13 | X | Photograph | 49 |
| 14-25 | X | Photographs | 52 |
| 26 | X | Excerpt | 59 |

**JA31**

```
 1              (Digitally-recorded proceedings in open court.)

 2                   (October 20, 2021, 1:17 P.M.)

 3                            -  -  -

 4         THE COURT:  Thank you.  Good afternoon, everyone.

 5  Please be seated.

 6     All right.  Tara, would you call the case for me,

 7  please.

 8         THE CLERK:  This is the case of the United States of

 9  America versus Diana Toebbe, Criminal No. 3:21-cr-49, defendant

10  2.

11     Will counsel please note your appearance for the record.

12         MS. SMOLAR:  Jessica Smolar from the U.S. Attorney's

13  Office on behalf of the United States.  And with me today is

14  Derek Shugert from the Department of Justice National Security

15  Division.

16         THE COURT:  Good afternoon.  Thank you.

17         MR. MACMAHON:  Good afternoon, Your Honor.  Edward

18  MacMahon and Barry Beck for the defendant who is present.

19         THE COURT:  Good afternoon, gentlemen.

20     All right.  This is the companion case to the other case.

21  We were originally scheduled for a preliminary hearing in this

22  matter on a complaint and a detention hearing.  And

23  subsequently the government is -- had an -- an indictment has

24  been filed against the defendant in this matter.  So we'll do

25  an initial appearance, we'll do an arraignment, and then turn
```

```
 1   to the detention hearing as the final component of today's
 2   hearings.
 3       So turning to the initial appearance first, Ms. Toebbe, do
 4   you understand English?
 5               THE DEFENDANT:  Yes.
 6               THE COURT:  All right.  My name is Robert Trumble.
 7   I'm the United States Magistrate Judge.  Would you stand and be
 8   sworn by the clerk, please.
 9       (The defendant was sworn in.)
10               THE DEFENDANT:  I do.
11               THE COURT:  Thank you.  Please be seated.
12       Ms. Toebbe, you are a citizen of the United States?
13               THE DEFENDANT:  Yes, Your Honor.
14               THE COURT:  Would you state your full name for the
15   record, please.
16               THE DEFENDANT:  Diana Smay Toebbe.
17               THE COURT:  Ms. Toebbe, what is your date of birth?
18               THE DEFENDANT:  12/23/1975.
19               THE COURT:  And what is your physical address should
20   you be released?
21               THE DEFENDANT:  125 Boyd Drive, Annapolis, Maryland
22   21403.
23               THE COURT:  And a telephone number where you can be
24   reached should you be released?
25               THE DEFENDANT:  303-475-6859.
```

7

```
 1              THE COURT:  All right.  Thank you.
 2       Ms. Toebbe, this is an initial appearance today.  All
 3   persons who are charged with a crime are to be brought before a
 4   judge as soon as possible after their arrest.  The purpose for
 5   the initial appearance is to allow me to tell you the charges
 6   that are pending against you, to let you know you have a right
 7   to an attorney and determine whether you'll be released pending
 8   your trial or whether we have to set a detention hearing.  This
 9   is not a trial so there's no determination of guilt or
10   innocence at this stage of the proceedings.
11       You are charged in a multi-count indictment here in the
12   Northern District of West Virginia.  Specifically, you were
13   charged in Count 1 of that indictment with conspiracy to
14   communicate restricted data, and you're charged in Counts 2
15   and 3 of that indictment with communication of restricted
16   data.
17       The penalty if you are convicted of the charge contained in
18   Count 1 is up to life imprisonment, a fine of $100,000, and
19   five years of supervised release.  As to the counts -- charges
20   in Counts 2 and 3, the communication of restricted data, both
21   of those each also carry a potential penalty of up to life
22   imprisonment, a fine of $100,000, and five years of supervised
23   release.  So that constitutes the charges and their penalties.
24       Let's move to your constitutional rights.  I've provided
25   you with a copy of your constitutional rights on the table in
```

**JA34**

```
 1   front of you.  Do you have them there?
 2                THE DEFENDANT:  Yes, sir.
 3                THE COURT:  I'm going to read your constitutional
 4   rights to you and ask that you follow along with me, please.
 5        You have a constitutional right to remain silent.  If you
 6   give up your right to remain silent, anything you say can and
 7   will be used against you in this or any other court of law.
 8   Even if you may have given a statement to the police or others,
 9   you have a constitutional right to make no further statement to
10   the authorities.  If you start to make a statement, you have a
11   constitutional right to stop in mid-word or sentence and say no
12   more.  You have a right to counsel to assist you in this
13   matter.  If you cannot afford an attorney, you may qualify to
14   have an attorney appointed to represent you.  And whether
15   appointed or retained, you have the right to the assistance of
16   counsel at every stage of the proceedings against you and
17   during any questioning by the authorities.
18        Do you understand your constitutional rights as I've read
19   them to you?
20                THE DEFENDANT:  Yes, I do.
21                THE COURT:  You have a right to retain counsel or ask
22   that counsel be appointed for you if you do not have the funds
23   to hire an attorney.  Now, previously, when the complaint was
24   filed, you sought court-appointed counsel, and I appointed the
25   attorneys who are with you and present in the courtroom with
```

```
 1  you today.  They will continue to represent you in this matter
 2  as it relates to the indictment.
 3     Is the government moving to detain the defendant?
 4        MS. SMOLAR:  Yes, Your Honor.  The government has
 5  filed a motion for detention.
 6        THE COURT:  All right.  If that's the case, we will
 7  conduct that detention hearing, but first I want to take up the
 8  arraignment in this matter.
 9     So I'll turn to Mr. MacMahon or Mr. Beck.  Who will be
10  speaking on behalf of the defendant?
11        MR. MACMAHON:  I can, Your Honor.
12        THE COURT:  All right.  Very well.  Has the defendant
13  had an opportunity to review the original indictment with
14  counsel?
15        MR. MACMAHON:  She has.
16        THE COURT:  Does the defendant waive the reading of
17  the original indictment in open court?
18        MR. MACMAHON:  She does waive reading.
19        THE COURT:  How does the defendant plead to the
20  charges contained in the original indictment?
21        MR. MACMAHON:  Not guilty.
22        THE COURT:  And is the defendant seeking pretrial
23  discovery and inspection, sir?
24        MR. MACMAHON:  Yes.
25        THE COURT:  All right.  Thank you.
```

**JA36**

1    All right.  Counsel, these will be the dates and times

2  utilized for trial and pretrial with regard to this matter.

3  Government disclosures are due October 27, 2021.  Reciprocal

4  discovery is due November 3, 2021.  Exculpatory evidence is to

5  be disclosed by October 27, 2021.  All motions that need to be

6  filed, need to be filed by November 10, 2021, and responses are

7  due November 17, 2021.  If a hearing is required on any motion,

8  we'll conduct that hearing on December 1, 2021, at 1:30 P.M.

9  Your Rule 404(b), Jencks, Roviaro, and Giglio disclosures are

10 due November 22, 2021.  Your voir-dire instructions and motions

11 in limine are due November 24, 2021.  Your witness and exhibit

12 lists are due November 22, 2021.  All plea agreements to be

13 submitted to the Court by November 30, 2021.  Your final

14 pretrial conference before Judge Groh is set for December 9,

15 2021, at 9:30 A.M. with jury selection and trial to commence

16 before Judge Groh on December 14, 2021, at 9:00 A.M.

17    As required by Rule 5(f), the United States is ordered to

18 produce all exculpatory evidence to the defendant pursuant to

19 *Brady v. Maryland* and its progeny.  Not doing so in a timely

20 manner may result in sanctions, including exclusion of

21 evidence, adverse jury instructions, dismissal of charges, and

22 contempt proceedings.  An order pursuant to the Due Process

23 Protection Act will be entered simultaneously herewith.

24    All right.  Any questions as it relates to the

25 arraignment?

```
 1              MS. SMOLAR:  No, Your Honor.

 2              MR. MACMAHON:  No, Your Honor.

 3              THE COURT:  All right.  Then we're ready to move to

 4    the detention hearing.  Are the parties ready to proceed?

 5              MS. SMOLAR:  Yes, Your Honor.

 6              MR. MACMAHON:  Yes.

 7              THE COURT:  All right.  Thank you.

 8        All right, Counsel.  Ms. Smolar, will you be conducting the

 9    examination?

10              MS. SMOLAR:  I will, Your Honor.

11              THE COURT:  All right.  Would you proceed for me,

12    please.

13              MS. SMOLAR:  Your Honor, at the outset, the

14    government wishes to proffer the criminal complaint executed in

15    this case on October 8th of 2021 before Your Honor just for

16    additional facts so as to try to streamline the process a bit

17    today.

18              THE COURT:  All right.  Thank you.

19              MS. SMOLAR:  The government has filed a motion for

20    detention on the basis of risk of flight, risk of

21    nonappearance, as well as obstruction of justice.

22        At this time, the government calls FBI Special Agent Peter

23    Olinits.

24        (The witness was sworn in.)

25              THE WITNESS:  I do.
```

PETER OLINITS – DIRECT EXAMINATION

1          THE CLERK:  You may have a seat, please.
2                    DIRECT EXAMINATION
3   BY MS. SMOLAR:
4   Q.  Can you please state your full name for the record.
5   A.  Peter Olinits.
6   Q.  How do you spell your last name?
7   A.  O-L-I-N-I-T-S.
8   Q.  And where are you currently employed?
9   A.  Employed as a special agent with the FBI from the -- out of
10  the Pittsburgh Division.
11  Q.  How long have you been a special agent with the FBI?
12  A.  Approximately 11 1/2 years.
13  Q.  And within the Pittsburgh Division of the FBI, where are
14  you assigned?
15  A.  I'm assigned to a counterintelligence division.
16  Q.  Could you explain to us what that means?  What type of
17  cases do you work on?
18  A.  So counterintelligence is basically the FBI's defensive
19  posture against a foreign adversary's offensive efforts to
20  collect national intelligence information.  So espionage cases,
21  for example, are some of the types of cases we work on our
22  squad.
23  Q.  Prior to joining the FBI 11 1/2 years ago, what did you do
24  for employment?
25  A.  I was a biochemist at a pharmaceutical company in

PETER OLINITS – DIRECT EXAMINATION

1  Swiftwater, Pennsylvania.

2  Q.  Do you have training and experience in working on espionage

3  cases?

4  A.  Yes.  Over my 11 1/2 years as a special agent in the FBI,

5  I've worked several espionage investigations.

6  Q.  Were you involved in the investigation involving Jonathan

7  and Diana Toebbe?

8  A.  Yes.  I was involved with both of their investigations.

9  Q.  Were you one of the primary case agents on that

10  investigation?

11  A.  Yes.  I was considered a co-case agent.

12  Q.  How old is Diana Toebbe?

13  A.  She is 45 years old.

14  Q.  Is she employed?

15  A.  She is.  She's employed at the Key School in Annapolis,

16  Maryland.

17  Q.  And do you know anything about the status of her current

18  employment?

19  A.  I believe she's potentially going to be suspended if she's

20  not already.

21  Q.  What's her marital status?

22  A.  She's married to Jonathan Toebbe.  They've been married for

23  18 years.

24  Q.  And what's her educational background?

25  A.  She has a Ph.D. in anthropology.

PETER OLINITS – DIRECT EXAMINATION

1  Q.  Where is Mr. Toebbe employed?

2  A.  He is a nuclear engineer for Naval Reactors out of the Navy

3  Yard in Washington D.C.

4  Q.  How long has he been in that position?

5  A.  Since 2012.

6  Q.  And can you explain to us what GS level his position has?

7  A.  He is a GS-15 which is the highest GS level you can get in

8  the government without becoming an SES level which is a senior

9  executive level in the government.  So he's the highest

10  government employee as a GS-15.

11  Q.  And does he hold any special clearances for the government?

12  A.  He holds a top secret clearance as well as a Q clearance.

13  Q.  Explain to us what a Q clearance is.

14  A.  A Q clearance is basically the Department of Energy's

15  equivalent to a top secret clearance.

16  Q.  Could you explain Mr. Toebbe -- just briefly --

17  Mr. Toebbe's career trajectory within the United States Navy.

18  A.  So in 2012 he became active duty, and he worked in active

19  duty until 2017 where he became a civilian and also was in

20  reserves at that point.

21  Q.  And does he work within a special section of the United

22  States Navy?

23  A.  He works within Naval Reactors.  Naval Reactors is

24  responsible for the design implementation of the Navy's nuclear

25  fleet, specifically the Virginia-class submarines.

PETER OLINITS - DIRECT EXAMINATION

1   Q.  How much does a Virginia-class submarine cost to build?

2   A.  Approximately three billion dollars, not including the R&D

3   that goes into it or the maintenance.

4   Q.  And are Virginia-class submarines currently being used by

5   our United States Navy?

6   A.  They are.

7   Q.  And are they expected to be used in the future?

8   A.  I believe until 2060.

9   Q.  What's Mr. Toebbe's educational background?

10  A.  He has a bachelor's degree in physics, a master's degree in

11  physics, and a master's degree in nuclear engineering.

12  Q.  Did your investigation reveal that Jonathan Toebbe had

13  access to Restricted Data as defined both in the complaint

14  affidavit and in the indictment recently filed in this case?

15  A.  He did.

16  Q.  And was that Restricted Data relating to the Virginia-class

17  submarine?

18  A.  It was.

19  Q.  And did he obtain that information during the course of his

20  employment with the United States Navy to your -- the best of

21  your knowledge?

22  A.  To the best of my knowledge, he did.

23  Q.  Did your investigation also reveal whether Mr. Toebbe was

24  trained on counterintelligence measures?

25  A.  Yes, he was.

16

PETER OLINITS - DIRECT EXAMINATION

1  Q.  Can you tell us what started the FBI's investigation into

2  Diana and Jonathan Toebbe?

3  A.  So in December 2020, the FBI received from a legal attaché

4  named COUNTRY1 a volunteer letter that was addressed to

5  COUNTRY1's military intelligence services.  On the letter, the

6  postmark was dated April 1, 2020, and the return address was a

7  Dr. Alice Hill in Pittsburgh, Pennsylvania.

8  Q.  And did the letter also contain something else in it?

9  A.  So it contained 17 hard copy pages of confidential

10  Restricted Data as defined by the government.  It also

11  contained an SD card which contained an additional

12  electronic -- in an electronic format an additional 76 pages of

13  confidential Restricted Data related to the Virginia-class

14  submarines.

15  Q.  And to be clear, when we talk about Restricted Data here

16  today, did the FBI provide that data to the Navy to ascertain

17  whether it was, in fact, classified or Restricted Data?

18  A.  Absolutely.  It was provided to a Navy subject matter

19  expert who did confirm that that was authentic and classified

20  information.

21  Q.  And did the pages that you just referred to that were in

22  the letter, did they have a legend on them indicating that they

23  were in some way confidential?

24  A.  Yes.  There was banner markings on them which clearly said

25  "confidential information."

**JA43**

PETER OLINITS – DIRECT EXAMINATION

1  Q.  Can you read to us a portion of the text from that letter
2  relevant to today's proceeding?
3  A.  I can.  So the letter that was sent to COUNTRY1, a
4  volunteer letter, dated April 1, 2020:  "I have in my
5  possession several thousand pages of classified documents
6  describing the [REDACTED].  A small random sample of them is
7  included in this envelope to convince you of the truth of my
8  claim.  A 76-page summary of the documents, tables of contents,
9  drawings, schematic lists, et cetera, is loaded on the memory
10  card taped to this letter.  Also on this memory card are the
11  instructions and keys necessary to decrypt the documents using
12  the publicly available GPG software.  Please have your experts
13  examine the documents.  I think they will agree that your
14  country's effort to develop a [REDACTED] would be greatly
15  aided.  This information is extremely valuable, and I am
16  risking my life to offer it to you.  I expect to be very well
17  paid in cryptocurrency.  Please do not delay in contacting me
18  to agree on a sale price.  If you do not contact me by
19  December 31, 2020, I will conclude you're uninterested and will
20  approach other possible buyers."
21      There was also a second part of that where there was a
22  portion that was translated to COUNTRY1's language, and it was
23  also written in English.  And it says, "I apologize for this
24  poor translation into your language.  Please forward this
25  letter to your military intelligence agency.  I believe this

PETER OLINITS – DIRECT EXAMINATION

1  information will be of great value to your nation.  This is not

2  a hoax."

3  Q.  Thank you.  So to be clear, this case began when a letter

4  was actually received by COUNTRY1; correct?

5  A.  Yes.

6  Q.  And then COUNTRY1 provided that letter to the FBI legal

7  attaché; correct?

8  A.  That's correct.

9  Q.  And the letter contains specific instructions for the

10  foreign military intelligence agent to follow?

11  A.  Absolutely.  And it talks about how to encrypt this

12  information.

13  Q.  And does it refer to something called ProtonMail?

14  A.  Yes, it does.

15  Q.  And what is ProtonMail?

16  A.  ProtonMail is an encrypted email server based out of

17  Switzerland, and it is a very secure way to communicate email

18  messages.

19  Q.  When the FBI received this letter from its legal attaché in

20  COUNTRY1, what then did the FBI do with regard to this

21  investigation?

22  A.  So because obviously we realized that this was real -- the

23  information in there was authenticated by the Navy as

24  classified information -- we had a deadline of December 31,

25  2020, to meet because we were afraid that this was going to be

19

PETER OLINITS - DIRECT EXAMINATION

1  shopped around to other possible buyers.  So on December 26,
2  2020, the FBI commenced an undercover operation to try to
3  identify the sender or senders of this letter.
4  Q.  And were there numerous messages sent back and forth
5  between the sender of the letter and the FBI undercover
6  agents?
7  A.  Yes, via ProtonMail.
8  Q.  And did the FBI pay any money to the sender of the letter?
9  A.  We paid $10,000 as a sign of good faith.
10  Q.  How was that paid?
11  A.  It was paid in cryptocurrency as he suggested and
12  specifically it was Monero.
13  Q.  What is Monero?
14  A.  Monero is an untraceable form of cryptocurrency.
15  Q.  And based on your experience in espionage cases, why would
16  an individual request Monero payment?
17  A.  Because it would be very difficult for law enforcement to
18  track.
19  Q.  What was the intent of the FBI in the communications with
20  the sender of that letter?
21  A.  To try to gain bona fides in an effort to develop our
22  relationship where we could start passing information that
23  wasn't in an electronic form; i.e., some kind of dead drop or
24  some kind of in-person meeting.
25  Q.  Can you explain what a dead drop is?

**JA46**

PETER OLINITS – DIRECT EXAMINATION

 1  A.  So a dead drop is a very common tradecraft maneuver that

 2  the counterintelligence -- it's using counterintelligence.

 3  Basically, it's a covert exchange of information where there's

 4  no need to have a face-to-face information -- face-to-face

 5  meeting.  One party will put something in a location -- and

 6  obviously both parties know where it's at -- and then the other

 7  party will likely also leave something.  And, therefore, the

 8  information could be exchanged at the convenience of either

 9  side.  But it reduces the need to have a face-to-face meeting.

10  Q.  But it still allows the FBI to identify and ultimately

11  arrest the person who is sharing the Restricted Data; correct?

12  A.  That is correct.

13  Q.  What happened next on the investigation?  Was there

14  actually a dead drop that took place?

15  A.  Yes.  On June 26th in Jefferson County at approximately

16  10:41 A.M., the FBI observed Jonathan and Diana, with the

17  assistance of Diana, fill a dead drop location.

18  Q.  Were you present on June 26th in Jefferson County,

19  West Virginia?

20  A.  I was.

21  Q.  And you observed the dead drop operation?

22  A.  I did.

23  Q.  Did the FBI memorialize the dead drop in both still images

24  and video surveillance?

25  A.  We did.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  Could you explain to us how Diana and Jonathan Toebbe

2  arrived at the dead drop location and where they parked?

3  A.  So we weren't able to identify them until after they had

4  returned to their vehicle and we were able to get their license

5  plate.  But subsequent investigation revealed that they both

6  drove together in their BMW Mini Cooper and parked in a

7  visitors parking lot approximately a mile and a half away from

8  the dead drop location.  It's important to note, I believe,

9  that there are several parking lots that were much closer to

10  the dead drop location, however, they parked at one that was a

11  mile and a half away.  They both exited the vehicle and walked

12  to the dead drop location, approximately a mile and a half.

13  That is indicative of normal tradecraft of espionage subjects.

14  What we would call a surveillance detection route or an SDR.

15  During that time, for a mile and a half, you're able to

16  determine if you're being followed or if there's anybody

17  suspicious where you might be able to kind of get out of that

18  situation before you actually exchange the information.  So I

19  will talk about it later, but they conducted many SDRs

20  throughout this investigation.

21  Q.  Okay.

22          MS. SMOLAR:  Your Honor, permission to approach the

23  witness with an exhibit?

24          THE COURT:  You may.  Has the exhibit been marked?

25          MS. SMOLAR:  Yes.

PETER OLINITS - DIRECT EXAMINATION

```
 1          THE COURT:  Okay.  Thank you.  And what exhibit --
 2          MS. SMOLAR:  They've all been marked, and I'll
 3  provide them to counsel as well.
 4          THE COURT:  All right.  Thank you.
 5  BY MS. SMOLAR:
 6  Q.  Special Agent, can you tell us and identify for us
 7  Government's Exhibit 1, please.
 8  A.  So this is a picture of the -- it's a silver BMW Mini
 9  Cooper that was parked in the parking lot in Jefferson County a
10  mile and a half away from the dead drop location.
11  Q.  And is that the car that Diana and Jonathan Toebbe arrived
12  at the dead drop location in?
13  A.  Yes.
14  Q.  And do you know who the car is registered to?
15  A.  Diana.
16          MS. SMOLAR:  Your Honor, I'd ask that Government's
17  Exhibit 1 be admitted.
18          THE COURT:  Mr. MacMahon, any objection to the
19  admission of defendant's -- Government's Exhibit No. 1?
20          MR. MACMAHON:  No, Your Honor.
21          THE COURT:  It'll be so admitted.
22      (Government's Exhibit No. 1 was admitted.)
23  BY MS. SMOLAR:
24  Q.  Once they arrived at the park and did the mile-and-a-half
25  drive, what did you observe them doing next?
```

23

PETER OLINITS - DIRECT EXAMINATION

1    A.  So they walked to the location and paused for some time in

2    and around the dead drop location itself posing as tourists.

3    Again, typical tradecraft of espionage subjects.  Dressed like

4    hikers.  And so we -- Diana had a camera and was taking

5    photographs of the scenery.  They were both -- Jonathan had a

6    backpack on.  She had a large pack around her waist.  And they

7    kind of hung out in that area until basically there was no one

8    around.

9    Q.  They were together the entire time?

10   A.  Yes.

11        MS. SMOLAR:  Your Honor, at this time, I'd like to

12   show the witness Government's Exhibit 2.

13        THE COURT:  Yes, you may.

14   BY MS. SMOLAR:

15   Q.  Agent, can you identify Government's Exhibit 2 for us,

16   please.

17   A.  Yes.  This is a picture of Jonathan Toebbe and Diana Toebbe

18   walking from their vehicle to the dead drop location.

19   Q.  And they're both wearing hats; correct?

20   A.  Yes.

21   Q.  And sunglasses?

22   A.  Sunglasses, hats, typical wear that you would have in the

23   specific area of Jefferson County to blend in.

24   Q.  And just to be clear, all of these photos that I'm about to

25   show you were photos taken by FBI surveillance; correct?

**JA50**

PETER OLINITS - DIRECT EXAMINATION

1    A.   Yes.

2            MS. SMOLAR:  I'd ask that Government's Exhibit 2 be

3    admitted.

4            THE COURT:  Any objection?

5            MR. MACMAHON:  No, Your Honor.

6            THE COURT:  It'll be so admitted.

7        (Government's Exhibit No. 2 was admitted.)

8    BY MS. SMOLAR:

9    Q.   Let's discuss a little bit about what Diana Toebbe was

10   doing during the course of the dead drop.  What did you observe

11   her doing?

12   A.   So, again, Diana and Jonathan were near each other the

13   whole time.  There was a couple other people in the area, and

14   they waited until they cleared out.  They approached the dead

15   drop location where Jonathan clearly identified and Diana

16   clearly identified where they needed to walk to.  As the dead

17   drop was serviced by Jonathan, Diana was right behind him

18   within a meter away -- she can probably almost touch him --

19   basically keeping a lookout to make sure that no one was coming

20   up on either of them during that operation.

21           MS. SMOLAR:  I'd like to show the witness

22   Government's Exhibit 3.

23           THE COURT:  All right.

24   BY MS. SMOLAR:

25   Q.   Agent, can you describe for us what we're seeing in

PETER OLINITS - DIRECT EXAMINATION

1   Government's Exhibit 3, please.

2   A.   This is a photo of Diana acting as a lookout for Jonathan

3   as he's servicing the dead drop.  Again, looking all around at

4   different directions for anybody that may approach --

5              MR. MACMAHON:  Your Honor, I object.  It's a still

6   picture.  She's not looking around in all directions.  The

7   agent is obviously well prepared to testify today, but that is

8   well beyond the scope of the question -- the picture would even

9   call for.  That's his conclusion.

10             MS. SMOLAR:  Your Honor, she's clearly looking away

11  from the defendant, but we also have video that we're happy to

12  share with the Court that will show --

13             THE COURT:  Given that this is a detention hearing,

14  and the Rules of Evidence are not necessarily applicable to

15  that, we're going to overrule your objection and allow the

16  testimony to continue.

17      Go ahead, please.

18  A.   At the end of the dead drop when Jonathan clearly finished

19  serving -- servicing it, Diana provided a very distinctive head

20  nod as if they needed to get out of the area, and I observed

21  that.

22  BY MS. SMOLAR:

23  Q.   And to be clear, in the picture is Jonathan on the ground

24  right below Diana?

25  A.   Yes.

PETER OLINITS - DIRECT EXAMINATION

1           MS. SMOLAR:  I'd ask that Government's Exhibit 3 be

2   admitted.

3              THE COURT:  Mr. MacMahon, any objection?

4              MR. MACMAHON:  No objection, Your Honor.

5              THE COURT:  It will be so admitted.

6      (Government's Exhibit No. 3 was admitted.)

7           MS. SMOLAR:  Permission to approach the witness, Your

8   Honor?

9              THE COURT:  You may.

10  BY MS. SMOLAR:

11  Q.  Agent, can you tell us what we're seeing in Government's

12  Exhibit 4, please.

13  A.  It's, again, a picture of Diana directly looking at the

14  dead drop and Jonathan servicing it.

15  Q.  How far away from each other, based on your observation at

16  the time, were they?

17  A.  Two to three feet maybe.  No more.

18  Q.  What's around Diana's waist?

19  A.  It's a -- I believe it's a camera bag but -- kind of just a

20  waist bag.

21           MS. SMOLAR:  Government moves to admit Government's

22  Exhibit 4, please.

23              THE COURT:  Any objection, sir?

24              MR. MACMAHON:  No, Your Honor.

25              THE COURT:  It'll be so admitted as Government's

PETER OLINITS - DIRECT EXAMINATION

1  Exhibit 4.

2      (Government's Exhibit No. 4 was admitted.)

3  BY MS. SMOLAR:

4  Q.  Did the FBI also capture video of -- video surveillance of

5  Diana and Jonathan Toebbe on June 26th of 2021 at -- in

6  Jefferson County, West Virginia, at this dead drop?

7  A.  Yes, ma'am.

8          MS. SMOLAR:  Your Honor, we would request permission

9  to show the Court and defense counsel an excerpt of that

10  video.

11          THE COURT:  You may.  Now, we're going to make sure

12  that this is not on the Zoom video feed or published to the

13  rest of the participants here in the courtroom other than the

14  parties themselves.  So are we ready to do that?

15      All right.  You may proceed.

16  BY MS. SMOLAR:

17  Q.  And, Agent, we're about to show Government's Exhibit 5

18  which is a composite exhibit of three videos.  And this is from

19  June 26, 2021; correct?

20      (Play video.)

21  A.  Am I supposed to watch down here?  Yes, this is correct.

22  Q.  Okay.  We'll just watch, and then I'll ask you questions.

23      (Play video.)

24  BY MS. SMOLAR:

25  Q.  Agent, can you tell us, based on your observation of the

PETER OLINITS – DIRECT EXAMINATION

1  video, what matters of relevance does it raise for you as an

2  espionage agent?

3  A.  So, again, the drop was completed fairly quickly which is

4  very good tradecraft.  They weren't sitting on the "X," per se,

5  very long.  He was able to do it with the cover of Diana

6  helping as a lookout.  They conducted an SDR by walking a mile

7  and a half to that location.  Thereafter, they walked quite a

8  long distance again, probably around a half a mile more,

9  conducting additional SDRs to make sure they're not being

10  followed.

11  Q.  And what specifically did you notice about Diana's

12  behavior?

13  A.  She was intent on watching both the location of where

14  Jonathan was and around their surroundings to ensure nobody

15  else was coming up on them while that was being serviced.

16         MS. SMOLAR:  The government moves to admit Exhibit 5

17  with regard to this video.

18            THE COURT:  Any objection, sir?

19            MR. MACMAHON:  No objection.

20            THE COURT:  You may turn it back on.

21      Yes, it will be admitted.  Thank you.

22      (Government's Exhibit No. 5, excerpt, was admitted.)

23            THE COURT:  You may proceed.

24  BY MS. SMOLAR:

25  Q.  Did the FBI retrieve the item that was left by Diana and

**JA55**

PETER OLINITS - DIRECT EXAMINATION

1   Jonathan Toebbe from the dead drop?

2   A.   We did.

3   Q.   And what was it?

4   A.   Basically, it was an additional -- it was an additional

5   sample of classified information regarding the Virginia-class

6   submarines.   And what it was, was on an SD card that

7   wrapped in Saran Wrap, placed between two pieces of bread on a

8   peanut butter sandwich, which was in a bag.   That was what was

9   left in the dead drop.

10           MS. SMOLAR:   Your Honor, I'd ask to approach the

11  witness?

12           THE COURT:   You may.

13  BY MS. SMOLAR:

14  Q.   We're looking at Government's Exhibit 6.   Can you identify

15  that for us, please.

16  A.   Yes.   Again, that's the SD card that was put in the dead

17  drop location serviced by Jonathan with the assistance of

18  Diana.

19  Q.   And the blue thing that we're seeing on -- in the midst of

20  the sandwich that's the SD card?

21  A.   Yes, ma'am.

22           MS. SMOLAR:   Move to admit Government's Exhibit 6,

23  please.

24           THE COURT:   Any objection, sir?

25           MR. MACMAHON:   No, Your Honor.

PETER OLINITS – DIRECT EXAMINATION

1           THE COURT:  It'll be so admitted.

2       (Government's Exhibit No. 6 was admitted.)

3   BY MS. SMOLAR:

4   Q.  Did the FBI then pay for the password to that SD card?

5   A.  Yes.  So the information that was contained on the SD card

6   was encrypted.  So in order for us to decrypt it, we paid

7   $20,000 in Monero for that decryption code.

8   Q.  So you paid cryptocurrency of $20,000 at that time?

9   A.  Yes.

10  Q.  And you'd previously paid $10,000 in cryptocurrency as

11  well; correct?

12  A.  Correct.

13  Q.  And were you able to decrypt the SD card?

14  A.  Yes.

15  Q.  What did it contain?

16  A.  So, again, it did contain additional information that was

17  classified Confidential Restricted Data to the United States

18  Navy.  It also contained a typed message.  It was in electronic

19  format but a message from this individual.

20  Q.  And did the SD card contain specific Restricted Data

21  relating to the Virginia-class submarine reactors?

22  A.  Yes, it did.

23  Q.  And that was determined by a subject matter expert for the

24  United States Navy?

25  A.  Yes.  By a subject matter expert.

**JA57**

PETER OLINITS - DIRECT EXAMINATION

1  Q.  You said there was also a letter?

2  A.  Yes.  There was a letter, and I have an excerpt here.

3  Q.  Can you read us an excerpt of that letter, please.

4  A.  So the letter reads, "I hope your experts are very happy

5  with the sample provided, and I understand the importance of a

6  small exchange to grow trust.  Most of the material I possess

7  is similar in format.  Multiple pages per sheet.  Drafted

8  drawings are split over several regular sheets to preserve good

9  detail.  And I used color where it seemed important like graphs

10 and several lines.

11     "For now I propose we continue with weekend exchanges at

12 suitable parks and trails similar to this one.  Details of my

13 daily routine may narrow an investigator's search too much if

14 your organization is infiltrated by an adversary one day.

15 Hiking and visiting historical sites is easier to explain than

16 unexpected stops during rush hour if they ever take a special

17 interest in me.

18     "I hope you will forgive my excess caution.  I want our

19 relationship to be very successful for both of us -- for us

20 both and that means that I must be careful at every step."

21 Q.  Did the FBI investigate the metadata of that SD card?

22 A.  Yes.  So the information on the SD card that was sent to

23 COUNTRY1 in April 2020 was -- we could tell it was a Macintosh

24 operating system.  That same operating system was the metadata

25 that was on this card as well.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And we'll get to the search of the Toebbe home, but let's

2  just briefly touch on that now.  At the time of the arrest of

3  the defendants in this case, was there a search of their

4  residence?

5  A.  Yes.  In Annapolis, Maryland.

6  Q.  And were Macintosh items found in that home --

7  A.  Yes.

8  Q.  -- electronic items?

9  A.  Yes.

10 Q.  Was there another dead drop that took place in this case

11 after the June 26, 2021, dead drop?

12 A.  There was.  There was another dead drop on July 31, 2021,

13 in South Central Pennsylvania.

14 Q.  Were you present for that dead drop as well?

15 A.  Yes.

16 Q.  And was Diana Toebbe also present at that dead drop?

17 A.  Yes.  That morning they drove -- they left their residence

18 and drove in the BMW Mini Cooper to the South Central

19 Pennsylvania location.  We also know from geolocational data of

20 their cellular devices that Jonathan left his cell phone on and

21 at his residence.

22 Q.  As an investigator, what does that mean to you?

23 A.  It's an obvious way to try to obfuscate surveillance and

24 FBI potentially tracking geolocational data with their cellular

25 device.

33

PETER OLINITS - DIRECT EXAMINATION

1   Q.  And where was Diana's phone that day?

2   A.  She had it on in the vehicle until they arrived to the

3   location where she either turned it off or put it in WiFi mode

4   because the location --

5          MR. MACMAHON:  Your Honor, I object.  If he doesn't

6   know, he doesn't know.  He's speculating now as to what she did

7   with her phone.

8          THE COURT:  I understand.  Go ahead with your --

9   what's your response to the objection?

10         MS. SMOLAR:  I can ask a few more questions to get to

11  that.

12         THE COURT:  Let's go ahead and ask a few more

13  questions, please.

14  BY MS. SMOLAR:

15  Q.  At the time of Ms. Diana Toebbe's arrest, what did she tell

16  you -- what -- what did she tell you about the location of her

17  phone?

18  A.  She had her phone on and it was in WiFi mode.

19  Q.  You mean airplane mode?

20  A.  I'm sorry.  Apology.  Airplane mode.

21  Q.  What is airplane mode?

22  A.  It's a way to put your phone on so it's not communicating

23  with cellular towers.

24  Q.  So if, for example, the FBI is tracking your cell phone and

25  it's in airplane mode, you can't tell where it is; correct?

PETER OLINITS - DIRECT EXAMINATION

1          MR. MACMAHON:  Your Honor, I object --
2   A.  Correct.
3          MR. MACMAHON:  -- to the leading question.  There's
4   no way to link that to this case.
5          MS. SMOLAR:  It's a detention hearing, Your Honor.
6          THE COURT:  This is a deten -- thank you.  It's a
7   detention hearing.  I'm going to allow it.  I think the Court
8   has an understanding of what leading questions are and what
9   information can be gleaned from this information so I'm going
10  to allow it.
11  BY MS. SMOLAR:
12  Q.  Now, you said that Diana was present with Jonathan at this
13  dead drop location.  What did you observe her doing
14  specifically on that day?
15  A.  Again, they meandered around that area for approximately
16  one hour before servicing the dead drop together.  As they
17  approached the location of the dead drop, the location was set
18  so that the geographic terrain was kind of on a hill, and the
19  location of the drop was behind a large boulder.  And so Diana
20  strategically placed herself at a higher level to continue the
21  lookout position while he serviced the dead drop because where
22  she was, she was able to see a parking lot and basically behind
23  where Jonathan was was nothing but trees.
24          MS. SMOLAR:  I'd like to show the witness
25  Government's Exhibit 7.

PETER OLINITS - DIRECT EXAMINATION

```
1              THE COURT:  You may.
2   BY MS. SMOLAR:
3   Q.  Like the other dead drops, the FBI had both still images
4   and video surveillance of this dead drop; correct?
5   A.  Yes.
6   Q.  And is this one of the still images?
7   A.  It is.
8   Q.  Can you identify what we're seeing in this Government's
9   Exhibit 7?
10  A.  So Jonathan Toebbe is servicing the dead drop and actually
11  in this particular picture, he's taking out a letter left by
12  the FBI.
13  Q.  So let's talk about that for a minute.  This dead drop was
14  a little bit different.  There was not going to be -- well,
15  tell us why it was different.
16  A.  So this was more of an information exchange.  As part of
17  the undercover operation, we didn't ask for classified
18  information.  We more or less wanted to know what this
19  individual had access to.  How much of it they had access to.
20  Try to gain some bone fides between us as the undercovers and
21  the targets.
22  Q.  And in this picture, it appears that Mr. Toebbe is looking
23  up.  Do you know, based on your observation that day, what was
24  above him?
25  A.  It was Diana.
```

PETER OLINITS – DIRECT EXAMINATION

1           MS. SMOLAR:  Move to admit Government's Exhibit 7.

2           THE COURT:  Any objection, sir?

3           MR. MACMAHON:  No objection, Your Honor.

4           THE COURT:  Be so admitted as Government's

5    Exhibit 7.

6       (Government's Exhibit No. 7 was admitted.)

7    BY MS. SMOLAR:

8    Q.  I'd like to show you Government's Exhibit 8.

9       Special Agent, can you tell us what we see on Government's

10   Exhibit 8?

11   A.  So right prior to that, the FBI observed Jonathan not only

12   take out that envelope but also place in something which was

13   later discovered to be a Band-Aid.  And, again, contained

14   within the Band-Aid, which was sealed, was an SD card and

15   that was wrapped within a plastic bag.  So right after he

16   serviced this, they rendezvoused together and walked away

17   together out of the area, got into their BMW Mini Cooper, and

18   drove away.

19          MS. SMOLAR:  Your Honor, at this time, I'd request

20   permission to play for the Court and defense counsel the video

21   from Exhibit 5 on July 31, 2021.

22          THE COURT:  That's fine.  We'll go ahead and turn off

23   the Zoom feed as it relates to Exhibit 5.

24      All right.  You may proceed.

25      (Play video.)

**JA63**

PETER OLINITS – DIRECT EXAMINATION

```
 1   BY MS. SMOLAR:
 2   Q.  Special Agent, based on your --
 3           THE COURT:  Hold on.  All right.  You may proceed.
 4   BY MS. SMOLAR:
 5   Q.  Special Agent, based on your training and experience, what
 6   did you take away from that video?
 7   A.  Again, the time on the "X" and the time at the dead drop
 8   was very limited which is a very good tradecraft technique by
 9   espionage subjects.  Jonathan clearly had Diana watching as a
10   lookout.  You can clearly see Jonathan take something out of
11   his left pocket and place it into the location and also clearly
12   take out a letter.  Right after it was serviced, there was a
13   nonverbal signal given by Jonathan to Diana where they met up
14   on the trail and walked away and again drove out of the area.
15           MS. SMOLAR:  Government moves to admit the video on
16   Exhibit 5 from July 31st.
17           THE COURT:  Any objection, sir?
18           MR. MACMAHON:  No objection, Your Honor.
19           THE COURT:  It'll be so admitted.
20       (Government's Exhibit No. 5, excerpt, was admitted.)
21   BY MS. SMOLAR:
22   Q.  I'm going to show you what's been marked as Government's
23   Exhibit 9.
24       Special Agent, can you identify what we're seeing in
25   Government's Exhibit 9?
```

PETER OLINITS – DIRECT EXAMINATION

1  A.   This is a picture after the FBI opened the Band-Aid.  So,

2  again, what was happening was Jonathan took this out of his

3  left pocket and left it in the dead drop.  The FBI later

4  recovered it.  The Band-Aid was sealed potentially with some

5  adhesive or something, but it was as if it was not opened at

6  all.  When we opened it, it's just a typical Band-Aid, and

7  inside of it was a 32 gigabyte SD card that was hidden.

8  Q.   Is 32 gigabytes a large size?

9  A.   I'm not sure.

10 Q.   Okay.  And on the SD card, was there -- did you -- were you

11 able to access the SD card?

12 A.   Yes.  So we exchanged information again to decrypt it

13 because it was encrypted, but there was no money exchange.  But

14 we were able to open it up.

15 Q.   And did it contain the Navy's Restricted Data?

16 A.   No.

17 Q.   What did it contain?

18 A.   It contained basically a letter to us explaining what this

19 individual had access to.

20 Q.   And what did the individual say that he or she had access

21 to?

22 A.   Basically --

23 Q.   You're welcome to read it.

24 A.   Okay.  Basically if you add it all up, it's a little more

25 than 11,000 pages of classified material that they're willing

PETER OLINITS - DIRECT EXAMINATION

1  to send to us in exchange for additional money.

2  Q.  And does the letter indicate how this data was taken from

3  the United States Navy?

4  A.  Yes.  So let me just read this little excerpt.  It will

5  clarify that question.

6     "I hope your experts are very happy with the sample

7  provided."  Which he was referring to the Jefferson County

8  drop.

9     "This information was slowly and carefully collected over

10 several years in the normal course of my job to avoid

11 attracting attention and smuggled past security checkpoints a

12 few pages at a time.  I can answer your expert's questions

13 using my knowledge.  I've divided the [REDACTED] into 51

14 packages.  All but the last have 100 sheets each.  The first

15 contains the [REDACTED] and the first of the drawings.  If I

16 understand your letter correctly, you offer an additional

17 $70,000 in Monero for the [REDACTED].  I propose the same

18 payment schedule for the remaining files:  100,000 U.S. dollars

19 in Monero for each of the 49 packets -- there's nothing -- not

20 additional for 51.  In total, $5 million in U.S. -- U.S.

21 dollars in Monero."

22    And then he concludes -- and concludes, "My friend, we have

23 both taken considerable risks to reach this point and with good

24 luck we will have -- will soon have much to celebrate."

25 Q.  So to --

PETER OLINITS – DIRECT EXAMINATION

1      MS. SMOLAR:  Your Honor, at this time, I'd ask that
2  Government's Exhibit 9 be admitted.
3          THE COURT:  Any objection, sir?
4          MR. MACMAHON:  No objection, Your Honor.
5          THE COURT:  It will be so admitted.
6      (Government's Exhibit No. 9 was admitted.)
7  BY MS. SMOLAR:
8  Q.  So to summarize, based on what you just read to us, the
9  writer of that letter was offering 51 packages of Restricted
10  Data for a total of $5 million in cryptocurrency?
11  A.  That's correct.
12  Q.  Did the FBI agree to the demands set out in the letter?
13  A.  Yes.
14  Q.  And was another dead drop then set up?
15  A.  Yes.
16  Q.  And where was that one set up for?
17  A.  So that one was set up for August 28th in eastern Virginia.
18  Q.  What did the FBI observe on August 28, 2021, with regard to
19  this dead drop?
20  A.  So the FBI observed Jonathan Toebbe arrive at this dead
21  drop alone where he serviced it.
22  Q.  And location information for Diana's whereabouts, what did
23  that tell you?
24  A.  She was at their residence in Annapolis, Maryland.
25  Q.  And based on your investigation, do you have an

PETER OLINITS – DIRECT EXAMINATION

1  understanding of why she was not with him?

2  A.  So prior to that, the FBI learned through investigation and

3  through observation that Diana had ankle surgery, and she was

4  wearing a walking boot.  And the location of the eastern

5  Virginia dead drop was a rough terrain, and it would likely be

6  difficult for her to walk into that.

7  Q.  You were present on the August 28, 2021, dead drop?

8  A.  Yes.

9  Q.  And what did you observe of Jonathan's demeanor on that

10  day?

11  A.  Jonathan was extremely nervous.  More nervous than we've

12  seen him on the previous ones and just very cautious of what

13  was going on around him.

14  Q.  Based on your training and experience, what did you

15  attribute that nervousness to?

16  A.  Because Diana was not there to act as a lookout.

17  Q.  Did Jonathan leave something for -- in the dead drop?

18  A.  Yes.  Again, he had left -- and it was exchange of

19  information.  He took our information and left information.

20  Q.  And did the FBI retrieve another SD card from this dead

21  drop?

22  A.  Yes.  It was housed within a package of gum.

23  Q.  And did the SD card contain Restricted Data relating to the

24  United States Navy?

25  A.  It contained 1 of the 51 packets of the Restricted Data.

PETER OLINITS - DIRECT EXAMINATION

1  Q.   And the FBI paid how much Monero cryptocurrency for this
2  data?
3  A.   $70,000.
4  Q.   Was there also a letter in with this SD card?
5  A.   Yes.
6  Q.   Can you please read the relevant portions of that letter?
7  A.   "I have considered the possibility -- the possible need to
8  leave on short notice.  Should that ever become necessary, I
9  will be forever grateful for your help extracting me and my
10 family.  I surmise the first step would be unannounced travel
11 to a safe third country with plans to meet your colleagues.  We
12 have passports and cash set aside for this purpose.  I pray
13 such a drastic plan will never be needed, but you are right.
14 It is a comfort to know you are ready and willing to aid us.
15 Please let me know what I should do to prepare for this last
16 resort.
17     "You asked if I am working alone.  There's only one other
18 person I know is aware of our special relationship, and I trust
19 that person absolutely.  I was extremely careful to gather the
20 files I possess slowly and naturally in the routine of my job
21 so no one would suspect my plan.  We received training on
22 warning signs to spot insider threats.  We made very sure not
23 to display even one -- even a single one.  I do not believe any
24 of my former colleagues would suspect me if there is a future
25 investigation.

PETER OLINITS - DIRECT EXAMINATION

1     "Thank you for your partnership as well as my -- as well,
2   my friend.  One day when it is safe, perhaps two old friends
3   will have a chance to stumble into each other at a cafe, share
4   a bottle of wine, and laugh over stories of their shared
5   exploits.  A fine thought but I agree that our mutual need for
6   security may make that impossible.  Whether we meet or not, I
7   will always remember your bravery in serving your country and
8   your commitment to helping me."
9     Signed, "Alice."
10  Q.  Special Agent, you just read that there was -- the letter
11  states, "There was only one other person I know is aware of our
12  special relationship, and I trust that person absolutely."
13     And then it also says, "We received training on warning
14  signals to spot insider threats.  We made sure -- we made very
15  sure not to display even a single one."
16     Based on your training and experience in espionage cases,
17  what stands out to you about those statements?
18  A.  It's the first time that a letter was passed to the FBI
19  where the pronoun "we" was used multiple times.  It clearly
20  states that there was somebody else that was aware of this
21  relationship, and the FBI is only aware of Diana assisting him
22  in this investigation.
23  Q.  How many of the dead drops -- there were four dead drops
24  total; correct?
25  A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  How many of those four dead drops did Diana assist Jonathan

2  with?

3  A.  Three.

4  Q.  So there was another dead drop that was planned after the

5  August 28th one; correct?

6  A.  Correct.  That was, again, in Jefferson County in

7  West Virginia on October 9th.

8  Q.  What was the FBI expecting to receive at that dead drop?

9  A.  So in the exchange of information in the Eastern

10 District -- in the eastern Virginia dead drop, the FBI

11 requested five additional 100-page package -- packets for a

12 total of $500,000.  So there will be potentially 500 pages of

13 additional classified information.

14 Q.  You were present on October 9, 2021, in Jefferson County,

15 West Virginia?

16 A.  Yes.

17 Q.  And who else was present at that dead drop location --

18 A.  Diana.

19 Q.  -- of the defendants?  Was it both Jonathan --

20 A.  Jonathan and Diana.

21 Q.  -- and Diana?

22 A.  Yes.

23 Q.  Did the FBI document this dead drop with still images and

24 video surveillance?

25 A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And what -- tell us about the status of both of their

2  phones on that day.

3  A.  Again, geolocational information on Jonathan's phone showed

4  that it was on and at home.  Diana's phone was in airplane

5  mode, and it was working fine all morning not in airplane mode

6  until she got in the vehicle to drive to Jefferson County where

7  at that point, the geolocational information failed to register

8  so the airplane mode was turned on.

9  Q.  And when she was arrested, what did she tell you about the

10 status of her cell phone?

11 A.  She said it was in airplane mode.

12 Q.  How long was the drive from their home in Annapolis,

13 Maryland, to the dead drop location?

14 A.  I think it was like an hour and a half.

15 Q.  Each way; correct?

16 A.  Yes.

17 Q.  And did they leave anyone at home during their drive to

18 West Virginia?

19 A.  They left their 11-year-old minor child at home alone.

20 Q.  And how do you know that?

21 A.  Through surveillance and a subsequent search warrant at

22 their residence revealed that that individual was the only

23 person at home.

24 Q.  If a phone was on airplane mode and another phone was in

25 the house, based on your experience, how would that 11-year-old

PETER OLINITS - DIRECT EXAMINATION

1  child be able to contact his parents by phone?

2  A.  They would not be able to.

3  Q.  Going to show you what's been marked as Government's

4  Exhibit 10.

5     Can you please identify what we are seeing on Government's

6  Exhibit 10?

7  A.  So this was a drop location in Jefferson County,

8  West Virginia, on October 9, 2021.  Jonathan is servicing the

9  dead drop.  Again, with Diana acting as a lookout.

10  Q.  How close would you say Diana is to Jonathan in this

11  picture?

12  A.  A couple feet away.

13          MS. SMOLAR:  Move to admit Government's Exhibit 10.

14          THE COURT:  Any objection, sir?

15          MR. MACMAHON:  No, Your Honor.

16          THE COURT:  It will be so admitted as Government's

17  Exhibit 10.

18     (Government's Exhibit No. 10 was admitted.)

19  BY MS. SMOLAR:

20  Q.  I want to show you what's been marked as Government's

21  Exhibit 11.

22          MS. SMOLAR:  And I'd move to admit Government's --

23  oh, I did that.  Sorry.

24  BY MS. SMOLAR:

25  Q.  Can you please identify Government's Exhibit 11?  Is this

PETER OLINITS – DIRECT EXAMINATION

1  one of the photos that the FBI took from the October 9th dead

2  drop?

3  A.  Yes.

4  Q.  What's happening in this photo?

5  A.  Again, they're arriving at the location of the dead drop

6  together.  They are clearly looking around for potentially

7  people that could see them doing it.  And when it was serviced,

8  there was no one in the area.

9          MS. SMOLAR:  Move to admit Government's Exhibit

10 11.

11         MR. MACMAHON:  No objection, Your Honor.

12         THE COURT:  It'll be so admitted.

13    (Government's Exhibit No. 11 was admitted.)

14 BY MS. SMOLAR:

15 Q.  I'm going to show you what's been marked as Government's

16 Exhibit 12.

17    Agent, is this another angle of the same dead drop?

18 A.  It is.

19 Q.  What are we seeing here?

20 A.  So actually in the previous picture, you can see that

21 Jonathan was holding a water bottle.  In this picture, she is

22 holding Jonathan's water bottle as she's acting as a lookout

23 while he services the drop.

24         MS. SMOLAR:  Move to admit Government's Exhibit 12.

25         MR. MACMAHON:  No objection, Your Honor.

PETER OLINITS – DIRECT EXAMINATION

1              THE COURT:  It'll be so admitted.

2       (Government's Exhibit No. 12 was admitted.)

3  BY MS. SMOLAR:

4  Q.  Did the FBI also have video surveillance of this dead

5  drop?

6  A.  Yes.

7              MS. SMOLAR:  Your Honor, at this time, I'd ask that

8  we show Government's Exhibit 5, the last video, to the Court

9  and to defense counsel.

10             THE COURT:  Are we ready to proceed with that?

11             THE CLERK:  Yes.

12             THE COURT:  All good?

13      All right.  You may proceed.

14      (Play video.)

15             THE CLERK:  Go ahead and turn it on (indiscernible).

16             THE COURT:  You may proceed.

17             MS. SMOLAR:  Turn it back on.  Just give me a second,

18  please.

19             THE COURT:  All right.

20  BY MS. SMOLAR:

21  Q.  Agent, based on your training and experience, can you tell

22  us what you observed of relevance in that video?

23  A.  Again, walking down to the trail together.  Looking around.

24  Specifically, Diana making sure she was watching the

25  surroundings as a dead drop was being serviced.  A very quick

PETER OLINITS – DIRECT EXAMINATION

 1  service which is very typical of tradecraft of espionage

 2  subjects.  They don't want to be on the "X" too long.  And,

 3  again, walking away together.  Dressed as you would if you were

 4  taking a hike in the woods.

 5        MS. SMOLAR:  Move to admit the last video on

 6  Government's Exhibit 5.

 7        MR. MACMAHON:  No objection, Your Honor.

 8        THE COURT:  It'll be so admitted.

 9     (Government's Exhibit No. 5, excerpt, was admitted.)

10  BY MS. SMOLAR:

11  Q.  What was left at the dead drop by Diana and Jonathan Toebbe

12  that day?

13  A.  So it was an additional SD card.  Again, in a gum wrapper.

14  A gum package.

15  Q.  I'm going to show you what's been marked as Government's

16  Exhibit 13.

17     Could you please identify Government's Exhibit 13?

18  A.  So it's a Dentyne Ice gum packet where one of the pieces of

19  gum is pushed through the foil, and replaced is a small SD card

20  that fits in that specific spot.  And that's what was left at

21  the drop location.

22        MS. SMOLAR:  Move to admit Government's Exhibit 13.

23        MR. MACMAHON:  No objection, Your Honor.

24        THE COURT:  It will be so admitted.

25     (Government's Exhibit No. 13 was admitted.)

PETER OLINITS – DIRECT EXAMINATION

1   BY MS. SMOLAR:

2   Q.  The defendants were arrested on October 9th after making

3   this drop; correct?

4   A.  Yes.  Both.

5   Q.  And was the FBI able to access this SD card?

6   A.  No.

7   Q.  Was the FBI able to determine what was on the SD card in

8   general?

9   A.  Yes.  So, again, we asked for 500 pages.  Five 100-page

10  documents of classified Navy information.  When we looked at

11  the SD card, we saw five large PDF files.  We saw -- and they

12  were encrypted.  We saw one text file which was encrypted which

13  we believe is likely a letter because that's what's been

14  happening in all these other subsequent ones or previous ones.

15  And there was one unencrypted Monero address so which we would

16  be able to pay them, and they would be able to give us the

17  decryption code to access these packets of information.

18  Q.  Was a search conducted at the Toebbe residence on

19  October 9th after their arrest?

20  A.  Yes.

21  Q.  By the FBI?

22  A.  Yes.

23  Q.  And what was that address?

24  A.  125 Boyd Drive in Annapolis, Maryland.

25  Q.  Just generally can you tell us the types of things that

PETER OLINITS – DIRECT EXAMINATION

1   were located in that home?

2   A.  So the FBI recovered a crypto-wallet, shredded documents,

3   $11,300 in cash, children's valid passports, information

4   contained about their passports.  There was a go-bag in their

5   bedroom that contained a Macintosh computer, a USB drive, and

6   some latex gloves in the backpack.  We also were able to

7   identify Jonathan's iPhone in the on position, plugged in,

8   charging in their bedroom among other things that we were able

9   to identify.

10          MS. SMOLAR:  Your Honor, at this time, I'd like to

11  show the witness Government's Exhibit 14 to 25 just to speed

12  things up a bit.  I'll provide a packet to everyone of those

13  exhibits.

14          THE COURT:  That's fine.  Go ahead.

15  BY MS. SMOLAR:

16  Q.  Special Agent, I'm going to take -- ask you to take a look

17  at Government Exhibits 14 to 25.  We will go through each one

18  individually, but can you tell us generally what this packet of

19  exhibits includes?

20  A.  It includes photographs that the FBI took of some of the

21  items I just described.

22  Q.  Okay.  Great.  Let's look at Government's Exhibit 14

23  specifically.  And can you tell us what some of the items that

24  we see in that photograph are and the location of that

25  photograph?

PETER OLINITS – DIRECT EXAMINATION

1   A.   Yeah.   The location of this photograph is in Jonathan and

2   Diana's bedroom.   Item number 4 is Jonathan's iPhone.   Item

3   number 9 is some type of box but within that box was $11,300 in

4   cash.   It appears to be a cardboard box.   Items number -- item

5   number 8 were the two minor children's passports that are

6   valid.   And item number 6 was the location of the

7   crypto-wallet.   It was in a container.   That was what that

8   picture shows.

9   Q.   Okay.

10           MS. SMOLAR:   Move to admit Government's Exhibit 14.

11           THE COURT:   Any objection, sir?

12           MR. MACMAHON:   No objection to any of these exhibits,

13   Your Honor, if that helps.

14           THE COURT:   All right.

15           MS. SMOLAR:   That will speed things up.

16           THE COURT:   That will speed things up quite a bit.

17   Thank you.

18     They'll all be admitted.   And you're referring to Exhibits

19   14 through --

20           MS. SMOLAR:   Through 25.

21           THE COURT:   Through 25.

22     (Government's Exhibit Nos. 14 through 25 were admitted.)

23   BY MS. SMOLAR:

24   Q.   If you could draw your attention to Government's Exhibit 15

25   and just tell us what that is.

PETER OLINITS - DIRECT EXAMINATION

1  A.  It's Jonathan Toebbe's iPhone that's plugged in in the on

2  position.

3  Q.  Turned on you mean?

4  A.  Turned on.

5  Q.  And Government's Exhibit 16?

6  A.  That's the cardboard box that the $11,300 was found in in

7  cash.

8  Q.  And Government's Exhibit 17.  Is that the cash you're

9  referring to?

10 A.  Yes.  It was $100 bills wrapped up in rubber bands.

11 Q.  All $100 bills?

12 A.  Yes.

13 Q.  Government's Exhibit 18.  Is that the go-bag that you

14 referred to?

15 A.  Yes.

16 Q.  Tell us what a go-bag is.

17 A.  It's a bag that you can utilize to get out of a situation

18 or leave very quickly.

19 Q.  And let's look at Government's Exhibit 19.  What was in the

20 go-bag?

21 A.  A Macintosh computer which is number 15 in this photograph.

22 Evidence item number 15.

23 Q.  And I'm going to ask you to turn your attention to

24 Government's Exhibit 20.  Is that the Macintosh with something

25 on top of it?

PETER OLINITS - DIRECT EXAMINATION

1  A.  Yes.  Latex gloves.

2  Q.  And were the latex gloves also found in the go-bag?

3  A.  Yes.

4  Q.  And just to go back to the Macintosh for a minute, did you

5  tell us earlier that the metadata from the SD cards that you

6  examined were from a Macintosh?

7  A.  Macintosh operating system, yes.

8  Q.  Government's Exhibit 21.  What's that?

9  A.  This is the USB drive that was also found in that go-bag.

10  Q.  Let's look at Government's Exhibit 22 and 23 together.

11  What is -- where was this item found and what is it?

12  A.  So this item was found in a different room of the house.

13  This appears to be in a laundry room.  They are -- it's a large

14  bag.  A trash bag full of shredded documents.

15  Q.  Just going to point out it looks like a lot of these

16  documents are in color.  Did any of the letters refer to color

17  photographs?

18  A.  Yes.  The writer of those letters that we were receiving as

19  part of the undercover operation indicated that they had

20  created color documents and graphs to make it easier for

21  COUNTRY1 to understand what they were looking at.

22  Q.  Let's look at Government's Exhibit 24 and 25.  Can you

23  explain what these two exhibits show?

24  A.  Sure.  Item 25 actually may be better to start with.  So

25  they're photographs of Diana and Jonathan.  Their passport

PETER OLINITS - DIRECT EXAMINATION

1    photographs.  On the top right of that -- of this exhibit, you
2    see only two photographs.  And there actually should be four so
3    two were missing.  In this same area, which was on their
4    kitchen table, we also found a United States Postal Service
5    receipt with a tracking number that was dated September 18,
6    2021, and it was directed towards Philadelphia, Pennsylvania.
7    Q.  And did your investigation reveal what was happening with
8    Diana and Jonathan's passports?
9    A.  So -- yes.  They had expired in February 2021.  And this
10   happened on a Saturday that we did this search.  On Monday the
11   FBI followed up with the Department of State, and they did
12   confirm that they had in their possession both of their
13   passports, and they were being processed in an expedited
14   fashion.
15   Q.  So they had requested expedited passports; correct?
16   A.  Yes.
17   Q.  Did you have an opportunity to examine as part of your
18   investigation whether Diana and Jonathan share a bank account?
19   A.  Yes.  And they do.
20   Q.  And did that bank account have a sufficient balance to
21   allow them to leave the United States?
22   A.  Yes.
23   Q.  We've talked about some of the things that you did find in
24   the house.  Let's talk about what you didn't find in the house.
25   Did you find the $100,000 in cryptocurrency Monero that was

PETER OLINITS - DIRECT EXAMINATION

1  paid by the FBI to the Toebbes?

2  A.  No.

3  Q.  Did you find the extra 50 packets of Restricted Data that

4  were offered to the FBI for $5 million in the home?

5  A.  We did not.

6  Q.  And you still haven't located those packets; correct?

7  A.  That's correct.

8  Q.  Based on your training and experience, you've discussed a

9  few things about tradecraft and what the Toebbes did to

10 disguise their identities and not get caught; correct?

11 A.  Yes.

12 Q.  We talked about airplane mode.  We talked about her acting

13 as a lookout.  Was there anything else that you have since

14 their arrest located on a search of any of their devices?

15 A.  Yes.  So a subsequent search of Jonathan's cell phone and

16 prior investigation revealed that Diana also had a Signal

17 account.  So there's a Signal account registered to Diana as

18 well as Jonathan.  And a Signal account is an encrypted

19 application to communicate.

20 Q.  Was there also a Telegram application on her phone?

21 A.  Yes.

22 Q.  What's that?

23 A.  It's also an encrypted application to communicate between

24 two parties.

25 Q.  Okay.  And during your review of that Signal application,

PETER OLINITS - DIRECT EXAMINATION

1  did you find any communications by Diana Toebbe that reflected
2  an interest in leaving the country?
3  A.  Yes.  We found quite a bit.
4  Q.  And did you prepare an exhibit for purposes of today's
5  hearing to read to the Court concerning these statements?
6  A.  Yes.
7  Q.  I'm going to show you Government's Exhibit 26.  Do you have
8  a copy?
9  A.  Yes.
10 Q.  So this is not all the communications that you have;
11 correct?
12 A.  No.
13 Q.  This is just an excerpt that you prepared for today's
14 hearing?
15 A.  Right.
16 Q.  Correct?  And it's from the Signal application?
17 A.  Yes.  That was found on Jonathan's phone.
18 Q.  Can you please read the date, the person stating the
19 statement, and the message for us, please.
20 A.  So there was four messages on March 4, 2019.  Jonathan
21 says, "I am also thinking about Plan A.  It's not morally
22 defensible either.  We convinced ourselves it was fine, but it
23 really isn't either, is it?"
24     Diana responded, "I have no problems at all with it.  I
25 feel no loyalty to abstractions."

PETER OLINITS – DIRECT EXAMINATION

1     Diana writes, "This was totally and completely different."

2     John writes, "Let's forget entirely about Plan B.  Wrong to

3  have even considered it.  I'm checking on A now."

4     On March 7, 2019, Jonathan writes, "We've got passports and

5  some savings.  In a real pinch, we can flee quickly."

6     Diana writes, "Right.  Let's go sooner than later."

7     Jonathan writes, "I really don't want to go back to making

8  $50,000 a year, especially not in a country where we don't know

9  the language."

10    Diana writes, "That wouldn't necessarily be how it would

11  be."

12    Jonathan says, "Realistically, my engineering degree is

13  basically worthless overseas."

14    Diana says, "You keep saying that, but I don't see the

15  evidence.  I cannot believe that the two of us wouldn't be

16  welcomed and rewarded by a foreign government."

17    Jonathan writes, "I'm not a PE, and my specialized

18  knowledge makes it hard to get anything in commercial nuclear

19  which is just as dead in Europe as here."

20    Jonathan writes again, "Let's talk when I get home."

21    Diana says, "I'm done talking about it right now.  I'm

22  getting angry."

23    On October 5, 2020, Diana writes, "I think we need to be

24  actively making plans to leave the country."

25         MS. SMOLAR:  Your Honor, this is a demonstrative

PETER OLINITS - DIRECT EXAMINATION

1  exhibit for purposes of today's hearing.  We can move its

2  admission if there's no objection.

3        THE COURT:  Is there an objection to the admission?

4        MR. MACMAHON:  No objection, Your Honor.

5        THE COURT:  Be so admitted.

6        MS. SMOLAR:  Admitted.

7     (Government's Exhibit No. 26 was admitted.)

8  BY MS. SMOLAR:

9  Q.  So we talked about the fact that the $100,000 in Monero has

10  not been located; correct?

11  A.  Yes.

12  Q.  All the classified documents have not yet been recovered;

13  correct?

14  A.  Yes.

15  Q.  And the FBI also has not yet obtained full access to the

16  ProtonMail accounts of the defendants; correct?

17  A.  That's correct.

18  Q.  And during the course of your investigation, did you

19  discover whether or not Jonathan Toebbe had a ProtonMail

20  account?

21  A.  Yes, he did.

22  Q.  And at some point in your investigation, did you learn

23  whether he had upgraded that account?

24  A.  Yes.  So in November -- so Jonathan Toebbe had a Proton

25  account since at least 2012 because he used it on his SF-86.

PETER OLINITS – DIRECT EXAMINATION

1  However, in 2018 -- in November of 2018, Jonathan purchased

2  what's called a Visionary Proton Plan.  It costs $479 and it's

3  a two-year plan.

4      That plan gives you access to the ability to resonate out

5  of -- of your choice of 55 countries, a VPN network as well as

6  a Tor which is The Onion Router.  So it's a way to deeply

7  encrypt and disguise any communications on ProtonMail.  It's

8  their highest level of protection that they offer.  After that

9  expired in November 2020, he renewed it for another two years

10 for $479, and I was able to see that in their joint checking

11 account.

12 Q.  And is there any -- based on your training and experience,

13 what concerns do you have about -- for example, if Mrs. Toebbe

14 was to go home today and access the internet, what could she

15 do?

16 A.  She could further hide the $100,000 where the government

17 would not be able to find that.  She could use that money to

18 flee the country.  She could access that money from any country

19 as long as she had access to the internet.  She could alter any

20 type of electronic accounts that we're unaware of or unable to

21 get into, including ProtonMail accounts.  She could alter or

22 destroy any type of cloud-based accounts that the two of them

23 may have.

24 Q.  And did you learn during the course of your investigation

25 that there was a drop box account that has yet to be accessed

PETER OLINITS - CROSS EXAMINATION

```
 1  as well?
 2  A.  Yes.  And, lastly, she could potentially sell this to other
 3  buyers as was described which was already part of potentially
 4  their plan.
 5  Q.  And at this point in time, you don't know whether other
 6  countries have been solicited by these defendants?
 7  A.  Not at this time.
 8            MS. SMOLAR:  No further questions, Your Honor.
 9            THE COURT:  Mr. MacMahon, cross examination, sir?
10            MR. MACMAHON:  Thank you, Your Honor.
11                      CROSS EXAMINATION
12  BY MR. MACMAHON:
13  Q.  Agent, I'm sorry.  It's been a while.  I forgot your
14  name.
15  A.  Peter Olinits.
16  Q.  How do you say that again?
17  A.  Olinits.
18  Q.  Let's try to go backwards.  These Telegram messages that
19  you just read --
20  A.  Yeah.
21  Q.  -- those are from a couple of years ago; right?
22  A.  That's correct.
23  Q.  And they all predate anything that happened in this case,
24  don't they?
25  A.  No.  So there is metadata on the original --
```

PETER OLINITS – CROSS EXAMINATION

1   Q.  Sir, these -- what you just read to the Court predates what
2   happened in this case.  I'll ask you --
3   A.  Now --
4   Q.  -- about the metadata in a second.
5   A.  Okay.
6           MS. SMOLAR:  Objection, Your Honor.  He was trying to
7   answer the question.
8           THE COURT:  I'm going to allow him to answer the
9   question, but I think Mr. MacMahon's question was "Do they
10  predate?"  I'd like to hear the defendant -- the witness's
11  answer to that.
12  A.  So the metadata showed that the SD card that was sent to
13  COUNTRY1 on April 1, 2020, was taken around the timeframe or
14  was put on that card around the timeframe of 2018.  So this is
15  after that.
16  BY MR. MACMAHON:
17  Q.  Okay.  Well, let's -- you know from all of your
18  surveillance of the Toebbe residence that Mrs. Toebbe was not a
19  fan of President Trump; correct?
20  A.  I suppose.
21  Q.  Yeah.  And there was talk in other documents that you saw
22  about her wanting to leave the country if Trump got reelected.
23  You saw that too, didn't you?
24  A.  Yes.
25  Q.  She's not the only liberal that's wanted to leave the

PETER OLINITS - CROSS EXAMINATION

 1  country over politics; right, sir?

 2          MS. SMOLAR:  Objection, Your Honor.  That's not a

 3  relevant question for this agent.

 4          THE COURT:  It's not, but I'm going to allow him to

 5  ask his questions.  I allowed you to ask your questions.  This

 6  is a detention hearing so go right ahead.

 7  BY MR. MACMAHON:

 8  Q.  That's correct, isn't it, sir?

 9  A.  Yes.

10  Q.  Now, the computer that you accessed, the Macintosh

11  computer, you've of course had a chance to look at that

12  computer, haven't you?

13  A.  Not at this time.

14  Q.  That was Mr. Toebbe's computer, wasn't it?

15  A.  Yes.

16  Q.  Mrs. Toebbe's computer was given to her by her work.  Have

17  you seized that too?

18  A.  I believe so.

19  Q.  Okay.  And did you find any evidence on Ms. Toebbe's

20  computer at all that she drafted a single one of these notes

21  that you sat here and read in court today?

22  A.  We haven't been able to examine all the evidence at this

23  time.

24  Q.  But the Macintosh computer that you were -- you seized from

25  the residence, you're saying you haven't been able to look at;

**JA90**

64

PETER OLINITS - CROSS EXAMINATION

1  correct?

2  A.  It's still an ongoing investigation.

3  Q.  Okay.  But that's the kind of computer that the notes that

4  you read here on and on in court today would have been composed

5  on, isn't that correct?

6  A.  Yes.

7  Q.  Okay.  And so you don't have any evidence sitting here

8  today that Mrs. Toebbe drafted a single one of those notes that

9  you read today in court; correct?

10 A.  Again, not at this time.

11 Q.  And you've been working on this for a while, haven't you,

12 sir?

13 A.  Yes.

14 Q.  Okay.  Did you put wiretaps inside of their house?

15 A.  No.

16 Q.  So you don't have any -- did you put wiretaps inside of

17 their car?

18 A.  No.

19 Q.  Any listening devices at all?

20 A.  No.

21 Q.  So did you record any of the cell phone calls between

22 Mr. and Mrs. Toebbe?

23 A.  No.

24 Q.  That's part of your investigate -- you didn't do any of

25 that as part of your investigation?

**JA91**

PETER OLINITS - CROSS EXAMINATION

1  A.  We've done quite a bit of search warrants but not any kind

2  of listening devices.

3  Q.  You didn't do anything proactive while any of the events

4  you've talked about today were happening; correct?

5  A.  We did search warrants on historical cell site data,

6  geolocational data of their phones, their email accounts,

7  things like that.

8  Q.  Right.  And the FBI can go to a judge and get permission to

9  put a listening device in somebody's car, can't they?

10 A.  Yes.

11 Q.  And you didn't do it?

12 A.  Right.

13 Q.  Right?

14 A.  That's correct.

15 Q.  Okay.  So you don't have any recordings of what Mr. Toebbe

16 may have told Mrs. Toebbe as they drove to any of these sites;

17 correct?

18 A.  That is correct.

19 Q.  And you don't have any listening device warrants for the

20 house; you can't give me any -- you don't have any recordings

21 whatsoever of what Mr. Toebbe may have told her he was up to in

22 this timeframe; right?

23 A.  No.  But, again, in the letter, he had stated that there

24 was one person that knew about this relationship, and the only

25 person --

PETER OLINITS - CROSS EXAMINATION

1  Q.  Agent, this will go a lot faster if you answer my

2  questions.  You don't have any -- you don't have any recordings

3  whatsoever of what Jonathan Toebbe told his wife he was up to

4  in the time that you were working on this case?

5  A.  Correct.

6  Q.  That's correct.  And when you read the email, you have no

7  evidence that Mrs. Toebbe ever saw that email, drafted it, or

8  had anything to do with it; correct?

9  A.  Not at this time, but we still have a lot of evidence to

10  review.

11  Q.  And when it says that there's only one person -- you don't

12  even know if that's a true statement, do you?

13  A.  What I do know is that she was there for three of the four

14  dead drops where classified information was exchanged.

15  Q.  And, again, you don't have any idea what Mr. Toebbe told

16  her he was up to at all.  You just assumed she was a

17  conspirator in his plans; correct?

18       MS. SMOLAR:  Objection, Your Honor.  He's asked and

19  answered the same question many times already.

20       THE COURT:  Go ahead with your line of questioning.

21  I'm going to overrule your objection.

22     Go ahead, Mr. MacMahon.

23  BY MR. MACMAHON:

24  Q.  Do you need me to ask that question again?

25  A.  Yes, please.

PETER OLINITS - CROSS EXAMINATION

1  Q.  Other than your suspicion, based upon your training and

2  experience, that she was present when these three dead drops

3  took place and that she had a phone on airplane mode, you don't

4  have any evidence whatsoever that she knew what Mr. Toebbe was

5  doing with any of these plans that he took with him from the

6  Navy Yard, do you?

7  A.  No -- no listening -- recorded plans.

8  Q.  No anything.  You don't have anything, do you?

9  A.  Again, we have a lot of digital evidence to review at this

10  time.

11  Q.  Did it occur to you as part of your investigation that

12  maybe Mr. Toebbe was telling her he was up to something other

13  than espionage against the United States?

14  A.  I think that would be a difficult thing to sell but maybe.

15  Q.  But maybe.  Mrs. Toebbe never had access to any classified

16  information at all, did she?

17  A.  She did not.

18  Q.  Right.  She wasn't stealing information from the Navy Yard

19  and taking it out and bringing it home, was she?

20  A.  No.

21  Q.  Right.  You don't have any evidence she ever even went to

22  the Navy Yard or any other facility where these documents for

23  the $3 billion submarine might have come from; correct?

24  A.  Correct.

25  Q.  Never, never in her life did this woman have access to any

PETER OLINITS - CROSS EXAMINATION

1   classified information whatsoever?

2   A.  She never had a clearance, no.

3   Q.  Okay.  And you don't know of any discussions that she may

4   have had with her husband about whether he stole classified

5   information from the federal government; right?

6   A.  I don't believe so.

7   Q.  Now, you testified a lot about Mrs. Toebbe and her SDRs.

8   That's a great word in counterespionage, isn't it, Agent?

9   A.  It's a tradecraft term, sir.

10  Q.  Right.  And the tradecraft in this case was not good.  It

11  was terrible, wasn't it?

12  A.  I mean they went above and beyond to disguise things in

13  different -- you know, as we saw in a Band-Aid, in gum

14  wrappers, dressing the part for the locations they were at,

15  walking significant, you know, distances to try to -- when

16  there was areas that they could have parked a lot closer.

17  Q.  Sir, you knew what they were doing the whole time.  Its SDR

18  and tradecraft was terrible, wasn't it?  He fell right for your

19  trap and handed you all these documents in exchange for a

20  little bit of money.  That's correct, isn't it?

21  A.  I don't think it was terrible.

22  Q.  Okay.  Well, they're certainly here now, aren't they?

23  A.  Yes.

24  Q.  Okay.  And Mrs. Toebbe was never trained whatsoever in

25  anything like an SDR or tradecraft or anything like that, was

PETER OLINITS - CROSS EXAMINATION

1  she?

2  A.  It said in one of the letters that "We" -- the pronoun we

3  -- "have been very careful in not to present any of the insider

4  threats."  That was a quote.

5  Q.  Right.  And you don't even know if that's true, whoever

6  wrote that; right?

7  A.  Whoever wrote it was trying to be honest with the

8  undercover operation.

9  Q.  And it says actually in the letter -- I think your own

10  counsel -- it says, "We received training on warning signs."

11  Right?  "We received training."

12      You said, "Oh, Judge, here's a place where they said we

13  again."  Right?

14  A.  That's right.

15  Q.  You remember that?

16  A.  Yes.

17  Q.  She never received any training.  She's a school teacher.

18  A.  He had training, and he could have trained her.

19  Q.  But you don't know that that ever happened.  That's another

20  one of your suppositions in this case; right?

21  A.  We have to review more evidence.

22  Q.  And you want her detained while you review more evidence to

23  find out maybe this woman is innocent; correct?

24  A.  I would like her detained because I believe she's a flight

25  risk.

**JA96**

70

PETER OLINITS - CROSS EXAMINATION

1   Q.   Okay.  Well, she doesn't even have a passport, does she?

2   A.   The passport is currently with the Department of State.

3   Q.   Sir, she doesn't have a passport; right?

4   A.   That's correct.

5   Q.   Okay.  And in your review of the evidence you seized in her

6   house, didn't you find out that the family was planning a trip

7   in early February and that's why they were getting their

8   passports renewed?

9   A.   They were planning a trip, but that still doesn't preclude

10  her from potentially leaving the country.

11  Q.   Okay.  You told the judge that she was ordering passports

12  on an expedited basis, and you wanted to suggest to the Court

13  that she was getting ready to flee the United States; right?

14  A.   Yes.

15  Q.   But she was going on a trip in February.  Why didn't you

16  tell the judge that?  It wasn't on the list of questions, sir?

17  A.   I did know about the trip that they were potentially

18  planning.  I think it was in the spring of 2022.

19  Q.   Right.  And you don't have any information that Mrs. Toebbe

20  knows where any of this crypto-money is, how to access it, or

21  how to do anything with cryptocurrency, do you?

22  A.   At this time, no, but we did find a crypto-wallet in their

23  house.

24  Q.   Right.  Did you take fingerprints off of that?

25  A.   At this time, we have to analyze that.

PETER OLINITS - CROSS EXAMINATION

1  Q.  But you didn't -- you're not going to tell the judge you
2  found her fingerprints on a crypto-wallet; right?
3  A.  I don't -- we did not at this point.
4  Q.  Okay.  You didn't find her fingerprints on any of the
5  documents or anything that was left at any of the dead drops;
6  right?
7  A.  Some of that is still being processed.
8  Q.  Oh.  They're still working on that too, sir?  You have any
9  video of her packing a sandwich with an SD card in it?
10 A.  We do not, sir.
11 Q.  Do you have any video of Mrs. Toebbe putting a Band-Aid
12 together with an SD card in it?
13 A.  No.
14 Q.  You didn't put any cameras inside their house as part of
15 this investigation to see what they were up to?
16 A.  We did not.
17 Q.  You think Mrs. Toebbe knows the first thing about nuclear
18 submarines?
19 A.  I don't have any reason to believe she would.
20 Q.  What do you know about Mrs. Toebbe's background?  She has
21 no prior record at all; correct?
22 A.  That is correct.
23 Q.  All right.  She has a husband who has apparently been
24 running around trying to sell secrets that the FBI is chasing
25 around; correct?

PETER OLINITS - CROSS EXAMINATION

1   A.  With her there.

2   Q.  Right.  With her there.  But you've already told us you

3   don't know that she knew everything that was going on; correct?

4   A.  At this time, we still have a lot to review.  We have a ton

5   of digital evidence we need to look at.

6   Q.  Well, in the affidavit that was -- the arrest warrant

7   was -- Ms. Toebbe's name is about three times in a 25-page

8   document, isn't it?

9   A.  Yes because she was at three locations.

10  Q.  Right.  But in terms of drafting things, stealing things,

11  trying to sell things, you don't have her identified as doing

12  any of that, do you?

13  A.  No.

14  Q.  Do you know how Mr. Toebbe was able to steal these

15  documents from classified American facilities?

16  A.  The only thing I know is that he -- that the letter

17  indicated that he was taking out the information several pages

18  at a time as to avoid scrutiny by security officers.

19  Q.  Okay.  Did you go to the Navy Yard and do a

20  counterintelligence operation to see if you could catch him

21  there doing it?

22  A.  No.

23  Q.  Didn't that occur to you, sir?

24  A.  So how he was getting those documents out of the Navy is

25  yet to be determined.

PETER OLINITS - CROSS EXAMINATION

1  Q.  Right.  And, again, she's never even been there, has no

2  access to any of this information; right?

3  A.  I don't believe so.

4  Q.  Right.  And she couldn't give -- whoever COUNTRY1 is, she

5  couldn't give anything to COUNTRY1 or anybody else if she got

6  out; right?

7  A.  She did not have access to classified information.

8  Q.  Right.  And she couldn't flee the United States without a

9  passport; right?

10 A.  That's incorrect.  So --

11 Q.  With an ankle monitor on?

12 A.  So I've worked other espionage cases that you may be

13 familiar with, and I know this Court is familiar with, where

14 the defendant left the country multiple times without a

15 passport.

16 Q.  Okay.  Not after they'd been arrested and were on bond;

17 correct?

18 A.  That's correct.

19 Q.  Right.  And with an ankle monitor on which the pretrial

20 tells the judge is a very good way.  Or how about if their

21 father came and stayed with them who is a retired naval

22 officer --

23         MR. MACMAHON:  Excuse me, Your Honor.

24 BY MR. MACMAHON:

25 Q.  -- that would -- could help as well, wouldn't it?

74

PETER OLINITS – CROSS EXAMINATION

1    A.   I just read various things about her trying to leave the
2    country, and she was at several of these drops.  So, you know,
3    I think she'll try to leave the country if she's let out.
4    Q.   But you have no proof that she ever tried to leave the
5    country and flee these charges at all; right?
6    A.   No, but she has traveled outside the country before.
7    Q.   Well, so have you, haven't you?
8    A.   I have, sir.
9    Q.   Is that evidence of a crime?
10   A.   No.
11   Q.   Is having a Signal account evidence of a crime?
12   A.   No.  It's just tradecraft behavior of espionage subjects.
13   Q.   Right.
14   A.   It's one of many things.
15   Q.   So I have a Signal account.  Does that make me a spy too,
16   sir?
17   A.   No, sir.
18   Q.   How about a Telegram account?
19   A.   It does not.
20   Q.   But you want to tell the judge she had one; right?  Make it
21   look like she was a spy because she had a Signal account?  Is
22   that right, sir?
23   A.   No, sir.  I don't want that.
24              MR. MACMAHON:  Can I consult with counsel for a
25   second, Your Honor?

PETER OLINITS – CROSS EXAMINATION

```
 1              THE COURT:  You may, sir.
 2  BY MR. MACMAHON:
 3  Q.  Sir, I'm sorry.  One last thing.
 4              MR. MACMAHON:  I'm sorry, Your Honor.
 5  BY MR. MACMAHON:
 6  Q.  There's two children in the house, aren't there?
 7  A.  Yes.
 8  Q.  And you know from the surveillance of the house that
 9  Mrs. Toebbe loves and takes care of her children; correct?
10  A.  I do know -- I do know she's there quite a bit.
11  Q.  Right.  And she's a school teacher at a private school in
12  Annapolis?
13  A.  Yes, sir.
14  Q.  You believe that her kids might need their mother at home?
15  A.  I believe that if they needed to get in touch with their
16  mother when she was committing an espionage activity with her
17  husband that she shouldn't have had her phone off that day.
18  Q.  Okay.  Sir, that's a good argument.  You don't have any
19  proof that she was committing espionage that day, do you?
20  A.  She was witness to it, and she was assisting with it.
21  Q.  She was a witness to it.  Okay.
22              MR. MACMAHON:  Thank you, Your Honor.  That's all I
23  have.
24              THE COURT:  Any redirect?
25              MS. SMOLAR:  Yes, Your Honor.
```

76

PETER OLINITS - REDIRECT EXAMINATION

```
 1                    REDIRECT EXAMINATION
 2   BY MS. SMOLAR:
 3   Q.  Special Agent, are you aware of an indictment that was
 4   returned yesterday that charged Diana Toebbe with three very
 5   serious federal crimes?
 6   A.  Yes.
 7   Q.  Espionage crimes under the Atomic Energy Act; correct?
 8   A.  Yes.
 9   Q.  For aiding and abetting Jonathan Toebbe at these particular
10   drops of Restricted Data; correct?
11   A.  Yes.
12   Q.  And the Toebbes have been married for 18 years; correct?
13   A.  Eighteen years.
14   Q.  And during that time, Mr. Toebbe worked for the Navy;
15   correct?
16   A.  He did.
17   Q.  And the MacBook that you found as well as the cash, the
18   $11,300 in cash, as well as the latex gloves, they were all
19   found in their shared bedroom; correct?
20   A.  Shared bedroom, yes.
21   Q.  And you don't know if Mr. Toebbe provided Ms. Toebbe with
22   the passwords to the ProtonMail account, to the
23   cryptocurrency -- we don't know any of that yet, do we?
24   A.  No.
25   Q.  But we're going to find out; right?
```

PETER OLINITS – REDIRECT EXAMINATION

1  A.   We will.

2  Q.   The documents that were taken from the Navy pursuant to

3  Mr. Toebbe's messages, they were taken several years ago;

4  correct?

5  A.   Yes.  At least around the 2018 -- 2018 timeframe.

6  Q.   And you learned that from looking at the metadata on the SD

7  card; correct?

8  A.   Yes.

9  Q.   That had the date of 2018?

10 A.   That was the time that information was put on the SD card.

11 Q.   Let's just talk about the passports briefly.  I know you

12 stated that you worked on a case where someone was able to

13 leave the country without a passport.  Can you explain that?

14 A.   So espionage subject wanted to basically defect to Russia

15 to sell classified information.  As part of that plan that

16 individual conducted a scouting trip to ensure their safe

17 passage to and from Mexico.  And I think it was May of 2019

18 where that person was able to cross over into Mexico without a

19 passport and cross back into the United States.  Thereafter --

20 I think it was August of that month -- of that year -- she

21 kidnapped her six-year-old child and took her down to Texas

22 where they took a taxi into Mexico without a valid passport.

23 And they also had class -- she also had classified information

24 with her during that trip.

25 Q.   And isn't it possible that if there was a country that

PETER OLINITS - REDIRECT EXAMINATION

1   wanted to obtain the 50 packets of Restricted Data from

2   Mrs. Toebbe, they could provide her with safe passage to

3   another country with or without her current passport?

4           MR. MACMAHON:  Objection to the form of the question

5   about possibility.  The government hasn't even bothered to talk

6   about what embassy was reached out to.  Whether it's a friendly

7   country or otherwise.  I think it's very speculative for the

8   agent to say what might be possible in this regard.

9           MS. SMOLAR:  Counsel just asked all kinds of

10  possibility and speculation questions.

11          THE COURT:  There's a lot of speculation and

12  possibility going on in this room right now.  Let's move along

13  with the questioning, please.

14  BY MS. SMOLAR:

15  Q.  The three drops that Diana Toebbe was present for and aided

16  and abetted her husband with in this case on the July 26th --

17  I'm sorry -- June 26th, July 31, and October 9th, she left her

18  children for those drops; correct?

19  A.  Yes.

20  Q.  And then finally with regard to the Signal messages that we

21  referred to, there's a discussion in here about more than one

22  plan; correct?  Plan A and Plan B?

23  A.  Correct.

24  Q.  Do any of those plans refer to President Trump?

25  A.  No.  Not that I know of.

**JA105**

PETER OLINITS – RECROSS EXAMINATION

```
 1              MS. SMOLAR:  No further questions.
 2              THE COURT:  Any recross?
 3                        RECROSS EXAMINATION
 4   BY MR. MACMAHON:
 5   Q.  Sir, you just told us before that this isn't even all the
 6   messages.  These are the ones you picked out.
 7   A.  That's correct.
 8   Q.  Correct.  So on the exhibit that you picked out, there's
 9   nothing about Donald Trump?
10   A.  It has to do with them fleeing the country.
11   Q.  Well, that's the way you read it; right?  And there are --
12   A.  That's what it says.
13   Q.  -- other messages that deal with leaving the country
14   because of President Trump; right?
15   A.  I don't remember specifically but maybe.
16              MR. MACMAHON:  That's all, Your Honor.
17              THE COURT:  Any redirect?
18              MS. SMOLAR:  Nothing further, Your Honor.
19              THE COURT:  All right, sir.  Thank you.  You may step
20   down.  Thank you.
21      (Witness excused).
22              THE COURT:  All right.  Before we proceed, let's
23   take about a five-minute break.  Give everybody a chance
24   to get a drink of water and take an urgency break if
25   necessary.
```

**JA106**

```
 1        So we'll be back in five minutes.  We'll take a brief
 2   recess.
 3          (Recess 2:57 P.M. - 3:04 P.M.)
 4              THE COURT:  All right.  Counsel, any additional
 5   evidence or witnesses that you'd like to present?
 6              MS. SMOLAR:  Just argument, Your Honor.  No further
 7   witnesses.
 8              THE COURT:  All right.  Very well.  Does the
 9   defendant have any witnesses or evidence that you would like to
10   present, sir?
11              MR. MACMAHON:  No, Your Honor.  Thank you.
12              THE COURT:  All right.  I'll hear argument from the
13   parties.
14              MS. SMOLAR:  Your Honor, I'd first just refer the
15   Court to the pretrial services recommendation which is in favor
16   of detention in this case.  Clearly, electronic monitoring,
17   home detention are insufficient to address --
18              THE COURT:  Let me just interrupt you.  We may do
19   things a little bit differently in this court, but you do --
20   both parties have been given access to the pretrial services
21   report.
22              MS. SMOLAR:  Correct.
23              THE COURT:  As part of the evidentiary aspects of
24   this case, you're proffering the pretrial services report to
25   the Court for consideration?
```

```
 1              MS. SMOLAR:  Yes, Your Honor.

 2              THE COURT:  All right.

 3              MS. SMOLAR:  Thank you.  And I apologize for

 4  that.

 5              THE COURT:  And if you -- and what we tend to do

 6  here is that if you proffer that, there may be portions of

 7  your pretrial services report that you'd like to point out to

 8  the Court.  And what I do is then I give defense counsel the

 9  opportunity to respond to that proffer and acknowledge that

10  our pretrial services officer is also present in the

11  courtroom for examination if they'd like.  So I'll give you

12  that same option.  If you want to call the pretrial services

13  officer, you may.  If you want to proffer that, I'm also

14  going to give the defense counsel the opportunity to respond

15  to the proffer or call the pretrial services officer.  So that

16  is entirely up to you, but I just wanted to alert you as to my

17  procedure.

18              MS. SMOLAR:  In that case, Your Honor, I very much

19  appreciate that, and I apologize for not being familiar with

20  that.

21     I would like to call very briefly the pretrial services

22  officer in this matter.

23              THE COURT:  All right.  Very well.

24     (The witness was sworn in.)

25              THE WITNESS:  I do.
```

**JA108**

MICHAEL DEHAVEN - DIRECT EXAMINATION

1                    DIRECT EXAMINATION

2    BY MS. SMOLAR:

3    Q.  Good afternoon, sir.  Can you please state your name.

4    A.  Yes.  It's Michael DeHaven.

5    Q.  And what's your title?

6    A.  I'm a United States probation officer in the Northern

7    District of West Virginia assigned to the Martinsburg office.

8    Q.  And did you prepare this pretrial services report regarding

9    Diana Toebbe?

10   A.  I did.

11   Q.  And what was your recommendation in this report?

12   A.  I recommended the defendant be detained.

13   Q.  And what were the reasons, just generally if you could,

14   that you recommended detention?

15   A.  We consider primarily two categories:  Risk of

16   nonappearance and risk of danger.  I made recommendations for

17   detention based on both -- aspects of both those categories.

18   Q.  And what were your concerns regarding risk of

19   nonappearance?

20   A.  Risk of nonappearance, if I can refer to the report, Your

21   Honor, would be the nature of the instant offense.  That would

22   include the circumstances of the conduct, the allegations

23   against her, the potential penalty of the offenses with which

24   she's charged, substance abuse history, mental health -- oh,

25   I'm sorry.  I believe I'm reading the -- reviewing the risk of

**JA109**

MICHAEL DEHAVEN - DIRECT EXAMINATION

1   danger here.  Nature of the instant offense, substance abuse
2   history, mental health history, and unexplained or potentially
3   undisclosed assets.
4   Q.  With regard to the unexplained assets, what do you mean by
5   that?
6   A.  During my interview with the defendant, she claimed almost
7   no knowledge of the financial assets of her household.  She'd
8   give very little information regarding, you know, income and
9   outcome, expenses of the house, assets, liabilities,
10  obligations.  Even simple things like checking account
11  balances, savings account balances.
12  Q.  And you also indicate a substance abuse history?
13  A.  Yes.  During the interview with the defendant, she
14  acknowledged basically social consumption of alcohol but also
15  persistent use of -- occasional use of marijuana for a number
16  of years.
17  Q.  And on page 8 of your report, you indicate under the
18  assessment of danger that the charge involved using a computer
19  to facilitate the offense.  Explain that to us, please.
20  A.  Yes.  Just the ready availability of technology to
21  potentially expand upon the alleged offense conduct to use it
22  to facilitate flight or, you know, disclose additional
23  restricted information.
24  Q.  Just practically speaking, if the defendant was barred --
25  was released but barred from using the internet, would that

MICHAEL DEHAVEN - DIRECT EXAMINATION

 1  necessarily solve all the risk?
 2  A.  It wouldn't.  It's definitely a strategy to take to attempt
 3  to mitigate that specific identified risk, but it would be very
 4  simple for the defendant to, say, borrow a smart phone from
 5  somebody and circumvent that.
 6  Q.  Well, she has two children; right?
 7  A.  Yes, ma'am.
 8  Q.  And they're teenage age; correct?
 9  A.  Yes, ma'am.
10  Q.  I assume they have cell phones that would have to be taken
11  away; correct?
12  A.  I believe they do.  If they were in the home with her, I
13  would recommend that certainly.
14  Q.  So you'd recommend that no one in the home have any access
15  to the internet?
16  A.  That would be my recommendation.  You know, prohibition on
17  devices capable of accessing the internet in the home with the
18  added stipulation that the defendant be restricted to the
19  residence and monitored via location monitoring.
20  Q.  And in these days with Zoom and school sometimes remote
21  that could be very difficult for children not to have internet;
22  correct?
23  A.  Yes, ma'am.  I imagine it would be.
24  Q.  And then if the defendant is on home detention with
25  electronic monitoring, and she decides to cut that monitor off

MICHAEL DEHAVEN - DIRECT EXAMINATION

1   and leave the home, how quickly can you get there to stop

2   her?

3   A.   Because of her place of residence, if we're talking about

4   her releasing back to the address in Annapolis, her supervision

5   would be transferred to the U.S. Probation Office in the

6   District of Maryland.  Their probation office locations are

7   actually in Baltimore and Greenbelt, Maryland.  I would say

8   probably the quickest possible response time would involve the

9   monitoring center receiving the alert, sending that alert to

10  the officer assigned to supervise the defendant, the officer

11  assessing the specific nature of that alert, and then if it

12  was something like, you know, obviously equipment was tampered

13  with or he was, you know, after a time unable to get a hold of

14  the defendant or had some other information, you know,

15  contacting local law enforcement and having them respond to

16  the residence.

17  Q.   So that's a number of steps; correct --

18  A.   Correct.

19  Q.   -- once that monitor is cut?

20  A.   Yes, ma'am.

21  Q.   Likewise, if the defendant was permitted to leave the home,

22  for example, for a doctor's appointment or to meet with her

23  counsel, and decided to drop some restricted data somewhere

24  along the way, would you have any knowledge of that?

25  A.   No, ma'am.

MICHAEL DEHAVEN – CROSS EXAMINATION

```
1              MS. SMOLAR:  No further questions.
2              THE COURT:  Any cross examination?
3              MR. BECK:  Yes.  Thank you, Your Honor.  I'm going to
4    do this.
5                         CROSS EXAMINATION
6    BY MR. BECK:
7    Q.  Mr. DeHaven, am I correct that Ms. Toebbe indicated to you
8    that her husband handled all the financial affairs of the
9    family?
10   A.  Yes.  She said in large part, he made the payments on
11   student loans, car payments, those sort of things, yes.
12   Q.  And did you confirm that with her husband?
13   A.  I did not, no.
14   Q.  Did someone in your office?
15   A.  I believe during Officer Bartholomay -- who was assigned to
16   interview him.  He did -- was able to provide much greater
17   detail with regard to the finances.
18   Q.  My question was, "Did he confirm though that he was the
19   person responsible in their household for handling the
20   financial affairs?"
21   A.  I'm not a hundred percent if he was asked that question and
22   answered "yes."
23   Q.  Would it be important for us to know that since Mrs. Toebbe
24   said she had no knowledge of the accounts because she didn't
25   handle the affairs of her family -- financial affairs?
```

MICHAEL DEHAVEN – CROSS EXAMINATION

1   A.   I think it's a legitimate question, yes.  My recollection

2   was her representation was she had limited knowledge.  Not that

3   she was completely uninvolved.

4   Q.   So the fact that she had limited knowledge of her financial

5   affairs, is that of any significance here today?

6   A.   It speaks to or it piques my assessment of the risk as a

7   risk factor being that she's a, you know, obviously in speaking

8   with her, highly intelligent, capable adult with a Ph.D. and

9   couldn't even give an estimation of basic financial

10  information.

11  Q.   Would it shock you if I told you that my wife handles all

12  our financial affairs?

13  A.   I guess it would.

14  Q.   Okay.  Are you aware of couples that do that?  That one

15  spouse handles the affairs and the other one just kind of makes

16  the money or provides income and the other one pays it?

17  A.   Yeah, I certainly don't think that's an arrangement that

18  doesn't exist.  I'm just saying in the context of my assessment

19  of the defendant's risk in this particular circumstance, it was

20  a line item I considered.

21  Q.   Well, I guess one -- are you saying that you think she's

22  not telling the truth, and she knows where all the money is or

23  that because she doesn't know where all the money is, it's a

24  risk?  Which one are you saying?

25  A.   Well, I'm not saying it's black or white one way or the

MICHAEL DEHAVEN – CROSS EXAMINATION

1  other.  I'm saying it's possible that there are assets that she

2  knows about she's not disclosing, particularly in a case where,

3  you know, $100,000 was alleged to be distributed to the

4  defendant.  You know, when she has a salary coming in that

5  she's not able to estimate her own salary -- I mean --

6  Q.  She told you what her salary was from her school; correct?

7  A.  Yes, she estimated her salary.

8  Q.  Okay.

9  A.  I'm talking about I guess in more specific terms.

10  Q.  Well, I guess what I'm -- are you saying that it's possible

11  she's lying to you about not knowing where the assets are?  Is

12  that what you're saying?

13  A.  I do believe it's a possibility, yes.

14  Q.  It's also possible she's telling the truth; right?

15  A.  Yes, sir.

16  Q.  And you don't know one way or the other whether she --

17  whether one is true versus the other; correct?

18  A.  Not with any certainty.

19  Q.  Okay.  So that shouldn't play any role in the Court's

20  determination of whether to release her or not; correct?

21  A.  In my opinion, it's a factor that the Court could

22  consider.

23  Q.  Well, if you don't know, how does the scale lean one way

24  or the other?

25  A.  That's a determination for the Court to make.

MICHAEL DEHAVEN - CROSS EXAMINATION

1  Q.  Well, you made the recommendation.  So I'm just asking you

2  to admit that for purposes of now that we know more about it,

3  it shouldn't play any role whatsoever in the detention

4  decision; correct?

5  A.  I'm not sure what I -- what more I know about it.

6  Q.  All right.  I think I understand your answer.

7     So there's also a mention in your report regarding foreign

8  travel that the Toebbes had engaged in in the past; is that

9  correct?

10 A.  Yes.

11 Q.  Okay.

12 A.  We discussed travel.

13 Q.  And one of the indications was that Ms. Toebbe forgot to

14 mention to you a 2018 vacation to the Bahamas; correct?

15 A.  Yes.  She did not report that.

16 Q.  Okay.  And we -- I was present for that interview; correct?

17 A.  Yes, sir.

18 Q.  At the time, I think that might have been -- was either

19 Wednesday or Thursday of last week.  I can't recall.  Do you

20 recall what day?

21 A.  It was the 14th.  I believe it was Thursday.

22 Q.  Okay.  Thursday.  At the time, she had been in the custody

23 of the Eastern Regional Jail for -- since Saturday when she was

24 arrested; correct?

25 A.  Yes, sir.  That's my understanding.

**JA116**

MICHAEL DEHAVEN – CROSS EXAMINATION

1    Q.  At that time, did she report to being in severe
2    psychological distress?
3    A.  She described her mental state as delicate and felt it was
4    declining I believe.
5    Q.  And the reason she said it was is because for the entire
6    period of time up to that date that she had been in custody,
7    despite having been on medication for years to treat a mental
8    health issue, she had not received any of those drugs; correct?
9    A.  That is my understanding.  I don't know specifically.  I
10   believe there was an exchange you had with the defendant where
11   some of the medical issues were rectified or she got one
12   medication but not another, but I don't know specifically
13   which.
14   Q.  Well, you recall though she had not received her mental
15   health medications; correct?
16   A.  That's my recollection, yes, sir.
17   Q.  She did get some blood pressure medication or something
18   like that?
19   A.  I believe that to be true.
20   Q.  And she indicated her mental health was declining for that
21   reason; correct?
22   A.  Yes, sir.
23   Q.  Okay.  So the fact that she may have forgotten a trip to
24   the Bahamas under those circumstances that's not something
25   you're asking the Court to consider in its decision whether or

**JA117**

MICHAEL DEHAVEN – CROSS EXAMINATION

1  not to detain her; correct?
2  A.  I think it is one element in the totality of circumstances
3  for the Court to consider.  I don't think it is the overriding
4  factor much like the money.
5  Q.  Well, are you saying that she purposely failed to disclose
6  that?
7  A.  It is a possibility that she did.
8  Q.  Is it also a possibility that she was in extreme mental
9  distress for lack of medication and in the stress of the
10  situation, she just forgot?
11  A.  Yes, sir.
12  Q.  Okay.  So, again, you can't say one way or the other which
13  one of those is the case; correct?
14  A.  Correct.
15  Q.  But you're asking the Court to consider that in determining
16  whether she should be detained?
17  A.  Yes, I think it is an element the Court should consider.
18  Q.  You also mentioned there's a history of drug use?
19  A.  Yes, sir.
20  Q.  Okay.  To be specific, isn't it a fact that Ms. Toebbe
21  indicated to you that she had occasionally used marijuana for
22  purposes of helping her sleep?
23  A.  Yes, sir.
24  Q.  Okay.
25  A.  And I believe that's what the report reflects.

**JA118**

MICHAEL DEHAVEN – CROSS EXAMINATION

1  Q.  Are you aware that in the state of Maryland where she

2  resides that the personal use of marijuana under those

3  circumstances is not illegal?

4  A.  I'm not a hundred percent on the details of the law.  I

5  know in a lot of jurisdictions, it's based on a quantity of

6  substance or a number of plants.  But I do know generally that

7  a lot of jurisdictions have relaxed laws on recreational use of

8  marijuana.

9  Q.  And we release people in this court all the time that have

10  drug and substance abuse issues; correct?

11  A.  Yes, sir.

12  Q.  Some with heroin or crack.  Severe narcotics.  We release

13  them all the time, don't we?

14  A.  Yes, sir.  On occasion.

15  Q.  And we monitor them; correct?

16  A.  Yes, sir.

17  Q.  And is there any reason why if the Court felt like

18  Mrs. Toebbe's occasional marijuana use in a state where it's

19  legal should be stopped that she couldn't be tested to make

20  sure she was complying?

21  A.  She could, yes.

22  Q.  Okay.  Now, you mentioned that there is a risk that --

23  well, in your PSR, you also talk about her mental health

24  history; correct?

25  A.  Yes, sir.

MICHAEL DEHAVEN - CROSS EXAMINATION

1   Q.   Okay.  And I just indicated to you that she has been in the

2   ERJ or was in the ERJ for at least five or six days and not

3   having received any treatment for her mental health; is that

4   right?  You remember saying that a few minutes --

5   A.   That is my understanding.  I have not reviewed jail medical

6   records, but it is my understanding.

7   Q.   Okay.  And are you aware that even to this day, they still

8   have only given her one of her mental health medications?

9   A.   I do not have any knowledge of that, but I would believe

10  it's credible if you say that.

11  Q.   Are you suggesting that her mental health is better or will

12  be better -- that her treatment of her mental health issues

13  will be better if she were in the ERJ?

14  A.   I can't speak to that.

15  Q.   So are you asking the Court to give her mental health a

16  consideration in its decision to detain or not?

17  A.   As a risk factor, yes, but I'm not qualified to say the

18  quality of treatment she's receiving at the jail or what the

19  circumstances of her release, how they would impact or affect

20  her mental stability or well-being.

21  Q.   Well, don't you think -- I mean you know as much as I do

22  about how the ERJ is.  Don't you think she would be better off

23  mentally if she had access to her medications on a regular

24  basis, access to her therapist, the doctor she's been treating

25  with for years?  Don't you think she'd be better off?  Can we

MICHAEL DEHAVEN - CROSS EXAMINATION

1   agree on that?

2   A.  We can agree on that.  That would --

3   Q.  Okay.

4   A.  -- be a reasonable assumption.

5   Q.  All right.  Thank you.  And as far as these assets that

6   Mrs. Toebbe said she doesn't know -- I don't know if she said

7   she didn't know about assets.  She just didn't know exactly

8   what was in her bank account at any given time because her

9   husband paid the bills.  Is that right?

10  A.  My recollection is she could not provide an estimate of any

11  account balance.

12  Q.  Okay.

13  A.  Retirement accounts --

14  Q.  All right.

15  A.  -- checking accounts, savings account.

16  Q.  Do you have any information to indicate there are assets,

17  even if she knew about them, that she could take and somehow

18  run away?

19  A.  Well, I would assume if she were released, she would have

20  access to bank accounts and whatever finances would be

21  available there.

22  Q.  I understand.  But my question is if you get access to a

23  bank account that doesn't have any money in it, it's not going

24  to do you any good; right?

25  A.  I'm not familiar with the balances of her bank account.

MICHAEL DEHAVEN – CROSS EXAMINATION

1   Q.   Okay.  So you can't say one way or another whether her

2   access to whatever bank accounts they have would be of any

3   assistance in her leaving the jurisdiction or fleeing?

4   A.   No, sir.

5   Q.   Okay.  Am I correct that as part of her pretrial services

6   release, she could be required to provide information about her

7   bank accounts?

8   A.   Yes, sir.

9   Q.   Okay.  So if she were released today and your colleague

10  in Baltimore said come to my office tomorrow and bring all

11  your banking work and so forth, she would have to do that;

12  right?

13  A.   If the Court directed those conditions, yes, sir.

14  Q.   Okay.  Are you aware that Ms. Toebbe has two teenage

15  children?

16  A.   Yes.  I believe a 15 and 11 year old.

17  Q.   Okay.  Are you aware that they have issues that I'll just

18  describe as physical or mental?

19  A.   Yes, sir.

20  Q.   And are you aware that if Ms. Toebbe were released, she

21  would return to her home and take care of her children?  Is

22  that what she told you she wanted to do?

23  A.   Yes.  She indicated that would be her preferred release

24  plan.  To return to her residential address and to have the

25  children brought back into the home.

**JA122**

MICHAEL DEHAVEN - CROSS EXAMINATION

1  Q.  And are you aware -- did you -- you spoke to her father;
2  correct?
3  A.  Yes, sir.
4  Q.  Okay.  Are you aware that he's a decorated Navy veteran?
5  A.  We did not discuss that, no.
6  Q.  If I -- well, assuming he was -- and I'll represent to the
7  Court he is -- and he were to agree to reside with her during
8  her pretrial detention or pretrial home confinement, that would
9  provide an extra layer of security that she would not do
10 anything that would constitute fleeing or somehow injure
11 someone else.  Wouldn't that make you feel comfortable that he
12 -- that her retired Navy -- decorated veteran Navy father was
13 in the same household?
14 A.  I think there could be positive aspects to it for her.  In
15 terms of security, my understanding is that Mr. Smay is 80
16 years old.  I don't know that he would be a physical security
17 but --
18 Q.  Well, I'm just talking about someone you could trust as --
19 you would generally think would be honest assuming that history
20 that I just told you about.
21 A.  Yeah.  I had nothing but a favorable impression from my
22 conversation with him.
23 Q.  Right.  So if he were someone that the Court said, hey, you
24 are charged with letting us know if she leaves this house
25 without permission or without the proper clearance with her

MICHAEL DEHAVEN - CROSS EXAMINATION

1  pretrial services officer that's the kind of person you would

2  want to have in the house; correct?

3  A.  Based on my limited knowledge, I would say he would present

4  with what I know as a decent third-party custodian.

5  Q.  And, lastly, regarding the charges against Ms. Toebbe, you

6  were present during the FBI agent's testimony?

7  A.  Yes, sir.

8  Q.  Are you aware of any evidence indicating that she knew what

9  her husband was doing other than what was conveyed by the FBI

10  agent?

11  A.  The -- other than the documented evidence, the video and

12  photo evidence in the court, and the agent's testimony, no,

13  sir.

14  Q.  Right.  You aren't -- you have no evidence yourself that

15  she was aware that he was selling or attempting to sell

16  American submarine secrets when he made -- went to those drops;

17  correct?

18  A.  No, sir.

19  Q.  Okay.  So all you know is she's been charged with that;

20  right?

21  A.  Yes, sir.  That's correct.

22  Q.  Okay.

23         MR. BECK:  Thank you, Your Honor.

24         THE COURT:  Any redirect?

25         MS. SMOLAR:  Just very briefly, Your Honor.

98

MICHAEL DEHAVEN – REDIRECT EXAMINATION

1                          REDIRECT EXAMINATION

2     BY MS. SMOLAR:

3     Q.  You indicated that Diana Toebbe's father is 80 years old?

4     A.  Yes, ma'am.  That's my understanding.

5     Q.  And is it your understanding that he -- do you know if he

6     has any health problems?

7     A.  He was cogent and alert when we spoke.  He seemed -- I

8     don't know about his physical health or anything.

9     Q.  Referring back to electronic monitoring, if she were to cut

10    off the electronic monitor in the middle of the night when her

11    father is asleep, for example, he cannot be tasked with chasing

12    her down and stopping her, can he?

13    A.  I would not expect him to do that.

14    Q.  Likewise, he cannot be tasked with being a 24/7 babysitter

15    for Diana Toebbe either, can he?

16    A.  I don't think that's possible, no.

17    Q.  With regard to your report, you indicate also that the

18    defendant's brother came in from California and was willing to

19    assist with the children?

20    A.  Yes.

21    Q.  You also note on page three that the defendant acknowledged

22    having a United States passport but was unable to account for

23    the document's whereabouts.  The defendant reported that she

24    believed her passport is expired.  She advised that she

25    recently made application for a new passport but could not tell

**JA125**

MICHAEL DEHAVEN - REDIRECT EXAMINATION

1  if she had mailed off the old one with her renewal or not.  Is

2  that accurate?

3  A.  Yes.

4  Q.  So she said she didn't know whether she had applied for a

5  new passport?

6  A.  Yes.  She said she didn't know -- she knew she had applied

7  for the passport.  She didn't know if they had retained

8  possession of the -- what she believed to be expired passport

9  or if it was submitted with the renewal paperwork.

10        MS. SMOLAR:  Thank you.  No further questions.

11        THE COURT:  Mr. Beck, any redirect --

12        MR. BECK:  No thank you, Your Honor.

13        THE COURT:  -- or any recross?  Excuse me.

14        MR. BECK:  No thank you, Your Honor.

15        THE COURT:  All right.  Anything further with this

16  witness?

17        MS. SMOLAR:  Nothing further, Your Honor.  Thank you.

18        THE COURT:  You may step down, sir.  Thank you.

19        THE WITNESS:  Thank you.

20    (Witness excused.)

21        THE COURT:  All right.  Any additional witnesses or

22  evidence from the government at this time?

23        MS. SMOLAR:  Not at this time, Your Honor.

24        THE COURT:  Mr. MacMahon, any additional witnesses or

25  evidence from the defendant?

```
1          MR. MACMAHON:  No, Your Honor.

2          THE COURT:  All right.  I'll hear argument from the

3   parties.  Go right ahead.

4          MS. SMOLAR:  Your Honor, I think the evidence that

5   you've heard today -- heard and seen today shows how serious of

6   an offense this is.  The offense -- the defendants were charged

7   in a three-count indictment all of which -- all of the counts

8   carry life imprisonment as the maximum penalty.

9      Specifically, with regard to Diana Toebbe, her guideline

10  range is 210 to 262 months.  Approximately 17.5 to 22 years.

11  So it could be an actual life sentence for this soon-to-be 46

12  year old.

13     This defendant had encrypted messaging applications of

14  Signal and Telegram on her phone.  She had tradecraft that she

15  utilized when accompanying her husband on these drops.  Three

16  of the four drops she's present.  In three of the four drops, I

17  think we've seen that she's looking around.  She's a lookout

18  for him.  She's standing very close to him.  She is watching

19  what he's doing.

20     They've been married for 18 years.  During that time, he's

21  worked for the Navy.  They've discussed leaving the country on

22  multiple occasions and specifically in the messages that we saw

23  here today.  The motivation for that is irrelevant, but I will

24  say those messages refer to a Plan A and a Plan B as early as

25  2018, the same time that the metadata shows that this
```

1   information was sent to COUNTRY1.

2       Most alarming to the government is the substantial evidence

3   of her ability to flee prosecution and not appear should this

4   case -- when this case goes forward.  There's a message that

5   you heard from August 28th -- from the August 28th dead drop in

6   which the person that left the message says, "I've considered

7   the possible need to leave on short notice.  Should that ever

8   become necessary, I will be forever grateful for your help in

9   extracting me and my family.  I surmise the first step would be

10  unannounced travel to a safe third country with plans to meet

11  your colleagues.  We have passports and cash set aside for this

12  purpose.  I pray such a drastic plan will never be needed, but

13  you are right.  It's a comfort to know you are ready and

14  willing to aid us.  Please let me know what I should do to

15  prepare for this last resort."

16      The search of their house on October 9th revealed in the

17  bedroom that Diana and Jonathan Toebbe shared $11,300 in

18  hundred dollar bills wrapped up and concealed in a box.  It

19  also had -- it also showed a go-bag with electronics, latex

20  gloves, a thumb drive.  The house also had shredded documents,

21  and they had their children's passports ready to go and theirs

22  were being expedited.  Any trip that they were planning was not

23  until the spring of 2022.  Certainly no need to expedite that

24  in order to have that by that time.

25      You heard testimony from Agent Olinits that he did review

```
 1   the balances in their joint bank account, and it was certainly
 2   sufficient to flee the country.
 3       The money that the FBI paid Jonathan and Diana Toebbe,
 4   $100,000 in Monero cryptocurrency, has not been located.  All
 5   that is required is somebody to log onto the internet, to move
 6   that money, put it in an oversees bank account, get rid of it.
 7   In addition, the 51 packets of restricted data, we only have 1.
 8   We're still looking for the additional 50 packets.  That is
 9   extremely sensitive data.  That's the reason for this very
10   serious indictment and these very serious federal charges that
11   have been brought against Diana Toebbe for aiding and abetting
12   her husband.
13       She was present for two -- for three of the four dead drops
14   in which all of this restricted data was provided to the FBI.
15   And in the messages that you heard today, Jonathan Toebbe
16   refers to his wife implicitly as his co-conspirator.
17       He says, "You asked if I am working alone.  There is only
18   one other person I know is aware of our special relationship,
19   and I trust that person absolutely."
20       The only other person seen with Jonathan Toebbe at these
21   dead drops was his wife, Diana, and she was seen three of the
22   four times.  She has no ties to the Northern District of
23   West Virginia.  She has no documented criminal history, but
24   it's clear that she and her husband have been discussing
25   leaving the country as far back as 2018.  She is not expected
```

1  to have employment prospects if released.  My understanding is

2  that she's been suspended indefinitely from her job and he is

3  incarcerated.

4      Whatever triggered her to aid and abet her husband with

5  this very serious federal crime hasn't gone away.  There is no

6  reason to believe that given the -- facing life imprisonment at

7  this point in time that she would not potentially flee the

8  country and has the resources to do that.  As the agent stated,

9  there have been cases where people have been able to leave the

10  country, as the Court is well aware, without a passport.

11  Certainly if a hostile country was interested in obtaining

12  these 50 packets of information from Ms. Toebbe, they could

13  provide safe passage for her.

14      In addition, if she were to have access to the internet,

15  she could obstruct justice by accessing the restricted data, by

16  accessing the missing cryptocurrency, and by altering the

17  ProtonMail accounts in which the communications were made.  All

18  of that information is still being investigated and looked for

19  by the FBI quite actively.

20      Finally, the testimony of the pretrial officer is quite

21  compelling.  Her 80-year-old father cannot be forced to be a

22  babysitter for Diana Toebbe should she be released and also to

23  be able to care for her two children.

24      In addition, there were several statements made to the

25  probation officer that were questionable at best.  The fact

1   that she didn't know where her passport was.  The fact that she
2   didn't know any of her finances despite her advanced education.
3       So the recommendation here is compelling.  It is not one
4   that is often given.  And in this case, given the seriousness
5   of this offense, the extreme damage to the Navy should this
6   information get out, it's quite significant.
7       In addition, as we heard, the probation office can't stop
8   her if she chooses to leave her house and cut off her
9   electronic monitor.  We don't have GPS monitoring in the
10  District of Maryland I don't believe; but even if they did,
11  they can't track her every move in order to make sure that she
12  appears for court in the Northern District of West Virginia.
13  Thank you.
14          THE COURT:  All right.  Thank you.
15      Mr. Beck, Mr. MacMahon, who is going to make the argument?
16          MR. MACMAHON:  Yes, Your Honor.  Thank you very much.
17  Please the Court.  First of all, under the Bail Reform Act and
18  under the constitution of the United States, the defendant is
19  entitled to bail, and bail cannot be withheld.  An unreasonable
20  bail.  And the reason for that is because lawyers often need
21  their clients to help them with a case as well.  And sitting in
22  the ERJ is no way to prepare a case, prepare a defense.  I've
23  done it before.  And it's just no way that we can review all
24  this evidence.  She has a constitutional right to get out if
25  the Court finds that she's entitled to get out.  And in this

1    case, you should find exactly that.  And that is that there are
2    a combination of conditions that can ensure the safety of the
3    community and that she will reappear in court.
4        This is not a rebuttable presumption case.  You would think
5    with these espionage charges -- with all respect to the
6    pretrial, they see an espionage case, and they think detention.
7    They look at it and they decide that it's got to be a detention
8    case.  Well, not under the law it's not.  Under the law, you
9    have -- the government bears the burden of proof of proving no
10   set of combinations or conditions will ensure the safety of the
11   community or Ms. Toebee's appearance.
12       And, Judge, in this case, I think it's obvious to you
13   sitting through this hearing, which was more like a preliminary
14   hearing against Mr. Toebbe than one against Mrs. Toebbe, that
15   she has a very substantial defense to this case and one that
16   Mr. Beck and I will put forward before a jury in this district.
17   And the -- well, then the prosecutor stands up and starts
18   talking about Signal and Telegraph and encryption -- and she
19   didn't have -- they admitted they don't have any evidence of
20   any of this stuff, of her knowing what her husband was up to.
21   You know, why they were going places.  You know, there's no
22   evidence at all really.  If you want to consider the quality of
23   the government's evidence against Mrs. Toebbe, it's purely
24   speculative at this point.
25       They go to emails -- and I'll bet you dollars to doughnuts,

1   Your Honor, when they get into the Mac computer that they found
2   next to Mr. Toebbe's grab bag -- which the agent called
3   something that people used to flee which that would apply to
4   every bag people have in their bedroom -- that that's -- you're
5   going to find that the metadata on that computer is going to
6   show that it was Mr. Toebbe that wrote all these notes, and it
7   was Mr. Toebbe that stole all the documents.
8       And the issue for the Court and the jury to find in this
9   case is did she know anything about it?  And right now the
10  government can't do anything but say she was on the hiking
11  trail with him, and she looked both ways.  They didn't even
12  bother to put a listening device out there where they could
13  have heard some of these things.  They didn't put a listening
14  device in their car.  The National Security Division doesn't
15  even bug a house.  And now they want to say they know what
16  every -- well, it must be that they were talking about these
17  things.  It can't be.  You have to weigh this as you make this
18  decision.
19      There's a substantial claim of innocence that we can put
20  forward in this case.  And the fact that it's such a serious
21  charge makes it even more important that you weigh that, Your
22  Honor.
23      Ms. Toebbe wants to defend this case, and she wants to be
24  able to help her lawyers do it.  Now, what are we going to --
25  all this evidence of the passport.  She doesn't have a

107

```
 1   passport.  You know, I don't know -- the District of Maryland
 2   has monitoring.  I don't even know where that came from, Your
 3   Honor.  The District of Maryland is a very sophisticated
 4   office.  It deals with crime in Baltimore.  I can guarantee
 5   they are able to monitor somebody who is on -- who is wearing
 6   an ankle bracelet.  I've had clients wearing an ankle bracelet.
 7   I've never heard of one person that's been supervised with an
 8   ankle bracelet on that fled.  Usually the government says they
 9   want the ankle bracelet because it's so effective.  Until they
10   think you might release somebody on an ankle monitor, then they
11   say that a five year old could cut it off and flee the United
12   States without a passport.  You know that's not true, Judge.
13       So here's what I have to say.  A combination of conditions
14   is that we can come up with some kind of a reasonable bond.
15   Hopefully a PR bond.  This is not a rich family, Your Honor.
16   You know they have court-appointed lawyers, but they may be
17   able to come up with some money for a reasonable bond for the
18   Court.
19       She could be released back to her house to take care of her
20   children which is her primary concern sitting here.  And you
21   know that as a mother -- as a father or mother that's what she
22   really, really wants to do.  That's what she told this
23   gentleman she wanted to do.  And she's not going to flee the
24   United States and leave her children who need her here.  That's
25   not going to happen.  So if she goes back to her house in
```

108

```
 1   Maryland and her father who is 80 years old -- but he loves his
 2   daughter.  The family is willing to do anything, Judge, that
 3   you order to help get her out.  And if it means the brother has
 4   to come back, if it means that she can't have any internet -- I
 5   mean how many cases of child pornography have you heard here
 6   where the government says the defendant can't have access to
 7   the internet?  They don't say, oh, well, he could steal a
 8   phone.  They don't -- he could steal phones.  He could go next
 9   door.  He could do all these things.  I mean this desire to
10   lock her up has gotten to the point where they're twisting
11   arguments they use in cases before you all the time.  The Court
12   can monitor and the pretrial services people do monitor whether
13   people don't have the internet.  And she can't have the
14   internet.  If the government thinks she's going to try to
15   monitor anything, they can block the internet from getting in
16   the house and that's easily done.  The children can go next
17   door if they have a Zoom call.  There's no reason to think
18   Ms. Toebbe would not want her children to go to school because
19   she didn't have the internet while she fought these charges.
20       So, you know, the combination of conditions are mainly that
21   she's -- she, as you can tell today, is insisting that she's
22   innocent to these charges and wants to clear her name.  And the
23   government really doesn't have much of a case against her,
24   Judge.  The FBI agent thinks he knows everything that's going
25   on but he doesn't.  He doesn't have any evidence other than
```

**JA135**

```
 1   they were walking together.  You've seen the conspiracy charge

 2   about mere presence is not enough.  You know, she didn't have

 3   access to this stuff.  She doesn't have any access to any

 4   classified information.  She never had access to classified

 5   information.  You don't need to protect the people of the

 6   United States from Diana Toebbe releasing plans that her

 7   husband may have stolen from the Navy yard.  The government can

 8   -- if they had evidence that she stole something or that it was

 9   found on one of her computers, they would have given it to you.

10   It would have been up here in a video for you to look at.

11       But I'm going to go back.  The right to bail is a

12   constitutional matter in this country.  It's right in our

13   constitution.  The Court has to grant reasonable bail.  And

14   there is a combination of conditions; and whatever they are,

15   she'll comply with them, Judge.  And with that, I'll rest my

16   argument.  Thank you, Your Honor.

17               THE COURT:  Thank you, sir.

18       All right, Counsel, I appreciate the argument today and the

19   evidence that's been presented.  And unfortunately I hate to be

20   anti-climatic, but the Court is going to take the argument and

21   the evidence under consideration and issue a written ruling as

22   to that.

23       Anything further we need to address before we adjourn this

24   afternoon?

25               MS. SMOLAR:  Nothing further, Your Honor.
```

**JA136**

```
 1              MR. BECK:  Not from --

 2              MR. MACMAHON:  I'm --

 3              MR. BECK:  -- the defendant, Your Honor.

 4              MR. MACMAHON:  I'm sorry, Your Honor.

 5              THE COURT:  That's fine.

 6              MR. MACMAHON:  Excuse me.

 7              THE COURT:  That's fine.  With that in mind, the

 8    defendant is remanded to the custody of the U.S. Marshals

 9    Service, and we stand adjourned.  Thank you.

10

11              (Hearing concluded at 3:42 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA137**

```
1                            CERTIFICATE

2

3          I, Kate A. Slayden, Registered Professional Reporter

4    and Official Court Reporter of the United States District Court

5    for the Northern District of West Virginia, do hereby certify

6    that the foregoing is a true and correct transcript to the best

7    of my ability of the digitally-recorded proceedings had in the

8    above-styled action on October 20, 2021, as transcribed by me.

9          I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial Conference of

11   the United States.

12         Given under my hand this 1st day of December, 2021.

13

14

15                          /s/Kate A. Slayden

16                          Kate A. Slayden, RPR, CCR
                            Official Reporter, United States
17                          District Court for the Northern
                            District of West Virginia
18

19

20

21

22

23

24

25
```

**JA138**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

              Plaintiff,

**v.**                           **Case No.:   3:21CR49-2
(GROH)**

**DIANA TOEBBE**,

              Defendant.

## <u>DETENTION ORDER</u>

On October 20, 2021, came the United States of America by S. Derek Shugert and  Jessica Lieber Smolar, Assistant United States Attorneys and came the Defendant, DIANA TOEBBE, who appeared in person and by her counsel, Edward B. MacMahon, Jr. Esq., and by her local counsel, Barry P. Beck, Esq., for a hearing on the United States Motion to Detain [ECF No. 10], in accordance with the Bail Reform Act, Title 18, United States Code, Section 3142(f). Evidence and witness testimony were presented to the Court.

### A. The Standards

Title 18, United States Code, § 3142(g) provides the specific factors that are to be considered to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. Those factors are:

    1.      The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal

**JA139**

crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2.    The weight of the evidence against the person;

3.    The history and characteristics of the person, including but not limited to community ties, employment, criminal history, record of court appearance or whether the person was on probation or parole at the time the current offense was committed; and

4.    The seriousness of the danger to any person or the community that would be posed by the person's release.

## B.  Findings of Fact and Conclusions of Law

On October 19, 2021, an indictment was filed against the Defendant charging her with one count of conspiracy to communicate restricted data, and two counts of communication of restricted data, in violation of 42 U.S.C. §§ 2274(a) and 2014 and 18 U.S.C. § 2(a). ECF No. 37.

The Court finds as follows:

1.    The rebuttable presumption to detain does not apply in this case.

2.    The nature and circumstances of the offense charged according to the complaint, indictment, testimony of the FBI Special Agent and the exhibits presented at the detention hearing are as follows: Defendant's husband, co-Defendant Jonathan Toebbe, held an active "Top Secret" security clearance through the United States Department of Defense and an active "Q" clearance through the United States Department of Energy, which granted him access to information involving or incorporating "Restricted Data" within the meaning

2

**JA140**

of the Atomic Energy Act of 1954, 42 U.S.C.§ 2011 et seq. ECF No. 37. From on or about April 1, 2020, through October 9, 2021, Defendants Jonathan and Diana Toebbe allegedly conspired to sell this restricted information to a foreign nation with the intent to injure the United States and secure advantage to a foreign nation. Id. After the foreign government, hereinafter COUNTRY1, received the sample of Restricted Data and instructions for establishing a covert relationship to purchase additional Restricted Data, COUNTRY1 informed the FBI and the FBI contacted the supplier to establish an undercover covert relationship. During this undercover operation, the FBI arranged four dead drops with Defendants. Defendant Diana Toebbe was present at three of the four dead drops. Video from the dead drops show that Diana Toebbe is a willing participant in the activity. See Gov't Ex. 5. Additionally, messages between the Defendants from as early as March 2019 through October 5, 2020, demonstrate that Defendants were contemplating an activity that may require them to leave the country quickly. Gov't. Ex. 26.[1] Specifically, on March 4, 2019, Jonathan Toebbe wrote: "I am also thinking about Plan A…it's not morally defensible either. We convinced ourselves it was fine, but it really isn't either, is it?" Id.  Diana Toebbe wrote in response to Jonathan on the same date. "I have no problems at all with it.  I feel no loyalty to abstractions." Id. On March 7, 2019, Jonathan Toebbe wrote, "We've got passports, and some savings. In a real pinch we can flee quickly. Id. Diana responded on the same date, "Right. Let's go sooner than later." Id. The FBI

---

[1] Government's Exhibit 26 consists of a list of messages between Diana and Jonathan Toebbe taken from the Signal app on Jonathan's cell phone.

has not recovered the thousands of "Top Secret" documents that Defendant offered to sell to the FBI and the money paid to Defendants prior to their arrests on October 9, 2021.

3. The weight of the evidence against Defendant Diana Toebbe is strong. In the undercover correspondence provided by the Government, Defendant Jonathan Toebbe wrote:

*"….You asked if I am working alone. There is only one other person I know is aware of our special relationship, and I trust that person absolutely…."*

ECF No. 1-1 at 20, ¶ 63. Diana Toebbe's participation at three of the four dead drops is evidence of her involvement in the alleged crimes. Gov't. Ex. 5.

4. If convicted, Defendant is subject to a lengthy sentence, a maximum of life in prison.

5. Although Defendant has no prior criminal history, the nature and circumstances of the charges against her and her actions demonstrate that Defendant is a danger to every community and to our national security by clear and convincing evidence.

6. Further, Defendant is a flight risk by a preponderance of the evidence and should be detained on those grounds alone. In the undercover correspondence provided by the Government, Defendant Jonathan Toebbe wrote:

*….I have considered the possible need to leave on short notice. Should that ever become necessary, I will be forever grateful for your help extracting me and my family. I surmise the first step would be unannounced travel to a safe third country with plans to meet your colleagues. We have passports and cash set aside for this purpose. I pray such a drastic plan will never be needed, but you are right: it is a comfort to know you are ready and willing to aid us…..*

**JA142**

ECF No. 1-1 at 20, ¶ 63. Additionally, the messages provided in the Government's Exhibit 26 show Defendant Diana Toebbe's desire to leave the country as early as March of 2019. On October 5, 2020, Diana Toebbe wrote to Jonathan Toebbe, "I think we need to be actively making plans to leave the country." Id. The evidence seized by the FBI at Defendants' residence including a back pack, a computer, and a large sum of money concealed in a box, suggests Defendants' preparation to leave the country on short notice. Further, the Defendants were seeking renewal of their passports on an expedited basis despite not having travel plans until Spring of 2022.

7.  Defense counsel presented no evidence[2] or testimony but argued that electronic monitoring, a third-party custodian, and no computer or internet access would suffice to prevent Defendant from fleeing. The Court is unconvinced.

8.  No bond conditions can be set to reasonably ensure the appearance of Defendant and the safety of the community.

### C.  Decision

Based upon the evidence presented and the above findings of fact and conclusions of law, the Government's Motion to Detain [ECF No. 10] is **GRANTED.** Accordingly, it is hereby

**ORDERED** that:

1.  Defendant is hereby remanded to the custody of the United States Marshals pending further proceedings in this case;

---

[2] Defendant's Supplemental Proffer [ECF No. 56]  for Detention Hearing was filed on October 21, 2021. The Court did take this supplement into consideration in its determination.

5

**JA143**

2.    Defendant be confined in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

3.    Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel;

4.    On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant is confined shall deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding; and

5.    Any party seeking revocation or amendment of this Order shall file a motion pursuant to 18 U.S.C. § 3145.

The Clerk of the Court is directed to provide a copy of this Order to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: 10-21-2021**

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE

6

**JA144**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**UNITED STATES OF AMERICA**,

          Plaintiff,

**v.**

**DIANA TOEBBE,**

          Defendant.

**CRIMINAL ACTION NO.: 3:21CR49-2 (GROH)**

## ORDER DENYING DEFENDANT'S
## MOTION [ECF No. 75] TO REOPEN DETENTION HEARING

On October 20, 2021, this Court held a detention hearing and found that Defendant is a flight risk and a danger to the community. A Detention Order [ECF No. 57] was entered granting the Government's motion [ECF No. 10] to detain Defendant pending trial. On December 8, 2021, Defendant filed a motion [ECF No. 75] to reopen the detention hearing. The Government filed a response [ECF No. 79] on December 9, 2021, and the Defendant filed a reply [ECF No. 81] on December 16, 2021. The Court, having considered the motion and responsive pleadings, finds that a hearing is not warranted.

18 U.S.C. § 3142(f) provides that "The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

**JA145**

Although additional text messages were produced concerning Defendant's motivation to leave the United States, the same alternative reasons were addressed at the detention hearing and considered by the Court in rendering its decision. The Court finds that this evidence is not "new."

Even if the additional text messages are deemed "new," they do not have a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of the community. Regardless of the reason, the text message exchange demonstrates that Defendant previously contemplated leaving the country. Whether Defendant's motivation is spurred by her dissatisfaction with elected officials, her alleged involvement in the crime charged, or any other reason, it is not material to this Court's decision on Defendant's risk of flight by a preponderance of the evidence.

As for Defendant's second argument relating to exculpatory evidence, the issue before this Court is detention, not the determination of Defendant's guilt or innocence. Thus, the Court finds that this alleged exculpatory evidence has no material bearing on the issue of risk of flight or safety to the community. Accordingly, it is

**ORDERED** that Defendant's **Motion [ECF No. 75]** to reopen the detention hearing is **DENIED.**

The Court directs the Clerk of the Court to provide a copy of this Order to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: 12-20-2021**

ROBERT W. TRUMBLE

2    UNITED STATES MAGISTRATE JUDGE

**JA146**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                    **CRIMINAL ACTION NO.: 3:21-CR-49-2**
                                          **(GROH)**

**DIANA TOEBBE,**

      **Defendant.**

### ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER
### DENYING DEFENDANT'S MOTION TO REOPEN DETENTION HEARING

On January 10, 2022, Defendant Diana Toebbe filed an Appeal from Magistrate

Judge's Order Denying Motion to Reopen Detention Hearing. ECF No. 83. Therein, the

Defendant moves this Court, pursuant to 18 U.S.C. § 3145(b), to reopen her detention

hearing to consider purported new information and release her. Id. After reviewing the

record and applicable law, this Court affirms Magistrate Judge Trumble's decision.

### I. BACKGROUND

On October 19, 2021, a Grand Jury sitting in the Northern District of West Virginia

returned an indictment against the Defendant, charging three counts related to

communication of restricted data. See ECF No. 37. On October 20, 2021, Magistrate

Judge Trumble held a detention hearing and entered an Order detaining the Defendant

the following day. ECF No. 57. Magistrate Judge Trumble found the Defendant is a

danger to the community and a flight risk; accordingly, he ordered the Defendant be

detained pending resolution of the charges against her. Id. The Defendant did not appeal

**JA147**

Magistrate Judge Trumble's Order detaining her. However, on December 8, 2021, the Defendant filed a Motion to Reopen her detention hearing. ECF No. 75. The Defendant argued her detention hearing should be reopened because new information and evidence became available that warranted her release from detention. The Government opposed the Defendant's motion. ECF No. 79. Judge Trumble denied the Defendant's Motion to reopen her detention hearing. ECF No. 82. It is from this Order that the Defendant appeals. See ECF No. 83.

## II. APPLICABLE LAW

This Court reviews *de novo* a magistrate judge's decision to detain a defendant pending trial, and this Court "must make an independent determination of the proper pretrial detention or conditions of release." See United States v. Stewart, 19 F. App'x 46, 48 (4th Cir. 2001). 18 U.S.C. § 3142(f) provides that "The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

However, the Court notes that unlike the typical appeals it has considered in this context, the Defendant has not appealed the Magistrate Judge's detention Order, but instead, she has appealed a decision not to reopen the detention hearing. Although Rule 59 of the Federal Rules of Criminal Procedure may be the more appropriate vehicle for seeking this Court's review of a Magistrate Judge's Order denying a motion to reopen a detention hearing, the Court nonetheless utilizes the *de novo* standard set forth in

§ 18 U.S.C. 3145.

### III. ANALYSIS

The Court has reviewed the Defendant's appeal, Government's response, and the Defendant's reply, as well as the indictment, detention hearing transcript, detention order, motion to reopen and Order denying the same. Upon this Court's independent review and consideration, Magistrate Judge Trumble's order denying the Defendant's motion to reopen the detention hearing is affirmed.

The Defendant advances three major arguments in support of her appeal: 1) previously undisclosed text messages undermine the Government's arguments at the detention hearing; 2) since the detention hearing, the Defendant's husband (and alleged co-conspirator) says she is innocent; and 3) the Magistrate Judge did not address the $100,000 cash bond the Defendant's father was willing to post to assure her appearance.

Defendant's first argument is that the text messages Magistrate Judge Trumble relied upon as part of his Detention Order were taken out of context, and now that the Defendant has the context, the hearing should be reopened. Specifically, the Defendant avers that Signal messages she sent her husband about fleeing the country were "because of her intense dislike of the former president, Donald Trump, not because she was involved in any alleged criminal activity with her husband . . . ." ECF No. 83 at 3.

Government's Exhibit 26 was admitted during the detention hearing, detailing a series of messages between the Defendant and her husband co-defendant. Notably, there was conversation about leaving the country. The Defendant's husband said, "We've got passports and some savings. In a real pinch, we can flee quickly." See ECF No. 70 at 58. The Defendant agrees, and says, "[l]et's go sooner than later." Id. Later, the

Defendant says, "I cannot believe that the two of us wouldn't be welcomed and rewarded by a foreign government." Id.  In another message, the Defendant says, "I think we need to be actively making plans to leave the country."  Id.  The messages were admitted without objection.

When the Defendant's counsel cross examined the agent who testified about her Signal messages, he asked, "you know from all of your surveillance of the Toebbe residence that Mrs. Toebbe was not a fan of President Trump; correct?"  Id. at 62.  The agent conceded, and then agreed that he also observed conversations indicating the Defendant wanted "to leave the country if Trump got reelected."  Id.

This testimony starkly contradicts the Defendant's appeal, in which her counsel asserts that the Agent "denied any knowledge of [the Signal messages] referring to her wanting to leave the country because of political reasons." ECF No. 83 at 6. This assertion is inaccurate, as the detention hearing transcript shows.

Further, the Defendant makes a great deal about these messages being recently disclosed by the Government. The Court finds this of little consequence because the Defendant was a party to the messages and could have easily relayed this to her counsel. Indeed, it seems apparent to this Court that is exactly what happened because her counsel clearly knew their contents as demonstrated by his cross examination at the detention hearing. In short, there is no new evidence in these messages that the Defendant and her counsel were not aware of at the detention hearing.  In fact, her counsel questioned the FBI agent about the messages during the detention hearing.

Second, the Defendant offers jailhouse statements made by her husband, and co-defendant, that she is innocent. The Court can hardly rely upon statements by a co-

4

**JA150**

defendant—who shares minor children with the Defendant—that his wife and alleged accomplice is innocent. On February 14, 2022—Valentine's Day—Jonathan Toebbe stated under oath that he "conspired with Diana Toebbe to transmit restricted data to a foreign nation in exchange for payment with the intent to injure the United States." On page three of the plea agreement Mr. Toebbe signed, he stipulates that this Defendant "knowingly and voluntarily joined the conspiracy to communicate Restricted Data to another person with the intent to secure an advantage to a foreign nation and committed multiple overt acts in furtherance of the conspiracy . . . ." ECF No. 91 at 3.

Mr. Toebbe's jailhouse statements that the Defendant is innocent may be new, but they certainly are not material evidence. Under the facts and circumstances of this case, a co-defendant spouse's statements that his wife is innocent are a qualitative equivalent to her plea of not guilty. Particularly in light of Mr. Toebbe's contradictory testimony during his Rule 11 hearing, the Court finds no material value for reopening the detention hearing in these statements whatsoever.

Finally, the Defendant argues that because her father is now willing and able to post $100,000 cash bond, the Court should reopen the detention hearing. This Court disagrees. Although it appears that Judge Trumble did not explicitly address this argument in denying the motion to reopen the detention hearing, he considered an argument for cash bond as part of a combination of conditions for the Defendant's release: "So, here's what I have to say. A combination of conditions is that we can come up with some kind of reasonable bond. [T]hey may be able to come up with some money for a reasonable bond for the Court." ECF No. 70 at 107. Further, "[t]he family is willing to do anything, Judge, that you order to help get her out." Id. at 108.

It is clear to this Court that Magistrate Judge Trumble considered these arguments for release and rejected them. Similarly, this Court finds that Magistrate Judge Trumble made no error in denying the motion to reopen the detention hearing. Further, the Undersigned also finds that the Defendant has advanced no new material evidence that was unavailable at the time of her detention hearing.

### III. CONCLUSION

Therefore, considering the evidence and arguments submitted by the parties and having reviewed this matter *de novo*, the Court **AFFIRMS** Magistrate Judge Trumble's Order Denying Defendant's Motion to Reopen the Detention Hearing.

The Clerk of Court is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** February 15, 2022

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE

**JA152**



**FILED**

FEB 1 8 2022

U.S. DISTRICT COURT-WVND
MARTINSBURG, WV 25401

**United States Department of Justice**

*William Ihlenfeld*
*United States Attorney's Office*
*Northern District of West Virginia*

United States Courthouse
1125 Chapline Street          Phone: (304) 234-0100
P.O. Box 591                  FAX:  (304) 234-0111
Wheeling, WV 26003

Edward B. MacMahon, Jr.                          February 15, 2022
107 East Washington Street
Middleburg, VA 20117
VIA E-MAIL DELIVERY

In re:   <u>United States v. Diana TOEBBE</u>, Criminal No.: 3:21-CR-49-002

Dear Mr. MacMahon:

　　　This will confirm conversations with you concerning your client, Diana Toebbe (hereinafter referred to as "Defendant" or "Ms. Toebbe"). All references to the "Guidelines" refer to the guidelines established by the United States Sentencing Commission, effective November 1, 1987, as amended.

　　　It is agreed between the United States and your client as follows:

　　　1.　　Ms. Toebbe will plead guilty to Count One of the Indictment, Conspiracy to Communicate Restricted Data, in violation of Title 42, United States Code, Sections 2274(a) and 2014.

　　　2.　　The maximum penalty to which Ms. Toebbe will be exposed by virtue of her plea of guilty to Count One is: imprisonment for a term of not more than life, a fine of not more than $100,000, and a term of supervised release of not more than five (5) years, pursuant to Title 42, United States Code, Section 2274(a) and Title 18, United States Code, Sections 3559(a)(1) and 3583(b)(1). Ms. Toebbe will also be required to pay a mandatory special assessment of $100 (Title 18, United States Code, Section 3013), which must be paid before the date of sentencing by money order, or certified check, made payable to the United States District Court. It is also understood that Ms. Toebbe might be required by the Court to pay the costs of any incarceration.

Diana Toebbe, Defendant

Edward B. MacMahon, Jr.
Counsel for Defendant

Date  2/16/22

Date  2/16/22

- 1 -

**JA153**

3.      Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree to the following binding term: **a sentence of not more than 36 months of imprisonment**. The Court will determine the amount of the supervised release and any fine. The parties understand that if the Court does not accept the binding provisions of this paragraph, then Ms. Toebbe will have the right to withdraw her plea of guilty.

4.      Pursuant to Sections 6B1.4 and 1B1.3 of the Guidelines, the parties hereby stipulate and agree that the base offense level is **Base Offense Level 37** pursuant to Section 2M3.1(a)(2) because the offense involved the communication of Restricted Data that was classified at the CONFIDENTIAL level.

The parties understand that pursuant to Section 6B1.4(d), the Court is not bound by the stipulations in this paragraph, and if not accepted by the Court, Ms. Toebbe will not have the right to withdraw her plea of guilty.

5.      The parties hereby stipulate and agree to the following facts:

At some time during the charged period, Ms. Toebbe knowingly and voluntarily joined a conspiracy with her husband, Jonathan Toebbe, to communicate Restricted Data to another person with the intent to secure an advantage to a foreign nation and committed multiple overt acts in furtherance of the conspiracy, including acting as a lookout while Mr. Toebbe serviced three dead drops, as described below.

On June 26, 2021, in Jefferson County, West Virginia, Jonathan Toebbe serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine reactors on an SD card, which was wrapped in plastic and concealed between two slices of bread on a half of a peanut butter sandwich. The SD card also contained a typed message that included statements, "I hope your experts are very happy with the sample provided," and "I want our relationship to be very successful for us both." On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

On July 31, 2021, in south-central Pennsylvania, Mr. Toebbe serviced a dead drop by leaving behind a typed message, which proposed a plan for him to provide 51 packages over time in exchange for a total of $5 million paid in cryptocurrency. The message also included statements that the information "was slowly and carefully collected over several years" and "smuggled past security checkpoints a few pages at a time" and that one of the sets of information "reflects decades of U.S. Navy 'lessons learned' that will help keep your sailors safe." On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

_____    Date ____2/16/22_____

Diana Toebbe, Defendant

_____    Date ____2/16/22_____

Edward B. MacMahon, Jr.
Counsel for Defendant

- 2 -

**JA154**

On August 28, 2021, in eastern Virginia, Mr. Toebbe serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine nuclear reactors on an SD card, which was concealed in a chewing gum package.  The SD card also contained a typed message, stating, in part:  "There is only one other person I know is aware of our special relationship, and I trust that person absolutely"; "I was extremely careful to gather the files I possess slowly and naturally in the routine of my job, so nobody would suspect my plan"; "I do not believe any of my former colleagues would suspect me, if there is a future investigation"; and "We have cash and passports set aside for th[e] purpose" of having to flee the United States.  When Mr. Toebbe wrote "one other person" was aware of Mr. Toebbe's relationship, Mr. Toebbe was referring to his wife, Ms. Toebbe.

October 9, 2021, in Jefferson County, West Virginia, Mr. Toebbe serviced a dead drop by leaving behind an SD card, which was concealed in a chewing gum package.  On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

6.     Ms. Toebbe waives any right to have sentencing determinations made by a jury and for a jury determination of any and all facts relevant to the application of the United States Sentencing Guidelines provisions and consents to the application of the Guidelines, in conformity with United States v. Booker, 543 U.S. 220 (2005), and to a determination of any and all facts and a resolution of the application of any and all Guidelines factors by the United States District Judge.  Ms. Toebbe further agrees that the District Judge should make any sentencing determinations, including, but not limited to, Guidelines determinations, using the preponderance of the evidence standard.

7.     Ms. Toebbe will be completely forthright and truthful with regard to all inquiries made of her and will give signed, sworn statements and testimony, including but not limited to, appearances at grand jury, trial, sentencing and other proceedings.  Ms. Toebbe will agree to submit to a polygraph examination if requested to do so by the United States Attorney's Office for the Northern District of West Virginia.

Moreover, Ms. Toebbe agrees to provide access to and consent to search all electronic devices and accounts owned, possessed, and/or controlled by her and any files contained therein.  The electronic accounts include but are not limited to all ProtonMail accounts.

In addition, Ms. Toebbe agrees to assist federal officials with locating and retrieving the $100,000, which the FBI paid via Monero cryptocurrency in exchange for the Restricted Data.  In this regard, Ms. Toebbe voluntarily abandons all right, title, interest, and claim to the $100,000.

_____          Date   2/16/22
Diana Toebbe, Defendant

_____          Date   2/16/22
Edward B. MacMahon, Jr.
Counsel for Defendant

- 3 -

**JA155**

Finally, Ms. Toebbe agrees to assist federal officials with locating all classified information and Restricted Data in any form possessed and/or controlled by her or contained in premises, including electronic devices and accounts, possessed and/or controlled by her.

8.      Nothing contained in any statement or any testimony given by Defendant, pursuant to Paragraph 7, will be used against her as the basis for any subsequent prosecution. Defendant understands that the use immunity granted in this agreement does not cover any statements or admissions that she committed, or was directly involved in committing, a crime of violence. This means that such statements or admissions can be used against the Defendant in any state or federal prosecution. In this regard, Defendant admits that, prior to the proffer, pursuant to Miranda v. Arizona, 384 U.S. 436 (1996), she has been adequately advised and warned that any admission that she committed, or was directly involved in committing, a crime of violence is not covered by the use immunity under this agreement. It is further understood that any information obtained from Defendant in compliance with this cooperation agreement will be made known to the sentencing court; however, pursuant to Guideline 1B1.8, such information may not be used by the Court in determining Defendant's applicable guideline range.

This agreement does not prevent Defendant from being prosecuted for any violations of other Federal and state laws she may have committed should evidence of any such violations be obtained from an independent legitimate source, separate and apart from that information and testimony being provided by her pursuant to this agreement.

In addition, nothing contained in this agreement shall prevent the United States from prosecuting Defendant for perjury or the giving of a false statement to a federal agent, if such a situation should occur by virtue of her fulfilling the conditions of Paragraph 7 above.

9.      Ms. Toebbe understands and agrees that she shall not knowingly have contact with any foreign government, or agents thereof, except with the express written permission of the FBI, unless such contact is solely for the purpose of obtaining a visa for foreign travel, entering, and departing a foreign country through customs control, or otherwise related to lawful international travel. Ms. Toebbe shall not seek or knowingly accept, personally or through another person or entity, any benefit from any foreign government or agent thereof. Should such a benefit be received by Ms. Toebbe, or some person or entity on her behalf, she hereby assigns any such benefit to the United States.

10.     As part of this plea agreement, and based upon the concessions of the United States in this plea agreement, Ms. Toebbe knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, Ms. Toebbe knowingly, willingly, and voluntarily waives all pending requests for discovery.

_____                        Date _2/16/22_____
Diana Toebbe, Defendant

_____                        Date _2/16/22_____
Edward B. MacMahon, Jr.
Counsel for Defendant

- 4 -

**JA156**

11.     Ms. Toebbe understands and agrees that no later than 30 days following her sentencing hearing, she will, through her attorneys, return to the United States all discovery provided by the United States in this case, with the exception of any unclassified materials this Office gives Ms. Toebbe and provides express, written permission to retain. The Government reserves the right to inspect the specific documents Ms. Toebbe wishes to retain to determine whether they are classified or otherwise must be returned to the Government. Except for materials the Government permits Ms. Toebbe to retain, Ms. Toebbe expressly consents to the United States destroying or retaining these items as it sees fit without notice to her.

12.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, Ms. Toebbe agrees to forfeit and abandon to the United States all of Ms. Toebbe's right, title, and interest in the following items that Ms. Toebbe agrees constitute money, property, and/or assets derived from or obtained by Ms. Toebbe as a result of, or used to facilitate the commission of, Ms. Toebbe's illegal activities: all papers, digital media, and electronic devices seized from her residence, her vehicles, and Mr. Toebbe's Naval Reactors offices in October 2021.

13.     At final disposition, the United States will advise the Court of Ms. Toebbe's forthrightness and truthfulness, or failure to be forthright and truthful, and ask the Court to give the same such weight as the Court deems appropriate.  In addition, at the sentencing hearing, the United States will move to dismiss Counts Two and Three of the Indictment as they pertain to her.

14.     Although this agreement contains a binding term regarding imprisonment, the United States will make the following <u>nonbinding</u> recommendations: 1) if Ms. Toebbe accepts responsibility, and if the probation office recommends a two-level reduction for "acceptance of responsibility," as provided by Guideline 3E1.1, the United States will concur in the recommendation; and 2) should Ms. Toebbe give timely and complete information about her own involvement and provide timely notice of her intent to plead guilty, permitting the United States to avoid trial preparation, and comply with all the requirements of this Agreement, the United States will recommend, if applicable, an additional one-level reduction for this "timely acceptance" of responsibility.   In order to be eligible for this timely acceptance of responsibility, **Ms. Toebbe must execute this Plea Agreement on or before 5:00 p.m., February 17, 2022**, and return or fax an executed copy to the United States by that day and time.

15.     If, in the opinion of the United States, Ms. Toebbe either engages in conduct defined under Application Notes 4(A) through (K) of Guideline 3C1.1, fails to cooperate as promised, fails to make a truthful debriefing, is found to be deceptive during any polygraph, fails to testify fully and truthfully either at grand jury or any trial, fails to pay the special assessment prior to the sentencing hearing, or violates any other provision of the Plea Agreement, then the United States will not be bound to make the foregoing recommendations or take the foregoing actions and will have the right to revoke this agreement.

_____
Diana Toebbe, Defendant

Date  2/16/22

_____
Edward B. MacMahon, Jr.
Counsel for Defendant

Date  2/16/22

- 5 -

**JA157**

16.     Ms. Toebbe is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  Acknowledging this, and in exchange for the concessions made by the United States in this plea agreement, the defendant waives the following rights, if the Court sentences her pursuant to Paragraph 3 of this agreement:

a.   The defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the defendant's conviction on any ground whatsoever.  This includes a waiver of all rights to appeal the defendant's conviction on the ground that the statute(s) to which the defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

b.   The defendant knowingly and expressly waives all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.   To challenge the conviction or the sentence which is within the maximum provided in the statute of conviction or the manner in which it was determined in any post-conviction proceeding, including any proceeding under 28 U.S.C. § 2255.

Nothing in this paragraph, however, will act as a bar to the defendant perfecting any legal remedies she may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct.  The defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct.

The United States waives its right to appeal any sentence within range specified in Paragraph 3. Both parties have the right during any appeal to argue in support of the sentence.

17.     The United States reserves the right to provide to the Court and the United States Probation Office, in connection with any presentence investigation that may be ordered pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, or in connection with the imposition of sentence should the Court, pursuant to Rule 32(c)(1), not order a presentence investigation, relevant information, including information regarding Ms. Toebbe's background, criminal record, the offenses charged in the Indictment and other pertinent data appearing at Rule 32(c)(2) of the Federal Rules of Criminal Procedure, as will enable the Court to exercise its sentencing discretion.  The United States also retains the right to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the anticipated

_____          Date  _2/16/22_

Diana Toebbe, Defendant

_____          Date  _2/16/22_

Edward B. MacMahon, Jr.
Counsel for Defendant

- 6 -

**JA158**

presentence investigation report to be prepared by the Probation Office of the Court, and to respond to any written or oral statements made to the Court by Ms. Toebbe or her counsel.

     18.    Ms. Toebbe agrees that all monetary penalties imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided for in Title 18, United States Code, Section 3613. Furthermore, Ms. Toebbe agrees to provide all requested financial information to the United States and the Probation Office and agrees to participate in any presentencing debtor examinations. Ms. Toebbe also authorizes the U.S. Attorney's Office for the Northern District of West Virginia to access her credit report from any major credit reporting agency prior to sentencing, in order to assess the financial condition for sentencing purposes. Ms. Toebbe agrees, under penalty of perjury, to complete a financial statement to be returned with the plea agreement. If the Court imposes a schedule of payments, Ms. Toebbe agrees that it will be deemed to be merely a minimum schedule of payments, not the only method available to the United States to enforce the judgment. Ms. Toebbe agrees to participate in the Federal Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. In addition, Ms. Toebbe agrees that the United States may submit any unpaid criminal monetary penalty to the United States Treasury for offset, regardless of the defendant's payment status or history at the time of said submission.

_____       _____
Diana Toebbe, Defendant            Date   2/16/22

_____       _____
Edward B. MacMahon, Jr.          Date   2/16/44
Counsel for Defendant

- 7 -

19.    The above eighteen (18) paragraphs constitute the entire agreement between Ms. Toebbe and the United States of America in this matter.  **There are no agreements, understandings or promises between the parties other than those contained in this Agreement.**

Very truly yours,

WILLIAM IHLENFELD
United States Attorney

By:    Jarod J. Douglas
Assistant United States Attorney

Jessica Lieber Smolar
Special Assistant United States Attorney

S. Derek Shugart
Trial Attorney

Matthew J. McKenzie
Trial Attorney

As evidenced by my signature at the bottom of the eight (8) pages of this letter agreement, I have read and understand the provisions of each paragraph herein and, hereby, fully approve of each provision.

Diana Toebbe, Defendant

Date    2/16/22

Edward B. MacMahon, Jr.
Counsel for Defendant

Date    2/16/+

- 8 -

**JA160**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                      Plaintiff,

 6   vs.                          Criminal Action No. 3:21-cr-49-1,2

 7   Jonathan Toebbe,
     and Diana Toebbe,
 8                      Defendants.

 9

10          Proceedings had in the Sentencing Hearing in the

11   above-styled action on August 16, 2022, before the Honorable

12   Gina M. Groh, United States District Judge, at Martinsburg,

13   West Virginia.

14

15                           APPEARANCES

16   On behalf of the United States of America:

17          Jarod J. Douglas
            Assistant United States Attorney
18          United States Attorney's Office - Wheeling
            P.O. Box 591
19          Wheeling, West Virginia 26003

20          Jessica Lieber Smolar
            Assistant United States Attorney
21          United States Attorney's Office - Pittsburgh
            700 Grant Street, Ste. 4000
22          Pittsburgh, Pennsylvania 15219

23

24   The defendants were present in person.

25   Proceedings reported by means of stenotype; transcript produced
     by official court reporter.
```

2

```
 1                    APPEARANCES (Continued)

 2

 3   On behalf of the United States of America:

 4           Matthew J. McKenzie, Esq.
             United States Department of Justice
 5           950 Pennsylvania Avenue, NW
             Washington, DC 20530

 6

 7   On behalf of the defendant, Jonathan Toebbe:

 8           Mr. Nicholas Compton
             Assistant Federal Public Defender
 9           Federal Public Defender's Office
             651 Foxcroft, Ste. 202
10           Martinsburg, West Virginia 25401

11   On behalf of the defendant, Diana Toebbe:

12           Barry P. Beck, Esq.
             Power, Beck & Matzureff Law Offices
13           308 West Burke Street
             Martinsburg, West Virginia  25401

14

15           Edward B. MacMahon, Jr.
             Edward B. MacMahon, Jr., Esq.
16           107 East Washington Street
             Middleburg, Virginia  20118

17

18   United States Probation Officers C. Bartholamay and M. DeHaven

19

20

21

22

23

24

25
```

**JA162**

3

```
1                    P R O C E E D I N G S
2                (August 16, 2022, at 1:00 P.M.)
3                          - - -
4         THE COURT:  Please be seated, everyone.  Good
5  afternoon, Counsel.
6         MR. DOUGLAS:  Good afternoon, Your Honor.
7     (Simultaneous speech.)
8         THE COURT:  We'll call our cases.
9         THE CLERK:  This is the case of the United States of
10 America versus Jonathan Toebbe and Diana Toebbe, Criminal No.
11 3:21-cr-49, defendants 1 and 2.
12    The Government is -- the Government is represented by
13 counsel, Jarod Douglas, Jessica Lieber Smoler, and Matthew
14 McKenzie.  The defendants are present in person and by counsel,
15 Nicholas Compton for Mr. Toebbe, Barry Beck and Edward
16 MacMahon, Jr. for Ms. Toebbe.
17    Are the parties ready to proceed?
18         MR. DOUGLAS:  The Government is ready, Your Honor.
19         MR. COMPTON:  Mr. Toebbe is ready, Your Honor.
20         MR. BECK:  Your Honor, Mrs. Toebbe is ready.
21         THE COURT:  All right.  Thank you, Counsel.
22    Ms. Toebbe, I'm going to ask you to stand and raise your
23 right hand.  We're going to get you under oath to answer any
24 questions I may have for you today, ma'am.
25    (The defendant, Diana Toebbe, was sworn in.)
```

**JA163**

4

```
 1              THE CLERK:  Thank you.
 2              THE COURT:  Ms. Toebbe, I'll remind you now -- you
 3    may have a seat, gentlemen.  You may have a seat.  That's fine.
 4       I'll remind you now you're under oath, and if you make any
 5    untruthful statements or answers during today's proceeding,
 6    those untruthful statements or answers could form the basis for
 7    a separate action for perjury or false swearing.  That having
 8    been said, feel free to ask questions.  If you don't hear
 9    something, ask for it to be repeated.  If you don't understand
10    something, ask for an explanation.  And at all times, feel free
11    to consult with your lawyers.
12       Mr. Beck, have you received a copy of the presentence
13    investigation report and reviewed it to your -- with your
14    client?
15              MR. BECK:  Yes, we have, Your Honor.
16              THE COURT:  All right.  And, Ms. Toebbe, most
17    importantly, have you received a copy of that report --
18              MS. TOEBBE:  Yes.
19              THE COURT:  -- and reviewed it to your satisfaction
20    with your lawyer?
21              MS. TOEBBE:  Yes, Your Honor.
22              THE COURT:  Has the Government received both the PSR
23    in Ms. Toebbe's and Mr. Toebbe's case?
24              MR. DOUGLAS:  Yes, Your Honor.
25              THE COURT:  All right.  Same process for you,
```

5

1   Mr. Toebbe.  If you would please stand, we're going to get you
2   under oath.
3       (The defendant, Jonathan Toebbe, was sworn in.)
4           THE CLERK:  Thank you.
5           THE COURT:  Please be seated.
6       Mr. Toebbe, I'm reminding you now that you're under oath.
7   That if you make any false statements or untruthful answers
8   during today's hearing, those untruthful statements or answers
9   could form the basis for a separate action for perjury or false
10  swearing.  That having been said -- same with Ms. Toebbe --
11  feel free to ask questions.  If you don't hear something, ask
12  for it to be repeated.  If you don't understand something, ask
13  for an explanation always.  And always feel free to consult
14  with your attorney, Mr. Compton.
15          MR. TOEBBE:  Yes, Your Honor.
16          THE COURT:  Mr. Compton, have you received the
17  presentence investigation report and reviewed it with your
18  client?
19          MR. COMPTON:  Yes, Your Honor.
20          THE COURT:  And, Mr. Toebbe, have you, in fact,
21  received that report and reviewed it to your satisfaction with
22  your lawyer?
23          MR. TOEBBE:  Yes, Your Honor.
24          THE COURT:  Counsel, as we all know, we're here today
25  for sentencing for Mr. and Ms. Toebbe.  Are there any witnesses

6

 1  to be called today at any stage in this proceeding?

 2          MR. DOUGLAS:  Your Honor, there is a representative

 3  of the victim, the Department of the Navy, that would like to

 4  make a victim impact statement whenever the Court deems that

 5  appropriate.

 6          THE COURT:  And who is that?

 7          MR. DOUGLAS:  Your Honor, that is William J. Houston.

 8  He's a vice admiral in the Department of Navy.

 9          THE COURT:  He's the one that authored the victim

10  impact statement that was attached to your --

11          MR. DOUGLAS:  That is correct, Your Honor.  He

12  authored the victim impact statement attached to the

13  unclassified sentencing memorandum filed in Mr. Toebbe's case.

14          THE COURT:  Okay.  Thank you.

15      Counsel, in preparation for today's hearing, I did review

16  the indictment, the sentencing memorandum that we touched on

17  briefly, the presentence investigation report, and other

18  relative filings.  During my preparation -- I need to be

19  honest -- I developed some general concerns about these plea

20  agreements, Counsel.  So I have some -- I'm going to have some

21  questions for you before we proceed any further.

22      But at the outset, for everyone involved in these questions

23  and answers, we need to be clear no classified information is

24  discussed in this courtroom today.  If the need arises to

25  reference or discuss classified materials, we will recess.  The

7

1   Court will conduct a closed proceeding on the record with the

2   necessary participants in another location.

3       As a preliminary matter in this case, both of these

4   defendants entered into plea agreements containing binding

5   sentencing ranges.  In other words, these agreements tie the

6   Court's hands to a large extent because I must impose a

7   sentence within the binding range agreed to by the parties

8   regardless of the advisory guideline range, the Court's usual

9   ability to vary upward or downward from the advisory guideline

10  range, or the sentencing factors the Court is required to

11  consider when fashioning an appropriate sentence.

12  Particularly, in Ms. Toebbe's case, the binding range is no

13  more than 36 months so I'm quite limited when considering the

14  advisory guideline range and the statutorily-allowed penalties.

15      That having been said, my first question is going to be for

16  you, Mr. Douglas, but to preface it, the indictment contains

17  three counts in which both defendants are named.  Count 1

18  alleges a conspiracy to communicate restricted data.  Counts 2

19  and 3 allege communication of restricted data on two separate

20  dates.  Both defendants have pled guilty to Count 1 of the

21  indictment which alleges they conspired to communicate

22  restricted data.  According to the indictment, the object of

23  the defendants' conspiracy was to enrich themselves by

24  demanding and accepting payment in return for communicating,

25  transmitting, or disclosing to a foreign nation information

8

1    involving or incorporating restricted data.  The term
2    "restricted data" is used throughout the indictment.
3        My question, Mr. Douglas, is whether any of the restricted
4    data involved in the conspiracy or referenced in this
5    indictment anywhere or involved in the offense conduct in this
6    case was classified at a top-secret level?
7            MR. DOUGLAS:  No.  The answer is no, Your Honor.
8    None of it was at the top-secret level.  None of it was at the
9    secret level.  All the data we're talking about is at the
10   confidential level which is that third level when you come down
11   from top secret to secret to confidential.
12           THE COURT:  In all the documents that were reviewed,
13   Mr. Douglas and Mr. Compton and Mr. Beck, nothing was marked
14   secret or top secret?
15           MR. DOUGLAS:  That is correct, Your Honor.
16           THE COURT:  You understand why I ask that question?
17           MR. DOUGLAS:  Yes, Your Honor.
18           THE COURT:  Because it pertains to the calculation of
19   the guidelines.  In order to get a picture of what we were
20   looking at, both the recommended guideline range with regard to
21   these pleas that are before me to determine whether I'm
22   accepting or rejecting them but also, if it was classified at
23   another level, the guideline ranges would change.  In fact, it
24   may be helpful for us to take a look at the chart that we have
25   prepared and even asking you all to advise the Court whether

9

1  this -- these pleas in either one of these cases are within the

2  community's interest.

3      So I'll go ahead and pass out what I used to make it easier

4  for me to wrap my mind around what we were looking at both with

5  the binding pleas and also with regard to information if it was

6  not at this lower level.  I've got a copy for each of you at

7  counsel table for Mr. Douglas, Mr. Beck, and Mr. Compton.  And

8  then we'll go ahead and make a copy for Chad so the record is

9  clear what we were reviewing.

10         MR. BECK:  Your Honor, actually, unless I'm

11  overlooking it, we don't have a copy of that document.

12         THE COURT:  I used that in preparation this week for

13  today's hearing so I'm going to go ahead and have Mr. Mullen

14  pass them out now.

15         MR. BECK:  Okay.  Understood, Your Honor.

16         THE COURT:  I'll give you a moment to look at that.

17      While they're looking at that, where's Admiral Houston?

18  Are you here?

19      If I accept this plea, I'm going to go ahead and give you

20  the opportunity to address the Court as Mr. Douglas told me you

21  would, but -- and this may sound like a simple question, but

22  this is -- my business is the law, and I understand that you're

23  the commander of the Submarine Forces in the Atlantic?

24         ADMIRAL HOUSTON:  Yes, Your Honor.

25         THE COURT:  None of this information involved in this

**JA169**

1   conspiracy was classified secret or top-secret level?

2           ADMIRAL HOUSTON:  Yes, Your Honor.

3           THE COURT:  So that's an accurate statement?

4           ADMIRAL HOUSTON:  Yes, Your Honor.

5           THE COURT:  Okay.  Thank you, sir.

6       Setting that aside, Counsel, knowing that we're all on the

7   same page with regard to the classification level of this

8   information, I am still not inclined to accept the plea

9   agreements in these binding ranges because they're below the

10  advisory guideline range in Ms. Toebbe's case or my hands are

11  tied with regard to Mr. Toebbe's case.  So I'm going to hear

12  from each of you why I should accept these pleas and sentence

13  these defendants to relatively minimal incarceration

14  considering the backdrop of their alleged offenses.

15      Mr. Douglas, we'll start with you.

16          MR. DOUGLAS:  Thank you, Your Honor.  I appreciate

17  the opportunity to be heard.  With regard to Mrs. Toebbe, Your

18  Honor, the appropriateness of the 36-month sentence starts with

19  a careful review of that sentencing guideline section that the

20  Court was referencing.  As the Court indicated, all that

21  guideline section says is what the base offense level should be

22  depending on what type of information it is.  There is no

23  specific offense characteristic.  For example, there's no

24  sentencing enhancement for the quantity of classified

25  information that a defendant gathered or for the number of

1   transmissions that a defendant made.

2         THE COURT: But the recommended guideline range is

3   151 to 188 months and this plea is to -- the binding plea is to

4   36 months. That's significant variance below the low end of

5   the recommended guideline range.

6         MR. DOUGLAS: Correct, Your Honor. It is a quarter

7   of the low end of the range as calculated. That's the

8   guideline range that we calculate for anybody. If you would

9   have called an old college buddy to drive him one time to

10   Harpers Ferry that would also be facing a low end of 12 years.

11   If that college buddy drove him there 15 times, he would be

12   facing a low end of 12 years.

13      So the varied sort of brief framework of that section, the

14   Government would argue, indicates a heavy reliance on the

15   statutory sentencing factors to fashion a sentence that is

16   reasonable considering a defendant's level and nature of

17   involvement in the offense. And the Government believes that

18   the statutory sentencing factors do support a sentence of 36

19   months for Ms. Toebbe in this case for a few reasons.

20      First, the history and characteristics of the defendant.

21   The defendant is married to her codefendant, but we must be

22   careful to discern important differences in their

23   characteristics. Mr. Toebbe is an expert on classified

24   submarine information through years of education, training, and

25   experience. The defendant here, Diana Toebbe, has no

12

1   specialized understanding of this information.  The
2   significance is that she did not as fully understand the extent
3   of the damage that could be caused by providing the information
4   to a foreign nation, and she did not employ a special skill as
5   this defendant did.
6       Mr. Toebbe was long employed by the Navy.  Long held a
7   security clearance.  Long had been granted access to classified
8   information, and he had been many times trained on the proper
9   handling of classified information.  Mrs. Toebbe was not
10  employed by the Navy.  She had no such clearance.  No such
11  access.  No such training.  Thus, Mrs. Toebbe's actions are not
12  as fully informed and do not involve an abuse of a position of
13  trust as it does for Mr. Toebbe.
14      Second, the nature and circumstances of the offense.  The
15  defendant, Mrs. Toebbe's, offense conduct.  Again, she is
16  married to her co-conspirator.  Under basic conspiracy laws,
17  she's criminally responsible for her co-conspirator's
18  reasonably foreseeable conduct.
19          THE COURT:  Regardless of whether she was his wife or
20  not.
21          MR. DOUGLAS:  Correct.  And so we've got to look at
22  what her conduct was.  Mr. Toebbe is the one who selected
23  classified information to smuggle from a secure government
24  facility.  He then smuggled it from that facility.  He
25  digitized the removed documents and uploaded them to an

1    encrypted laptop.  He got rid of the removed documents, the
2    hard copies.  He created encrypted email accounts.  He opened
3    cryptocurrency wallets.  He communicated with -- he contacted
4    the government by mailing a proposal letter.  He then
5    communicated with a purported foreign official to develop a
6    plan to exchange restricted data for monetary payment.  He
7    uploaded classified information to SD cards to be left at dead
8    drops.  He concealed the SD cards in a peanut butter sandwich,
9    gum packages, and a Band-Aid wrapper.  He serviced the dead
10   drops.  He provided the decryption key for the SD cards.  He
11   provided the instructions for cryptocurrency payments.
12       The defendant did none of those things.  Really her offense
13   boils down to acting as a cover and a lookout on three
14   occasions in a three-month period.  Nothing more than that.
15   Nothing less.
16           THE COURT:  Isn't the lookout for a robbery just as
17   guilty as the lookout -- as the person who is committing the
18   robbery?
19           MR. DOUGLAS:  Yes and absolutely should be punished.
20   Should be a felon.  Should be a spy for life.  Should go to
21   prison.  But not commensurate with anywhere near someone like
22   Jonathan Toebbe, who is the one who stole it.  In fact, her
23   contribution was not even essential.  It was not essential to
24   the commission of the offense.  In fact, on one of the
25   occasions, he serviced the dead drop by himself without her

1   even being there.  So he would have done this without her and

2   would have been able to do it without her.

3      Third, the requested sentence avoids unwarranted sentencing

4   disparities.  There have been other husband and wife espionage

5   cases as we've outlined in our sentencing memorandum.  Marjorie

6   Mascheroni, who received a sentence of 12 months and a day in

7   2014, and Gwendolyn Myers, who received a sentence of 81 months

8   in 2010.

9      Both the defendant, Ms. Toebbe, and Ms. Mascheroni played

10   limited passive roles in schemes led by their husbands who

11   abused positions of trust by removing restricted data from

12   their places of employment and offering it for sale to a

13   foreign nation.

14      Now, Gwendolyn Myers was more significantly involved in the

15   scheme with her husband than Mrs. Toebbe here.  Myers acted as

16   an agent of a foreign intelligence service for three decades.

17   Myers was also an active participant in meetings with the

18   undercover FBI agent.

19      So what the Government was trying to express there is this

20   isn't an outlier.  This wouldn't be an outlier for Diana Toebbe

21   to receive three years in prison for this.  It would not be an

22   outlier when you look at other husband and wife espionage cases

23   and look at the roles that those wives played in those cases.

24   So considering those cases, this sentence of 36 months would be

25   reasonable.

```
 1        Fourth, the defendant's post-plea cooperation provides
 2   further support for the requested sentence we argue.
 3   Mr. Toebbe had opened several cryptocurrency wallets and for
 4   one of the wallets, he had asked her to remember the pass
 5   phrase.  That was her only additional involvement that we have
 6   discovered.  And the defendant, Mrs. Toebbe, cooperated by
 7   providing us with that pass phrase.  And that cooperation in
 8   that regard substantially assisted the Government by allowing
 9   us to corroborate Mr. Toebbe's claim that no payments have been
10   received on that wallet.  As is more fully discussed in the
11   Government's classified sentencing memorandum filed in
12   Mr. Toebbe's case, the ability to corroborate that claim was
13   critical to a larger damage assessment concerning Mr. Toebbe's
14   offense conduct.
15        Lastly, Your Honor, the Government consulted with the
16   Department of the Navy, the victim in the case, and knowing the
17   full scope of the defendant's conduct and the potential damage
18   that the overall offense caused, the Navy fully supports a
19   sentence of 36 months for this defendant.  And the Government
20   argues that it is a reasonable sentence under the statutory
21   sentencing factors as applied to this very obtuse guideline
22   section and very -- applies the same to everybody.  And so we
23   would ask the Court to accept the 36 months.
24             THE COURT:  And the 36 months you believe,
25   Mr. Douglas, is within the best interest of the community given
```

16

1  the impact Ms. Toebbe's actions had on national security?

2        MR. DOUGLAS:  Your Honor, the Government believes

3  that for the protection of the community, the person who came

4  up with this idea, who had the access to do this, who had the

5  specific knowledge to do it, to know not just -- I mean it's --

6  I'm a janitor.  I work at this place.  Let me grab this stuff

7  off the desk and sell it.  But someone who worked with this for

8  ten years.  That person is the one that I believe the community

9  would be most concerned about.

10     The Government is not declining prosecution and not

11 pursuing Diana Toebbe.  We believe that there still is a

12 deterrence factor that is shown by the Government pursuing

13 someone who stood three times with her hands on her hips next

14 to him while he's servicing the dead drop.  She did that three

15 times and looked around, and she's being prosecuted and will be

16 labeled a spy the rest of her life, and she's 46 years old.

17     So we do believe there are some other deterrence factors

18 that are still here.  I know it sounds like a defense counsel

19 argument.  We don't normally say, oh, she's going to be a

20 felon.  It's the felon of a worst kind.  That's what she's

21 going to be.

22        THE COURT:  It is a felon of the worst kind.  That's

23 why the 36 months troubles me.

24        MR. DOUGLAS:  Yes.

25        THE COURT:  We sentence drug dealers every day in

17

```
1   this court that are lower-level drug dealers that go to prison
2   for way longer than 36 months, and they also don't understand
3   the impact on this opioid epidemic your office is fighting --
4           MR. DOUGLAS:  Right.
5           THE COURT:  -- in this community and this country.
6           MR. DOUGLAS:  And the Government certainly
7   understands that there are other types of offenses that are
8   sentenced sometimes more severely than the Government is
9   proposing in this case.  But dealing with the Justice
10  Department, the National Security Division, dealing with the
11  FBI, dealing with the Department of Navy throughout this case
12  for really over a year at this point and learning about those
13  other cases that have been out there with husband and wives,
14  again, the Government does not believe this is an outlier.
15  This would not be an outlier to sentence this defendant to 36
16  months.  And we believe it's reasonable for the reasons we
17  stated, and we would ask the Court to accept it.
18          THE COURT:  Thank you, Mr. Douglas.
19          MR. DOUGLAS:  Thank you, Your Honor.
20          THE COURT:  Mr. Beck --
21          MR. BECK:  Yes, Your Honor.
22          THE COURT:  -- why should I accept this plea?
23          MR. BECK:  I'm sorry, Your Honor?
24          THE COURT:  Why should I accept this plea?
25          MR. BECK:  Your Honor, I don't want to repeat
```

**JA177**

1  everything that Mr. Douglas said.  I think he eloquently
2  articulated the distinction between the level of involvement of
3  our client, Mrs. Toebbe, and her husband, Mr. Toebbe.  I think
4  the best way to summarize it -- and Mr. Douglas did this in
5  ways that none of us would be standing here -- at least
6  Ms. Toebbe and myself and her counsel -- if it wasn't for her
7  husband's involvement and instigation of this offense.
8      She indeed got involved in it at some point voluntarily and
9  knowingly, but it was at a highly limited level.  And as
10  Mr. Douglas said, she never had access to it.  She never had a
11  position of trust with the government.  And, frankly, like me
12  and most of the people in this courtroom, she probably wouldn't
13  have known what it was if she read it.  Now, she understood, of
14  course, it should not have been distributed, and that's where
15  her crime occurred.  But, again, it's -- she wasn't the one --
16  she's not why we're here today.  It's because her husband had
17  an ill-conceived idea to make money, and she agreed to go along
18  with it at some point.
19      Secondly, Your Honor, the Court, in addition to the
20  guidelines, has to consider -- is required to consider the
21  history and characteristics of the defendant.  In this case,
22  Ms. Toebbe has no criminal history whatsoever.  She is a mother
23  of two children that she, up until getting involved in this
24  mess, had been devoted to and raised.  And she was a teacher, a
25  school teacher, and from what I understand, a successful school

```
 1   teacher.  Unfortunately for her, she also had some -- I'll say
 2   personal issues.  I don't want to lay all her problems out
 3   before the Court or actually before the public in general, but
 4   she had some significant personal issues and family issues that
 5   I would describe as pretty tremendous and somewhat unusual for
 6   folks that this Court sees.  Those factors don't excuse what
 7   she did, but it certainly casts some light on why she exercised
 8   such poor judgment here.  She had troubles.  And by all
 9   accounts, from the outside, she looked like a normal, happy
10   individual living a suburban life in Annapolis, but underneath
11   that, there were some significant issues that probably played a
12   role in what she did here.
13        She certainly regrets, Your Honor, what happened here.
14   She -- you know, it was out of character.  She's never done
15   anything wrong in her life.  She -- once she gets whatever
16   sentence this Court imposes, if the Court accepts the plea and
17   imposes the agreed-upon sentence, she's going to do those 36
18   months in a federal prison.  She's already been serving time in
19   -- you know, I don't want to disparage our local jail, but
20   doing time there is certainly harder than doing it in most
21   places; and she's been doing time there for the last ten
22   months.  But when she does get out, Your Honor, she will
23   have -- she will have lost everything that she ever had in her
24   entire life.  She will have lost her husband.  She will have
25   lost so much time with her children.  She will have lost her
```

1  career.  She will unlikely, I think, ever be able to work in a
2  field that she's worked in the past.  And she will most likely
3  never have any meaningful contact for the near future with her
4  husband.  And this conviction will be with her the rest of her
5  life.  She will never -- this will be a scarlet letter that
6  will live with her forever.
7      So going back to the Court's point about drug defendants, I
8  agree there are many drug defendants that often come before the
9  Court that get similar or sometimes more time.  The only thing
10 I would say, Your Honor, is, at least in my experience, a great
11 deal of those, if not most of them, come before the Court
12 having had, shall I say, a checkered past, prior convictions,
13 run-ins with the law.  Indications that they can't comply with
14 the law; and, therefore, more sentencing time is justified to
15 protect the public.
16     In Mrs. Toebbe's case, Your Honor, I dare say that --
17 especially because she has no knowledge of nuclear science or
18 nuclear submarines -- she will never be a risk to the public
19 again.  You know, she will be someone who will live the rest of
20 her life with this scarlet letter on her, and hopefully she
21 will do the best she can; but her punishment, Your Honor, will
22 last forever.
23     So those are the reasons, Your Honor, in addition to what
24 Mr. Douglas said about the nature of the limited number of
25 other cases where individuals like Mrs. Toebbe have been

1  prosecuted.  And I would just say as I read in the case

2  involving the woman in New Mexico, the spouse of that

3  individual, one could certainly -- at least I read it -- that

4  person was more involved than Mrs. Toebbe was in this

5  particular case, and the judge there felt that that was an

6  appropriate sentence given under the circumstances.  So that's

7  why we're asking that the Court accept this plea, Your Honor,

8  and impose the sentencing of 36 months.  Thank you, Your Honor.

9         THE COURT:  Thank you, Mr. Beck.

10     Mr. Douglas, wasn't the Elizabeth Shirley case your case,

11  3:20-cr-21?

12         MR. DOUGLAS:  That was -- yes, Your Honor, as well as

13  Mr. Compton and Mr. MacMahon were co-counsel on that case

14  representing her.

15         THE COURT:  Didn't she get more time than 36 months?

16         MR. DOUGLAS:  Yeah, she got about seven years or so,

17  and so about, you know, double.  She was the contractor who had

18  the clearance.  She stole the documents.  She also kidnapped

19  her own child and went to Mexico.  And there were indications

20  that she was making attempts or at least planning to transmit

21  the information herself to a foreign nation.

22     So the Government would argue that is distinguishable; and,

23  again, it's not a sentencing disparity with Elizabeth Shirley

24  either.

25         THE COURT:  She didn't -- Ms. Shirley didn't transmit

 1 | any information, however, did she?  She was trying to make the
 2 | contacts.
 3 |         MR. DOUGLAS:  She did not transmit it, no.  She was
 4 | preparing to transmit.  And it did involve secret and even
 5 | top-secret classified information.  So not in this area of
 6 | confidential.  It was at the highest levels of classified
 7 | information.
 8 |         THE COURT:  Thank you, Mr. Douglas.
 9 |         MR. DOUGLAS:  Thank you, Your Honor.
10 |         THE COURT:  Would you comment further on Mr. Toebbe's
11 | plea or --
12 |         MR. DOUGLAS:  Yes.
13 |         THE COURT:  -- did you -- do you think you covered
14 | it?  I'm not certain whether you did so --
15 |         MR. DOUGLAS:  No, I did not.  I didn't really.  If I
16 | may.
17 |         THE COURT:  Yes, sir.
18 |         MR. DOUGLAS:  Your Honor, what the proposed binding
19 | term does in Mr. Toebbe's case is it cuts off a couple of years
20 | from the top end, and, of course, as I think the Court alluded
21 | to, would prevent the Court from giving an upward variant
22 | sentence.  The reason for that is a little more
23 | straightforward, and it's been explained in the Government's
24 | classified sentencing memorandum that his post-plea cooperation
25 | was substantial.  Very substantial.  Not in the eyes of me, not

1  in the eyes of the U.S. Attorney's Office, but in the eyes of

2  the Department of Navy and the FBI.

3      It was critical to a larger assessment of that defendant's

4  conduct which we may have never known.  The Navy would never

5  have known what his conduct was and what the scope was without

6  his cooperation.  And so we anticipated that going into the

7  plea agreement.  That's why the plea agreement doesn't just say

8  our typical "we'll be completely forthright and truthful," but

9  it says you're going to give us access to computers, you're

10  going to give us access to the encrypted email accounts, which

11  we can't get access to.  They're in Switzerland.  And there's

12  not really a way to get access to those in a way that can be

13  used.  And so that was a -- that was -- he enabled us --

14  completely himself enabled us to be able to make that damage

15  assessment that the Department of Navy is highly grateful for.

16      So that's why we have proposed this binding term which

17  simply just cuts two years off the top and avoids an upward

18  variant sentence.  Otherwise, it's still -- a large portion of

19  that binding range overlaps with what would have been the range

20  as calculated or what is the range that's calculated.  So

21  really for that reason, we believe that it's reasonable and ask

22  the Court to accept it.

23              THE COURT:  Thank you, Mr. Douglas.

24              MR. DOUGLAS:  Thank you.

25              THE COURT:  Mr. Compton, in minimizing Ms. Toebbe's

```
 1  role, the lawyers have cast your client in a much different
 2  light.  Why do you -- what can you tell me to convince me that
 3  I should accept your client's plea?
 4          MR. COMPTON:  Well, Your Honor, again, I won't
 5  belabor what Mr. Douglas has said, but the binding term does --
 6  it's not exact with regard to the guideline range that's called
 7  for, but it does track pretty closely, and it does reflect the
 8  extensive cooperation that Mr. Toebbe provided.  I think I had
 9  mentioned that, you know, we are talking about days long
10  meetings.  Three in total.  And I think Mr. Douglas accurately
11  represented what was provided, including information that the
12  Department of Navy would not have known but for Mr. Toebbe.
13      I know the Court has read the sentencing memos,
14  particularly the classified memos.  I would just implore the
15  Court to again look at those.  In my opinion, that alone
16  justifies the slight modification that the binding term makes
17  to the guideline range.  You know, whether the Court imposes
18  the low end of that range or the high end of that range, the
19  Court does have discretion in that sense with regard to the
20  binding term.  The Court can take into consideration within the
21  binding term the 3553(a) factors in this case.  So I think the
22  Court is not limited in that sense.
23      You know, again, these are serious crimes, but we are
24  talking about serious punishment.  Twelve and a half years to
25  seventeen and a half years is not a slap on the wrist.  The
```

1  defendant, who has never been in trouble before, is going to

2  have a felony conviction which is not -- for someone like

3  Mr. Toebbe is not insubstantial.  He will never hold a

4  classified -- a clearance again which means any work that he

5  has known up to this point, he will never be able to do for the

6  rest of his life.  That also means that there is almost zero

7  chance of recidivism in this case.

8      But the punishment itself is that type of punishment that

9  is reserved for -- the Court had mentioned drug cases earlier.

10  It's reserved for those most serious of the drug cases, the

11  career offenders.  The folks that have done this twice or three

12  times before and have now come back to the Court not having

13  learned their lesson.  That's this type of punishment.  It's

14  only slightly less punishment than we see when somebody has

15  committed a crime that's resulted in the death of another

16  individual.

17      This is serious punishment that the defendant is facing.

18  And, in fact, if the Court, in looking at the Government's own

19  sentencing memo, the unclassified version -- I know the

20  Government is trying to make another point there, but when the

21  Court looks at those cases that deal with the 2274, the

22  restricted data charges -- not the 794, the other charges --

23  but the restricted data charges, this offense and this

24  guideline range, this binding term range is much higher than

25  what those defendants received.

```
 1        Now, the Government says that the difference is because
 2   Mr. Toebbe actually made contact whereas these folks had always
 3   happened to be talking to the FBI.  But Roy Oakley was
 4   sentenced to 72 months of imprisonment.  Mr. Oakley had only
 5   been -- happened to be only dealing with the FBI, but
 6   Mr. Oakley delivered -- according to the Government, delivered
 7   uranium enrichment fuel rods and associated items to an
 8   undercover FBI agent who he thought was a foreign government.
 9   I mean, we're talking dirty bombs there.  That's significant in
10   my opinion, and Mr. Oakley was sentenced to 72 months.  Again,
11   Mr. Mascheroni, a 2274 charge, 60 months.
12             THE COURT:  Mr. Mascheroni was 70 years old too;
13   correct?
14             MR. COMPTON:  Well, and what I'm suggesting, Your
15   Honor, is that -- yes, he was 72.  So the defendant is not as
16   old, and he made contact.  So that could account for, I would
17   say, the difference between 60 months and 151 months to put the
18   binding term in perspective for the Court.
19        Mr. Awwad wasn't even convicted of the 22 -- he was
20   convicted of attempted 794.  So, you know, and, again, with
21   regard to the others, the Government, in trying to make the
22   comparison with the 794, those -- each of those individuals,
23   while they did make contact, they were all -- this was all
24   top-secret information that they were -- or secret -- secret or
25   top-secret information that they were dealing with, and most of
```

1    these individuals -- Peter Debbins, Mariam Thompson, Jerry Lee
2    -- what were they involved in?  Classified national defense
3    information regarding deployed Special Forces.  Providing
4    Russian intelligence agents with names -- names.  Information
5    about -- personal identifying information about former Special
6    Forces team members so the agents can evaluate those
7    individuals.  Mariam Thompson.  True names.  Personal
8    identifying information.  Background information.  Photographs
9    of human assets.
10        This is the type of stuff that 794 deals with because it's
11   -- we're talking about actual identifiable individuals who are
12   put in harm's way and are facing death because of what the
13   individuals did.  And what were they sentenced to?  Mr. Debbins
14   was sentenced to 188 months.  That's within the range that
15   we're talking about for Mr. Toebbe, and Mr. Toebbe wasn't
16   giving out names of Special Forces that could be killed because
17   of his actions.  Mariam Thompson was --
18            THE COURT:  Couldn't servicemen be killed because of
19   his actions?
20            MR. COMPTON:  Well, of course, there's damage, Your
21   Honor, and that's what the -- that's what the classification
22   is, and that's why the punishment is there.  Damage.  Could
23   service members be killed?  Yes.  In a theoretical sense,
24   somebody could be put into danger and somebody could be put
25   in -- just like when a drug dealer deals 5 grams of crack, it's

1   possible that society is put at risk and so somebody out there

2   could be killed.  But the differences between a hypothetical

3   possibility of somebody being -- a service member being killed

4   and Mr. Debbins and Ms. Thompson, who are providing actual

5   names and photographs of individual people who are involved in

6   human intelligence for the government -- here is their name.

7   Here is their photograph.  Here is what they're doing.  By the

8   way, if you want to go kill them because they were helping

9   target the Quds Force commander.

10      That's not what we have here.  But that's not to say --

11  and, you know, we get -- in an effort to -- and I noticed this

12  as we were preparing -- preparing for this hearing.  In an

13  effort to, you know, push back a little bit on some of the

14  Government's arguments in here now in an effort to convince the

15  Court to take this, we're not trying to minimize his activity,

16  his involvement.  It was serious.  It is serious.  It involved

17  serious misconduct.  He has taken responsibility for that.  He

18  has done everything he can post-misconduct, as you heard just

19  now from Mr. Douglas, to try and do whatever he can to make it

20  right.  And this guideline, this binding term, is the

21  punishment that goes along with it.

22      It's not -- it's not, Your Honor, a slap on the wrist.

23  It's not nothing.  It's more than not nothing.  It's something.

24  It's substantial.  And it reflects the guideline that's called

25  for, but not only that, the 3553(a) factors and this

29

1    defendant's significant, significant cooperation with the

2    United States as outlined by both Mr. Douglas and in our

3    collective memorandum.

4        So I would urge the Court to adopt this plea.  The Court

5    still has discretion within the range to impose a sentence that

6    the Court thinks is appropriate.  It's not a slap on the wrist.

7    It is a significant punishment for Mr. Toebbe combined with all

8    of the other felony -- the felony conviction, the loss of

9    clearance activity, and everything else that we talk about in

10   our memorandum.  So we would encourage the Court to adopt the

11   binding term.

12           THE COURT:  Thank you, Mr. Compton.

13       Counsel, for all three of you, anything else for me to

14   consider before I recess to give this some more time for

15   thought?

16           MR. DOUGLAS:  Your Honor, one very quick thing with

17   regard to Mr. Toebbe.  Kind of alluded to there, but to drive

18   this point home specifically.  In the jurisprudence of

19   restricted data cases, this Atomic Energy Act, which has been

20   around since the '50s, a sentence within the range that the

21   parties are proposing would be the most significant sentence

22   ever given.  I think there was -- maybe around in the '50s,

23   there might have been a life, but in modern times, a sentence

24   between 12 and 17 years would be one of the most, if not the

25   most, significant sentences in the history of the Atomic Energy

 1    Act.  So I just wanted to make that clear for the Court's
 2    consideration as well, Your Honor.
 3           THE COURT:  Thank you, sir.
 4       We're going to take a recess.  We'll get back on the record
 5    as soon as I can.
 6       (Recess 1:45 P.M. to 2:21 P.M.)
 7           THE COURT:  Please be seated, everyone.  We have
 8    everyone here for the hearing.  Back on the record.
 9       Counsel, as I stated at the beginning of this hearing, I
10    had some concerns with whether or not the Court should accept
11    or reject these plea agreements as presented to the Court.  I
12    reviewed everything that had been filed with the Court prior to
13    today's hearing, and today I've listened to the arguments of
14    counsel, and I considered the 3553(a) factors.
15       The defendants in this case pleaded to conspiracy to
16    communicate restricted data, which is a very serious crime.  So
17    serious, in fact, that it's punishable by life imprisonment by
18    statute.  The advisory guideline ranges in this case suggest a
19    sentence higher than what the Court may impose based upon the
20    binding terms contained within each defendant's plea agreement.
21    Moreover, looking at the -- even the high end of Mr. Toebbe's
22    binding range, that's about 17 1/2 years.  So what's to say he
23    gets out early with good time, and the information he still
24    possesses and has access to is still in step with current
25    technology, and he uses that and provides it to another country

1   that gains an advantage over this country?

2      What if Ms. Toebbe has other pass codes memorized?  I think

3   it was Mr. Douglas who referred to her having a pass code

4   memorized.  What if she has other pass codes memorized that she

5   can use when she gets out in about two years?

6      Make no mistake these defendants have been charged with

7   very serious crimes.  And as you all know, sometimes I may

8   question counsel about whether or not I should accept a plea,

9   and I listen to your arguments, but in the end, I generally

10   honor plea agreements negotiated by the parties even when they

11   have binding ranges.  But I find the sentencing options for the

12   Court in this case that are available to me strikingly

13   deficient in this case.

14      For example, Ms. Toebbe's plea agreement limits this Court

15   to imposing a sentence of no more than 36 months for an active

16   participant in a conspiracy to communicate restricted data.  An

17   act that was apparently done for selfish and greedy reasons but

18   that could have easily caused great harm to the Navy, the

19   United States, servicemen, and even the world.  These are tough

20   times we're in.

21      The time contemplated by Mr. Toebbe's plea also falls short

22   given the background of the parties' motivation, his trusted

23   employment position, and threats to national and global

24   security and service personnel alone that his actions caused.

25      I found quite revealing the victim's impact statement

1  provided to the Court by the Government.  That statement
2  prepared by Vice Admiral William Houston.  It gave this Court
3  quite a lot of food for thought, and just briefly touching upon
4  some comments by the vice admiral that I find most significant.
5  He stated, "Mr. Toebbe captured some of the most secure and
6  sensitive information about our nuclear-powered fleet.  A
7  critical component of national defense has been irreparably
8  compromised.  Mr. Toebbe served as a nuclear engineer with the
9  Naval Nuclear Propulsion Program, or Naval Reactors, as a
10 federal government civilian employee.  This information
11 concerned the design, arrangement, development, manufacturing,
12 testing, operation, administration, training, maintenance and
13 repair of the propulsion plants of nuclear-powered vessels.  By
14 definition, it's comprised of information that provides a
15 strategic advantage to our nation in dealing with foreign
16 adversaries.  The information Mr. Toebbe disclosed and tried to
17 sell to a foreign nation is related to the design and operation
18 of nuclear-powered submarines."
19     There's also a statement that "Our adversaries -- anywhere
20 on the world's oceans, including under the polar ice,
21 undetected and at maximum capability for extended periods."
22 That's how that submarine operates.
23     The vice admiral states, "Mr. Toebbe's illegal conduct has
24 now threatened those critical military advantages.  The nation
25 has spent billions of dollars developing naval nuclear

1  propulsion technology.  Mr. Toebbe's actions have compromised

2  the integrity of this protected information, thereby

3  undercutting the military advantage afforded by decades of

4  research and development.  This information could provide

5  foreign navies the opportunity to close the gap in capabilities

6  which would require an extraordinary effort and resources to

7  restore.  Resources will now be needed to develop information

8  and technologies to account for the information Mr. Toebbe

9  compromised.  This information could be used by an adversary to

10 harm or disable currently operating U.S. nuclear submarines.

11 The lives of nearly 25,000 active duty submarine sailors today

12 are at great risk" -- or at greater risk rather -- "than they

13 were before directly due to Mr. Toebbe's actions.  Mr. Toebbe

14 undertook these actions not because of some disadvantage due to

15 ignorance or lack of professional opportunity, development, or

16 training.  Rather, he did so in spite of and directly contrary

17 to receiving years of basic and advanced training about these

18 submarine operational systems and the critical importance of

19 maintaining secrecy."

20      There's a statement that Mr. Toebbe and his deliberate

21 actions betray the trust that the Navy and the nation placed

22 upon him.

23      Close to the end, the vice admiral comments that "Such

24 conduct poses a very real and profound threat to national

25 security allowing our adversaries access to one of our prized

34

1   strategic advantages."

2       Counsel, it's not in the best interest of this community

3   or, in fact, this country to accept these plea agreements.

4   Therefore, I'm rejecting them as presented to me.  There's no

5   question that the binding terms are outside the guideline

6   range.  The only question is whether they're outside the range

7   for justifiable reasons, and I don't find any justifiable

8   reasons for accepting either one of these plea agreements.

9       Given that, Counsel, we need to make sure that the

10  defendants understand that I'm not required to follow the plea

11  agreement, and I need to give the defendants, each of them, the

12  opportunity to withdraw their pleas.

13      I'm advising you, Mr. Toebbe and Ms. Toebbe, of that fact,

14  and I'm advising you that if your plea is not withdrawn, I may

15  dispose of this case less favorably towards you than your plea

16  agreement contemplated.  Meaning I -- if you don't withdraw

17  your plea, I can sentence you outside that binding range.  If

18  you do withdraw your plea, dates will then be set for trial.

19  That's not to say you can't go back to the drawing board and

20  formulate a different plea, but I'm rejecting this one as --

21  this plea agreement as presented.

22      Given that, is there anything you don't understand,

23  Ms. Toebbe, about what I've just told you?

24          MS. TOEBBE:  No, Your Honor.

25          THE COURT:  Mr. Toebbe?

**JA194**

```
 1              MR. TOEBBE:  I am.

 2              THE COURT:  Is there anything you don't understand

 3    about what I've just told you?  That you have the opportunity

 4    to withdraw your plea because if you don't, I'm not restricted

 5    in any way in sentencing you?

 6              MR. TOEBBE:  No, Your Honor.  I understand.

 7              THE COURT:  Okay.  Now, Mr. Compton and Mr. Beck and

 8    Mr. Douglas, knowing the gravity of these offenses and the

 9    sentencing that the Court can contemplate in this case,

10    ordinarily, we -- I take a brief break.  I come back on the

11    record and allow you -- allow you a bit of time to consult with

12    your clients to determine what you want to do.  Would you

13    prefer for me to give you until the end of the week to let the

14    Court know what your clients have decided, and then we can

15    either set dates in an order for trial or reset this for

16    sentencing?  We've got some light days in September that we

17    could reset this for sentencing.

18              MR. COMPTON:  Your Honor, I would probably just need

19    about actually five minutes to make sure Mr. Toebbe understands

20    the Court -- what the Court has advised and what my anticipated

21    advice to him is going to be.  I would -- I'm speaking for

22    myself.  I would prefer an order from the Court setting trial

23    dates so that we can then, I guess, work with that if we need

24    additional time through a motion to continue or something along

25    those lines.
```

```
 1              THE COURT:  Mr. Beck.
 2              MR. BECK:  Your Honor, I think I agree with
 3  Mr. Compton that if we could have just a brief recess so I can
 4  make sure, absolutely sure, Ms. Toebbe understands what her
 5  options are and then proceed.  I don't think it would take more
 6  than five minutes.
 7              THE COURT:  Okay.  Then why don't we go ahead and
 8  take about five.  We'll make sure you all are ready before I
 9  come back out here to get on the record.
10              MR. BECK:  Thank you, Your Honor.
11        (Recess 2:32 P.M. - 2:45 P.M.)
12              THE COURT:  Please be seated, Counsel.
13        We are back on the record.  We took a brief recess while
14  counsel conferred with their clients to determine whether they
15  wanted to stand upon their plea after rejection of the plea
16  agreement by the Court and receive a sentencing on their plea
17  or withdraw their plea and have us set trial dates.
18        Mr. Compton.
19              MR. COMPTON:  Your Honor, after speaking with
20  Mr. Toebbe, I believe he'll exercise his privilege under the
21  Federal Rule 11 and withdraw from the plea agreement at this
22  time, and we would ask that the Court set trial dates.  I would
23  only request that the -- just the Court recognize the complex
24  nature of this case when it's setting the trial date in the
25  future.
```

**JA196**

```
 1              THE COURT:  Absolutely.
 2         Mr. Toebbe is everything Mr. Compton told me accurate?
 3              MR. TOEBBE:  I'm sorry, Your Honor.  I couldn't hear
 4    you.
 5              THE COURT:  Is everything Mr. Compton told me
 6    accurate?  In other words, you wish to withdraw your plea of
 7    guilty and have me set trial dates?
 8              MR. TOEBBE:  Yes, Your Honor, I wish to withdraw my
 9    plea.
10              THE COURT:  Okay, sir.
11         Mr. Beck.
12              MR. BECK:  Your Honor, Ms. Toebbe would also like to
13    withdraw her plea and respectfully request the Court set a
14    trial date at an appropriate time.
15              THE COURT:  Ms. Toebbe, is what Mr. Beck just told me
16    correct?  You wish to withdraw your plea of guilty and have the
17    Court set trial dates?
18              MS. TOEBBE:  Yes, Your Honor.
19              THE COURT:  All right.  Understanding this case is
20    going to take some work for everyone involved, including the
21    Court, I'm looking at the -- I think what the latest trial date
22    according to our calculations can be is in January.  So we can
23    set this for pretrial January 12, 2023, at 9:30 for pretrial
24    and January 17, 2023, at 9:00 for jury trial.
25         Counsel, if those dates don't work, then just file a
```

38

```
1   motion, and we can work with that.
2           MR. COMPTON:  Thank you, Your Honor.
3           MR. DOUGLAS:  Thank you, Your Honor.
4           THE COURT:  Anything further on behalf of the
5   Government?
6           MR. DOUGLAS:  No, Your Honor.  Thank you.
7           THE COURT:  Anything further on behalf of your
8   client, Mr. Compton?
9           MR. COMPTON:  No, Your Honor.  Thank you.
10          THE COURT:  Anything further, Mr. Beck, on behalf of
11  your client?
12          MR. BECK:  No thank you, Your Honor.
13          THE COURT:  The defendants are remanded to the
14  custody of the United States Marshal.
15
16                  (Hearing concluded at 2:47 P.M.)
17
18
19
20
21
22
23
24
25
```

39

```
1                        CERTIFICATE

2

3         I, Kate A. Slayden, Registered Professional Reporter

4    and Official Court Reporter of the United States District Court

5    for the Northern District of West Virginia, do hereby certify

6    that the foregoing is a true and correct transcript of the

7    proceedings had in the above-styled action on August 16, 2022,

8    as reported by me.

9         I certify that the transcript fees and format comply

10   with those prescribed by the Court and the Judicial Conference

11   of the United States.

12        Given under my hand this 22nd day of September 2022.

13

14                        /s/Kate A. Slayden

15

16                        Kate A. Slayden, RPR
                          Official Reporter, United States
17                        District Court for the Northern
                          District of West Virginia
18

19

20

21

22

23

24

25
```



**United States Department of Justice**

*William Ihlenfeld*
*United States Attorney's Office*
*Northern District of West Virginia*

United States Courthouse
1125 Chapline Street          Phone: (304) 234-0100
P.O. Box 591                 FAX:  (304) 234-0111
Wheeling, WV  26003

Jessica N. Carmichael, Esq.                  September 19, 2022        **FILED**
Carmichael Ellis & Brock
108 N. Alfred Street, 1st Floor                                        SEP 2 7 2022
Alexandria, VA 22314
VIA E-MAIL DELIVERY                                          U.S. DISTRICT COURT-WVND
                                                            MARTINSBURG, WV 25401

In re:   <u>United States v. Diana TOEBBE</u>, Criminal No.: 3:21-CR-49-002

Dear Ms. Carmichael:

      This will confirm conversations with you concerning your client, Diana Toebbe (hereinafter referred to as "Defendant" or "Ms. Toebbe"). All references to the "Guidelines" refer to the guidelines established by the United States Sentencing Commission, effective November 1, 1987, as amended.

      It is agreed between the United States and your client as follows:

      1.    Ms. Toebbe will plead guilty to Count One of the Indictment, Conspiracy to Communicate Restricted Data, in violation of Title 42, United States Code, Sections 2274(a) and 2014.

      2.    The maximum penalty to which Ms. Toebbe will be exposed by virtue of her plea of guilty to Count One is:  imprisonment for a term of not more than life, a fine of not more than $100,000, and a term of supervised release of not more than five (5) years, pursuant to Title 42, United States Code, Section 2274(a) and Title 18, United States Code, Sections 3559(a)(1) and 3583(b)(1).  Ms. Toebbe will also be required to pay a mandatory special assessment of $100 (Title 18, United States Code, Section 3013), which must be paid before the date of sentencing by money order, or certified check, made payable to the United States District Court.  It is also understood that Ms. Toebbe might be required by the Court to pay the costs of any incarceration.

_____                    9/20/22
Diana Toebbe, Defendant                             _____
                                                    Date

_____                    9/20/22
Jessica N. Carmichael, Esq. Barry P. Beck, Esq.     _____
Counsel for Defendant                               Date

- 1 -

**JA200**

3.      Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree to the following binding term:  **a sentence of imprisonment of not more than the low end of the applicable Guidelines range**.  The parties' reference to "low end" means the lowest number of months of imprisonment available in the applicable Guidelines range.  The Court will determine the amount of the supervised release and any fine.  The parties understand that if the Court does not accept the binding provisions of this paragraph, then Ms. Toebbe will have the right to withdraw her plea of guilty.

4.      Pursuant to Sections 6B1.4 and 1B1.3 of the Guidelines, the parties hereby stipulate and agree that the base offense level is **Base Offense Level 37** pursuant to Section 2M3.1(a)(2) because the offense involved the communication of Restricted Data that was classified at the CONFIDENTIAL level.

The parties understand that pursuant to Section 6B1.4(d), the Court is not bound by the stipulations in this paragraph, and if not accepted by the Court, Ms. Toebbe will not have the right to withdraw her plea of guilty.

5.      Prior to sentencing and pursuant to Section 5K1.1 of the Guidelines, the United States will move the Court to depart downward from the otherwise applicable Guidelines range.  More specifically, the United States will move the Court for a **three-level reduction** pursuant to Section 5K1.1 of the Guidelines.  The United States' agreement in this regard is explicitly conditioned upon the defendant fulfilling her obligations under this plea agreement.

6.      The parties hereby stipulate and agree to the following facts:

At some time during the charged period, Ms. Toebbe knowingly and voluntarily joined a conspiracy with her husband, Jonathan Toebbe, to communicate Restricted Data to another person with the intent to secure an advantage to a foreign nation and committed multiple overt acts in furtherance of the conspiracy, including acting as a lookout while Mr. Toebbe serviced three dead drops, as described below.

On June 26, 2021, in Jefferson County, West Virginia, Jonathan Toebbe serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine reactors on an SD card, which was wrapped in plastic and concealed between two slices of bread on a half of a peanut butter sandwich.  The SD card also contained a typed message that included statements, "I hope your experts are very happy with the sample provided," and "I want our relationship to be very successful for us both."  On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

On July 31, 2021, in south-central Pennsylvania, Mr. Toebbe serviced a dead drop by leaving behind a typed message, which proposed a plan for him to provide 51 packages over time in exchange for

_____        9/20/22
Diana Toebbe, Defendant                 Date

_____        9/20/02
Jessica N. Carmichael, Esq. *Barry P. Beck, Esq.*    Date
Counsel for Defendant

- 2 -

**JA201**

a total of $5 million paid in cryptocurrency. The message also included statements that the information "was slowly and carefully collected over several years" and "smuggled past security checkpoints a few pages at a time" and that one of the sets of information "reflects decades of U.S. Navy 'lessons learned' that will help keep your sailors safe." On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

On August 28, 2021, in eastern Virginia, Mr. Toebbe serviced a dead drop by leaving behind Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine nuclear reactors on an SD card, which was concealed in a chewing gum package. The SD card also contained a typed message, stating, in part: "There is only one other person I know is aware of our special relationship, and I trust that person absolutely"; "I was extremely careful to gather the files I possess slowly and naturally in the routine of my job, so nobody would suspect my plan"; "I do not believe any of my former colleagues would suspect me, if there is a future investigation"; and "We have cash and passports set aside for th[e] purpose" of having to flee the United States. When Mr. Toebbe wrote "one other person" was aware of Mr. Toebbe's relationship, Mr. Toebbe was referring to his wife, Ms. Toebbe.

October 9, 2021, in Jefferson County, West Virginia, Mr. Toebbe serviced a dead drop by leaving behind an SD card, which was concealed in a chewing gum package. On this date, Ms. Toebbe provided cover and acted as a lookout for Mr. Toebbe while he serviced the dead drop.

7.   Ms. Toebbe waives any right to have sentencing determinations made by a jury and for a jury determination of any and all facts relevant to the application of the United States Sentencing Guidelines provisions and consents to the application of the Guidelines, in conformity with United States v. Booker, 543 U.S. 220 (2005), and to a determination of any and all facts and a resolution of the application of any and all Guidelines factors by the United States District Judge. Ms. Toebbe further agrees that the District Judge should make any sentencing determinations, including, but not limited to, Guidelines determinations, using the preponderance of the evidence standard.

8.   Ms. Toebbe will be completely forthright and truthful with regard to all inquiries made of her and will give signed, sworn statements and testimony, including but not limited to, appearances at grand jury, trial, sentencing and other proceedings. Ms. Toebbe will agree to submit to a polygraph examination if requested to do so by the United States Attorney's Office for the Northern District of West Virginia.

Moreover, Ms. Toebbe agrees to provide access to and consent to search all electronic devices and accounts owned, possessed, and/or controlled by her and any files contained therein. The electronic accounts include but are not limited to all ProtonMail accounts.

_____
Diana Toebbe, Defendant

_____
Jessica N. Carmichael, Esq. ~~Jessica N. Carmichael, Esq.~~ Barry P. Beck, Esq.
Counsel for Defendant

9/20/22
_____
Date

9/20/22
_____
Date

- 3 -

**JA202**

In addition, Ms. Toebbe agrees to assist federal officials with locating and retrieving the $100,000, which the FBI paid via Monero cryptocurrency in exchange for the Restricted Data. In this regard, Ms. Toebbe voluntarily abandons all right, title, interest, and claim to the $100,000.

Finally, Ms. Toebbe agrees to assist federal officials with locating all classified information and Restricted Data in any form possessed and/or controlled by her or contained in premises, including electronic devices and accounts, possessed and/or controlled by her.

9.      Nothing contained in any statement or any testimony given by Defendant, pursuant to Paragraph 8, will be used against her as the basis for any subsequent prosecution. Defendant understands that the use immunity granted in this agreement does not cover any statements or admissions that she committed, or was directly involved in committing, a crime of violence. This means that such statements or admissions can be used against the Defendant in any state or federal prosecution. In this regard, Defendant admits that, prior to the proffer, pursuant to Miranda v. Arizona, 384 U.S. 436 (1996), she has been adequately advised and warned that any admission that she committed, or was directly involved in committing, a crime of violence is not covered by the use immunity under this agreement. It is further understood that any information obtained from Defendant in compliance with this cooperation agreement will be made known to the sentencing court; however, pursuant to Guideline 1B1.8, such information may not be used by the Court in determining Defendant's applicable guideline range.

This agreement does not prevent Defendant from being prosecuted for any violations of other Federal and state laws she may have committed should evidence of any such violations be obtained from an independent legitimate source, separate and apart from that information and testimony being provided by her pursuant to this agreement.

In addition, nothing contained in this agreement shall prevent the United States from prosecuting Defendant for perjury or the giving of a false statement to a federal agent, if such a situation should occur by virtue of her fulfilling the conditions of Paragraph 8 above.

10.     Ms. Toebbe understands and agrees that she shall not knowingly have contact with any foreign government, or agents thereof, except with the express written permission of the FBI, unless such contact is solely for the purpose of obtaining a visa for foreign travel, entering, and departing a foreign country through customs control, or otherwise related to lawful international travel. Ms. Toebbe shall not seek or knowingly accept, personally or through another person or entity, any benefit from any foreign government or agent thereof. Should such a benefit be received by Ms. Toebbe, or some person or entity on her behalf, she hereby assigns any such benefit to the United States.

_____          9/20/22
Diana Toebbe, Defendant                   _____
                                          Date

_____          9/20/22
Jessica N. Carmichael, Esq. Barry P. Beck, Esq.   _____
Counsel for Defendant                     Date

- 4 -

**JA203**

11.     As part of this plea agreement, and based upon the concessions of the United States in this plea agreement, Ms. Toebbe knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, Ms. Toebbe knowingly, willingly, and voluntarily waives all pending requests for discovery.

12.     Ms. Toebbe understands and agrees that no later than 30 days following her sentencing hearing, she will, through her attorneys, return to the United States all discovery provided by the United States in this case, with the exception of any unclassified materials this Office gives Ms. Toebbe and provides express, written permission to retain. The Government reserves the right to inspect the specific documents Ms. Toebbe wishes to retain to determine whether they are classified or otherwise must be returned to the Government. Except for materials the Government permits Ms. Toebbe to retain, Ms. Toebbe expressly consents to the United States destroying or retaining these items as it sees fit without notice to her.

13.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, Ms. Toebbe agrees to forfeit and abandon to the United States all of Ms. Toebbe's right, title, and interest in the following items that Ms. Toebbe agrees constitute money, property, and/or assets derived from or obtained by Ms. Toebbe as a result of, or used to facilitate the commission of, Ms. Toebbe's illegal activities: all papers, digital media, and electronic devices seized from her residence, her vehicles, and Mr. Toebbe's Naval Reactors offices in October 2021.

14.     At final disposition, the United States will advise the Court of Ms. Toebbe's forthrightness and truthfulness, or failure to be forthright and truthful, and ask the Court to give the same such weight as the Court deems appropriate. In addition, at the sentencing hearing, the United States will move to dismiss the remaining counts of the Indictment but expressly reserves the right to reinstate and prosecute any dismissed charge should the defendant's conviction later be vacated on appeal or collateral attack.

15.     Although this agreement contains a binding term regarding imprisonment, the United States will make the following nonbinding recommendations: 1) if Ms. Toebbe accepts responsibility, and if the probation office recommends a two-level reduction for "acceptance of responsibility," as provided by Guideline 3E1.1, the United States will concur in the recommendation; and 2) should Ms. Toebbe give timely and complete information about her own involvement and provide timely notice of her intent to plead guilty, permitting the United States to avoid trial preparation, and comply with all the requirements of this Agreement, the United States will recommend, if applicable, an additional one-level reduction for this "timely acceptance" of responsibility. In order to be eligible for this timely acceptance of responsibility, **Ms. Toebbe must execute this Plea Agreement on or before 5:00 p.m., September 23, 2022**, and return or fax an executed copy to the United States by that day and time.

_____        9/20/22
Diana Toebbe, Defendant          Date

_____        9/20/22
Jessica N. Carmichael, Esq.  Barry P. Beck, Esq.   Date
Counsel for Defendant

- 5 -

**JA204**

16.     This Plea Agreement is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Plea Agreement at the date and time scheduled with the Court by the United States (in consultation with the defendant's attorney). If the defendant withdraws from this agreement, or commits or attempts to commit any additional federal, state, or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this agreement, then:

a.   The United States will be released from its obligations under this agreement. The defendant, however, may not withdraw the guilty plea entered pursuant to this agreement.

b.   The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense.

c.   Any prosecution, including the prosecution that is the subject of this agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant. The defendant waives any right to claim that statements made before or after the date of this agreement, including the statement of facts described above in Paragraph 5, or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines, or any other provision of the Constitution or federal law.

Any alleged breach of this agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of this Plea Agreement by a preponderance of the evidence.

17.     Ms. Toebbe is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, and in exchange for the concessions made by the United States in this plea agreement, the defendant waives the following rights, if the Court sentences her pursuant to Paragraph 3 of this agreement:

a.   The defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the defendant's conviction on any ground whatsoever. This includes a waiver of all rights to appeal the defendant's conviction on the ground that the statute(s)

_____          _9/20/22_____
Diana Toebbe, Defendant                              Date

_____          _9/20/22_____
Jessica N. Carmichael, Esq. Barry P. Beck, Esq      Date
Counsel for Defendant

- 6 -

**JA205**

to which the defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

b.  The defendant knowingly and expressly waives all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.  To challenge the conviction or the sentence which is within the maximum provided in the statute of conviction or the manner in which it was determined in any post-conviction proceeding, including any proceeding under 28 U.S.C. § 2255.

Nothing in this paragraph, however, will act as a bar to the defendant perfecting any legal remedies she may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. The defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct.

The United States waives its right to appeal any sentence within range specified in Paragraph 3. Both parties have the right during any appeal to argue in support of the sentence.

18.  The United States reserves the right to provide to the Court and the United States Probation Office, in connection with any presentence investigation that may be ordered pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, or in connection with the imposition of sentence should the Court, pursuant to Rule 32(c)(1), not order a presentence investigation, relevant information, including information regarding Ms. Toebbe's background, criminal record, the offenses charged in the Indictment and other pertinent data appearing at Rule 32(c)(2) of the Federal Rules of Criminal Procedure, as will enable the Court to exercise its sentencing discretion. The United States also retains the right to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the anticipated presentence investigation report to be prepared by the Probation Office of the Court, and to respond to any written or oral statements made to the Court by Ms. Toebbe or her counsel.

19.  Ms. Toebbe agrees that all monetary penalties imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided for in Title 18, United States Code, Section 3613. Furthermore, Ms. Toebbe agrees to provide all requested financial information to the United States and the Probation Office and agrees to participate in any presentencing debtor examinations. Ms. Toebbe also authorizes the U.S. Attorney's Office for the Northern District of

_____          _____
Diana Toebbe, Defendant                          Date        9/20/22

_____          _____
~~Jessica N. Carmichael, Esq.~~  Barry R. Beck, Esq.    Date        9/20/22
Counsel for Defendant

- 7 -

**JA206**

West Virginia to access her credit report from any major credit reporting agency prior to sentencing, in order to assess the financial condition for sentencing purposes. Ms. Toebbe agrees, under penalty of perjury, to complete a financial statement to be returned with the plea agreement. If the Court imposes a schedule of payments, Ms. Toebbe agrees that it will be deemed to be merely a minimum schedule of payments, not the only method available to the United States to enforce the judgment. Ms. Toebbe agrees to participate in the Federal Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. In addition, Ms. Toebbe agrees that the United States may submit any unpaid criminal monetary penalty to the United States Treasury for offset, regardless of the defendant's payment status or history at the time of said submission.

20.     The above nineteen (19) paragraphs constitute the entire agreement between Ms. Toebbe and the United States of America in this matter. **There are no agreements, understandings or promises between the parties other than those contained in this Agreement.**

Very truly yours,

WILLIAM IHLENFELD
United States Attorney

By:     Jarod J. Douglas
Assistant United States Attorney

Jessica Lieber Smolar
Special Assistant United States Attorney

S. Derek Shugert
Trial Attorney

*For*  Matthew J. McKenzie
Trial Attorney

As evidenced by my signature at the bottom of the eight (8) pages of this letter agreement, I have read and understand the provisions of each paragraph herein and, hereby, fully approve of each provision.

Diana Toebbe, Defendant                                      9/22/22
                                                            Date

Jessica N. Carmichael, Esq. ~~Jessica P. Beck, Esq~~        9/22/22
Counsel for Defendant                                       Date

- 8 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

v.                    **CRIMINAL ACTION NO.: 3:21-CR-49-2**
                                 **(Chief Judge Groh)**

**DIANA TOEBBE,**

     **Defendant.**

### AMENDED SUPPLEMENTAL MEMORANDUM IN SUPPORT OF BELOW-GUIDELINES, VARIANT SENTENCE[1]

COMES NOW the Defendant, Diana Toebbe, and submits this supplemental memorandum in support of her request for the Court to accept the parties' Fed. R. Crim. P. 11(c)(1)(C) plea agreement and sentence her to a term of thirty-six months imprisonment for her conviction in the above-captioned case.

> **A sentence of thirty-six months would be consistent with, and in some cases greater than, sentences imposed for other accomplices, as well as even some principle offenders.**

Although the statutes charged in the following list of examples may not be the same as the statute the government chose to lodge against Mrs. Toebbe in this case, the conduct of these individuals amounts to the same type of offense – that is these individuals provided, attempted to provide, or assisted in providing, classified

---

[1] This Supplemental Memorandum is amended to correct two typographical errors: one on page 13 (4.9 instead of .49); and one in footnote 27 (now footnote 28) to cite page 51 instead of 45.

information to an agent of a foreign government, generally for financial gain. The cases, which are divided into two categories: principal offenders; and accomplices, support for the conclusion that a sentence of 36 months is appropriate for Mrs. Toebbe, as an accomplice.

PRINCIPALS

| Case name/no./district | Sent. year | Trial/plea | Desc. of Conduct | Sentence | Notes |
|---|---|---|---|---|---|
| Hassan Abu-Jihaad 3:07cr57 (D.Conn.) | 2008 | Trial | U.S. Navy signalman provided classified information about the upcoming movements of his battle group to an alleged terrorism support cell in London | 120 months[2] | |
| Michael Hahn Allen (UCMJ) | 1987 | Trial | Retired Navy Senior Chief Radioman turned civilian clerk passed classified information to Philippine intelligence officers "to promote his local business interests which included a used car dealership, a bar, and a cockfighting ring." | 96 Months | Military Jury Sentencing[3] |
| Joseph Garfield Brown (E.D. Va.) | 1993 | Plea | Former US airman and martial arts instructor obtained classified CIA documents on Iraqi terrorist activities during the Persian Gulf War and assassination plans by a Philippine insurgent group from martial arts student and CIA secretary, Virginia Jean Baynes. Provided these | 72 months[4] | |

---

[2] *See* U.S. Dep't of Justice Press Release, *United States v. Abu-Jihaad*, 3:07CR57 (MRK) (*available at* https://www.justice.gov/usao-ct/us-v-hassan-abu-jihaad).

[3] Defense Personnel Security Research Center, *Espionage Cases 1975-2004* at 1 (Nov. 2004) (*available at* https://www.hsdl.org/?view&did=482512)(hereinafter "*Espionage Cases 1975-2004* Report").

[4] *See id.* at 5.

**JA209**

| | | | | | |
|---|---|---|---|---|---|
| | | | documents to an official with the Philippine government with the hope of receiving money. | | |
| John Douglas Charlton 2:95cr460 (C.D. Cal.) | 1996 | Plea | Retired Lockheed Corporation engineer attempted to sell highly classified information on the U.S. Navy's anti-submarine program to an undercover agent posing as a foreign government representative. | 24 months | A search of his residence revealed a cache of illegal guns and several classified documents outlining US defense projects.[5] |
| Allen John Davies 3:86cr01003 (N.D. Cal.) | 1987 | | Former Air Force Sergeant attempted to relay secret information about Warsaw Pact military preparedness to an undercover agent he thought was a Soviet agent. | 60 months | Government requested a 120-month sentence.[6] |
| James Wilbur Fondren, Jr. 1:09cr263 (E.D. Va.) | 2010 | Jury Trial | Drafted opinion papers on international relations from classified information he learned on his job, in exchange for compensation by a foreign national who Fondren knew maintained a close relationship with a Chinese official. | 36 months[7] | Not guilty on 3 of 6 charges[8] |
| Ronald Dean Graf (UCMJ) | 1989 | Unclear | Along with co-defendant, delivered $150,000 worth of sensitive and classified aircraft parts and technical manuals to an undercover law enforcement agent they believed was a foreign government representative. | 60 months[9] | |

---

[5] *See id.* at 7.

[6] *See* Associated Press, *Ex-Air Force Sergeant Gets 5 Years for Spying* (Aug. 28, 1987) (*available at* https://www.nytimes.com/1987/08/28/us/ex-air-force-sergeant-gets-5-years-for-spying.html).

[7] *See* U.S. Dep't of Justice Press Release, Defense Department Official Sentenced to 36 Months for Espionage, False Statement Charges (Jan. 22, 2010)(*available at* https://www.justice.gov/opa/pr/defense-department-official-sentenced-36-months-espionage-false-statement-charges)

[8] *See United States v. Fondren*, 1:09cr263, *Verdict,* ECF No. 91 (Sept. 25, 2009)

[9] *See Espionage Cases 1975-2004* Report at 25-26.

| Douglas F. Groat 1:98cr109 (D.D.C.) | 1998 | plea | A former CIA covert officer for 16 years, Groat contacted two foreign governments to market his services, providing his knowledge to foreign governments. Then he demanded $1 million from the CIA "for not disclosing to foreign governments how the United States intercepts their communications." | 60 months[10] | |
| Ron Rockwell Hansen 1:06cr57 (D. Utah) | 2019 | plea | U.S. Army Warrant Officer with a background in signals intelligence and human intelligence who spoke Mandarin-Chinese and Russian, retired to work for the DIA in 2006. Received hundreds of thousands of dollars in exchange for providing Chinese intelligence agents with classified information. Arrested with classified information in his possession at the airport while attempting to board a flight to China. | 120 months[11] | |
| Randy Miles Jeffries (D.D.C.) | 1986 | Plea | "offer[ed] to sell an undercover FBI agent, posing as a Soviet operative named 'Vlad,' copies of three classified documents for | 36 months[13] | Accomplice who received classified documents and drove Jeffries on one of his trips to |

---

[10] Bill Miller and Walter Pincus, *Ex-CIA Agent Given 5 Years in Extortion Case,* The Washington Post (Sept. 26, 1998) (*available at* https://www.washingtonpost.com/archive/politics/1998/09/26/ex-cia-agent-given-5-years-in-extortion-case/e6323eaf-c214-4143-953d-ccd406668599/)

[11] *See* U.S. Dep't. of Justice Press Release, *Former Intelligence Officer Convicted of Attempted Espionage Sentenced to 10 Years in Federal Prison* (Sept. 24, 2019)(*available at* https://www.justice.gov/opa/pr/former-intelligence-officer-convicted-attempted-espionage-sentenced-10-years-federal-prison)

[13] *See* Katherine L. Herbig, Ph.D., *The Expanding Spectrum of Espionage by Americans, 1947-2015*, PERSEREC Technical Report 17-10 at 16 (Aug. 2017) (available at https://www.dhra.mil/Portals/52/Documents/perserec/reports/TR-17-10_The_Expanding_Spectrum_of_Espionage_by_Americans_1947_2015.pdf?ver=2018-02-14-073446-943) (hereinafter "Herbig Report")

| | | | | | |
|---|---|---|---|---|---|
| | | | $5,000. One of the documents was a transcript, marked 'top secret,' of a House Armed Services subcommittee hearing about sensitive military communications programs.[12] | | the Soviet Military Office escaped charges, possibly on immunity grounds.[14] *See also infra* "ACCOMPLICES" |
| | | | | | |
| Ben-Ami Kadish 1:09cr1336 (S.D.N.Y.) | 2009 | Plea | Between 1980 and 1985 provided classified documents, including some relating to U.S. missile defense systems, to an Israeli agent. | No incarceration ($50,000 fine) | Age 85 at the time of sentencing. Government did not charge the case for 23 years. Government did not seek jail time.[15] |
| | | | | | |
| Robert Chaegun Kim 1:97cr117 (E.D.Va.) | 1997 | Plea | Navy civilian computer specialist, working at the Office of Naval Intelligence passed dozens of classified documents (including some Top Secret) to agents from his country of birth, South Korea. The documents included military assessments about North Korea and China and US intelligence assessments of South Korean government officials. Unclear whether motive was loyalty to his birth country or to address his considerable debt. | 108 months[16] | |
| | | | | | |

---

[12] Ruth Marcus, *Jeffries Pleads Guilty to Spying Count,* The Washington Post (Jan. 24, 1986)(*available at* https://www.washingtonpost.com/archive/politics/1986/01/24/jeffries-pleads-guilty-to-spying-count/08fb831e-8c79-4b90-ba19-03af9c95d4f0/)

[14] *See supra* n. 11.

[15] *See* Christine Kearney, *US Man Who Gave Secrets to Israel Spared Prison,* Reuters (May 29, 2009) *available at* https://www.reuters.com/article/us-usa-israel-spy/u-s-man-who-gave-secrets-to-israel-spared-prison-idUSTRE54S65H20090529

[16] *See* Brooke A. Masters, *VA Man Sentenced to 9 Years in Spy* Case, The Washington Post (July 12, 1997) (*available at* https://www.washingtonpost.com/archive/local/1997/07/12/va-man-sentenced-to-9-years-in-spy-case/6adf232c-ea1c-434f-88a3-e8746616fd6a/)

| Subrahmanyam Kota 1:95cr10015 (D. Mass.) | 1997 | Plea | Was paid to steal classified information for an undercover FBI agent posing as a member of the Soviet KGB.[17] | 12 months of home detention[18] | |
| Peter Lee 2:97cr01181 (C.D. Cal.) | 1998 | Plea | Scientist who provided classified DoE information to Chinese scientists | 12 months in halfway house (60 months incarceration suspended)[19] | |
| Ronald N. Montaperto 1:06cr00257 (E.D. Va.) | 2006 | Plea | Former Defense Intelligence Agency analyst held classified documents and passed Top Secret" information to Chinese intelligence officials. Motive unclear [20] | 3 months incarceration, 3 months home confinement[21] | |
| Roy Lynn Oakley 3:07cr00088 (E.D. Tenn.) | 2009 | Pled Guilty the day his trial was set to begin | Formerly employed as a laborer and security escort at a DOE facility, he stole parts of uranium enrichment equipment, classified as restricted under the Atomic Energy Act, and tried to sell them for $200,000 to an undercover agent posing as | 72 months[22] | |

---

[17] *See* Tim Weiner, *Spies Cant't Even Trust the Other Side Anymore,* The New York Times (Nov. 12, 1996) *available at* https://www.nytimes.com/1996/11/12/world/spies-can-t-even-trust-the-other-side-anymore.html

[18] *See United States v. Kota*, 1:95-cr-10015, ECF No. 444, 445 (Jan. 13, 1995).

[19] *See* Hearings before the Senate Subcommittee on Administrative Oversight and the Courts of the Committee on the Judiciary United States Senate*, The Peter Lee Case*, 106th Congress, Second Session, (2000)(*available at* https://www.govinfo.gov/content/pkg/CHRG-106shrg73205/html/CHRG-106shrg73205.htm); *Espionage Cases 1975-2004* Report at 28.

[20] *See* The Washington Times, *Ex-DIA Analyst Admits Passing Secrets to China* (June 23, 2006)(*available at* https://www.washingtontimes.com/news/2006/jun/23/20060623-120347-7268r/).

[21] *See United States v. Montaperto*, 1:06-cr-00257, ECF No. 23 (Sept. 12, 2006).

[22] *See* U.S. Dep't of Justice Press Release, *Former Oak Ridge Complex Employee Sentenced to Six Years in Prison for Attempting to Sell Restricted Uranium Enrichment* Equipment (June 18, 2009) (*available at* https://archives.fbi.gov/archives/knoxville/press-releases/2009/kx061809.htm).

| | | | an agent of a foreign government. | | |
|---|---|---|---|---|---|
| Jeffrey Loring Pickering (UCMJ) | 1983 | Plea | Stole classified material from USS Fanning. Expressed an interest in the KGB and advised of fantasizing about espionage. Admitted mailing a five-page Secret document to the Soviet Embassy, Washington, DC, along with a typed letter offering additional classified material to the Soviet Union. | 60 months at hard labor, forfeiture of $400 per month for 60 months, reduction to E-1 and a bad conduct discharge[23] | |
| Sharon Marie Scranage 1:85cr155 (E.D.Va.) | 1985 | Plea | CIA clerk who provided classified information to the Ghanan government. | 60 months, later reduced to 24 months[24] | "Reagan Administration officials said today that they believed at least one Central Intelligence Agency informant in Ghana was murdered after his identity was disclosed by an agency employee charged with espionage."[25] |
| Phillip Tyler Seldon 1:96cr305 (E.D.Va.) | 1996 | Plea | Passed classified documents to a Salvadoran air force officer while on active military duty in El Salvador as a US Army captain. Claimed to have thought the | 24 months[26] | |

---

[23] *See* Norman Polmar and Thomas B. Allen, *The Decade of the Spy* (Volume 3) at 278-280 (1989)(*available at* https://nsarchive2.gwu.edu/NSAEBB/NSAEBB407/docs/EBB-PollardDoc14.pdf)(hereinafter "Polmar Report").

[24] *See* (b)(3)(c), CIA, Ghana, and the (b)(1), Vol. 34 at 36 ((Fall 1990)(available at https://www.cia.gov/readingroom/docs/DOC_0000624354.pdf)(hereinafter "CIA Report").

[25] Stephen Engelberg, *Officials Think Spying Led to Death of CIA Informant in Ghana,* The New York Times (July 13, 1985)(*available at* https://www.nytimes.com/1985/07/13/us/officials-think-spying-led-to-death-of-cia-informant-in-ghana.html).

[26] *See Espionage Cases 1975-2004* Report at 42.

| | | | Salvadoran officer had the appropriate clearances. | | |
|---|---|---|---|---|---|
| | | | | | |
| Bryan Underwood 1:11cr261 (D.D.C.) | 2013 | Plea | Former civilian guard at a U.S. Consulate compound under construction in China collected classified information on the consulate including photos, surveillance camera diagrams, and schematics with security system upgrades. Attempted multiple times to engage officials from the Chinese government to sell his classified information, but was unsuccessful at getting a response. | 108 months | "After initially being arraigned … Underwood was released on his personal recognizance, with certain conditions, including staying within the Washington, D.C. metropolitan area and returning to court for a status hearing …. Instead of returning to court as promised, Underwood purchased a bicycle, racks, panniers, helmet and multiple energy snack bars. He left a fake suicide note at his hotel room in Springfield, Va. Then, alive and well, he pedaled west out of Springfield and eventually boarded a bus in Wytheville, Va., under a false name. He was arrested on Sept. 24, 2011 in a hotel room in Los Angeles, with over $10,000 in cash and 80,000 Japanese yen."[27] |
| | | | | | |

---

[27] U.S. Dep't of Justice Press Release *Former U.S. Consulate Guard Sentenced to Nine Years in Prison for Attempting to Communicate National Defense Information to China* (Mar. 5, 2013)(*available at* https://www.justice.gov/opa/pr/former-us-consulate-guard-sentenced-nine-years-prison-attempting-communicate-national-defense).

| Ronald Craig Wolf 3:89cr00120 (N.D. Tx.) | 1990 | Plea | Former Air Force pilot who flew intelligence missions. Passed classified information on Top Secret signals intelligence to an undercover agent posing as a representative of the Soviet Union "for monetary gain and to get revenge for his treatment by the United States government." | 120 months[28] | |
| | | | | | |
| Jay Wolff (jurisdiction unknown) | 1984 | Plea | Former Navy enlisted man offered to sell classified information dealing with US weapons systems aboard a US Navy vessel to an undercover agent. | 60 months[29] | |

## ACCOMPLICES

| Case name/no./district | Sent. year | Trial/ plea | Desc. of Conduct | Sentence | Notes |
|---|---|---|---|---|---|
| Rosario Ames 1:94mj00104 (E.D. Va.) | 1994 | Plea | Aided and abetted her husband's espionage. Husband was Aldrich Ames, a 31-year veteran of the CIA who spied for the Russians for 9 years and who has been described as "the most notorious and destructive spy in CIA history." He was sentenced to life in prison.[30] Mrs. Ames' statement to the Court stated that she "provided advice and support" for her husband's spying for the Soviet Union and then Russia.[31] | 63 months | Aldrich Ames admitted that was paid more than $2.5 million, compromised dozens of CIA operations and exposed numerous foreigners who were spying for the CIA. The government says at least 10 were executed.[32]

Mrs. Ames' house was bugged. Evidence from this surveillance showed that "[o]n one mission she told him, 'I hope you didn't screw it up.' On another, she told him that she hoped a lost |

---

[28] *Espionage Cases 1975-2004* Report at 51.

[29] *See id.* at 51.

[30] Sally Quinn, *The Terrible Secret of Rosario Ames,* The Washington Post (Oct. 19, 1994)(*available at* https://www.washingtonpost.com/archive/lifestyle/1994/10/19/the-terrible-secret-of-rosario-ames/00958966-8ae4-4071-a1a2-2710fe20209b/)

[31] Michael J. Sniffen, *Rosario Ames Sentences to 63 Months in Prison in Spy Case,* Associated Press (Oct. 21, 1994)(*available at* https://apnews.com/article/b855e1cfacdaf9e6fe5d151dd2c0a52a)

[32] *See id.*

**JA216**

| | | | | | suitcase didn't contain "anything that shouldn't have been {there}." She warned him about the weather, and suggested he send a message to the Russians before it got bad. Another time she suggested the possibility that the house was bugged. And in one instance she drove with him when he went to a site to check a signal. Once she advised him that he should be 'more imaginative' in carrying packages back to the United States." A letter that Aldrich Ames had composed to the Russians was found in his home and it and said "My wife has accomodated {sic} herself to understanding what I am doing in a very supportive way."[33]

At sentencing prosecutors said that "in mid-1992 after learning the source of her money she went with her husband to New York and happily spent $6,000 in KGB money in one weekend," and that greed motivated her.[34] |
| Virginia Jean Baynes 1:92cr226 (E.D.Va.) | 1992 | Plea | CIA secretary who provided classified CIA documents on Iraqi terrorist activities during the Persian Gulf War and assassination plans by a Philippine insurgent group to her martial arts instructor, Joseph Garfield Brown to assist him in his espionage activity with the Philippine government. | 41 months[35] | |
| Marjorie Mascheroni | 2014 | Plea | Worked at the Dept. of Energy with access to classified | 12 months | |

---

[33] *Supra* n. 29.

[34] *Supra* n. 30.

[35] *See Espionage Cases 1975-2004* Report at 5-6.

| | | | | | |
|---|---|---|---|---|---|
| 1:10cr2626 (D.N.M.) | | | information. Assisted her husband, who also worked at the DoE, in providing classified information to individuals they believed were agents of a foreign government, but were actually undercover FBI agent. Edited her husband's written documents and occasionally accompanied him on dead drops and face-to-face meetings.[36] | and one day[37] | |
| Gwendolyn Myers 1:09cr00150 (D.D.C.) | 2010 | Plea | Together with her husband, who held a position involving classified information with the State Department, provided classified information to Cuba for 30 years, beginning in 1979. In 2009, the FBI initiated an undercover operation and four meetings with both Myers and her husband. Myers was an active participant, processing the classified documents that her husband brought home for delivery to the Cuban agent.[38] | 81 months[39] | |
| Nathaniel Nicholson 3:09cr40 (D. Or.) | 2010 | Plea | Enlisted by his father, a former CIA official already imprisoned for espionage, to continue spying by providing the Russian government with information contained in notes from his father. | Five years probation [40] | |
| Anne Henderson Pollard | 1986 | Plea | Wife of Jonathan Jay Pollard. Assisted her husband who | 60 months | Gave a *60 Minutes* interview prior to sentencing hearing in |

---

[36] FBI, *Former Los Alamos Lab Workers Sentenced* (Feb. 5, 2015)(*available at* https://www.fbi.gov/news/stories/former-los-alamos-lab-workers-sentenced)

[37] *See United States v. Mascheroni*, 1:10-cr-2626, ECF No. 538 (Sept 29, 2014).

[38] *See United States v. Myers*, Case No. 1:09-cr-00150, *Statement of Offense*, ECF No. 51 at 3-12 (Nov. 20, 2009).

[39] *See id., Judgment*, ECF No. 69 (Aug. 2, 2010).

[40] Drew Kann, *How a CIA Traitor Turned His Son Into a Russian Spy,* CNN (Sept. 2017)(*available at* https://www.cnn.com/interactive/2017/09/us/declassified-book-excerpt/#:~:text=Nathan%20avoided%20prison%2C%20but%20was,serving%20for%20his%20previous%20crimes)

| | | | | | |
|---|---|---|---|---|---|
| | | | was selling classified material to an Israeli intelligence unit.[41] Jonathan Pollard was sentenced to life imprisonment and released on parole after 30 years.[42] | | which she stated, "I feel my husband and I did what we were expected to do, and what our moral obligation was as Jews, what our moral obligation was as human beings, and I have no regrets about that."[43] |
| | | | | | |
| Kevin Quander | | | Received classified information from Randy Miles Jeffries for "safekeeping," and "destroyed them shortly before Jeffries' arrest because he felt 'uneasy about the situation….'" Drove Jeffries on one of his trips to the Soviet Military Office.[44] | Not charged | Alleged to have "received immunity from prosecution in return for testifying before a federal grand jury investigating the case"[45] |
| | | | | | |
| Barbara Walker | | | Ex-wife of notorious soviet spy, John A. Walker Jr. Knew about his espionage activities while they were married and "covering them up 'became a way of life.'"[46] Eventually she and John Walker divorced and she turned him in. Said she sent John Walker a warning that she had turned him in so he could flee to Russia. | Not charged | Reported that she was granted immunity in exchange for testimony[47] |

---

[41] *See* Polmar Report at 278-280 (1989).

[42] Peter Baker and Jodi Rudoren, Jonathan Pollard, *American Who Spied for Israel, Released After 30 Years*, New York Times (Nov. 20, 2015)(*available at* https://www.nytimes.com/2015/11/21/world/jonathan-pollard-released.html).

[43] Edwin Black, *Why Jonathan Pollard is Still in Prison*, Forward (June 28, 2002) (*available at* https://forward.com/news/318100/why-jonathan-pollard-is-still-in-prison/).

[44] *Supra* n. 11.

[45] *Id.*

[46] Jane Perlez, *Spy Suspect's Ex-Wife Tells of Warning Him so He Could Flee to Soviet,* The New York Times (June 21, 1985) *available at* https://www.nytimes.com/1985/06/21/us/spy-suspect-s-ex-wife-tells-of-warning-him-so-he-could-flee-to-soviet.html

[47] *See* Laura Castaneda, *Barbara Walker Testifies in Whitworth Spy Trial,* Associated Press (May 13, 1986)(*available at* https://apnews.com/article/b967951729d8545bafd9f4b4bb5757bd)

Additionally, according to the Department of Defense's own research, 42% of all espionage offenders between 1990 and 2015 were sentenced to a period of incarceration between .1 and 4.9 years: [48]

**Table 8**
**Consequences of Espionage**

| Characteristics | 1947-1979 | | 1980-1989 | | 1990-2015 | |
|---|---|---|---|---|---|---|
| | n=67 persons | % | n=72 persons | % | n=66 persons | % |
| Initial prison sentence, in years | | | | | | |
| None | 15 | 22 | 6 | 8 | 3 | 4 |
| .1 – 4.9 years | 8 | 12 | 15 | 21 | 28 | 42 |
| 5 – 9.9 years | 10 | 15 | 14 | 20 | 13 | 20 |
| 10 – 19.9 years | 13 | 19 | 14 | 20 | 11 | 17 |
| 20 – 29.9 years | 4 | 6 | 10 | 14 | 2 | 3 |
| 30 – 39.9 years | 4 | 6 | 6 | 8 | 5 | 8 |
| 40 years | 2 | 3 | 1 | 1 | 0 | 0 |
| Life in prison | 11 | 17 | 6 | 8 | 4 | 6 |

The vast majority of the cases represented in this chart were classic espionage, not "leaks" (to the press), or other types of espionage:[49]

---

[48] Herbig Report at 40.

[49] Herbig Report at 62.

13

**JA220**

**Table 12**
**Types of Espionage by Americans**

| Characteristics | 1947-1979 | 1980-1989 | 1990-2015 |
|---|---|---|---|
| | n=68 | n=74 | n=67 |
| **Number of Persons Coded as One Type of Espionage** | | | |
| Classic | 56 | 68 | 42 |
| Foreign Agent | 3 | 1 | 11 |
| Export Control | 0 | 1 | 4 |
| **Number of Persons Coded as Two Types of Espionage** | | | |
| Classic + Leak | 0 | 0 | 7 + Snowden[28] |
| Classic + Foreign Agent | 8 | 2 | 2 |
| Classic + Export Control | 0 | 0 | 1 |
| Economic + Foreign Agent | 1 | 0 | 0 |
| Export Control + Foreign Agent | 0 | 2 | 0 |

Thus, in keeping with these cases and statistics, and pursuant to the §3553(a) factors set forth in her original sentencing memorandum, a sentence of thirty-six months incarceration for Mrs. Toebbe is sufficient, but not greater than necessary to achieve the goals of sentencing.

**DEFENDANT**
**BY COUNSEL**

/s/ Jessica Carmichael
Jessica Carmichael, VA Bar 78339
CARMICHAEL ELLIS & BROCK
Counsel for Diana Toebbe
108 N. Alfred Street, 1st Fl
Alexandria, Virginia 22314
703.684.7908 / Fax 649.6360
jessica@carmichaellegal.com

/s/ Barry P. Beck
Barry P. Beck
Power, Beck & Matzureff
308 West Burke Street
Martinsburg, WV 25401
(304) 264-8870

## <u>CERTIFICATE OF SERVICE</u>

I, Barry P. Beck, counsel for Defendant, hereby certify that on the 31st day of

October, 2022, the foregoing **AMENDED SUPPLEMENTAL MEMORANDUM IN**

**SUPPORT OF BELOW-GUIDELINES, VARIANT SENTENCE** was

electronically filed with the Clerk of the Court using the CM/ECF system, which will

send notification of such filing to all counsel of record.

/s/ Barry P. Beck
Barry P. Beck

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                        Plaintiff,

 6   vs.                        Criminal Action Nos. 3:21-cr-49-1,2

 7   Jonathan Toebbe,

 8   Diana Toebbe,

 9                        Defendants.

10

11          Proceedings had in the Sentencing Hearings in the

12   above-styled action on November 9, 2022, before the Honorable

13   Gina M. Groh, United States District Judge, at Martinsburg,

14   West Virginia.

15                            APPEARANCES

16   On behalf of the United States of America:

17          Jarod J. Douglas
            Assistant United States Attorney
18          United States Attorney's Office
            P.O. Box 591
19          Wheeling, West Virginia  26003

20          Jessica Lieber Smolar
            Assistant United States Attorney
21          United States Attorney's Office
            700 Grant Street, Ste. 4000
22          Pittsburgh, Pennsylvania 15219

23

24   The defendants were present in person.

25   Proceedings reported by means of stenotype; transcript produced
     by official court reporter.
```

2

```
 1                    APPEARANCES (Continued)

 2

 3  On behalf of the United States of America:

 4           S. Derek Shugert, Esq.
             United States Department of Justice
 5           950 Pennsylvania Avenue, NW
             Washington, DC 20530

 6

 7  On behalf of the defendant, Jonathan Toebbe:

 8           Nicholas Compton
             Assistant Federal Public Defender
 9           Federal Public Defender's Office
             651 Foxcroft, Ste. 202
10           Martinsburg, West Virginia 25401

11  On behalf of the defendant, Diana Toebbe:

12           Barry Beck, Esq.
             Power, Beck & Matzureff Law Offices
13           308 West Burke Street
             Martinsburg, West Virginia  25401

14

15           Jessica Carmichael, Esq.
             Carmichael Ellis & Brock, PLLC
16           108 N. Alfred Street, 1st Floor
             Alexandria, Virginia  22314

17

18

19  Probation Officer Michael C. DeHaven was present.

20

21

22

23

24

25
```

3

```
 1                 P R O C E E D I N G S
 2              (November 9, 2022, at 11:09 A.M.)
 3                         - - -
 4         THE COURT:  Please be seated, everyone.  We will call
 5  our cases.
 6         THE CLERK:  This is the case of the United States of
 7  America versus Jonathan Toebbe and Diana Toebbe, Criminal
 8  Numbers 3:21-cr-49, defendants 1 and 2.
 9     The government is represented by counsel, Jarod Douglas,
10  Jessica Smolar, and Derek Shugert.  The defendants are present
11  in person and by counsel Nicholas Compton for Mr. Toebbe, Barry
12  Beck and Jessica Carmichael for Mrs. Toebbe.
13     Are the parties ready to proceed?
14         MR. DOUGLAS:  The United States is ready, Your Honor.
15         MR. COMPTON:  Jonathan Toebbe is ready, Your Honor.
16         MR. BECK:  Good morning, Your Honor.  Mrs. Toebbe is
17  ready.
18         THE COURT:  Good morning.  All right, counsel, I'm
19  going to go ahead and get the defendants under oath.  We'll
20  start with Mrs. Toebbe.
21     If you'll stand and raise your right hand, please, ma'am,
22  we're going to get you under oath to answer any questions I may
23  have for you today.
24     (The defendant, Diana Toebbe, was sworn in.)
25         DEFENDANT DIANA TOEBBE:  I do.
```

**JA225**

4

```
 1              THE CLERK:  Thank you.
 2              THE COURT:  Ms. Toebbe, I'll remind you now you're
 3  under oath, and if you make any untruthful statements or
 4  answers during today's proceeding, those untruthful statements
 5  or answers could form the basis for a separate action for
 6  perjury or false swearing.  That having been said, feel free to
 7  ask questions.  If you don't hear something, ask for it to be
 8  repeated.  If you don't understand something, ask for an
 9  explanation.  And at all times, feel free to consult with your
10  lawyers.  Fair enough?
11              DEFENDANT DIANA TOEBBE:  Yes, ma'am.
12              THE COURT:  All right.
13      Mr. Toebbe, if you will please stand.  We're going to
14  administer the same oath.
15              THE CLERK:  If you'll raise your right hand, sir.
16      (The defendant, Jonathan Toebbe, was sworn in.)
17              DEFENDANT JONATHAN TOEBBE:  I do.
18              THE CLERK:  Thank you.
19              THE COURT:  Mr. Toebbe, the same thing for you.
20  You're under oath now.  If you make any untruthful statements
21  or answers during today's proceeding, those untruthful
22  statements or answers could form the basis for a separate
23  action for perjury or false swearing.  That having been said,
24  feel free to ask questions.  If you don't hear something, ask
25  for it to be repeated.  If you don't understand something, ask
```

**JA226**

```
 1   for an explanation.  And at all times, feel free to consult
 2   with your lawyer.  Fair enough?
 3           DEFENDANT JONATHAN TOEBBE:  I understand.  Thank you,
 4   Your Honor.
 5           THE COURT:  You're welcome.
 6       Before we get started, Mr. Douglas and Mr. Compton and
 7   Mr. Beck, in looking at the money that was recovered in this
 8   case, it appears as though $54,300 of the 100,000 was
 9   recovered, that earnest money, but there's still $45,700
10   unaccounted for.  Is that the amount?
11           MR. DOUGLAS:  That is the correct figure, Your Honor.
12           THE COURT:  All right.  Where did the rest of the
13   money go?
14           MR. DOUGLAS:  The rest of the money is accounted for
15   Your Honor, in Mr. Toebbe's report that he spent a certain
16   amount of it.
17           THE COURT:  Uh-huh.
18           MR. DOUGLAS:  Okay.  And then in addition to that,
19   the fluctuation of the value of the Monero cryptocurrency
20   which, according to the FBI -- and they kind of have a little
21   more of an expertise in that than I do -- it matched to the
22   fluctuation that had occurred during that passage of time
23   before we were able to get access to it.
24           THE COURT:  And that's your understanding,
25   Mr. Compton and Mr. Beck, as well?
```

6

```
 1              MR. COMPTON:  Yes, Your Honor.
 2              MR. BECK:  Agreed, Your Honor.  That's our
 3  understanding.
 4              THE COURT:  And I know I had a question that I think
 5  probation had gotten with you on, Mr. Douglas, about
 6  restitution.  If that could be ordered in restitution.  The
 7  remaining amount that was unrecovered.  But apparently,
 8  according to the section under which the plea has been made,
 9  unless restitution is specifically in the plea agreement, then
10  the Court can't order restitution?
11              MR. DOUGLAS:  Yes, Your Honor.  So my understanding
12  of the restitution law is that either it's mandatory
13  restitution, and there's enumerated offenses that doesn't
14  include this offense --
15              THE COURT:  Right.
16              MR. DOUGLAS:  -- or if it's discretionary, then the
17  parties still need to agree to it in the plea agreement under
18  3663(a)(3) which the plea agreement is silent on that issue.
19              THE COURT:  Okay.  We're going to take a quick break
20  real quick and get back out here on the record, and then we'll
21  get started.  What I plan to do -- I don't know whether our
22  courtroom deputy let you all know or not -- is we'll start with
23  Mrs. Toebbe, and then we'll move on to Mr. Toebbe's sentencing.
24  I will let you know that I'm inclined to take these pleas
25  today.
```

**JA228**

7

```
1        (Recess 11:24 A.M. – 11:31 A.M.)
2             THE COURT:  Please be seated, everyone.
3     All right.  We'll proceed with Ms. Toebbe's matter first.
4  Has defense counsel received the presentence investigation
5  report?
6             MR. BECK:  We have, Your Honor.
7             THE COURT:  And have you, Ms. Toebbe, received that
8  report and reviewed it to your satisfaction with your lawyer?
9             DEFENDANT DIANA TOEBBE:  Yes, ma'am.
10             THE COURT:  The government has received and reviewed
11  it of course?
12             MR. DOUGLAS:  Yes, Your Honor.
13             THE COURT:  And referring to the latest versions;
14  correct?
15             MR. DOUGLAS:  Yes, Your Honor.
16             THE COURT:  All right.  We do have some objections to
17  the report so let's go ahead and take care of those now.
18     Mr. Beck, I'm looking through these.  Objection No. 1 to
19  what's now page 23, paragraph 154.  That report has been
20  revised so are you satisfied with that?
21             MR. BECK:  We are, Your Honor.
22     May I use the podium, Your Honor?
23             THE COURT:  Absolutely.
24             MR. BECK:  Thank you, Your Honor.
25     Yes.  That objection has been resolved, Your Honor.
```

**JA229**

```
 1              THE COURT:  Okay.  And then Objection No. 2, is that
 2    just a holdover from the last time we were here before the
 3    Court on the Court's consideration of the original plea
 4    agreement?  Because it refers to a downward variance, but we've
 5    got a binding in Ms. Toebbe's case to the low end of the
 6    guideline range.
 7              MR. BECK:  It is -- well, not more than the low end,
 8    Your Honor.
 9              THE COURT:  Right.
10              MR. BECK:  Yeah, I suppose it is a holdover to the
11    extent that we're still requesting that the Court go below the
12    guidelines.  Not --
13              THE COURT:  Okay.  So let's put it this way.  Because
14    you filed the new motion for a variant sentence below the low
15    end of the guideline range, this really dovetails into that so
16    the objection is no longer before the Court because I -- you
17    know I'm going to consider your motion for variant sentence?
18              MR. BECK:  I'm sorry, Your Honor?
19              THE COURT:  This objection is no longer technically
20    before the Court because you know I'm going to consider your
21    motion for variant sentence which is the same thing?
22              MR. BECK:  Correct.
23              THE COURT:  Okay.  So we can say it's withdrawn
24    because I'm considering your motion?
25              MR. BECK:  That's correct, Your Honor.
```

9

```
 1            THE COURT:  Okay.  I do have a question on if I
 2    rejected the plea because it was woefully insufficient the last
 3    time around on round one, why Ms. Toebbe believes that I would
 4    consider a three-year sentence at this point?
 5            MR. BECK:  Well, Your Honor, I hope that --
 6            THE COURT:  And I'll -- you can further explore that
 7    later when we get to the dispositional phase --
 8            MR. BECK:  Right.
 9            THE COURT:  -- but I am curious.
10            MR. BECK:  Well, Your Honor, I would hope -- and this
11    may -- I don't want to tout our horn too much here, but I would
12    hope that this time, the Court has been given information from
13    us that casts more light on what other courts have considered
14    reasonable sentences in these kind of cases.  As you know, we
15    presented the Court with a memorandum --
16            THE COURT:  That said they were all very low.  We
17    double checked that and everything was correct.
18            MR. BECK:  Well, Ms. Carmichael and I spent a lot of
19    time on that, Your Honor, trying to --
20            THE COURT:  I can see that, and I appreciate that.
21            MR. BECK:  -- trying to give the Court a greater
22    perspective on these kind of cases because, quite frankly, I've
23    never had one before.  And I know the Court has had a few, but
24    they tend to happen in other places more often.  So we wanted
25    to give the Court a greater perspective on what might be a
```

```
 1    reasonable sentence in this case, particularly in light of what
 2    we believe are mitigating factors here concerning Ms. Toebbe's
 3    role in the offense and her personal history and
 4    characteristics.
 5        So that's why we come before you today again, Your Honor,
 6    at least asking you to consider a three-year sentence and, at a
 7    minimum, consider a sentence below the applicable guideline
 8    range.
 9            THE COURT:  Okay.  That takes care of all the smaller
10    objections as well.  Let's back up to the objections now.  Now
11    we have this more meaty objection with regard to the
12    enhancement for the obstruction which is still on the table
13    because that was included in the guideline calculations by the
14    probation officer in the PSR.  Correct?
15            MR. BECK:  Right, Your Honor.
16            THE COURT:  And that's the last objection that the
17    defendant raises to the PSR?
18            MR. BECK:  That's correct, Your Honor.
19            THE COURT:  Okay.  And there were some clarifications
20    by the government with regard to the PSR.  Let's flip over to
21    that.
22        Mr. Douglas, what's styled as Objection No. 2 but you note
23    in the beginning this is --
24        You can stay there, Mr. Beck, because this is going to be
25    real quick.
```

```
 1              MR. BECK:  Oh, okay.

 2              THE COURT:  Thank you.

 3       This -- it states this is less of an objection and more of

 4    a request for clarification.  Was that just clearing up how the

 5    plea agreement was presented to the Court in that PSR?

 6              MR. DOUGLAS:  That as well as trying to provide some

 7    additional context to what we discussed in those letters --

 8              THE COURT:  Okay.

 9              MR. DOUGLAS:  -- specifically regarding sort of a

10    predetermined cover story that was discussed to the extent that

11    that is something the Court considers or gives any weight.

12              THE COURT:  Well, that was Objection No. 1 that you

13    stated this is less an objection, more of an offer, and I

14    understand that.  And I'll await your response after Mr. Beck

15    puts forth his argument against that enhancement.  But there

16    was a second one that was objection -- this is less of an

17    objection, more of a request for clarification, but it dealt

18    with the terms of the binding plea agreement.

19              MR. DOUGLAS:  Yes.  The way that the government

20    originally read that paragraph in the presentence report seemed

21    to be not accurate to how the provision is in the binding plea

22    agreement.

23              THE COURT:  And now you're satisfied with the

24    revision?

25              MR. DOUGLAS:  Yes, Your Honor.
```

```
 1              THE COURT:  Okay.  You as well, Mr. Beck?
 2              MR. BECK:  Correct, Your Honor.
 3              THE COURT:  Okay.  So that leaves only the objection
 4    to the enhancement for the obstruction?
 5              MR. BECK:  That's right, Your Honor.
 6              MR. DOUGLAS:  Yes, Your Honor.
 7              THE COURT:  Okay.  Just to make the record clear on
 8    this so the record is clear in case there's any appellate
 9    review of this, what we're talking about is that on
10    October 4th, probation office -- of this year -- the probation
11    office received information that some months prior, Mrs. Toebbe
12    made attempts to contact her husband, Mr. Toebbe, through
13    illicit channels of communication.  Specifically, on two
14    occasions, she tried to send handwritten letters to him.  And
15    those were intercepted, of course, by those folks monitoring
16    the communication between the codefendants at the jail;
17    correct?
18              MR. BECK:  That's right, Your Honor.
19              THE COURT:  Mr. DeHaven, since you're the PO on this
20    case, when did these letters first come to your attention just
21    to make sure it's clear on the record?
22              MR. DEHAVEN:  The first copy of a letter we received
23    was provided by regional jail staff I believe on October 7th.
24    On October 9th, the government provided copies of both the
25    letters in question.
```

**JA234**

1          THE COURT:  Okay.  And you had reached out to the

2     jail --

3          MR. DEHAVEN:  Yes.

4          THE COURT:  -- based on a request from the Court on

5     whether there was any interception of anything that would

6     affect my determination at sentencing in this case and whether

7     to accept these pleas in fact?

8          MR. DEHAVEN:  Yes, Your Honor.  Subsequent to the

9     Court's rejection of the previous plea agreement and the

10    defendant's entry of a second guilty plea, our office reached

11    out to the jail at the Court's request and in an effort to

12    provide supplemental information for the presentence report.

13    We requested information regarding their status, any issues,

14    disciplinary concerns, or other problems at the jail, and

15    that's when we were made aware of the attempts at

16    communication.

17         THE COURT:  And who did you receive these letters

18    from?

19         MR. DEHAVEN:  The first --

20         THE COURT:  The jail or the government?

21         MR. DEHAVEN:  Initially, we received one letter from

22    the jail on October 7th.  The government also was working to

23    provide copies of the letters.  They provided copies of both

24    letters to us on the 9th.

25         THE COURT:  And for a full understanding, how does it

14

1  come about that the jail comes into this information, and what
2  do they do when they obtain information such as this?
3       MR. DEHAVEN:  My understanding is the ingoing and
4  outgoing mail of both Mr. and Mrs. Toebbe was monitored by jail
5  staff with information being provided to the government.  The
6  first letter in question, I believe the December letter, was
7  attempted to be transmitted through another inmate, an inmate
8  trustee in the laundry room, and was intercepted.  The second
9  letter was attempted to be mailed out of the jail with a
10 falsified return address.  It came back in, and in the process
11 of monitoring the mail, incoming and outgoing, the jail
12 discovered it.
13      THE COURT:  So I presume that the government gets
14 these intercepted communications close in time to when they're
15 intercepted?
16      MR. DEHAVEN:  Yes.  I believe both letters were in
17 possession of both the government and defense counsel in early
18 January of 2022.
19      THE COURT:  So I guess my question is, Ms. Smolar or
20 Mr. Douglas, why weren't these provided to the Court?
21      MR. DOUGLAS:  Your Honor, really, you know, as this
22 came up, as -- and everything he described is accurate.
23 Mr. DeHaven.  When this came up in early October -- and he only
24 really brought to the attention the first letter.  Said, oh,
25 well, actually there's two letters.  Okay.

**JA236**

```
 1            THE COURT:  Okay.  I appreciate your filling in the
 2   blanks on this.
 3            MR. DOUGLAS:  Yes.  And, Your Honor, it was not any
 4   kind of a deliberate decision, as I've indicated to
 5   Mr. DeHaven, that we sort of withheld that from the probation
 6   office.  Of course not.  At the point where they entered the
 7   pleas, we kind of moved on.  Moved on to getting their
 8   cooperation, which the Department of Navy values extremely in
 9   this case, and got both of their cooperations.  And so we
10   weren't even really considering the letters at all anymore at
11   that point in time.
12            THE COURT:  And no one thought, Ms. Smolar or you,
13   that it would have been important for the Court to consider the
14   letters considering their nature?
15            MR. DOUGLAS:  In hindsight at this point, Your Honor,
16   obviously, I can see where this would be something that's
17   relevant to the Court.
18            THE COURT:  All right.  Well, to be clear on the
19   record on these -- thank you.
20            MR. DOUGLAS:  Thank you.
21            THE COURT:  The first letter is dated December 21,
22   2021, and it starts with, "Flush this once you've read it."
23       "Dear Jon,
24       "Flush this once you've read it.  My feelings right now are
25   very complex and include feeling betrayed, lied to, abandoned,
```

1   and cheated.  But you don't simply throw away 18 years of
2   marriage.  I still love you.  Beyond that, I don't know what to
3   think.

4       "First, it was a bitcoin algorithm that was going to make
5   us our millions.  Then it was selling the algorithm itself.
6   Then it was these privacy deals with encryption keys and God
7   knows what else.  And the whole time, it was all bullshit.
8   You've put me in great danger.  Even with the weakness of the
9   government's case, I may still be convicted on circumstantial
10  evidence.  I could go to jail for life for something I didn't
11  do.

12      "My lawyers don't think they will give you a plea deal that
13  doesn't involve me pleading guilty too.  I may rot in here
14  unless you do what you're probably trying to avoid doing.
15  Plead guilty.  Tell them the truth.  I didn't know anything
16  about any of this.  That's the only way I get out of here.  I
17  hate to ask you to do it, but if you don't for me, do it for
18  our sons.  They deserve to be raised by one of us.

19      "They are going to appeal the rejection of my detention
20  hearing, but my lawyers don't have any much hope of that
21  succeeding.  They really think that the best hope for me is a
22  guilty plea from you.  I don't know why you chose to do what
23  you did.  I can't hope to ever understand the mindset, but I
24  hope I can still count on you to do the right thing and tell
25  the truth at this stage.  If you plead guilty, they may still

1 | be lenient with you.
2 | "I'm always thinking about you and praying you will do
3 | what's right."
4 | And then she signed it "Love, Diane." But there's a PS
5 | that says, "I'm so sorry for not sending more messages through
6 | the phone. They're always listening. I was told if I even
7 | said I love you, it would be used against me."
8 | And there's a second part to this letter.
9 | "When you get this, please reply. My roommate works in the
10 | laundry and can intercept and deliver messages. If your
11 | laundry bag has a note for me, tie a sock around the knot of
12 | the bag. That way she will know to get the note before it goes
13 | in the wash."
14 | And then she says, "I'm now in BJ. Goldie will still do
15 | letters for us."
16 | Then there's a second letter, January 4, 2022, and this one
17 | was sent by what they call or refer to in the jail as a
18 | boomerang where Ms. Toebbe, as confirmed on the envelope -- a
19 | copy of which the Court has received -- put Mr. Toebbe's name
20 | in the return address there at the ERJ here in Martinsburg in
21 | the return address spot. And then it went to L. Toebbe at --
22 | who I presume is a fake person -- at a fake address in
23 | Martinsburg. So basically, it's sent. It boomerangs. When it
24 | comes back, it goes to the return address so that's how
25 | Mr. Toebbe would have gotten ahold of it if it wasn't

1 | intercepted.
2 |     This letter of January 4, 2022, reads:
3 | "Dear Jon,
4 | "I'm trying again to get a message to you.  My friend
5 | swears that this will work.  It's called boomeranging.  The
6 | things you learn in this place.  I originally tried to send you
7 | a message by the laundry, but this may be safer.  Tell me if
8 | you got my first note by pulling the same trick in reverse.
9 |     "I'd tell you that this place is hell, but you already know
10 | that.  What you may not know is that my lawyers aren't so sure
11 | of my chances unless you plead guilty and tell the truth that I
12 | had nothing to do with this and give up the locations and/or
13 | passwords for where you've hidden the money and the secrets.
14 | They think I'm a flight risk who will defect and sell what you
15 | had if they let me out.  And they won't give you a plea deal
16 | that isn't contingent on my taking one too.  Also, we need your
17 | testimony to get me out, and we can't call you as a witness
18 | unless you've pleaded guilty."
19 |     And then she struggles with whether it's "pled" or
20 | "pleaded" and then says "sigh."
21 |     "My lawyers say you will have to do this eventually.  I
22 | don't know what you're being told.  My feelings are all over
23 | the place.  Of course I love you.  I've loved you for 20 years,
24 | but I also feel hurt, betrayed, abandoned, and lost.  All that
25 | talk about bitcoin and about some of the algorithm and then the

1    privacy" -- I don't understand what that means -- "and then the

2    privacy" -- I can't understand the word.  The privacy nuts

3    maybe -- "who could have been criminals for all we knew."  I

4    think the word is "nuts" there.

5        "I believed you, and it was all bullshit.  Right now I need

6    to focus on the boys and getting back to them to give them

7    something of what remains of their childhood.  They deserve

8    that much.

9        "I wish I knew what else to say.  You heard, I think, that

10    I got moved to B5 because I was being threatened.  That was

11    scary as hell.  And if it happens again, the only place they

12    can put me is solitary since they don't have protective

13    confinement for women here.  I am scared.  I'm keeping my head

14    down, but I just never know when it will start up again.

15    Please tell me what you're thinking.  I'm so desperate and

16    alone.

17        "Love, Diana."

18        So that's not obstructing, Mr. Beck?

19            MR. BECK:  Well, Your Honor, if I may first touch on

20    the question you asked Mr. Douglas about the Court not having

21    this information previously.

22            THE COURT:  Did you?  When did you get it?

23            MR. BECK:  I had it -- I think I had -- I had one

24    letter for sure.  I think I had both of them, and I'm not

25    saying I didn't have both of them.  I certainly had one of

**JA241**

```
 1   them.
 2            THE COURT:  I don't expect -- in asking that
 3   question, I don't expect for you as the defense attorney to be
 4   throwing a shovelful of dirt on your defendant when she's
 5   already down -- on your own client.  So I'm not saying you
 6   didn't provide anything you should have to the Court, but I'm
 7   curious as to when you received it.
 8            MR. BECK:  It was certainly in the -- it was prior to
 9   the entry of our first plea, Your Honor.  The exact date I
10   cannot say, but Mr. Douglas -- I have no doubt his side
11   provided it to us in a timely manner.  We were --
12            THE COURT:  So the -- so we were here on the -- so it
13   was before you entered the -- before you reached the first plea
14   agreement or before we came here for the Court to consider the
15   plea?
16            MR. BECK:  I'm certain it was before we reached the
17   first plea agreement, Your Honor.
18            THE COURT:  And when did you reach the first plea
19   agreement in this case?
20            MR. BECK:  I have it here in my notes, Your Honor,
21   but --
22            THE COURT:  I'll find it.  I only have the second one
23   here in front of me easily retrievable.
24            MR. BECK:  I believe it was February of this year,
25   Your Honor, if I'm not mistaken.
```

| 1 | THE CLERK:  2/14. |

```
 1               THE CLERK:  2/14.
 2               THE COURT:  2/14.  That's when it was signed.
 3               MR. BECK:  Okay.  February this year.
 4               THE COURT:  Okay.  Thanks, Chad.
 5               MR. BECK:  So I do, in fact, believe Mr. -- I mean,
 6   Mr. Douglas may be able to confirm this but -- and I don't want
 7   to misstate this, but I'm fairly certain that we were aware of
 8   at least one of the letters prior to entry of the first plea
 9   agreement.
10               THE COURT:  Did you ever -- were you ever aware of
11   them, Mr. Compton?
12               MR. COMPTON:  Yes, Your Honor.
13               THE COURT:  Okay.  When did you receive them?  Again,
14   I don't expect you to throw dirt on your client to bury him on
15   this sort of information to bring it to the Court's attention.
16               MR. COMPTON:  I don't recall honestly, Your Honor,
17   when exactly I received them.  It was close in time to when
18   they were intercepted and shortly after the government, I
19   believe, was made aware.  I --
20               THE COURT:  So before you all came here for me to
21   consider the original plea agreements?
22               MR. COMPTON:  I'm almost positive it was before the
23   change of plea hearing which was on the 14th.  I believe it was
24   closer in time to when they were intercepted.
25               THE COURT:  Okay.  Thank you.
```

1   Mr. Douglas.

2        MR. DOUGLAS:  Yes, Your Honor.  The -- both letters

3   were sent to both counsel within a week or so of our receipt of

4   them so within the first half of January 2022 which would be a

5   month before the first pleas were reached.

6        THE COURT:  Thank you.

7   Mr. Beck.

8        MR. BECK:  So, Your Honor, I just want to explain

9   that we had the letters.  We subsequently entered -- and

10  obviously having received the letters, it was disappointing to

11  counsel that Mrs. Toebbe had made this effort.  We certainly --

12  you know, as attorneys we weren't happy with that, but after

13  we -- well, a couple things.  We -- after we entered the plea

14  agreement and while we were negotiating it, I can say and I can

15  confess that it never occurred to me that these would rear

16  their heads again and became an issue at the sentencing

17  hearing.  Perhaps -- and I can explain in a moment why the

18  thinking was in that direction at the time.  Some of it was

19  though that it was, as Mr. Douglas said, we reached a plea

20  agreement; and it's like after the ballgame where everybody is

21  fighting during the game and hates each other.  You come

22  together, you shake hands, and, you know, all sins are

23  forgiven.  And it just never --

24       THE COURT:  But the referee never saw the

25  interaction.

```
 1           MR. BECK:  I agree, Your Honor.
 2           THE COURT:  The referee that has to make the call.
 3  Right?
 4           MR. BECK:  The referee had to make a call here.  But
 5  -- and, again, I'll discuss in a moment why the other factors
 6  that I think went into our not thinking this would be an issue,
 7  in addition to the fact that we were at that stage where we had
 8  entered a plea agreement with the government, and we were --
 9  had a binding plea, and there really wasn't any more that we
10  were fighting about, and Mrs. Toebbe was cooperating and had
11  admitted her guilt.  So I --
12           THE COURT:  So she -- so admitted her guilt by
13  saying -- by not saying I just thought this was some bitcoin
14  thing.  She admitted her guilt in the charge to which she is
15  about to be --
16           MR. BECK:  That's right.
17           THE COURT:  -- about to be found guilty.  Right?
18           MR. BECK:  Right.  And, you know, at that point --
19           THE COURT:  So the bitcoin was a cover story?
20           MR. BECK:  No question, Your Honor.  And I want to
21  talk about that for a second if I can.  So the question before
22  the Court now is whether or not her ill-advised and unfortunate
23  decision to try to send these letters to her husband should
24  justify an obstruction of justice enhancement under the
25  guideline.  And what I would say to that, Your Honor, is that
```

1  the guideline itself talks about two kinds of obstruction as I

2  read it in Commentary No. 1.  It talks about the classic type

3  of obstruction that we have seen more often in this court and

4  other courts where someone is indicted.  There's a witness

5  that's going to testify against them.  They either make threats

6  to them or their family or they try to bribe them.  But there's

7  no --

8          THE COURT:  Or they try to encourage them to perjure

9  themselves --

10         MR. BECK:  That's right, Your Honor.

11         THE COURT:  -- as she did here.

12         MR. BECK:  The --

13         THE COURT:  Plead guilty and tell them I'm innocent.

14         MR. BECK:  The distinction though, Your Honor, I

15  think is that in those scenarios, the classic type of

16  obstruction, there is no preconceived plan between the two

17  parties that are subject to -- that are the subject of the

18  alleged obstruction.  In other words, the person who is on

19  trial didn't have a plan prior to getting arrested and

20  prosecuted.  That, hey, I'm going to threaten you, and you're

21  going to tell -- that's usually not what we're talking about.

22  And the reason I say that, Your Honor, is if you look at

23  Commentary Note 1, it makes a distinction about obstructed --

24  obstructive conduct that occurred prior to the start of the

25  investigation, and it talks about that sometimes may be covered

1   if the conduct was purposely calculated and likely to thwart

2   the investigation or prosecution of the offense.

3           THE COURT:  And it was -- right? -- because that was

4   their cover story on how Mrs. Toebbe was innocent, and her

5   husband was going to take the fall for it.  So maybe in the

6   usual case, defendants aren't as smart as these two, but

7   they're -- this offense of -- that's about to be the offense of

8   conviction involves a covert operation.  Stuff in a thumb drive

9   and a peanut butter sandwich.  A lot like stuff in a contraband

10  note at the jail, against the jail rules, into a laundry basket

11  with a sock tied around it.  Right?

12          MR. BECK:  Right, Your Honor.  You're correct.  This

13  was a preconceived, preplanned cover.

14          THE COURT:  And then she continued it at the jail.

15          MR. BECK:  Well --

16          THE COURT:  She kept that plan in action.  She wrote

17  a note to the defendant, to Mr. Compton's client, Mr. Toebbe,

18  that basically pressures him with, oh, I'm so scared.  My

19  children.  You got to tell the truth which she knew wasn't the

20  truth.  When you plead guilty, you know, you plead guilty, and

21  you deploy this -- basically to me, how I interpret this is now

22  it's time to deploy the cover plan.  So you go forth, and you

23  plead guilty, and you perjure yourself and tell them I had

24  nothing to do with this.

25          MR. BECK:  What I would say to that, Your Honor,

1  first of all, is that -- I think it's -- it should be

2  considered a factor in the Court's evaluation of this that

3  there's no dispute that the plan, the cover, was the brainchild

4  of Mr. Toebbe who was running this operation.

5          THE COURT:  It looks like she's driving the bus, and

6  it looked like she was driving the bus in the communications

7  that I had to review in preparation for the bond appeal

8  decision that Magistrate Trumble made way back when I first got

9  involved in this case as well.

10         MR. BECK:  Well, there were communications between

11 her and Mr. Toebbe where they talked about what they were doing

12 and why.  But I don't think there's any dispute -- and, you

13 know, if the government disagrees or Mr. Toebbe disagrees, they

14 can certainly tell the Court -- that this was his cover plan to

15 purposely protect Mrs. Toebbe in the event they were both

16 captured so that there would be someone remaining to take care

17 of their children.

18         THE COURT:  Okay.  Let's ask Mr. Compton as you

19 referred to Mr. Toebbe's counsel.

20     Mr. Compton, who is driving the bus on this cover story?

21         MR. COMPTON:  Your Honor, I am hesitant to insert

22 Mr. Toebbe into this scenario.  Mr. Toebbe never received these

23 communications from the codefendant.  I am aware through

24 communications with my client that prior to them being

25 arrested, they had discussed what would happen if they were to

 1    be arrested.  I'm also aware that when Mr. Toebbe was arrested

 2    and counsel was appointed that we had proceeded on the path

 3    that the Court is now -- has seen over the last several months,

 4    including our interactions with the government and our

 5    compliance with paragraph 7 of the plea agreement.

 6        Mr. Toebbe -- I mean to the extent I can answer the Court's

 7    question, Mr. Toebbe did not direct Mrs. Toebbe in any way to

 8    write these letters.  He didn't send her any letters that I'm

 9    aware of --

10            THE COURT:  You're unaware -- are not aware of them

11    either?

12            MR. COMPTON:  So, again, I guess I'm hesitant to

13    insert Mr. Toebbe into this.  He has proceeded on the path --

14            THE COURT:  On his own path.

15            MR. COMPTON:  -- from the very beginning of his case.

16    I believe he has been truthful and honest throughout.  I know

17    that doesn't quite answer the Court's question.

18            THE COURT:  That's fair.  As his counsel looking out

19    for his best interest, I suppose that puts you in a bad spot,

20    and that's as far as you can go.  So I understand that.

21            MR. COMPTON:  Thank you.

22            THE COURT:  Mr. Douglas, did you have something to

23    add before we go back to Mr. Beck?

24            MR. DOUGLAS:  Yes, Your Honor.  The government would

25    just caution that the information came from Mr. Toebbe pursuant

1  to his plea agreement, his debrief information, and deserves

2  some protections which is why, you know, that probably also

3  shouldn't be gotten into.  Also the way that the --

4          THE COURT:  You can't get into the cover story?

5          MR. DOUGLAS:  To ask him about his cover story when

6  he told us under a plea agreement?  It was debrief information

7  that has protections under the guidelines.  That just -- I'm

8  just -- I'm just --

9          THE COURT:  Okay --

10         MR. DOUGLAS:  I'm just letting the Court --

11         THE COURT:  -- that's fair.

12         MR. DOUGLAS:  -- know as matter of fact --

13         THE COURT:  That's fair.

14         MR. DOUGLAS:  -- it was debrief information.  That's

15  all.

16         THE COURT:  That's fair.  And I think having these

17  letters before me and reading them in the same vein as I read

18  all jail correspondence both in years as a prosecutor and here

19  on the bench, I have a pretty good understanding, I believe, of

20  what the motivation was for the letters, what the intent was,

21  and whether or not Ms. Toebbe obstructed or not.  So thank you,

22  Mr. Douglas.  We're going to take you out of the hot seat,

23  Mr. Compton.

24     I think I have all I need, but I will entertain your

25  argument on the objection further, Mr. Beck, as far as you want

1   to go in the hope that for you and your hope, I guess, that you

2   can convince me otherwise.

3           MR. BECK:  Well, Your Honor, I just have one more

4   point I'd like to make with regard to this issue.  Even though

5   counsel -- and I understand counsel's concerns about saying too

6   much and the government's as well.  There's -- I don't think

7   there's any dispute, and I think Mr. Compton did acknowledge

8   this was a preconceived plan by the parties.  And the guideline

9   talks about influencing someone to commit perjury or

10  intimidating, threatening, or otherwise unlawfully influencing.

11      When I look at these letters, Your Honor, obviously, when

12  Mrs. Toebbe falsely stated in them that this was about a

13  bitcoin operation and that he had falsely told her it was, he,

14  if he had received them, would have immediately known that was

15  part of the plan because he knew that was not true.  So --

16          THE COURT:  But -- and she knew it was not true, yet

17  she says, "Tell the truth."

18          MR. BECK:  Which that's the point I forgot to

19  mention, Your Honor.  I'm not sure it's going to sway the

20  Court's decision, but her declarations of innocence at that

21  time are not obstruction of justice per the guidelines.  So

22  that fact alone -- you know, if it wasn't for the fact that she

23  was communicating with him, I don't think we -- there would be

24  any arguments of obstruction of justice because under the

25  guidelines --

30

1       THE COURT:  No.  If she came in here before she pled
2   guilty and said, "I'm not guilty," that's her right.  But what
3   she's done in a letter is encourage him to lie.
4       MR. BECK:  Well, that was the point I was going to
5   make before I got sidetracked, Your Honor, and I apologize for
6   that.  Is that how -- what I'm failing to understand is what
7   would her saying that I'm following the plan that you agreed to
8   and you already told me you were going to follow, how does that
9   influence him to do something he wasn't already going to do?
10  In other words, it wasn't --
11      THE COURT:  People change their mind once they're
12  incarcerated and deals are being wheeled and dealed between
13  defense counsel and the government.  Sometimes folks -- their
14  position changes, and they decide to save their own petard
15  instead of somebody else's, Mr. Beck.  You know, maybe --
16      MR. BECK:  I understand that, Your Honor.
17      THE COURT:  -- she's just making sure -- sounds to me
18  as though she was just making sure he deployed the cover story
19  for her so she got out of this unscathed.
20      MR. BECK:  Or she could be just letting him know she
21  was deploying the cover story which, again, I think is the
22  obvious --
23      THE COURT:  Well, if she was doing it on her own, she
24  wouldn't have said, "Tell the truth."
25      MR. BECK:  Which, again --

```
 1              THE COURT:  Which wasn't the truth.

 2              MR. BECK:  No.  And he knew it wasn't the truth so

 3    why -- you know, if it was a pure threat or an intimidation or

 4    intent --

 5              THE COURT:  I think it's pressure.  I don't see it as

 6    a threat.  It's pressure.  She's pressuring him.  It sucks in

 7    here.  I'm scared.  Do it for the children.  This is horrible.

 8    I love you.

 9              MR. BECK:  Well, Your Honor --

10              THE COURT:  We once had a note passed right up here

11    during the course of jury selection.  I think that may have

12    been one of Mr. Compton's cases where we had --

13       Mr. Moss is raising a hand.  He's taking -- he's not taking

14    credit for that.  That was his case where the defendant slipped

15    it right to his codefendant, his baby mama, and it was

16    basically you -- I'm watching -- basically, I'm watching you.

17    You better tell the truth which wasn't the truth at all but

18    that happens --

19              MR. BECK:  I know it happens, Your Honor.

20              THE COURT:  -- right here in plain view.

21              MR. BECK:  I just -- at least this is my experience.

22    The first time that I've ever had a case where the parties had

23    this plan before they ever got arrested.

24              THE COURT:  This is the first time you'd had clients

25    that are confessed traitors; that they had covert operations;
```

```
1   that the whole offense was based in deceit and looking out for
2   their own selves -- if you believe the further story, their
3   family -- in committing these horrible acts against this
4   nation.  But it's the first case because you never had clients
5   in a case such as this who were smarter than your average bear.
6   Well, actually, for all practical purposes, thought they were
7   smarter than your average bear but were not, and this is how
8   they do things:  hide, deception, covert, hide the thumb drive
9   in the peanut butter sandwich, hide the note in the laundry
10  basket with a sock tied around it.  It's -- yes, it's unusual.
11  This is an exceptional story.  It's kind of one right out of
12  the movies.  But it happened, and this is obstruction just like
13  your basic drug dealer who slips his baby mama a note that says
14  you'd better be telling the truth.
15          MR. BECK:  Well, Your Honor, I think I've exhausted
16  all my arguments.  I'll just make the final point, Your Honor.
17  The consequence of this, given that the letters were
18  preconceived, in my opinion, they weren't attempting to
19  influence him because he knew they were lies.  He knew they
20  were lies.  And it was her most likely telling her she was
21  going -- him he was going off the plan.  They were sent early
22  on at a time when Mrs. Toebbe was --
23          THE COURT:  Someplace she'd never been before.
24          MR. BECK:  In hell to use her words.  And I will tell
25  you to the Court that we had a heck of a time getting her on
```

**JA254**

1   the proper medications so that she could maintain her

2   psychological stability.  She had been threatened, as she put

3   in the letter, by another inmate.  And the letters were never

4   received by her husband, and they had no impact whatsoever on

5   the prosecution of this case.

6        THE COURT:  But they impact -- they impact the

7   prosecution of the case if you look at it not in the long run

8   but in the middle because they had this plan to obstruct that

9   would have put the government off the trail of Mrs. Toebbe and

10  totally on the trail of Mr. Toebbe in the investigation and

11  perhaps even in preparation for the trial.  Right?

12       MR. BECK:  It was -- that was the plan, Your Honor,

13  but looking -- you know, this goes back to Application No. --

14  Note No. 1 where we're talking about these preconceived plans.

15  One of the elements in order for that to be considered

16  obstruction is that it be likely to thwart the prosecution.

17  Now, thwart, I don't know the exact definition of that, but

18  when I use it, it means likely to stop it.  These folks weren't

19  going to stop this by this half-baked, cockamamie story that

20  they had created.  The idea that the government was not going

21  to get Mrs. Toebbe or Mr. Toebbe because they came up with this

22  story.  I know the government would have gotten them.

23       So just to finalize my point, Your Honor, it just seems to

24  me that in this case, because of the circumstances I've talked

25  about, enhancing her sentence by three levels, which in effect

1  adds three years -- or two levels -- adds three years to her

2  guideline -- minimum guideline range, just doesn't seem

3  appropriate.  But that's all I have to say about it, Your

4  Honor.

5          THE COURT:  Thank you, Mr. Beck.

6      Mr. Douglas, any response?

7          MR. DOUGLAS:  No, Your Honor.

8          THE COURT:  To this Court and I find that the

9  intention of these parties to establish a false narrative of

10  plausible deniability from Mrs. Toebbe was plainly calculated

11  to frustrate the investigation and prosecution of the offense

12  of conviction.  Further, Ms. Toebbe's actions to prod

13  Mr. Toebbe to deploy their cover story while she was in jail,

14  her attempts at correspondence, they were all taken well after

15  the arrest and detention in this case.

16      She in her letter is basically encouraging him to deploy

17  the story, and she is basically telling him to lie.  She says,

18  "Tell the truth," but we know it's not the truth.  So basically

19  what she's saying is lie.  Lie.  Roll this lie out to save my

20  rear.

21      She made several attempts -- two that we know of -- to

22  induce Mr. Toebbe to plead guilty and provide statements to

23  authorities confirming her ignorance of his criminal scheme

24  which we know, because she's pled guilty now, was not his

25  criminal scheme.  It was their criminal scheme.  She made

1  repeated references to the children.  The potential for her to
2  care for them.  And she provided to Mr. Toebbe basically in
3  these letters that if he pled guilty, she basically would get a
4  lesser sentence.  She encouraged him to plead guilty so he
5  could be called as a witness in support of her efforts to
6  secure her own release from custody.
7      And nothing is clearer than in this letter where she knows
8  not -- knowing full well that it's not the truth where she
9  says, "Plead guilty.  Tell them the truth."  And she says
10 before that -- this is the whole sentence.  And this is in the
11 initial December 21, '21 letter.  "I may rot in here unless you
12 do what you are probably trying to avoid doing.  Plead guilty.
13 Tell them the truth.  I didn't know anything about any of
14 this."
15     So she feels as though maybe now he's incarcerated that
16 he's going to be backing out of the cover story, and she tries
17 to guilt him into staying with the cover story and deploying
18 that plan.  That's obstruction plain and simple.  It's a
19 different type of obstruction that we see in most of our normal
20 run-of-the-mill, for example, drug cases, but it's no different
21 really when you boil it down to it.  It's encouraging a
22 codefendant to lie to save the other codefendant's rear.
23     And, therefore, I'm going to overrule the objection.  The
24 presentence report will not be amended, but I'll note the
25 exception of the defendant to the Court's ruling here today.

1     Now, having this issue of obstruction come up in the

2   guideline calculations, counsel, in Mrs. Toebbe's case opened a

3   can of worms I'm afraid in this case with regard to the

4   guideline calculations and further calculation.

5     I'm going to give you the opportunity, Mr. Douglas, and

6   especially you, Mr. Beck, to present to the Court arguments on

7   why Mrs. Toebbe, based on this obstruction, shouldn't lose her

8   acceptance of responsibility.  As I see it, she violated the

9   rules of the jail so that's nothing more than the

10  run-of-the-mill drug dealer in jail who is making the hooch in

11  the ceiling or selling drugs in the jail.  Same as the -- or in

12  the same vein as an original offense that got them in there.

13  She's continuing these covert operations in the jail, and it

14  was obstructing.  Why shouldn't she lose her acceptance of

15  responsibility for that?

16    Mr. Beck.

17       MR. BECK:  Your Honor, the reason is, in my opinion

18  and our opinion, is that, again, those efforts occurred early

19  on in the case, they were ill-conceived, agreed, and after

20  that, Mrs. Toebbe told the truth.  She accepted responsibility.

21  She has cooperated extensively.  And she has left nothing on

22  the table as far as what her involvement in this offense was.

23  Should she have done what she did?  No.  But it has not in any

24  way impaired the prosecution of this case.  In fact, she's done

25  everything she could to make the prosecution easier since doing

1  these things.  So -- and I don't have the guideline section in

2  front of me, but -- well, under the --

3          THE COURT:  3E1.1.

4          MR. BECK:  Yes.  Under the objection 3C -- under the

5  Section 3C1.1, it does specifically talk about, Your Honor,

6  that there are cases where one could obstruct justice as this

7  Court has found but also accept responsibility and get credit

8  for that.  And this seems to be the classic case where that

9  would fit.  I mean, she did these things that she shouldn't

10 have done.  Again, we -- you know, the Court does not accept

11 our explanation of why she did it, but she did them, and

12 subsequent to that, she did everything she could to accept

13 responsibility, Your Honor.  So I don't -- it just seems this

14 is the classic case where you can have an obstruction and also

15 an acceptance of responsibility.

16         THE COURT:  But in Application Note 4, which touches

17 on 3E1.1, it states there may be extraordinary cases in which

18 adjustments under both 3C1.1 and 3E1.1 may apply.  What's

19 extraordinary about this?

20         MR. BECK:  Well, I think it's extraordinary -- well,

21 two things.  One, Your Honor, the conduct itself, albeit wrong,

22 had no impact on the case.  So what is extraordinary in those

23 circumstances I think is subject to different definitions.  But

24 after she did it, again, she pled guilty and extensively

25 cooperated.  As the Court knows from our previous filings, this

38

1  is a case where, you know, everyone after fighting -- and in
2  her case, sending these letters where she didn't tell the
3  truth -- made an agreement and left the field shaking hands,
4  and at that point, she's done nothing but accept
5  responsibility.  And it just seems -- you know, as the Court is
6  determined, she's going to get a two-level enhancement for
7  obstructing justice.  If the Court were -- just thinking ahead,
8  if the Court were to rule that way, it might be a disincentive
9  for a lot of people not to plead because, you know, there are
10  people out there -- you know, I'm sure there are other cases --
11  maybe not quite as elaborate as this one -- where people do
12  things in the beginning of the case they should have done, but
13  then they enter a plea, and they get the credit for acceptance
14  of responsibility.  So I just think this is a case where both
15  sections should apply.

16          THE COURT:  Thank you, Mr. Beck.

17     Mr. Douglas.

18          MR. DOUGLAS:  Your Honor, the government doesn't
19  believe and the government is not asking the Court to take
20  Diana Toebbe's acceptance of responsibility for some of the
21  same reasons that Mr. Beck has outlined.

22     Her conduct was early on in the case.  She has pled guilty
23  twice -- twice in a timely manner that avoided any trial
24  preparation and, in fact, allowed us to focus on Mr. Toebbe's
25  cooperation which again -- I don't think it's a small matter --

```
 1   the Department of Navy highly valued and allowed us to not
 2   think, oh, she's still out there; we've got to focus on her and
 3   getting her to plead guilty --
 4             THE COURT:  But that was --
 5             MR. DOUGLAS:  -- and not be able to go into him.
 6             THE COURT:  But that would support the government's
 7   motion under 3E1.1(b) that can only be made if the Court gives
 8   the defendant acceptance of responsibility under 3E1.1(a) in
 9   the first place.
10             MR. DOUGLAS:  Correct.  Just --
11             THE COURT:  So let's deal with in the first place.
12             MR. DOUGLAS:  Okay.  The prosecution is the victim of
13   this obstruction of justice -- right? -- because we're talking
14   about affecting the prosecution.  So I'm trying to give the
15   Court the perspective that the prosecution had in this case and
16   how it actually worked.
17             THE COURT:  Okay.
18             MR. DOUGLAS:  She pled guilty and accepted
19   responsibility so we could then focus on him.  Get his
20   cooperation which was very valuable to the Department of Navy.
21   Then she even did more than that by supplementing his
22   cooperation because there was a piece of information that he
23   said she had, and she gave us immediately, and it was extremely
24   helpful in assessing the scope of his conduct and any further
25   potential damage.  So --
```

```
 1              THE COURT:  It just corroborated what he told you.
 2              MR. DOUGLAS:  No.  I'm referring to the
 3  cryptocurrency wallet passphrase that he said she had.
 4              THE COURT:  Uh-huh.  But he said there's nothing in
 5  that wallet; right?
 6              MR. DOUGLAS:  He did say there was nothing in that
 7  wallet but --
 8              THE COURT:  And when she gave you the passphrase, he
 9  was right.
10              MR. DOUGLAS:  Yes, he -- yes, he was, Your Honor.
11  But if he says I don't have the passphrase, she has the
12  passphrase, and we never get the passphrase, we can never look
13  into the wallet and see if there's actually money in there.
14  And maybe he's lying to us, which is what we're trying to do is
15  corroborate what someone is telling us, and we're trying to get
16  into encrypted cryptocurrency wallets which we cannot otherwise
17  get into.
18      So the government does believe it's somewhat of an
19  extraordinary case where you do have this obstruction early on.
20  And, look, I've been a prosecutor for ten years.  Right?
21  Prosecuted drug defendants.  Okay.  Then later moved on to
22  white collar, public corruption, civil rights.  And those
23  aren't your typical hardened criminals; right?  They do weird
24  things at the beginning.  They have a lot harder time accepting
25  that they committed a crime.
```

```
1              THE COURT:  Or accepting that it's going to stick.
2              MR. DOUGLAS:  Accepting that it's going to stick.
3    I'm going to get out of this somehow.  Okay.  So this isn't
4    your typical drug case where you have a hardened criminal that
5    is engaging in this conduct.  And that's just from my
6    perspective.  Again, because we're talking about obstructing
7    the prosecution, I'm only trying to give the Court a full
8    picture from our point of view.  And so for all those reasons,
9    we don't believe the Court should take her acceptance of
10   responsibility.  Thank you, Your Honor.
11             THE COURT:  Thank you, Mr. Douglas.
12        Looking at 3E1.1(a) of the guidelines, it states if the
13   defendant clearly demonstrates acceptance of responsibility for
14   his -- or in this case her -- offense, decrease the level --
15   the offense level by two levels.  I don't find there was a
16   clear demonstrable acceptance of responsibility in this case
17   based on this defendant's actions.
18        And the application notes -- reviewing the application
19   notes which gives some guidance to this Court, those
20   application notes further support my finding.  In looking at
21   number one, Application No. 1(a), it states in part, "A
22   defendant who falsely denies relevant conduct that the Court
23   determines to be true has acted in a manner inconsistent with
24   acceptance of responsibility."
25        She falsely denied her cooperation, her part of the
```

42

1  conspiracy in these letters, and she leaned on Mr. Toebbe to
2  roll that false story out.  She also, when looking at
3  Application Note 1(b), kind of falls to the contrary of that.
4  We see for acceptance of responsibility, there must be a
5  voluntary termination or withdraw from criminal conduct or
6  associations.  So she's still not withdrawn but trying to fan
7  this cover story through these letters to Mr. Toebbe.
8      And in addition to that, in addition to trying to roll out
9  part B of the conspiracy, the cover story, she's also
10 committing violations at the jail by secreting this
11 correspondence that she's not supposed to give to Mr. -- not
12 supposed to be sending to Mr. Toebbe, and she knows that
13 because the beginning of the first letter says, "Flush this
14 when you get it."
15     Application Note 3 notes at the bottom, "A defendant who
16 enters a guilty plea is not entitled to an adjustment for
17 acceptance of responsibility under this section as a matter of
18 right."  It notes that this evidence of acceptance of
19 responsibility basically may be outweighed by conduct of the
20 defendant that is inconsistent with such acceptance of
21 responsibility.  And this certainly was.
22     And it also notes in Application Note 4, "Conduct resulting
23 in an enhancement under 3C1.1" -- the obstructing, which I've
24 already found -- "ordinarily indicates that the defendant has
25 not accepted responsibility for his criminal conduct."

1    Now, it does go on to say there may be extraordinary cases

2  in which adjustments under both obstructing and acceptance of

3  responsibility may apply, but this is not the case.  And,

4  therefore, when I review the guideline calculations, I am not

5  going to give Ms. Toebbe a reduction for acceptance of

6  responsibility.  I'll note the exception of the defendant and

7  the government to the Court's ruling in that regard.

8    I think we've reviewed all of the objections to the

9  presentence report.  I have given counsel the opportunity to

10  argue with regard to the Court's position that the defendant

11  doesn't qualify for an acceptance of responsibility under

12  Guideline 3E1.1(a) which then does not give the government the

13  opportunity to request another one-level reduction under

14  3E1.1(b).

15    And I don't think that leaves anything further before we

16  get to the guideline calculations, does it, Mr. Douglas?

17         MR. DOUGLAS:  No, Your Honor.

18         THE COURT:  Mr. Beck?

19         MR. BECK:  No, Your Honor.

20         THE COURT:  The presentence report is going to be

21  accepted and ordered filed and made a part of the record

22  herein.  It will be placed in the record under seal.  In the

23  event of an appeal of the sentence imposed herein, counsel on

24  appeal will be permitted access to the sealed report, but not,

25  however, to the recommendation section from probation.

44

1    I will note for the record in this case that, to back up,

2   on September 27, 2022, this defendant appeared in the United

3   States Magistrate Court for the Northern District of

4   West Virginia sitting in Martinsburg.  And at that time, she

5   tendered a plea of guilty by a written plea agreement to

6   Count 1 of the indictment charging conspiracy to communicate

7   restricted data.  After consideration, the Court accepted the

8   defendant's plea of guilty to the crime charged in Count 1 and

9   deferred acceptance of the plea agreement and adjudging the

10  defendant guilty.

11   Subsequent to acceptance of the guilty plea, a presentence

12  investigation report was ordered.  Having now received and

13  reviewed that report and ruled upon any factual and legal

14  issues raised thereby, I find the charge to which Ms. Toebbe is

15  pleading adequately reflects the seriousness of the offense

16  behavior.  I also find that acceptance of her plea agreement

17  will not undermine the statutory purposes of sentencing which

18  are deterrence, incapacitation, just punishment, and

19  rehabilitation.

20   So at this time, Ms. Toebbe, I accept your plea agreement

21  and your plea of guilty, and you now stand convicted of the

22  offense to which you pled guilty under your agreement with the

23  government.

24   I'll now announce my tentative findings as to the

25  applicable guidelines.  We start in this case with a base

**JA266**

1   offense level of 37 pursuant to Guideline 2M3.1(a)(2).  Then,

2   as we've discussed upon the record, pursuant to Guideline

3   3C1.1, two levels are added for obstructing or impeding the

4   administration of justice.  Here the Court considered it as

5   obstructing.  That brings us to an adjusted offense level of

6   39.

7       Defendant has a criminal history category of one based upon

8   zero points.  With a criminal history category of 1 and a total

9   offense level of 39, the guidelines recommend imprisonment in

10  the range of 262 to 327 months.  I'll note that the binding

11  plea in this case, which the Court has accepted, has a binding

12  term that the defendant cannot be sentenced any higher than the

13  bottom or the lowest number of the applicable guideline range.

14  So we're at 262 max on this.

15      The guidelines also recommend supervised release in the

16  range of two to five years; indicate defendant is ineligible

17  for probation; a fine in the range of 40,000 to $100,000.  And

18  there is a special assessment fee in the amount of $100 owed on

19  that one felony count of conviction.  The cost of imprisonment

20  is $3,688 per month, the cost of community confinement is

21  $2,980 per month, and the cost of supervision is $371 per

22  month.

23      Other than the objections we reviewed at the -- at an

24  earlier time in this proceeding, are there any objections to

25  the tentative guideline findings, counsel?

1   MR. DOUGLAS:  No, Your Honor.

2   MR. BECK:  No, Your Honor.

3   THE COURT:  Then the guidelines as announced will be

4 the advisory guidelines applicable to sentencing in this

5 matter.

6 Mr. DeHaven?

7   MR. DEHAVEN:  Your Honor, I believe the applicable

8 guideline fine for offense level 39 would be $50,000.

9   THE COURT:  Oh, thank you.  So I stand corrected.

10 Then the applicable guideline fine is in the range of 50,000 to

11 $100,000.

12 Any objection to that, counsel?

13   MR. DOUGLAS:  No, Your Honor.

14   MR. BECK:  No, Your Honor.

15   THE COURT:  Okay.  Mr. Beck, I will recognize you for

16 argument on your motion for a variant sentence and also any

17 other additional factors that which you believe I should

18 consider today in my decision on what sentence should be

19 imposed.

20   MR. BECK:  Thank you, Your Honor.

21 Your Honor, the sentence that Mrs. Toebbe would receive

22 under this plea agreement if the Court were to follow the

23 guidelines or at least the low end of the guidelines is now 262

24 months.  Of course, the guidelines are not the only factor that

25 the Court must consider in determining what her sentence should

1  be.

2      The number one factor listed under the statute is the

3  nature of the offense and the seriousness of the offense and

4  then the characteristics of the defendant.  Obviously, this is

5  a serious offense.  The Court has made that very clear.  And

6  they need to be made clear because everyone understands it was

7  a serious offense, and I understand why the Court made that

8  statement.  But what I think the Court should also take into

9  consideration with regard to Mrs. Toebbe is that this was not a

10 crime that she committed at her insistence.  It was one that

11 was initiated by her husband.  Her husband was the principal

12 actor here.  He's the one that had the position with the United

13 States government where he could get access to the information,

14 understood its significance and remove it, and then know how to

15 market it, so to speak, to the people who might be interested.

16     Mrs. Toebbe was a housewife, a teacher with a liberal arts

17 degree, and had no knowledge of what this stuff meant.

18 Obviously, she knew it was something that she shouldn't have

19 been involved in trying to transmit.  But she did not steal it,

20 nor did she abuse the position of trust with the government,

21 nor did she communicate with any foreign government.

22     My point, Your Honor, is that all of the essential elements

23 of this offense, ones that were absolutely critical to it being

24 committed, were done by her husband.

25          THE COURT:  Couldn't you look at it as though she had

1  the plan, and he had the access?

2          MR. BECK:  I'm sorry, Your Honor?

3          THE COURT:  Couldn't you also -- an alternative view

4  of that is she had the plan or was 50/50 part of the plan, and

5  he just had the access?

6          MR. BECK:  I don't think that's what the -- and I

7  don't want to get out of line here as far as classified, but I

8  don't think that there's been any evidence that this was a plan

9  that originated from anyone other than Mr. Toebbe.

10         THE COURT:  Well, in the end, does it really matter?

11  Because she's a principal in the first degree as well.  In for

12  a penny, in for a pound.

13         MR. BECK:  I think it matters to the extent of, Your

14  Honor, when you talk about her culpability.  These would be

15  Mr. Toebbe and her role in the offense.  She is more of an

16  accomplice than a principal in my mind.  She did help him.  She

17  went on three of these dead drops.  But, again, none of this

18  would have happened without her husband being in the position

19  he was, and I believe, from what I've heard, come up with the

20  idea to do this.

21     Now, secondly, Your Honor, the Court has to consider under

22  the statute the histories and characteristics of Mrs. Toebbe.

23  Those are important factors.  As you point out, she has no

24  criminal history.  She has no history other than having been a

25  school teacher, an educated person, a housewife, a mother, and

1  had never been in any kind of criminal involvement her entire
2  life.
3      What the Court also knows by virtue of our filings is that
4  she is someone who for many years, up to 25 years I think, has
5  suffered from serious mental illnesses.  And that's documented
6  by the report we submitted from her -- well, not report, but
7  from the notes we submitted from her treating physicians that
8  were contemporaneous to her seeking help for her problems and
9  also from the psychological evaluation that we obtained in
10 connection with this case.
11           THE COURT:  But there was no mental defense to
12 this --
13           MR. BECK:  No, there is no defense, Your Honor.  I'm
14 not suggesting in any way that she had the inability to
15 understand the wrongfulness of her conduct.
16     However, what I do think is important to note is -- and
17 this is documented in all the records we submitted -- that the
18 scheme to do what they did, culminated or originated or came to
19 fruition at or about the time these psychological problems were
20 at an apex for Mrs. Toebbe.  There are records indicating that
21 at around 2016, 2017, when I think this scheme began, she was
22 suicidal, had to be taken to the hospital on multiple occasions
23 for suicide risk, and was in a deep, deep dark depression.  And
24 that depression and that anxiety, albeit not something that
25 would amount to a defense to her crime, one cannot help but

```
 1  think that it clouded her judgment here in a way that is -- it
 2  had an effect on her in a way that it would not -- a normal
 3  person without those problems would not have had.  A normal
 4  person without those problems hopefully would have been able to
 5  react differently.
 6       And the other thing I would point out, Your Honor, because
 7  it's been discussed that, yes, the issue here was greed.  There
 8  was an effort to get money which is the definition of greed.
 9  And looking at these previous espionage cases that have
10  occurred in other jurisdictions, it appears to me that that
11  greed really amounts or arises from the traditional purposes of
12  someone being greedy.  Trying to buy a big house.  Trying to
13  have lots of money and have cars and so forth.  Here there was
14  a desire to get money, but going back to what the Court said,
15  if you look at those emails that were captured by the
16  government between Mrs. Toebbe and her husband, she genuinely
17  had a tremendous amount of emotional, psychological distress,
18  and she was unwell because of her -- you know, some might
19  say -- some people might disagree with this.  Some would say
20  maybe it was genuine or maybe it was something she should have
21  had, but she thought the country was going down the tubes.  And
22  you look at those emails, there is no question that that's what
23  she thought.  She was --
24            THE COURT:  So she was going to further send it down
25  the tubes by --
```

51

```
 1            MR. BECK:  Well --
 2            THE COURT:  -- helping her husband share secrets that
 3   go to the very heart of this country much less our allies'
 4   defense?
 5            MR. BECK:  Well, that's how -- that's how --
 6            THE COURT:  So she wanted to put the final torpedo in
 7   it?
 8            MR. BECK:  Well, no.  I think her goal was to get
 9   out.  And I think that -- you know --
10            THE COURT:  But burn the whole place down in the
11   process?
12            MR. BECK:  Well, it wasn't a rational decision, Your
13   Honor.  I guess that's my point, Your Honor, is she was so
14   obsessed with this.  She was also clearly operating under a
15   significant mental illness that caused her to be at a point of
16   suicide before -- you know, before this stuff even happened.
17        And as I pointed out in one of our memos, there were other
18   reasons.  Her family was in kind of a falling apart situation.
19   So it was just the perfect storm it seems to me where she made
20   a bad decision that she may not have made had she not been
21   suffering from all these problems.
22        Moving on, Your Honor, one of the other factors the Court
23   has to consider is the risk of recidivism.  Mrs. Toebbe, again,
24   never committed a crime that we know of before this.  She
25   doesn't have any kind of knowledge regarding nuclear submarines
```

1  or anything else that would allow her to get out of jail one

2  day and suddenly become an agent for a foreign government.

3      The government has extensively researched the prospect that

4  there may be other monies or information out there that

5  Mr. Toebbe and Mrs. Toebbe had, and they've come to the

6  conclusion with high confidence that there's nothing else out

7  there that she could ever get her hands on even if she knew

8  where it was.  So there's little, if any, harm that she will

9  ever do anything, much less something like this again.

10         THE COURT:  How do we know that if they had the

11 Plan B cover story, there is not a Plan C where something else

12 is secreted for when they get out that they can share and make

13 money from?

14         MR. BECK:  All I can say, Your Honor, is --

15         THE COURT:  They're not trustworthy based upon the

16 offenses they committed and their covert actions both outside

17 for both of them and then in the jail for Ms. Toebbe.  So how

18 can the Court be assured there's not a Plan C, the get-up plan

19 for when they're released from incarceration?

20         MR. BECK:  I think the way the Court can be assured

21 is what the government has done.  They have --

22         THE COURT:  Take them at their word?

23         MR. BECK:  Well, and I think they have done

24 everything they know how to do to confirm that there is no

25 further information out there.  And I would also suggest to the

1  Court that Mrs. Toebbe because of her lack of knowledge about

2  this, she wouldn't know what to do with it if it were.

3          THE COURT:  But she may know where it's buried.

4          MR. BECK:  Pardon me?

5          THE COURT:  She may know where it's buried,

6  figuratively.

7          MR. BECK:  If it were, but there isn't -- at least

8  according to the government, they have a high degree of

9  confidence there's not.

10     The last thing, Your Honor, with -- or not last thing but

11 one other point I want to make with regard to the guidelines,

12 Your Honor, which you've calculated, is if you look at

13 Guideline 2M3.1, which is the relevant guideline that we're

14 dealing with here, as you know, it really has two levels -- and

15 if the Court will bear with me a second, I left something over

16 here.  It has the level that if you are involved in espionage

17 involving top secret information, which doesn't apply in this

18 case, and it has the level 37, which is 5 levels lower than the

19 top secret if it's other information.

20     And what I find hard to understand, Your Honor, in the

21 guideline is, as the Court knows, the government uses in

22 general three levels of classification:  top secret, secret,

23 and confidential.  And the guideline says that the level of the

24 guideline is geared towards the significance of harm that would

25 be caused if the information is not kept confidential or is

**JA275**

1   disclosed, but it only distinguishes between top secret and
2   other.  And the reason I find that hard to understand, Your
3   Honor, if you look at -- and I think this is the accepted
4   definition across the government as to what constitutes
5   classified information.  Top secret is defined as information
6   that would be reasonably expected to cause exceptionally grave
7   damage to the national security.  And I'm reading from 18 CFR
8   § 3a.11.  Secret information is information that reasonably be
9   expected to cause serious damage to the national security.  And
10  then confidential information is defined as could reasonably be
11  expected to cause damage.
12      So then clearly, at least in the government regulations and
13  under the government definitions of concerned classification,
14  there's a major distinction between those three categories.
15  Yet, the guideline, itself, makes no distinction between secret
16  and confidential.  In other words, there's no five-level drop
17  down from secret to confidential.  And the reason that's
18  important in this case, Your Honor, is that all of the
19  information that Mr. Toebbe secreted from his place of work and
20  all the information that they attempted to transmit, neither
21  fell into the top secret or secret category.  It was all
22  confidential.
23      So it just seems to me that the Court in measuring
24  whether -- what the appropriate sentence is here, it should
25  consider that this guideline totally ignores that distinction.

**JA276**

1 Even though in the guideline itself, Your Honor, again, it says
2 that the guideline is based on what harm would be caused by the
3 release of the information.
4     Moving on, Your Honor --
5         THE COURT:  Well, doesn't -- remember the first
6 letter we had from Admiral Houston?  A six-page letter and no
7 matter what you call it, this -- your client put this country
8 in grave danger.  Just looking at a couple of the many things I
9 highlighted in this letter in preparation for my consideration
10 of whether to accept the original plea agreement, this admiral
11 concluded that Mr. Toebbe's actions continue to have a lasting
12 and serious impact on our national defense.  He captured some
13 of most secure and sensitive information about our
14 nuclear-powered fleet.  A critical component of national
15 defense has been irreparably compromised in the admiral's
16 words.
17     He stated that the Toebbes' illegal conduct now threatens
18 critical military advantages because the nation spent billions
19 of dollars developing naval nuclear compulsion technology and
20 now the integrity of this protected information was
21 compromised, undercutting the military advantage afforded by
22 decades of research and development.  That information provided
23 could provide foreign navies the opportunity to close the gap
24 in capabilities which would require an extraordinary effort and
25 resources to restore.  The Navy must operate on the assumption

1  Mr. Toebbe's actions resulted in information falling into the

2  possession of other entities and persons who wish to use it to

3  damage the U.S.

4      So no matter what you call it -- top secret, restricted --

5  the harm to this nation is grave, and these are scary times we

6  live in.

7          MR. BECK:  And I'm not arguing that, Your Honor.  I'm

8  just saying that it wasn't top secret which, again, designates

9  something that even would cause extreme -- I mean under their

10  own definitions, it would cause extreme danger versus secret

11  that's likely to cause grave danger and confidential which is

12  likely to cause danger.

13      Regardless of what the admiral said, and I certainly don't

14  disagree with him, this information fell into neither one of

15  those more serious categories.  It fell into a serious

16  category, but one that's not taken into account under this

17  guideline.  And that's the part I don't understand, Your Honor.

18  It seems to me that if a guideline is going to be based on the

19  danger that's caused by the release of this information, there

20  should be some distinction between class -- confidential versus

21  secret.  That's my point, Your Honor.  I'm not saying that it

22  wasn't harmful information that should have -- that could cause

23  harm to the U.S.

24      Your Honor, the final point that I would like to make is

25  that ultimately the Court has to decide what is a reasonable

 1  sentence in this case because that's what the law requires.
 2  And this goes back to what we talked about early on in this
 3  hearing is we have tried to provide the Court with a greater
 4  perspective on what is considered reasonable in these kind of
 5  cases, Your Honor.
 6      Ms. Carmichael and I have listed a number of cases that
 7  have come in the past -- that occurred in the past where people
 8  were accused of espionage.  They weren't accused of the
 9  specific offense in this case which is under the nuclear
10  statute, but they were all engaged in the same kind of
11  activity, and that is trying to sell secrets they shouldn't
12  have been selling.
13      The list of cases that we provided, Your Honor, indicate
14  that even principals -- people that were what we would say like
15  Mr. Toebbe, ones who were connected to the government and got
16  the information -- rarely receive sentences that would be
17  within this guideline range that the Court has adopted.
18      The other point we would make, Your Honor, is that with
19  regard to the accomplices, which we would characterize
20  Mrs. Toebbe, there are a number of people who have received
21  lesser sentences than what we had originally asked for when we
22  came before the Court.
23      The point being, Your Honor -- and one I just want to bring
24  to the Court's attention because I think it really highlights
25  the point I'm trying to make or we're trying to make is if you

1    -- there's a fellow named Ron Rockwell who was prosecuted in

2    Utah back in '06, pled in 2019.  He was an army officer who

3    spoke Chinese and Russian.  He went to -- retired and then went

4    to work for a defense intelligence agency.  And he started

5    selling Chinese folks, intelligence agents, classified

6    information.  He was arrested while he was trying to go to

7    China to sell some, and he received a sentence of 120 months.

8        Mrs. Toebbe, again, is nothing like that.  She was an --

9            THE COURT:  What type of classified information was

10   it?

11           MR. BECK:  I'm sorry, Your Honor?

12           THE COURT:  What type of classified information was

13   it?

14           MR. BECK:  I do not know, Your Honor.

15           THE COURT:  Please continue.

16           MR. BECK:  The other point I want to make, Your

17   Honor, is this.  Well, going back to the accomplices.  The ones

18   that we were able to find that we presented to the Court, their

19   sentences ranged anywhere from 63 to 41 to 12 -- these are the

20   sentences -- to 81 and 60 months.  In each one of those cases,

21   one could make the argument that the conduct of those

22   accomplices was even more egregious than Mrs. Toebbe's conduct,

23   yet they received sentences that are far below what the

24   projected guideline is in this case.

25       And then lastly, Your Honor, I think it's significant that

**JA280**

1   there is actually a DOD study out there that we found that
2   looked at prosecution of espionage cases over the years.
3   That's Table 8 in our memo.  And it looked at all kinds of
4   espionage, but the bulk of it, as we understand it, are the
5   classic espionage cases.  Not the kind where people leak to a
6   newspaper to get some -- it's a classic espionage like here.
7   And if you look at the prosecutions in the last -- well, from
8   1990 to 2015, most of those people, 42 percent of them,
9   received a sentence of below 5 years.  From 1.1 years to 4.9
10  years.  And then if you even -- if you look at people that
11  received less than 10 years, it's actually 66 percent of the
12  people received less than 10 years for this crime.
13      So we just ask the Court to consider that in context of the
14  requirement that the Court take into consideration disparity of
15  sentencing as part of the equation here along with all the
16  other factors of course.  That a sentence of -- in the
17  guidelines would be far in excess of what apparently is the
18  usual sentence in these cases and a sentence that's far in
19  excess of sentences that are imposed for people that do far
20  more than Mrs. Toebbe did, even principals.
21      So for all those reasons, Your Honor, we would respectfully
22  request that the Court impose a sentence consistent with the
23  bulk of sentences that have been imposed in these cases in the
24  last -- or at least between 1990 and 2015, and that would put
25  us in the range of 3 to 4.9 years.  Thank you, Your Honor.

60

1           THE COURT:  Thank you, Mr. Beck.

2      Mrs. Toebbe, you have the right to make a statement before

3  you're sentenced.  Do you desire to make a statement?

4           DEFENDANT DIANA TOEBBE:  Yes, I do.

5           THE COURT:  All right.  If you'll come on up to the

6  podium, please.

7           DEFENDANT DIANA TOEBBE:  I made a catastrophic

8  decision.  Initially, I should have followed my instinct and

9  tried harder to talk my husband out of this plan, but then my

10  family's difficulties continued, my depression was at an

11  all-time high, and I felt like the country's political

12  situation was dire.

13      I didn't just fail to talk him out of it.  I actually

14  participated in helping him, and I wanted him to succeed.  At

15  the time, I absurdly thought it was a way out of these

16  struggles, but this is inexcusable no matter what my family and

17  my country or I were going through at the time, and I deeply

18  regret every minute of it.

19      There are so many things I didn't think of then, but I'm

20  acutely aware of now.  I didn't think through what the impact

21  of my actions might have been on our servicemen and women.  I

22  was enticed by financial gain and the freedom that might have

23  come with it, and I ignored the very real harm that I might

24  have caused to those who fight for the freedom I have or had.

25      I didn't think of my mother and father who did not raise me

**JA282**

1   to act this way, who both taught and fostered my independence
2   while at the same time, instilling principals in me that I
3   betrayed.  After having spent decades of their lives raising
4   their children, they're now spending their retirement years
5   raising a grandchild.  I didn't think of my brother and
6   sister-in-law who, though money is tight, have bent over
7   backwards to take in my younger son.  I am beyond grateful to
8   all of them and so ashamed that I have made their lives so much
9   more complicated.
10      I didn't think of my children who have suffered the most in
11  this situation of my making.  I am now unable to provide the
12  support they need, and however well cared for they are now,
13  they deserve their mom and dad.  Their lives will be forever
14  marked by the decision I made.  There isn't a word for the
15  regret I feel.
16      My path forward will be rededicated to living life as I
17  know it should have been lived, to being an honest, hardworking
18  member of my community, and to being a mother and daughter.  I
19  will continue to seek mental help -- mental health support
20  through my professionals.  I plan to pursue a nursing career
21  after my period of incarceration as a way of providing --
22  contributing positively to others in my community.  I ask for
23  the chance to be able to go back to the person I once was and
24  the person I know I can be again.
25          THE COURT:  Thank you, Mrs. Toebbe.

**JA283**

```
 1      Mr. Douglas.

 2           MR. DOUGLAS:  Thank you, Your Honor.

 3      Your Honor, in considering the 3553(a) factors, first of

 4  all, starting with the seriousness of the offense.  It's

 5  universally accepted that the person with access, the person

 6  who is trusted, the person who has the specialized knowledge of

 7  the classified information should be punished more severely

 8  than someone who might have helped in some way.  For example,

 9  as a lookout.

10      Secondly, as Mr. Beck started to allude to, this will be a

11  disparity.  If the Court sentences Mrs. Toebbe to the low end

12  of this range or even half the low end of this range, it will

13  be a disparity so the question becomes is there a basis for

14  such a disparity?

15           THE COURT:  Let's back up.

16           MR. DOUGLAS:  Yeah.

17           THE COURT:  First of all, the lookout.

18           MR. DOUGLAS:  Yeah.

19           THE COURT:  If you had a defendant who was a lookout

20  let's say at a bank robbery -- let's say something that's

21  really bad inside, and there's a real danger to the folks

22  inside because someone is shot or folks are killed.  That

23  lookout would -- should get a lesser sentence than the person

24  who went into the bank armed just because a lookout was sitting

25  in the car waiting for the robber with the gun to come out with
```

```
 1   the bag of money?
 2           MR. DOUGLAS:  Completely different situation.  This
 3   isn't a drug case.  This isn't a bank robbery.  This isn't a
 4   murder for hire.  This is an espionage case.  And so --
 5           THE COURT:  That put the -- that put this country in
 6   grave danger.
 7           MR. DOUGLAS:  Correct.  However, the point is, as has
 8   been accepted by several courts across this land, acts as
 9   should be punished more severely, period.  And it's logical.
10   The person who had -- it couldn't have been committed without
11   him.
12           THE COURT:  It would have -- his guidelines would
13   have been more severe or higher than hers had she not
14   obstructed and not accept -- and failed to accept
15   responsibility.
16           MR. DOUGLAS:  Under the --
17           THE COURT:  Right?
18           MR. DOUGLAS:  Under the application of the
19   guidelines, yes.
20           THE COURT:  Correct.
21           MR. DOUGLAS:  Still, in the government's opinion, she
22   accepted responsibility and she cooperated.  And now she's
23   facing ten more years for two letters that --
24           THE COURT:  You find that laughable?
25           MR. DOUGLAS:  -- did not -- did not make it to the
```

64

```
 1   defendant --
 2            THE COURT:  You find that laughable, Mr. Douglas?
 3            MR. DOUGLAS:  It had no effect.
 4            THE COURT:  No, my question is, do you find that
 5   laughable?
 6            MR. DOUGLAS:  I find it to be under the application
 7   of the 3553 factors excessive to go ten years on top of a
 8   sentence for two letters that did not make it to the recipient
 9   and had no effect on the case.
10       There's also a disparity, Your Honor, from some of the
11   worst cases.  The worst cases are human asset, human
12   intelligence cases where you're literally naming people out
13   there that are supposed to remain secret and putting their
14   lives specifically at risk.  In fact, Peter Debbins, who got
15   188 months in such a case; Mariam Thompson recently, 276
16   months; Jerry Lee, 228 months.  These are people who had
17   access, had been trusted, broke that trust in the worst way in
18   giving HUMINT assets and putting them at risk.
19       We ask the Court to consider --
20            THE COURT:  But that's not the guideline range on the
21   plea that you've given Mr. Toebbe; right?
22            MR. DOUGLAS:  Your Honor, I'm attempting to contrast
23   what Mrs. Toebbe is facing, the 262 months at the low end --
24            THE COURT:  Okay.  So not exactly as opposed to her
25   husband but as opposed to these other defendants who have been
```

```
 1   sentenced --
 2            MR. DOUGLAS:  Correct, Your Honor.
 3            THE COURT:  -- in other courts?
 4            MR. DOUGLAS:  As opposed to others who had access in
 5   these cases with human intelligence.
 6        We ask the Court to consider, again, the cooperation of
 7   this defendant which we've asked multiple times for the Court
 8   to consider.  The FBI and the Department of Navy are uniquely
 9   positioned to assess this cooperation, and they're the ones who
10   benefit from incentivizing cooperation.
11        Your Honor, there is no evidence of a Plan C, full stop.
12   This was not a fly-by-night investigation conducted by
13   amateurs.  This was the Federal Bureau of Investigation.  We're
14   talking about an entire squad from the FBI Field Office in
15   Pittsburgh comprised of numerous agents and analysts.  They
16   received support from several field offices across the entire
17   country, including the Baltimore Field Office, the Washington
18   Field Office, headquarter support, support from Quantico.  They
19   also had support from the NCIS in this case.
20        It was an extensive investigation.  It included three dozen
21   search warrants across multiple districts.  We searched
22   electronic devices, electronic accounts.  We searched their
23   residence.  We searched their vehicles.  We searched his Naval
24   Reactors office.  We searched his satellite office on the
25   campus of the Naval Academy.  We also obtained search warrants
```

1  for location information on their cell phones.  We also

2  obtained a search warrant to place a tracking device on

3  Mr. Toebbe's vehicle they traveled to and from work.  We had

4  the GPS information on their phones for several months.  We had

5  the tracker on his car for several -- for a couple of weeks.

6  And there just is no evidence that there was some other

7  location that he was -- could be storing something.

8      Then we meet with him for over 20 hours, and he gives us

9  access to his heavily-encrypted laptop.  And it's clear from

10  the review of the laptop, it was the universal laptop that

11  contained all of the restricted data that he had been

12  referencing in the letters that he was dropping at the sites.

13  So there is no evidence that there is some type of Plan C.  In

14  fact, all of the evidence goes against such a conclusion.

15          THE COURT:  So are you saying all this not to

16  complain about the Court's calculation of the guidelines again

17  but to tell me that you in some way agree with the motion for

18  variant sentence?  Is that where this is going?

19          MR. DOUGLAS:  The way I see it, Your Honor, is that I

20  should make sure the Court hears from the government when it

21  states its concern about there being a Plan C on I think now

22  the third occasion.  That I should speak to that and because it

23  does go to -- if the Court is mentioning it multiple times, it

24  must be considering it important.

25          THE COURT:  Yes.

```
1              MR. DOUGLAS:  And I'm just trying to --

2              THE COURT:  So you're giving me a full disclosure on

3  what you believe the facts are?

4              MR. DOUGLAS:  Yes, Your Honor.

5              THE COURT:  Okay.  I appreciate that.

6              MR. DOUGLAS:  So that the concern should not be as

7  high as the Court has stated in considering the 3553(a)

8  factors.

9       Ultimately, Your Honor, the government is not going to give

10  a new recommendation.  It stands by its previous

11  recommendation, but it does believe that this should not --

12  this is not a case for such a disparity.

13             THE COURT:  So the government is opposing the motion

14  for variant sentence --

15             MR. DOUGLAS:  No.

16             THE COURT:  -- and asking me to sentence this

17  defendant to the low -- to the low end of the applicable

18  guideline which is the heart of the plea agreement in this --

19  is we start at the low end of the guideline, 262, because the

20  agreement was no higher than the applicable low end.  So I'm

21  not certain I understand what you're saying.  Are you saying

22  that you're asking the Court to impose a sentence of 262 or are

23  you asking the Court in joining in the defendant's motion for

24  variant sentence that you suggest a different number?

25             MR. DOUGLAS:  The government is taking no further
```

68

1  position than it did in the August 16th sentencing hearing

2  where the three years was on the table.

3          THE COURT:  So the government is asking me to grant

4  the motion for variant sentence and not sentence this defendant

5  to any more than 36 months, 3 years?

6          MR. DOUGLAS:  Yes, Your Honor.

7          THE COURT:  Why would I do that when that's the very

8  heart of the basis for why I rejected the plea agreement

9  itself, the original plea agreement, in Ms. Toebbe's case?

10          MR. DOUGLAS:  For all the reasons we've previously

11  stated, Your Honor.

12          THE COURT:  Okay.  Recite them again.

13          MR. DOUGLAS:  The seriousness of the offense.  She is

14  not the person with access.  The disparity that this would

15  create for someone who was simply a lookout on two or three

16  occasions, because of her cooperation, because there is no

17  concern about there being a Plan C.  And for all those reasons

18  under 3553(a), this should not be a sentence anywhere near 262

19  months.

20          THE COURT:  And you're asking me to sentence her to 3

21  years, 36 months?

22          MR. DOUGLAS:  Yes, Your Honor.

23          THE COURT:  Thank you, Mr. Douglas.

24          MR. DOUGLAS:  Thank you, Your Honor.

25          THE COURT:  We're going to take a break while I

1  further consider the arguments I've heard at disposition, and

2  then we'll get back here as soon as I have reached a decision,

3  counsel, to place the ruling upon the record and impose

4  sentence.

5      (Recess 1:00 P.M. – 1:45 P.M.)

6          THE COURT:  Please be seated, everyone.  We're back

7  on the record.  The defendants and their counsel are here

8  present.

9      Counsel, anything further for me to consider before I

10  impose sentence?

11          MR. DOUGLAS:  Not by the government, Your Honor.

12          MR. BECK:  Not from Mrs. Toebbe, Your Honor.

13          THE COURT:  All right.  Ms. Toebbe, please stand.

14      Pursuant to the Sentencing Reform Act of 1984, it's the

15  judgment of this Court that the defendant, Diana Toebbe, is

16  hereby committed to the custody of the Bureau of Prisons to be

17  imprisoned for a term of 262 months.  You may have a seat.

18      The Court makes the following recommendations to the Bureau

19  of Prisons:  That the defendant be incarcerated at an FCI or

20  facility as close to San Diego, California, as possible; that

21  she be incarcerated at a facility where she can participate in

22  substance abuse treatment as determined by the Bureau of

23  Prisons; that she be incarcerated at a facility where she can

24  participate in the 500-Hour Residential Drug Abuse Treatment

25  Program; that she be incarcerated at a facility where she can

1  participate in mental health treatment as determined by the

2  Bureau of Prisons; that the defendant be given credit for time

3  served since October 9, 2021.

4      Pursuant to 42 U.S.C. § 14135a, the defendant shall submit

5  to DNA collection while incarcerated in the Bureau of Prisons

6  or at the direction of the probation officer.  Upon release

7  from imprisonment, Ms. Toebbe, you shall be placed on

8  supervised release for a term of three years.

9      You must comply with the standard conditions that have been

10 adopted by this Court in its November 29, 2016, standing order

11 as well as the following special conditions:  You must

12 participate in a mental health treatment program and follow the

13 rules and regulations of that program.  The probation officer

14 in consultation with the treatment provider will supervise your

15 participation in the program.  That includes the provider, the

16 location, the modality, the duration, the intensity, et cetera.

17     You must participate in a substance abuse treatment

18 program.  The probation officer will supervise your

19 participation in that program, meaning supervising the

20 provider, the location, the modality, the duration, and the

21 intensity.  You must submit to substance abuse testing to

22 determine if you used a prohibited substance, and you must not

23 attempt to obstruct or tamper with the testing methods.  All of

24 these conditions assist probation in identifying treatment

25 needs, providing rehabilitation services, reducing the risk of

1    recidivism, and provide for protection of the community.

2        You must not use or possess alcohol.  This condition

3    assists probation in reducing the risk of recidivism and

4    provides for protection of the community.

5        You must provide the probation officer with access to any

6    requested financial information and authorize the release of

7    any financial information.  The probation officer may share

8    financial information with the U.S. Attorney's Office.  This

9    condition assists the probation office in legitimizing

10   defendant's employment and/or income, provides protection for

11   the community, and aids in the maximum collection of financial

12   penalties.

13       You must not engage in an occupation, business, profession,

14   or volunteer activity that would require or enable you to have

15   access to classified government information without prior

16   approval of the Court.  Unless excused for legitimate reasons,

17   if not in compliance with the condition of supervision

18   requiring full-time employment at a lawful occupation, you may

19   be required to perform up to 20 hours of community service per

20   week until employed as approved or directed by the probation

21   officer.  This condition assists probation in reducing the risk

22   of recidivism and provides for protection of the community.

23       You must consent to a third-party disclosure to your

24   employer in regard to your convictions.  This condition will

25   assist probation in monitoring defendant's compliance with the

1  conditions of supervision, providing for protection of the

2  community, and reducing the risk of recidivism.

3      It's further ordered you pay the United States a $100

4  special assessment fee as to Count 1 which I note has been paid

5  in full.  It's further ordered that you shall pay a fine in the

6  amount of $50,000.  This takes into account the fact that the

7  Court cannot order restitution to recover the remaining

8  basically $45,700 of earnest money that had not been recovered

9  by the government.

10      Additionally, the defendant agrees to forfeit and abandon

11  to the United States all of her right, title, and interest in

12  the following items that the defendant agrees constitute money,

13  property, and/or assets derived from or obtained by the

14  defendant as a result of or used to facilitate the commission

15  of her illegal activities.  Those are all papers, digital

16  media, electronic devices seized from her residence, her

17  vehicles, and Mr. Toebbe's Naval Reactor's offices in

18  October 2021.

19      Before I get into the specifics for the reasons for this

20  sentence imposed -- and I will say in imposing this sentence,

21  in determining what the proper sentence to be imposed was, I

22  did consider all those factors set forth in 18 U.S.C.

23  § 3553(a).

24      I did consider the arguments of defense counsel and the

25  government to support the defendant's motion for variant

1  sentence in this case.  The defendant asking for the Court to
2  vary downward to a sentence of 3 to 4.9 years and the
3  government asking the Court to vary downward to a sentence of
4  3 years.
5      Now, while the factors listed in mitigation by the
6  government and the defendant do impact the Court's sentencing
7  and did impact the Court's sentence in imposing the low end of
8  the applicable guideline range, the 262 months, and it also
9  factored in, in part, to my consideration of whether to accept
10 the plea -- the binding plea agreement in the first place, I
11 find these factors do not support a variant sentence for the
12 reasons that I'm going to place upon the record for this
13 sentence I imposed.
14     I also in denying the motion for variant sentence point out
15 that the 36 months is a big part of why I denied and did not
16 accept the original binding plea to 36 months in Ms. Toebbe's
17 case, and I incorporate all of my prior rulings at that
18 proceeding -- the one where I rejected the original binding
19 plea -- as further support and reasoning for rejecting and
20 denying the motion for variant sentence that was made today by
21 the government and the defendant.
22     I'll point out that this is not your usual case.  Everyone
23 has recognized this.  These are not your usual defendants.  And
24 this type of case is certainly not the usual nature of cases we
25 see in this courtroom in the Northern District of

74

1    West Virginia.  I look at every defendant in every case from
2    the smallest crime to the largest crime which I think with this
3    crime has hit the top of those we've seen in this courtroom or
4    at least I've seen.  I view the cases as unique, the offenses
5    as to these defendants unique, and the defendant's unique
6    characteristics and all those other considerations I must
7    consider under 18 U.S.C. § 3553(a).
8        In looking at parity or disparity between other espionage
9    cases where defendants were sentenced and this case, I'll note
10   there aren't a lot of them.  And each -- the facts of each of
11   those cases are very different, and the defendants are very
12   different as well.  For example, it wasn't in the table that
13   was provided by defense counsel, but Mr. Beck mentioned Ron
14   Hansen.  So we took a look in the back.  There was a DOJ press
15   release on that case, and this is the information I believe in
16   that press release that sets that case apart from this case.
17   This is a defendant from Utah.  He was 60 years old at the time
18   he was sentenced.  He admitted he solicited national security
19   information from an intelligence case officer working for the
20   DIA.  The documents he received were classified.  Those
21   documents included national security information related to
22   U.S. military readiness in a particular region.
23       What the information that Mr. Toebbe wanted to provide was
24   related to military readiness anywhere in the world where those
25   submarines would be.  This was information closely held by the

1   federal government in Mr. Hanson's case as well though.  Hanson
2   did not pose a security clearance -- did not possess a security
3   clearance, and he didn't possess the need to know the
4   information contained in his materials.
5       I also looked at Table 8, and I appreciate it.  It was
6   helpful to look at those cases.  I looked at Table 8 that
7   Mr. Beck referenced, and I did see the initial prison sentences
8   and years that were set forth and the number of individuals
9   that -- granted, and we all agree, there aren't a lot of these
10  espionage cases.  But I went to the low end, but also on the
11  high end, there were 21 cases according to my math that
12  resulted in life sentences.  So, obviously, some judges did
13  deem the sentences that needed to be imposed in those cases
14  even higher than what was before the Court in this case.
15      As we noted, every case is unique before the Court and
16  every defendant is unique, and I considered that, but they do
17  share some similarities.  For example, when we look at whether
18  lookouts are less culpable than the principal in the case, and
19  we look at that in the context of an offense that charges
20  conduct that had the potential for harm, physical harm to come
21  to individuals.  We often see a robbery case, for example, an
22  armed robbery, where the armed robber goes into the bank, and
23  there are individuals who are placed at risk, risk of their
24  lives or at least risk of injury, and we've got a lookout
25  outside.  That's a limited number of people in that bank.  If

1  we zoom out from that small view in a bank during an armed
2  robbery to the lookout situation in this case where we had the
3  potential for harm to U.S. soldiers, the military, civilians --
4  not in one location, not a small number of people, but in this
5  country, across the world, that's a huge lens, and that's the
6  lens that I used to, in part, impose a sentence that I impose
7  today.

8      In looking at the specific reasons for the sentence imposed
9  here today, aside from what I've already mentioned, the
10 defendant's conduct in this case was very serious in nature as
11 evidenced by the substantial penalties associated with her
12 conviction.  Her actions posed a legitimate concern for the
13 national security interests of this country.

14     Her activities had the potential to undermine countless
15 hours of effort made by an untold number of individuals and
16 service to the U.S. and could have endangered military service
17 personnel and compromised the security of military assets.
18 This conduct at a minimum spanned a period of many months.  The
19 scheme required substantial preplanning and considerable
20 efforts were undertaken to avoid detection and disruption.  The
21 defendant was an acknowledged co-conspirator and committed
22 partner to this endeavor.  She was not a minor participant.

23     She, by her own acknowledgement, knew of the scope of the
24 conspiracy.  She was aware of the special relationship her
25 husband had established with an entity he believed to be a

1 | foreign government.  She was positioned to benefit jointly in
2 | the illicit proceeds of the unauthorized distribution of the
3 | restricted data.  While the defendant didn't have access to the
4 | restricted data at its source within the United States Navy,
5 | she did have access to it after it was removed from its proper
6 | place by her husband.
7 |     Indeed the defendant participated directly in the
8 | distribution by accompanying her husband to drop deads -- dead
9 | drops in order to transfer the restricted data and by acting as
10 | a lookout.
11 |     The defendant's involvement in the offense conduct appears
12 | to have been motivated largely by greed, financial gain.  She
13 | was not coerced into engaging in this conduct.  And, quite
14 | frankly, in looking at the communication between the
15 | codefendants in this case when I was preparing to rule upon
16 | Ms. Toebbe's appeal of the MJ -- the magistrate judge's bond
17 | decision in this case and the intercepted communication between
18 | Mr. Toebbe at the jail -- well, actually not between the
19 | intercepted communication that Mrs. Toebbe was trying to get to
20 | Mr. Toebbe at the jail, pretending to spin that cover story,
21 | trying to get him to perjure himself, to say she wasn't
22 | culpable, to indicate that he was the one that was driving the
23 | bus, and she was basically a bystander or innocent, it's clear
24 | to this Court that it was most probably Mrs. Toebbe that was
25 | driving the bus.  While Mr. Toebbe had the access to the

78

1　information, she was a big part of the plan.  Not only in

2　carrying out the plan but also in the coverup story.

3　　　She was directing the furtherance of this conspiracy

4　through those letters that were intercepted.  She was telling

5　Mr. Toebbe in those letters basically to deploy the plan.  To

6　tell the truth is what she called it; but even she knew, and he

7　certainly knew, that she didn't want him to tell the truth.

8　She wanted him to lie.

9　　　At the time of the offense, Mrs. Toebbe had positive family

10　ties.  She possessed an advanced education.  I think she's kind

11　of referred to here in court today by counsel as, you know,

12　housewife, teacher, but she had an advanced education, and she

13　was gainfully employed.

14　　　The defendant made a deliberate and calculated choice to

15　act in pursuit of her own interests.  She disregarded the risks

16　to her family, her children, and her nation in doing so.  And

17　she's now confronted with the consequences unfortunately of

18　those choices.  In considering even at a basic level whether to

19　accept the binding plea in this case, I compared the

20　defendant's exposure, worst case scenario if she went to trial

21　and was convicted on all three counts, to the guideline

22　calculations pursuant to the plea agreement.  Because the

23　counts would be grouped for guideline calculations and the

24　Court would run them, as I would -- as is suggested in the

25　guidelines, concurrently, unless there's some exceptional

**JA300**

1  circumstance, there is no difference between the guideline
2  calculations if Mrs. Toebbe had gone to trial and been
3  convicted on all three counts and if the Court accepted the
4  binding plea under the guideline calculations, which I found to
5  be appropriate and applicable in this case.
6      But aside from that, I also considered the following:  The
7  uncertainty of obtaining a conviction at trial; whether the
8  government's hard sell on the variance in this case here today
9  and the first binding plea may be an indication of perhaps a
10 hesitancy to try this case because perhaps there's some defect
11 in this case that we're unaware of; the costs and time of a
12 trial to the government and the defense; the lengthy sentences
13 and length of sentences imposed in other espionage cases as
14 I've previously commented on, both those at the low end and
15 those at the high end; the potential of leaks that could come
16 from a trial and further harm our nation's security; and the
17 time and distance between the sentence imposed today and the
18 time the defendant would potentially be able to distribute any
19 information she or her husband held onto when she was released
20 from incarceration.
21     Looking at the length of this sentence and given likely
22 technological and military advances, by the time this defendant
23 is released from imprisonment, any information she has would
24 most certainly be outdated, stale, and worthless to any nation
25 who would want to cause us harm.

1       Finally, I considered the -- not only the original letter
2   from Admiral Houston that was the victim impact statement but
3   the one that I received after the second plea agreement was
4   made.  It was a supplemental victim impact statement, and he
5   told me that on behalf of the Navy, the Navy supported both
6   plea agreements in this case.  He stated that the plea
7   agreement further accomplishes final resolution of the cases
8   with -- and this was important to me -- with no further risks
9   to national security.
10      But he made a point to add in that supplemental victim
11  impact statement, as explained in Reference A, meaning the
12  original victim impact statement, the betrayal by the Toebbes
13  has had far-reaching consequences for the United States and the
14  sailors and the families who serve the United States Navy.
15      Based on defendant's involvement in the instant offense,
16  her personal history and characteristics, her lack of prior
17  criminal history, her conduct in this case both during the
18  course of the offense before she was incarcerated and
19  throughout her incarceration at the jail, and considering the
20  great impact her actions have had on this nation's security
21  and, in fact, the security of the world in these times that we
22  sit in today most especially, the defendant received a sentence
23  of 262 months' imprisonment.  This term of incarceration
24  reflects the very serious nature of this offense and will hold
25  the defendant accountable for her actions.

1    Overall, this sentence meets the sentencing objectives of

2    punishment, general deterrence, incapacitation, and

3    rehabilitation.  The three-year term of supervised release will

4    allow the probation office to monitor defendant's conduct in

5    the community following her release from incarceration and

6    hopefully assist her in returning to a law-abiding lifestyle.

7    I'll dismiss the remaining counts of the indictment upon

8    motion of the government which should be two and three.

9         MR. DOUGLAS:  So moved, Your Honor.

10         THE COURT:  Granted.  And I ask the probation officer

11   to prepare the judgment and commitment order.

12   Mrs. Toebbe, although a defendant who has pled guilty has

13   the right to appeal from the judgment of this Court, a

14   defendant who has pled guilty may waive that right as part of a

15   plea agreement.  You entered into a plea agreement which waived

16   in whole or in part your right to appeal your sentence.  Those

17   types of waivers are generally enforceable, and it appears as

18   though it's enforceable in your case.  However, if you believe

19   the waiver in your plea agreement is somehow unenforceable, or

20   you believe your guilty plea was somehow unlawful or

21   involuntary, or you believe there's some other defect in these

22   proceedings you didn't waive by your guilty plea, then you can

23   present that theory to the appellate court.

24   However, if you decide to appeal, you must file a notice of

25   appeal within 14 days following entry of the judgment and

1  commitment order.  If you request, the clerk of court will

2  forthwith file a notice of appeal on your behalf.  And if you

3  desire counsel on appeal, and you can't afford a lawyer, the

4  appropriate court will review your financial affidavit to

5  determine your eligibility for court-appointed counsel.

6      Anything further on behalf of the government?

7              MR. DOUGLAS:  No, Your Honor.  Thank you.

8              THE COURT:  Anything further on behalf of your

9  client, Mr. Beck?

10             MR. BECK:  No, Your Honor.

11             THE COURT:  All right.  Does your client wish to be

12 remanded to the custody of the marshals now and go back to

13 holding or would she prefer to stay here for Mr. Toebbe's

14 proceeding?

15             MR. BECK:  She would like to stay if that's an

16 option, Your Honor.

17             THE COURT:  That's an option.

18             MR. BECK:  She would like to stay.

19             THE COURT:  All right.  Counsel, do you need a break

20 before we go into Mr. Toebbe's case or should we keep on going?

21             MR. COMPTON:  I'm fine to proceed, Your Honor, as is

22 the defendant.

23             THE COURT:  Okay.  No one needs a comfort break?  I'm

24 sorry, Mr. Douglas.  I cut you off.

25             MR. DOUGLAS:  No, the government is prepared to

```
1  proceed as well.
2              THE COURT:  Okay.  We already have Mr. Toebbe under
3  oath; correct?
4              THE CLERK:  Correct.
5              THE COURT:  All right.  Mr. Compton, I'll turn to you
6  then.  Have you received the presentence investigation report
7  and gone over it with your client?
8              MR. COMPTON:  Yes, Your Honor.
9              THE COURT:  And, Mr. Toebbe, most importantly, have
10 you received that revised presentence investigation report and
11 reviewed it to your satisfaction with your lawyer?
12             DEFENDANT JONATHAN TOEBBE:  Yes, Your Honor.
13             THE COURT:  Mr. Douglas, has the government received
14 and reviewed it?
15             MR. DOUGLAS:  Yes, Your Honor.
16             THE COURT:  All right.  I think we have to take a
17 look at the objections, do we not, counsel?
18             MR. COMPTON:  Your Honor, I can hopefully speed this
19 along.  Objections 1, 2, 3, 4 have been resolved to our
20 satisfaction and --
21             THE COURT:  Is six moot now because of the nature of
22 the binding plea or not?  I skipped over five.
23             MR. COMPTON:  It is, Your Honor.  That was my very
24 next statement --
25             THE COURT:  Okay.  I'm sorry.  I cut you off.
```

84

1          MR. COMPTON:  No.  No, Your Honor --

2          THE COURT:  Okay.

3          MR. COMPTON:  My very next statement, Objection 6 is

4   also moot and withdrawn because of the binding term of the

5   plea, and we are not asking for a variant sentence.  That just

6   leaves us with Objection No. 5.  It's very minor, and it's

7   really only half of Objection 5.

8          THE COURT:  The first paragraph is gone of your

9   objection -- right? -- and we're only dealing with the terms of

10  the supervised release?

11         MR. COMPTON:  Yes, Your Honor, and it's --

12         THE COURT:  Okay.

13         MR. COMPTON:  Again, it's just a very minor -- and I

14  noted that the Court imposed the exact same condition when

15  sentencing Mrs. Toebbe.  I just had a concern about the

16  condition at paragraph 224 where it says --

17         THE COURT:  Let me turn to that real quick --

18         MR. COMPTON:  Yes, ma'am.

19         THE COURT:  -- because I had made some notes.  Hold

20  on.  Okay.  I'm with you.  As it reads now, "You must not

21  engage in any occupation, business, profession, or volunteer

22  activity that would require or enable you to have access to

23  classified government information without the prior approval of

24  the Court."

25     And you suggest a tweak to that?

**JA306**

```
 1          MR. COMPTON:  Well, I'm just not sure it's necessary,
 2  Your Honor.  I don't know -- the access to classified
 3  information is determined and granted by the executive branch.
 4  Mr. Toebbe is about to be convicted of a felony offense which I
 5  believe by its terms disqualifies him from having access to
 6  classified information.  And so I don't know of a scenario in
 7  which the defendant would be in a position to have access to
 8  classified information or where the Court would be in a
 9  position to approve or disapprove of the defendant having
10  access to classified information.  It seems to be a -- sort of
11  a -- an over -- I don't want -- it's not -- overreach is not
12  the right word, but it's -- and neither is piling on, but it's
13  more of a -- it's just not necessary.  It's --
14          THE COURT:  Well, how would it hinder him in any
15  future employment once he's released from incarceration?
16          MR. COMPTON:  I don't think it would injure him, Your
17  Honor, but I --
18          THE COURT:  Or hinder him I think was my word.
19          MR. COMPTON:  I'm sorry?
20          THE COURT:  How would it hinder him?  H-I-N-D-E-R.
21          MR. COMPTON:  Oh, hinder.  Well, I don't think it
22  would, Your Honor, but I don't think that that is the analysis
23  when we're looking at what conditions are to be imposed on
24  supervised release.
25          THE COURT:  I agree.  But here's the way I look at
```

```
 1   it, and I'm not terribly tech savvy, but let's -- I know he's
 2   forever foreclosed based upon his conviction and his actions
 3   from working in the capacity he had been working for the
 4   government and to officially have access to any sort of
 5   classified information.  But I can't think of, specifically,
 6   the situation in which it would arise, but let's say he's
 7   working for the IT department somewhere, and he somehow is able
 8   to gain access to classified information.  I just -- I just
 9   would like to err on the side of caution as opposed to just
10   removing this totally.
11           MR. COMPTON:  Perhaps sort of in the vein of -- was
12   it Henshaw where we were tweaking the condition that -- I
13   believe it started out by saying the defendant shall not, and I
14   think we tweaked it to say that the defendant -- the
15   employment -- the defendant can, you know, seek employment
16   subject to the approval of the probation office.  The probation
17   office shall approve employment unless it appears to the
18   probation office that there is some impact to national security
19   or some association with classified information.
20     I don't -- I'm a little -- I'm having a little trouble
21   trying to say how to phrase it because I just don't -- I don't
22   think that -- I don't think there's a scenario where it would
23   come up where the defendant -- again, not like the scenario
24   where we're talking about someone involved in perhaps a child
25   exploitation who might, you know, be in a position where they
```

1   could get a job as a delivery person which might raise some
2   questions with the probation office.  I just don't think
3   there's a scenario here where Mr. Toebbe would come to the
4   probation office and say, hey, I just got a job at the nuclear
5   lab down in Oak Ridge.  Can you -- what do you -- is it okay?
6   I don't see that as being a scenario so I'm having a little
7   trouble trying to phrase it.

8            THE COURT:  So basically what you suggest in trying
9   to think of how to rephrase it is to modify this to state that
10  the defendant must seek approval of probation before he begins
11  any new employment and that probation must approve the
12  employment unless it would require or enable the defendant to
13  have access to classified government information.

14           MR. COMPTON:  I would be satisfied with that, Your
15  Honor.  I think that the -- I think the probation office is
16  required to approve employment by standard conditions.  That
17  provides the probation office or that directs the probation
18  office to approve employment unless it would have some impact
19  on national security issues or classified information issues.
20  If it does and there's no approval, I think that would, at that
21  point, trigger Mr. Toebbe to be able to come to the Court and
22  seek approval through the Court if he wishes to continue down
23  that line.

24           THE COURT:  Okay.  Mr. Douglas?

25           MR. DOUGLAS:  No objection, Your Honor.

**JA309**

```
 1            THE COURT:  All right.  What's fair to Mr. Toebbe is
 2   fair to Mrs. Toebbe so I'm -- while we have her and her counsel
 3   here, I'm going to make a change to those conditions in her
 4   case, and it will be consistent with what my ruling is going to
 5   be on this objection.  That the defendant -- and this is how it
 6   will be in Mr. Toebbe's case as well.  The defendant must seek
 7   approval -- well, let's back up.  The defendant must advise
 8   probation before beginning any occupation, business,
 9   profession, or volunteer activity as to what that occupation,
10   business, profession, or volunteer activity is; and probation
11   must approve the occupation, business, profession, or volunteer
12   activity unless it would require or enable the defendant to
13   have access to classified government information.  How is that?
14            MR. COMPTON:  No objection, Your Honor.
15            MR. DOUGLAS:  No objection, Your Honor.
16            THE COURT:  All right.  Mr. Beck?
17            MR. BECK:  Your Honor, no objection.  And may I just
18   make one other point?  Ms. Toebbe brought up to me after you
19   imposed the sentence that because of the location of one of her
20   children, if the Court could make a recommendation that the BOP
21   place her as close as possible to Annapolis.  Not San Diego.
22            THE COURT:  Where are her children?
23            MR. BECK:  Her oldest child is in school near
24   Annapolis, Your Honor, and she believes that being closer to
25   that child would be best for their family.  If the Court would
```

1    be agreeable to recommend that instead of San Diego, she would

2    ask the Court to do that as well.

3          THE COURT:  So the oldest one right now is how old?

4          MR. BECK:  Sixteen, Your Honor.

5          THE COURT:  And that child is in Annapolis.  How much

6    further to go in school?

7          MR. BECK:  Two more years of high school, Your Honor,

8    and then I --

9          THE COURT:  Okay.  And then college is up in the air.

10   Right.  And then the younger child is in San Diego?

11         MR. BECK:  Santa Cruz with --

12         THE COURT:  Santa Cruz.

13         MR. BECK:  Santa Cruz with her brother, Your Honor.

14         THE COURT:  And how old is that child?

15         MR. BECK:  Twelve, Your Honor.

16         THE COURT:  Twelve.  And it's your preference,

17   Ms. Toebbe, for me to make a recommendation to the Bureau of

18   Prisons that you be here -- well, you be housed in a federal

19   facility as close to Annapolis, Maryland, as possible to be

20   closer to your older 16 year old?

21         DEFENDANT DIANA TOEBBE:  Yes, ma'am.

22         THE COURT:  Okay.  Then I'm going to change the

23   recommendation I made in that case to the Bureau of Prisons,

24   and it's my recommendation that Ms. Toebbe be housed at a

25   federal facility as close to Annapolis, Maryland, as possible.

**JA311**

```
1            MR. BECK:  Thank you, Your Honor.
2            THE COURT:  Does that satisfy your request?
3            MR. BECK:  Yes, Your Honor.  Thank you.
4            THE COURT:  Sorry, Mr. Compton.  I think that
5    concludes any objections you had to the PSR?
6            MR. COMPTON:  That's correct, Your Honor.
7            THE COURT:  All right.  Nothing from the
8    government?
9            MR. DOUGLAS:  No, Your Honor.
10           THE COURT:  Okay.  Then with the change made to the
11   employment condition, the PSR is accepted and ordered filed,
12   and made a part of the record herein.  With that minor
13   revision, it'll be placed in the record under seal.
14       I will note for the record that on September 27, 2022, this
15   defendant appeared in the United States Magistrate Court for
16   the Northern District of West Virginia sitting in Martinsburg.
17   And at that time, he tendered a plea of guilty by a written
18   plea agreement to Count 1 of the indictment charging conspiracy
19   to communicate restricted data.  After consideration, the Court
20   accepted the defendant's plea of guilty to the crime charged in
21   Count 1 and deferred acceptance of the plea agreement and
22   adjudging the defendant guilty.
23       Subsequent to acceptance of the guilty plea, a presentence
24   investigation report was ordered.  Having now received that
25   report and ruled upon any factual and legal issues raised
```

1  thereby, I find the charge to which Mr. Toebbe is pleading

2  adequately reflects the seriousness of the offense behavior.  I

3  also find acceptance of the plea agreement won't undermine the

4  statutory purposes of sentencing which are deterrence,

5  incapacitation, just punishment, and rehabilitation.

6      So at this time, Mr. Toebbe, I accept your plea agreement

7  and your plea of guilty, and you now stand convicted of the

8  offense to which you agreed to plead guilty under your

9  agreement with the government.

10     I'll now announce my tentative findings as to the

11  applicable guidelines.  We start in this case with a base

12  offense level of 37 pursuant to Guideline 2M3.1(a)(2) because

13  the offense involved the communication of restricted data that

14  was classified at the confidential level.  Then there's a

15  two-level adjustment for offense in the role.  The defendant

16  abused a position of public trust and used a special skill in a

17  manner that significantly facilitated the condition or

18  concealment of the offense.  Therefore, the offense level is

19  increased by two levels pursuant to Guideline 3B1.3.  That

20  brings us to an adjusted offense level of 39.

21     Following that, there's a two-level reduction for

22  acceptance of responsibility under Guideline 3E1.1(a), and upon

23  motion of the government, there will be an additional one-level

24  reduction under Guideline 3E1.1(b).

25          MR. DOUGLAS:  So moved, Your Honor.

1          THE COURT:  Granted.  We arrive then at a total

2    offense level of 36.  Defendant has a criminal history category

3    of one based upon zero points.  With a total offense level of

4    36 and a criminal history category of 1, the guidelines

5    recommend imprisonment in the range of 188 to 235 months.  The

6    guidelines indicate that probation is -- the defendant is not

7    eligible for probation.  The guidelines recommend two to five

8    years of supervised release, a fine in the range of 40,000 to

9    $100,000, and there's a special assessment fee in the amount of

10   $100 owed on that one felony count of conviction.

11      The cost of imprisonment is $3,688 per month, the cost of

12   community confinement is $2,980 per month, and the cost of

13   supervision is $371 per month.

14      Are there any legal objections to the tentative guideline

15   findings, counsel?

16          MR. DOUGLAS:  Not by the government, Your Honor.

17          MR. COMPTON:  No, Your Honor.

18          THE COURT:  Then the guidelines as announced will be

19   the advisory guidelines applicable to sentencing in this

20   matter.

21      Mr. Compton, I will hear from you now for a statement on

22   your client's behalf.  I will tell you I've reviewed the

23   sentencing memorandum and its supplemental sentencing

24   memorandum in particular.

25          MR. COMPTON:  Thank you, Your Honor.  Your Honor, I

1  also have received this after I filed those, a letter written

2  on Mr. Toebbe's behalf by -- it's actually by an inmate of the

3  Eastern Regional Jail who is in protective custody with

4  Mr. Toebbe.  I have marked it as Defendant's Exhibit 1 for

5  identification.  I provided a copy to Mr. Douglas.  I would ask

6  that this be admitted for the Court's consideration.  It's one

7  page and a couple of lines on the top.

8          THE COURT:  A lot of firsts for the Court today.  The

9  government recommending a variant sentence lower than that

10  requested by the defendant, an inmate with a character

11 reference for the defendant --

12          MR. COMPTON:  Well, I would like the Court to read

13 the letter, and then perhaps we can discuss it because I think

14 it -- I think it maybe talks more about Mr. Toebbe than --

15          THE COURT:  Okay.  And you've seen it, Mr. Douglas?

16          MR. DOUGLAS:  Yes, Your Honor, I have.

17          THE COURT:  Any objection to my reviewing it?

18          MR. DOUGLAS:  No, Your Honor.

19          THE COURT:  Okay.  Give me a moment.

20     So is this Stacey Taylor a male or a female?

21          MR. COMPTON:  It's a male, Your Honor.

22          THE COURT:  Okay.  All right.  I reviewed it.  We

23 will file it as part of the record in today's proceeding, but

24 I'm going to hang onto this, Chad.  I may refer to it during

25 sentencing but make sure I get it back to you.

```
 1            MR. COMPTON:  Thank you, Your Honor, and good
 2   afternoon.  I know a lot has been said already today in this
 3   case.  Since I gave the Court this letter, I might as well just
 4   start with it.  You know, Mr. Toebbe is in protective custody
 5   because of the nature of the charges and what's, you know,
 6   taken place over the course of the case.  So he presented this
 7   letter to me, and it was from this Stacey Taylor, who I don't
 8   know anything about, but I do know that he's in the same
 9   protective custody as Mr. Toebbe so that prompted me to ask,
10   well, what is Stacey Taylor in protective custody for?
11            THE COURT:  Did you ask the jail or did you ask your
12   client because --
13            MR. COMPTON:  I --
14            THE COURT:  -- sometimes they're not honest.  Not
15   meaning your client but folks who are in protective custody.
16            MR. COMPTON:  Well, I did ask.  I asked my client,
17   Your Honor, and he was honest with me because he could have
18   told me something that was more palatable than being in there
19   for child exploitation which is what Mr. Taylor is in there
20   for.  And not a good thing.  Awful.  And Mr. Taylor, whether
21   he's, you know, guilty or not, I don't -- I believe he's
22   awaiting trial in this case.  It's a person nonetheless, as is
23   Mr. Toebbe, who over the course of this case and in the media
24   and by lots of folks has been, you know, hit with that traitor
25   label which is never anything that you want to go around
```

**JA316**

1  through life with.  But I thought this letter was interesting
2  and helpful to me because what it shows to me at least is we
3  got somebody like Mr. Taylor, guilty or not -- but let's
4  presume he is guilty of the worst kind of crime -- down at the
5  Eastern Regional Jail.  He's doing his time, whatever, and he
6  comes across somebody like Mr. Toebbe.  And Mr. Toebbe, maybe
7  because he's in the same type of situation, maybe because he --
8  I don't know what reason, but I tend to think that it's because
9  of the kind of person that Mr. Toebbe is.  Is that he doesn't
10  sit there and look at Mr. Taylor and say, "You're some kind of
11  child molester.  Stay away from me.  Get away from me.  You're
12  not even worth me hanging around."

13      Mr. Toebbe has done what he could because he has the
14  education, because he has the smarts, because he's not like the
15  typical inmate at the ERJ.  To do what he can to help this man.
16  Now, he's not trying to help him, you know, get out of whatever
17  trouble he's in.  He's not trying to help him, you know, beat
18  the rap.

19          THE COURT:  He's not doing his legal work for him.
20          MR. COMPTON:  He's not doing his legal work for him.
21  I don't think Mr. Toebbe -- Mr. Toebbe is a physicist, but he's
22  not a lawyer.  I don't know that Mr. Toebbe could do my job,
23  and I certainly, certainly couldn't do his.  What he is doing
24  is helping Mr. Taylor where he can.  GED classes, math
25  homework, being a human being to somebody who maybe doesn't

 1  have a lot of human beings around him so to speak.

 2      So I just wanted to bring that to this Court's attention,

 3  and I think that sort of folds into the first thing I wanted to

 4  mention which has been mentioned a lot I think today and all of

 5  the filings that we made with the Court.  And that's what I

 6  will refer to as Mr. Toebbe's post-offense rehabilitative

 7  conduct.  His compliance with paragraph 7 of his plea

 8  agreement.  It's been nothing but phenomenal.  I don't know how

 9  else to describe it.

10      I think the government has described it in similar terms.

11  He has done everything that he can to -- in any way that he

12  can -- try and make right or atone in some small way for what

13  he has done.  Not only with regard to his -- the specific case

14  that we are here for today but with regard to information that

15  the government didn't even know about.  He has done phenomenal,

16  phenomenal work in trying to atone for what he has done.  And I

17  think -- I don't know how more to express how much I think the

18  Court should give weight to that.

19      I know the government has multiple times here today and I

20  know the vice admiral has in their letter talked about how much

21  Mr. Toebbe has done.  He's done that for several reasons.  He's

22  done it to atone for what he has done.  He's truly sorry.  He

23  is truly sorry.  And he's done it because -- and I -- and I've

24  spent now over a year with Mr. Toebbe.  Despite what he did, I

25  believe -- and I feel confident standing before the Court in

1  saying this -- that I believe Mr. Toebbe truly loves his

2  country.  I believe that.  And I've spent, as I say, over a

3  year with him.  And I think to his core, to his core, he

4  regrets what he has done.  And I say that in context -- I know

5  the Court in sentencing Mrs. Toebbe -- and this is why I want

6  to just briefly put this in here.  I know this Court looks at

7  every case separately.  And every case is different, and every

8  case has different facts.

9      I cited one specific case for the Court which I thought had

10  facts sort of similar to this case.  But one of the things that

11  stuck out to me that was different about that case -- and I

12  mentioned it in the thing -- is that that defendant who got a

13  lower sentence than Mr. Toebbe is looking at here, that

14  defendant had expressed, expressed to the agents that he was

15  dealing with, a hatred for this country.  By the way, a country

16  that had taken him in.  He was an immigrant.  He expressed

17  hatred for this country and expressed a desire to -- and

18  expressed a plan to perhaps physically harm citizens within

19  this country.

20          THE COURT:  So what's the difference really between a

21  hatred for the country and a disregard for the safety of the

22  country?

23          MR. COMPTON:  Well, I don't know that there is a

24  difference, Your Honor.  I think the two probably can go hand

25  in hand, but I think there's a -- what we have here, the

**JA319**

 1  difference I see here is I believe that at the time or during

 2  the period of time -- which this occurred over a period of

 3  time.  At the period of time that this was taking place,

 4  Mr. Toebbe was experiencing a great deal of stress, a great

 5  deal of tumult in his life.  We talked about the issues that he

 6  was having with his son.

 7       Mr. Beck told the Court that Mrs. Toebbe at the time this

 8  was going on was at the apex of the psychological problems that

 9  she was dealing with.  Mr. Toebbe was having stress issues at

10  work related to his employment, what he was being asked to do

11  at work, and then we add on top of this -- and this is not --

12  I'm not trying to say that this is -- had -- is the be all end

13  all or this has, you know, the major factor, but you add on top

14  of all of that this business about, you know, the direction of

15  the country and what was going on.  You add all that together

16  and Mr. Toebbe, who was a -- who has been a physicist, who was

17  an active member of the United States military, honorably

18  discharged, why would he -- where does this come from?  Why

19  does somebody all of a sudden decide, well, that's the reason

20  why?  Not because he hates the United States.  Not because he

21  wanted to see sailors dead.  Not because this country was so

22  repugnant to him that he wanted to do everything he can to put

23  it down unlike Mr. Mascheroni in the case that I cited who had

24  a hatred.  A hatred for his employer.  A hatred for the

25  country.

1    Mr. Toebbe found himself in a situation where he -- I think
2   he almost felt hopeless in terms of how to proceed.  And I
3   don't understand it.  I don't know how to explain how somebody
4   then goes from, you know, my life is, you know, in the ditch --
5   how do I -- you know, what do I do, and then you go to start
6   with the secrets.  I don't understand it.  I don't know that I
7   can explain it to the Court.  I don't know that Mr. Toebbe
8   expects the Court to understand it.  But he made a decision,
9   and it was the worst decision of his life.  It was the worst
10  decision that he could have come up with.  And to his core and
11  for the rest of his life, he will regret taking that action.
12  That doesn't mean that he hates this country.  I don't think he
13  does.  I think he loves this country, and I think everything
14  that he has done since the moment those agents approached him
15  in Harpers Ferry to take him into custody, everything that he
16  has done since then has been in an effort to atone for the
17  absolute poor, poor decision-making that he's made over the
18  last few years.
19    And I don't say -- again, I'm not -- he has offered I think
20  a heartfelt and a thorough defendant's version statement to try
21  to explain to the Court where he is.  I don't -- I don't think
22  he's trying to lay the blame for his decision-making at, you
23  know, the feet of his kids or the feet of his wife.  He knows
24  what he did.  He did it.  Nobody was holding a gun to his head.
25  He had access to the information.  And whether Mrs. Toebbe was

1  driving the train or not, he was the one that had access to the
2  information, and he was the one that could decide to take it or
3  leave it.  And he made a decision.
4      But we offer that and he offers that not as an excuse.  Not
5  as a, you know, get out of jail free.  This is where his
6  mindset was.  This is where he was.  This is why somebody with
7  honorable military service and no criminal history all of a
8  sudden decides to haul themselves to Harpers Ferry and
9  Gettysburg for misconduct.  I think the Court can see some of
10 that in something that I thought, you know, is a little -- is a
11 little unusual until you think about it for a little bit.
12     Mr. Toebbe has no criminal history, no real serious, you
13 know, physical health issues.  Clearly, there were some -- you
14 know, he was struggling with some -- I think some mental health
15 issues at the time -- but substance abuse.  And we're not
16 talking about marijuana.  We're not talking about crack.  We're
17 not talking about, you know, he wasn't -- he wasn't out on the
18 street corner.  What are we talking about?  Something that we
19 skip over a lot of the times in this courtroom.  Not because
20 it's not important.  Just because we're dealing with more
21 harder stuff than alcohol.  And doesn't that -- doesn't that
22 really express, you know, where he was in his mindset?
23     Mr. and Mrs. Toebbe were suburbanites.  You know, educated.
24 You know, you come home from a long day of work, you have a
25 glass of wine.  Well, that's fine until, you know, you're

1  trying to, you know, deal with your child's very serious mental

2  health issues.  You're trying to deal with your wife's very

3  serious mental health issues.  You're trying to deal with the

4  issues at work.  And the one glass of wine turns into two

5  glasses of wine, turns into three, turns into four, and all of

6  a sudden, you're drinking a lot at home.

7      I think that also incapsulates where his mindset was.

8  Where -- what was going on with him.  And the fact that this

9  was not some, you know, I hate this country.  How can I get --

10 how can I get back at this country?  How can I do this?  This

11 was a mindset that he had found himself in.  And sort of like

12 what Mr. Beck was saying too -- and I think it's important.

13 Yes, this was an offense motivated by money.  Is that the

14 definition of greed?  Probably a generic definition, yes.  But

15 I think -- I agree with Mr. Beck that this was not greed in the

16 sense that the Toebbes, you know, didn't like their house.  It

17 was -- they thought it was, you know, too plain or, you know,

18 the mini or whatever it was that they were driving wasn't fancy

19 enough.  That they wanted something more showy or classy for

20 the, you know, the private school set.  That's not what we were

21 talking about here.  The decision had been made as to how to

22 proceed and because that entailed going abroad that required

23 money.

24          THE COURT:  Like in the amount that they were

25 seeking?  Why didn't they just seek an amount, if that was the

**JA323**

1  case, that would pay off their debt and give them a little nest
2  egg to start over?
3          MR. COMPTON:  Well, I think --
4          THE COURT:  That's where it drops into greed; right?
5          MR. COMPTON:  Well, I think if the Court -- if the
6  Court wants to -- if you want to look at their debt that's one
7  thing.  I don't know that -- I think they had some debt and so
8  I don't know that that would necessarily be a lot.  But also --
9  and I think as the Court in questioning Mr. Douglas, for
10 whatever reason -- I think probably because of security, you
11 know, security issues, they were dealing -- Mr. Toebbe was
12 dealing in cryptocurrency which, you know, one day is $100,000
13 and the next day it's $50,000.  So, you know, I'm not -- I
14 don't know how secure that was.
15     The point though was -- I guess what I was trying to say
16 inartfully was -- is that in perhaps a lot of those cases that
17 have been cited, you know, we're not talking about $100,000.
18 We're talking about a million dollars, a hundred million
19 dollars, or tens of millions of dollars.  Because, again, the
20 folks aren't looking to -- you know, we're not looking just to
21 go to another country to get out of here or to leave our
22 problems behind.  We're looking to, you know, live the high
23 life in some other country or to live the high life in Loudoun
24 County or, you know, to do whatever we want to do to make -- to
25 be powerful and wealthy.  And I don't think that's the

1  situation that we have here.

2      The Court is well aware that Mr. Toebbe is highly educated.

3  He's highly employable.  So after the period of his

4  incarceration, he is going to be, as he has been except for

5  this period of time, a model citizen.  Again, I've mentioned

6  his military service to the Court.  I had a note about

7  disparity and deterrence, and I think the Court addressed those

8  issues when sentencing Mr. -- Mrs. Toebbe, but just for the

9  record here, Mr. Toebbe has no -- there -- has no Plan C or

10  Plan D.  He has no other information out there.

11      I think the Court correctly concluded in the previous

12  sentencing that by the -- given the guideline range and the

13  binding term, by the time that Mr. Toebbe would get out of

14  jail, the, you know, universe of technology will have passed --

15  any information that he had would pass them by.  And the Court

16  read it out loud, the statement from the vice admiral.  Final

17  resolution of the cases with no further risk to national

18  security.

19      Mr. Toebbe is not going to be able to get a security

20  clearance again.  He's not going to be able to do this type of

21  work again.  Any institutional knowledge that he may retain in

22  his mind and in his memory is going to be -- is -- I believe is

23  outdated now based on the admiral's statement, but certainly in

24  15 years, it's going to be worthless.  And I can tell the

25  Court, because Mr. Toebbe has told me and because I know that

1  the government has done an extensive amount of investigation

2  into this case, again, based on -- because that's what they do

3  and also based on Mr. Toebbe's post-offense rehabilitative

4  conduct that there is nothing else that I believe that the

5  Court needs to be worried about.

6      And so I believe that this Court can feel comfortable in

7  sentencing Mr. Toebbe to the low end of the binding term, the

8  low end of the guideline range, 188 months.  I believe that

9  takes into account and punishes him for the seriousness of his

10  misconduct, but it takes into account those 3553(a) factors

11  that we've presented to the Court both here and in our various

12  memoranda.  And most importantly, it takes into account that

13  phenomenal post-offense rehabilitative conduct that I believe

14  Mr. Toebbe wanted to do, needed to do, and was right in doing

15  to begin to atone for what he's done.

16          THE COURT:  Thank you, Mr. Compton.

17      Mr. Toebbe, you have the right to make a statement before

18  you're sentenced.  Do you desire to address the Court, sir?

19          DEFENDANT JONATHAN TOEBBE:  Yes, Your Honor.

20          THE COURT:  All right.  Come on up to the podium.

21          DEFENDANT JONATHAN TOEBBE:  Your Honor, 13 months in

22  jail has afforded me a lot of time to think about what I have

23  done, about the enormity of my crimes, and about the people

24  that I have impacted.  I failed in my responsibility to the

25  American people to preserve the secrets that were entrusted

1   with me.  I've let down my respected colleagues at the

2   National Laboratories and at Naval Reactors.  I failed my

3   family.  I brought shame to them and trauma to my children and

4   to my wife.

5       I come before you deeply ashamed of what I have done.  I

6   won't reiterate everything that I said in my written statement

7   in the presentence investigation out of respect for the medical

8   privacy of my children and for my wife, but I do want in some

9   way to explain my mindset as I carried out my crimes.  Not to

10  shirk responsibility but to provide you some insight into

11  myself as a person.  Hopefully to persuade you that I persuade

12  -- I pose no risk of recidivism.  And also I pray that other

13  individuals in the government who may be at risk of becoming an

14  insider threat will become aware of this testimony and will

15  perhaps take heed and listen and recognize in themself the

16  danger signs of a mental breakdown and seek help before taking

17  critical action before making the mistake that I did.

18      My family is everything to me.  And the confluence of their

19  mental health problems and the added stress at work of taking

20  on my supervisor's responsibilities to free him up day to day

21  to take on a special project on behalf of the admiral added

22  tremendously to my workload and to my operational stress.  The

23  COVID pandemic and the difficulties of managing government

24  remotely and appropriately handling classified information

25  ironically enough added to the stress that I was under, and

1  I began self-medicating with alcohol.  And it got out of

2  hand.

3      And I believed that my family was in dire threat.  That

4  democracy itself was on the verge of collapse, and that sort of

5  catastrophic thinking overwhelmed me, and I believed that I

6  must take -- must have taken precipitous action to try to save

7  them from grave harm.  I recognize now that I was in the midst

8  of a nervous breakdown over a period of perhaps 18 months and

9  failed to recognize the warning signs.  Failed to take

10  advantage of the resources that were available to me through

11  the Department of the Navy to help manage my operational

12  stress.

13      I should have known better.  I should have done better.

14  And as a result, I endangered the men and women of the United

15  States Navy whose uniform I was so proud to wear.  I betrayed

16  my colleagues at Naval Reactors and the National Laboratories

17  serving honorably in a job that I was so proud to share with

18  them.  And I brought shame to my family.  I have destroyed my

19  children's lives.

20      I can't take back what I have done.  I can't fix it.  I

21  can't put the toothpaste back in the tube.  But by god, Your

22  Honor, I've tried.

23      In addition to my post-arrest rehabilitation that

24  Mr. Compton has referred to already, part of my interrogation

25  and debriefing was with the FBI's Behavioral Analysis Unit, the

Mindhunters.  Again, attempting to help them come up with a
better profile for people like me in the hopes that they might
be able to intervene sooner and prevent the next threat from
happening.  Not just for the protection of the country but to
save that lost soul.

I am in anguish over what I have done, and I know I will
never be able to make it right.  In the ways that I am able, in
the ERJ, I've tried to reach out to fellow inmates to tutor
them in math.  To help Mr. Taylor with his grammar.  He has an
ambition to open a small business himself one day and wanted to
be able to speak properly when applying for a small business
loan.

My ambition while incarcerated is to continue to use those
skills and the blessings of my education to help other inmates
complete theirs in the hopes that that will put them on a
better path and reduce the risks that they will have to fall
back into that cycle of poverty and crime that so many inmates
face.

I beg Your Honor for lenience in sentencing to the bottom
end of the guidelines.  I know what I did is wrong.  I need to
be punished.  But I beg you to give me the opportunity to be a
solid citizen again one day, to be involved in my children's
lives, to help them grow up and to take on the burdens of being
the good young men that I know they are.  And I also ask for
the opportunity for my parents, my elderly parents, to live

1  long enough to see their prodigal son redeem himself in some

2  way.  I hope that they will live long enough to see me a free

3  man once again.  Thank you.

4          THE COURT:  Thank you, sir.

5      Mr. Douglas.

6          MR. DOUGLAS:  Your Honor, the government relies on

7  its written filings to continue to recommend a sentence of 210

8  months for this defendant.  Specifically, the basis, if not the

9  primary -- if not the sole basis, is the post-offense

10 rehabilitative conduct which is most specifically and

11 thoroughly described in the government's classified filings.

12 Thank you, Your Honor.

13         THE COURT:  Thank you, sir.

14         MR. COMPTON:  Your Honor, I neglected to mention

15 Mr. Toebbe would ask that the Court recommend that he be housed

16 at the federal facility in Petersburg, Virginia, the Low.

17 Petersburg offers programming which I think will benefit the

18 defendant.  I also think it will enable him to participate

19 perhaps on the teaching side of that programming for some of

20 the other inmates down there.  Petersburg also offers I think

21 protective custody levels that may benefit this defendant given

22 the nature of the case.

23     And, lastly, Petersburg -- I think what the Court had heard

24 from Mr. Beck, the oldest son will be on the Eastern Seaboard.

25 His parents -- Mr. Toebbe's parents are in the Louisville area

1  and so it's sort of a centralized location.

2          THE COURT:  Okay.  So the federal facility in

3  Petersburg.

4          MR. COMPTON:  Specifically, the Low.  I understand

5  and Mr. Toebbe does that the Bureau of Prisons ultimately makes

6  those decisions.

7          THE COURT:  Will make the classification.  Right.

8          MR. COMPTON:  Yes, ma'am.

9          THE COURT:  Okay.  I'll make that recommendation.

10     All right, counsel, we're going to take a brief break, and

11  then we'll get back out here on the record.

12     (Recess 2:55 P.M. - 3:30 P.M.)

13          THE COURT:  Please be seated, everyone.

14     Anything further, counsel, before I impose sentence?

15          MR. DOUGLAS:  Not by the government, Your Honor.

16          MR. COMPTON:  Your Honor, I -- it just occurred to

17  me, if the Court imposes a fine in this case -- just thinking

18  as to the previous sentence -- we would ask that the Court

19  impose a schedule of payments on that.  I don't know what the

20  defendant's ability is going to be to make payments while he's

21  incarcerated.  I understand -- I'm sure he'll be working at

22  some point and making money.  I know as the presentence report

23  indicates that there are some financial arrangements that can

24  be done.  But to the extent that he may still owe some money

25  when he gets out, I would hate for him to be set up for failure

1  immediately upon walking out.  If we can make a schedule of

2  payments for any fine in the amount of $100 per month beginning

3  the 5th of the month following his release.

4         THE COURT:  All right.  This is what I'll do in

5  imposing a fine.  I will order that the defendant pay $100 a

6  month beginning the 5th of each month beginning 6 months

7  following his release from incarceration, and I'll change, with

8  regard to Ms. Toebbe's fine as well, the schedule of payments

9  so we don't set anybody up for failure here.

10        MR. COMPTON:  Thank you, Your Honor.

11        THE COURT:  Okay.  Will the defendant please stand.

12  Pursuant to the Sentencing Reform Act of 1984, it's the

13  judgment of the Court that the defendant, Jonathan Toebbe, is

14  hereby committed to the custody of the Bureau of Prisons to be

15  imprisoned for a term of 232 months.  This sentence of

16  imprisonment is at the higher end of the advisory guideline

17  range and the higher end of the binding term of imprisonment

18  contained in the plea agreement.  You may have a seat,

19  gentlemen.

20   I make the following recommendations to the Bureau of

21  Prisons:  That the defendant be incarcerated at the federal

22  facility in Petersburg, the Low; that the defendant be allowed

23  to participate in substance abuse treatment, including the

24  500-Hour Residential Drug Abuse Treatment Program as determined

25  by the Bureau of Prisons; and that he be given credit for time

1   served since October 9, 2021.

2        Upon release from imprisonment, Mr. Toebbe, you shall be

3   placed on supervised release for a term of five years.  While

4   on supervised release, you must comply with the following

5   mandatory conditions:  You must not commit another federal,

6   state, or local crime.  You must not unlawfully possess a

7   controlled substance.  You must refrain from any unlawful use

8   of a controlled substance.  You must submit to one drug test

9   within 15 days of release from imprisonment and at least two

10  periodic drug tests thereafter as determined by the Court.  And

11  you must cooperate in the collection of DNA as directed by the

12  probation officer.

13       You must also comply with the standard conditions that have

14  been adopted by this Court in its November 29, 2016, standing

15  order as well as the following special conditions:  You must

16  submit to substance abuse testing to determine if you used a

17  prohibited substance and must not attempt to obstruct or tamper

18  with the testing methods.  This condition assists the probation

19  officer in identifying treatment needs, providing rehab

20  services, reducing the risk of recidivism, and provides for

21  protection of the community.

22       You must not use or possess any controlled substances

23  without a valid prescription.  If you do have a valid

24  prescription, you must disclose the prescription information to

25  your probation officer and follow the instructions on the

1  prescription. This condition assists probation in reducing the

2  risk of recidivism and provides for protection of the

3  community.

4      You must provide the probation officer with access to any

5  requested financial information and authorize the release of

6  financial information. The probation officer may share that

7  financial information with the U.S. Attorney's Office. This

8  condition assists the probation officer in legitimizing

9  defendant's employment and/or income, provides protection for

10 the community, and aids in the maximum collection of financial

11 penalties.

12     You must not engage in -- well, let's put it this way. We

13 reworded that section as far as the employment. You're

14 required to advise your probation officer of any new

15 occupation, business, profession, or volunteer activity before

16 you start, and the probation office must approve employment

17 unless that occupation, business, profession, or volunteer

18 activity requires or enables Mr. Toebbe to have access to

19 classified government information.

20     Unless excused for legitimate reasons, if not in compliance

21 with the condition of supervision requiring full-time

22 employment at a lawful occupation, you may be required to

23 perform up to 20 hours of community service per week until

24 employed as approved or directed by your probation officer.

25 This condition assists probation in reducing the risk of

1  recidivism and provides for protection of the community.

2      It's further ordered the defendant shall pay the United

3  States a special assessment fee in the amount of $100.

4      And, Chad, was that paid or not?

5          THE CLERK:  It was paid, yes.

6          THE COURT:  It was paid.  I'll note it has been paid

7  in full.

8      It's further ordered the defendant pay a fine in the amount

9  of $45,700.  I take that amount into consideration because

10 that's the amount that -- of the money, the earnest money that

11 was not recovered.  I don't find that the defendant or his wife

12 should profit because of a loophole in the guidelines or the

13 sentencing parameters in this case.

14     Additionally, defendant has agreed to forfeit to the United

15 States all right, title, and interest in the following items

16 that the defendant agrees constitute money, property, and/or

17 assets derived from or obtained by the defendant as a result of

18 his illegal activities:  All papers, digital media, and

19 electronic devices seized from his residence, his vehicles, and

20 his Naval Reactors offices in October 2021.

21     In reaching my decision as to the proper sentence to be

22 imposed, I did consider all those factors set forth in

23 18 U.S.C. § 3553(a).  Specifically, the reasons for the

24 sentence imposed here today are as follows:  The defendant

25 before this Court turned 44 years old today.  He is a son, a

1  husband, and a father.  He has no prior criminal record.  By

2  all counts, he was raised by successful and supportive parents,

3  who served as role models, who financially supported him

4  through his various educational endeavors, and who encouraged

5  him to set and achieve his goals.

6      His personal history and list of accomplishments reads of

7  one that many strive for but few achieve.  He holds multiple

8  college and advanced degrees.  He was an educator.  He served

9  in the U.S. Navy, and he entered an elite career field that

10  someone can only achieve through hard work, dedication, and

11  trust.

12      The Court has reviewed the circumstances of the instant

13  offense.  It's very clear that defendant's actions were

14  calculated and required advance planning over several years to

15  avoid possible detection.  In a manner that reads like a crime

16  novel or a movie script, the defendant abused his position of

17  trust and his skill as a nuclear engineer in the Naval Nuclear

18  Propulsion Program to threaten national security.  The

19  defendant's actions and greedy self-serving intentions placed

20  military service members at sea and every citizen of this

21  country in a vulnerable position and at risk of harm from

22  adversaries.

23      In his own words, the defendant's family, and I quote, "has

24  always been of primary importance," end of quote, in his life.

25  In seemingly searching for a palatable excuse for his actions,

1   the defendant suggests that he was devoted to protecting his
2   family so he made the decision to steal restricted data to help
3   them escape, quote, "the collapse of American democracy," end
4   of quote.  Those are his words.  He minimizes his actions,
5   placing the protected information he stole into categories of
6   "what," and then he opted not to steal the "hows" and the
7   "whys."  He justified his actions by stating he was trying to
8   limit the damage to the U.S., a country he was proud to serve
9   and swore an oath to protect.

10          The defendant was keenly aware of the consequences that he
11  could face by his misconduct.  He acknowledged to his wife in
12  communications that another country may not honor the skills
13  that he has to offer.  When the defendant took an oath, he was
14  made aware of the legal consequences of violating the terms of
15  his employment with the United States.  The defendant comes
16  face to face with these consequences today.

17          The unintended consequences of the defendant's activity
18  unfortunately are equally significant.  First, his children
19  lost critical time with their father while he was planning and
20  acting on his crime.  This was a time he could have spent
21  focusing on their immediate needs.

22          Secondly, the defendant will serve a term of imprisonment
23  that will not be present -- and will not be present to protect
24  and guide his children as a father should when they face life's
25  challenges.

     1       Third, the defendant may have already spent his last time

     2   with his parents prior to his incarceration which is a scenario

     3   that he created for his own mother and father.

     4       Lastly, the United States, defendant's mentees and former

     5   coworkers and friends can no longer trust the defendant.  The

     6   cumulative impact of the defendant's crime remains to be seen.

     7       Based on defendant's involvement in the instant offense,

     8   his personal history and characteristics, and his lack of

     9   criminal history, the sentence imposed here today is warranted.

    10   It's sufficient but not greater than necessary.  The sentence

    11   incorporates the binding term agreed on by the parties in the

    12   plea agreement, reflects the serious nature of the offense, and

    13   takes into consideration the risk to national security, the

    14   position of the Navy, but most importantly, the risk to

    15   national security created because of the defendant's own

    16   actions.  This sentence will also provide defendant with an

    17   opportunity to address his substance abuse issues and explore

    18   long-term career options.

    19       In a recent -- speaking of the position of the Navy, in a

    20   recent supplemental victims impact statement, Admiral Houston

    21   reported to the Court that the Navy agreed to both of the plea

    22   agreements in this case, and I gave that weight in determining

    23   whether to accept this plea and how to sentence the defendant.

    24   I also gave weight to what the vice admiral went on to say.  He

    25   went on to say, "Not only that the plea agreement further

1   accomplished final resolution of the case with no further risks

2   to the national security," but he also said, "As explained in

3   Reference A" -- meaning the original victim's impact statement

4   -- "the betrayal by the Toebbes has had far-reaching

5   consequences for the United States and the sailors and families

6   who serve the United States Navy."

7        Also, I compared the defendant's worst case scenario

8   exposure if he was convicted of all three counts in this

9   indictment at trial under the guidelines which would require me

10  to group those three counts for calculation purposes and also

11  to, most importantly, consider without exceptional

12  circumstances, have those counts run concurrently.

13       Worst case scenario if this defendant went to trial, the

14  range of imprisonment under the advisory guidelines would be

15  262 to 327 months.  That's 21 1/2 years to 27 1/4 years based

16  on my math.  With acceptance of this binding plea, which the

17  Navy supported, the guidelines recommended, as I stated at the

18  beginning during my calculation, 188 to 235 months.  That's

19  15.6 to 19.5 years.

20       I also had further considerations in support of the

21  sentence imposed, and they're as follows:  I considered the

22  intangibles and nuances of trying this case and the fact, as we

23  all know, that going to trial doesn't guarantee a conviction of

24  any or all counts.  I considered the trial costs associated

25  with trial, the potential for leaks that could further harm

1  this country's security during the course of trial, the length
2  of sentences imposed in other cases but also the specifics of
3  those cases, which are all different than that case that's
4  before me.  I considered the time and distance that this
5  sentence places between the defendant now and the defendant
6  when he's finally released from incarceration in the light that
7  hopefully technology and military advances will have advanced
8  to the point where any information he may have retained for
9  redistribution will be stale or worthless.

10      I also considered the defendant's role in the cover story
11  that was concocted before he was arrested in this case, but I
12  also considered some other mitigating factors.  I considered
13  his post-offense rehabilitative conduct which the government
14  agreed with the defendant about.  I considered in contrast to
15  Mrs. Toebbe that this defendant made productive use of his time
16  in the jail.  Not only with the rehabilitative conduct but also
17  even helping to improve those of lesser station, who would be
18  considered of lesser station considering the charges that
19  Mr. Taylor is facing in the jail.

20      Nonetheless, even though Mr. Toebbe and Mr. Taylor's worlds
21  collided there in the jail, Mr. Toebbe acknowledged that
22  Mr. Taylor was an individual just as himself, he was a human
23  being, and put Mr. Taylor's charges and alleged conduct aside
24  and helped him with his GED studies.  I think Mr. Compton
25  mentioned he helped him with his math.  Mr. Toebbe indicated he

1  was helping others to improve upon their education in the jail

2  as well.  In fact, he even helped Mr. Taylor, according to what

3  Mr. Taylor reports to the Court, learn how to play chess which

4  is not easy, but that gave him something else to focus on to

5  help him productively pass his time.  So Mr. Toebbe deserves

6  some credit for productive use of his time in jail.

7       Also in contrast to Mrs. Toebbe, both in writing in the

8  statement from the defendant in the PSR as well as his

9  presentation here in court, I found that his remorse that he

10 expressed to the Court was genuine.  I think he was -- is truly

11 ashamed and sorry for his actions, and I took that into account

12 as well.

13      Overall, this sentence of imprisonment meets the sentencing

14 objectives of punishment, general deterrence, incapacitation,

15 and rehabilitation, and it will promote respect for the law.

16 This sentence also reflects a commitment to protect our

17 nation's security as a whole and to serve as a warning to

18 those who are entrusted with valuable government secrets that

19 if you break the law and you're caught, you can and will be

20 punished.

21      A term of supervised release is required.  In this case, a

22 five-year term of supervised release was imposed and that will

23 allow the probation office to monitor defendant's conduct in

24 the community and will assist him in leading a law-abiding

25 lifestyle when he is released from incarceration.  This term of

1   supervised release will also assist the probation office with

2   monitoring the defendant's financial resources, his substance

3   abuse tendencies, and will provide the defendant with

4   additional guidance, support, and resources for obtaining

5   gainful employment to meet his family responsibilities.

6       I'll grant the motion of the government and dismiss the

7   remaining counts of the indictment which are two and three,

8   Mr. Douglas?

9           MR. DOUGLAS:  So moved, Your Honor.

10          THE COURT:  Granted.  And I ask probation to prepare

11  the judgment and commitment order.

12      Mr. Toebbe, although a defendant who has pled guilty has

13  the right to appeal from the judgment of this Court, a

14  defendant who has pled guilty may waive that right as part of a

15  plea agreement.  You entered into a plea agreement which waived

16  in whole or in part your right to appeal your sentence.  Those

17  types of sentences are generally enforceable, and it appears as

18  though it's enforceable in your case.  However, if you believe

19  the waiver in your plea agreement is unenforceable for some

20  reason, or you believe your guilty plea was somehow unlawful or

21  involuntary, or you believe there's some other defect in these

22  proceedings you didn't waive by your guilty plea, you can

23  present that theory to the appellate court.

24      However, if you decide to appeal, you must file a notice of

25  appeal with the clerk of this court within 14 days following

**JA342**

1  entry of the judgment and commitment order.  If you request,

2  the clerk of court will enter a notice of appeal for you.  And

3  if you desire counsel on appeal, and you can't afford a lawyer,

4  the appropriate court will review your financial affidavit to

5  determine your eligibility for court-appointed counsel.

6      Anything further on behalf of the government, Mr. Douglas?

7              MR. DOUGLAS:  No, Your Honor.

8              THE COURT:  Anything further on behalf of your

9  client, Mr. Compton?

10             MR. COMPTON:  No, Your Honor.  Thank you.

11             THE COURT:  All right.  Both defendants are remanded

12  to custody.

13             MR. DEHAVEN:  Your Honor --

14             THE COURT:  Yes, sir.

15             MR. DEHAVEN:  -- the Court did not mention anything

16 about potential waiver of the interest requirement on the fine

17 for either defendant.

18             THE COURT:  Oh, I'm sorry.  I'm going to waive the

19 interest requirement on those fines in both cases.  I think

20 that the fine is sufficient enough, and I don't find with the

21 size of that fine that the defendants are going to have the

22 resources to also pile on, for the amount of time they're

23 serving incarcerated, interest on those.

24      Thank you, Mr. DeHaven, for catching that.  Anything

25 further from anyone?

122

1          MR. DOUGLAS:  No, Your Honor.

2          THE COURT:  All right.  Defendants are remanded.

3

4              (Hearing concluded at 3:55 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Kate A. Slayden, Registered Professional Reporter and Official Court Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on November 9, 2022, as reported by me.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 12th day of January 2023.


                         /s/Kate A. Slayden


                         Kate A. Slayden, RPR
                         Official Reporter, United States
                         District Court for the Northern
                         District of West Virginia

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| DIANA TOEBBE | ) Case Number:  3:21CR49-2 |
|  | ) USM Number:  68857-509 |
|  | ) Barry P. Beck and Jessica Carmichael |
|  | ) Defendant's Attorney |

### THE DEFENDANT:

☑ pleaded guilty to count(s)   One (1)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 42 U.S.C. §§ 2274(a) and 2014 | Conspiracy to Communicate Restricted Data | 10/09/2021 | One |

☐ See additional count(s) on page 2

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Counts Two and Three are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 9, 2022
Date of Imposition of Judgment

_Gina M. Groh_ (signature)
Signature of Judge

Honorable Gina M. Groh, United States District Judge
Name and Title of Judge

November 17, 2022
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    8

DEFENDANT:  DIANA TOEBBE
CASE NUMBER:  3:21CR49-2

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total
term of:  Two hundred sixty-two (262) months

☑  The court makes the following recommendations to the Bureau of Prisons:

   ☑  That the defendant be incarcerated at an FCI or a facility as close to _Annapolis, Maryland,_____ as possible;

      ☑  and at a facility where the defendant can participate in substance abuse treatment, as determined by the Bureau of Prisons;

         ☑ including the 500-Hour Residential Drug Abuse Treatment Program.

   ☐  That the defendant be incarcerated at _____ or a facility as close to his/her home in
      _____as possible;

      ☐  and at a facility where the defendant can participate in substance abuse treatment, as determined by the Bureau of Prisons;
         ☐ including the 500-Hour Residential Drug Abuse Treatment Program.

   ☑  That the defendant be given credit for time served since October 9, 2021.

      ☑  That the defendant be allowed to participate in a mental health treatment program, as determined appropriate by the Bureau of
         Prisons.
      ☐  That the defendant be allowed to participate in any educational or vocational opportunities while incarcerated, as determined by ⊞
         the Bureau of Prisons.

☑  Pursuant to 42 U.S.C. § 14135A, the defendant shall submit to DNA collection while incarcerated in the Bureau of Prisons,
   or at the direction of the Probation Officer.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

   ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before  12:00 pm (noon)  _on_____  .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

   ☐  on _____, as directed by the United States Marshals Service.

☐

## RETURN

I have executed this judgment as follows:

   Defendant delivered on  _____  to  _____

at_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

## JA347

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

Judgment—Page   3   of   8

DEFENDANT:   DIANA TOEBBE
CASE NUMBER:   3:21CR49-2

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of : Three (3) years

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court in its November 29, 2016, Standing Order, as well as with any other conditions on the attached page (if applicable).

**JA348**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                Sheet 3A — Supervised Release

Judgment—Page   **4**   of   **8**

DEFENDANT:  DIANA TOEBBE
CASE NUMBER:  3:21CR49-2

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You shall not commit another federal, state or local crime.
4.  You shall not unlawfully possess a controlled substance. You shall refrain from any unlawful use of a controlled substance. You shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the probation officer.
5.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
6.  You must answer truthfully the questions asked by your probation officer.
7.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
9.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
10. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
11. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
12. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
13. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
14. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
15. You shall not purchase, possess or consume any organic or synthetic intoxicants, including bath salts, synthetic cannabinoids or other designer stimulants.
16. You shall not frequent places that sell or distribute synthetic cannabinoids or other designer stimulants.
17. Upon reasonable suspicion by the probation officer, you shall submit your person, property, house, residence, vehicle, papers, computers, or other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition.
18. You are prohibited from possessing a potentially vicious or dangerous animal or residing with anyone who possesses a potentially vicious or dangerous animal. The probation officer has sole authority to determine what animals are considered to be potentially vicious or dangerous.
19. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____      Date _____

**JA349**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 5 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  DIANA TOEBBE
CASE NUMBER:  3:21CR49-2

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

2. You must participate in a substance abuse treatment program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

3. You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

4. You must not use or possess alcohol.

5. You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation officer may share financial information with the U. S. Attorney's Office.

6. You must advise your probation officer before engaging in any occupation, business, profession, or volunteer activity and the probation officer must approve the occupation, business, profession, or volunteer activity unless it requires or enables you to have access to classified Government information.

7. Unless excused for legitimate reasons, if not in compliance with the condition of supervision requiring full-time employment at a lawful occupation, you may be required to perform up to 20 hours of community service per week until employed, as approved by the probation officer.

8. You must consent to a third-party disclosure to your employer in regard to your convictions.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   8

DEFENDANT: DIANA TOEBBE
CASE NUMBER: 3:21CR49-2

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 50,000.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

The victim's recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim receives full restitution.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**TOTALS**                $ _____      $ _____

☐ See Statement of Reasons for Victim Information

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑ the interest requirement is waived for the   ☑ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

*Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA351**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   7   of   8

DEFENDANT:  DIANA TOEBBE
CASE NUMBER:  3:21CR49-2

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $   50,100.00   due immediately, balance due

☐ not later than _____ , or
☑ in accordance with  ☐ C  ☐ D,  ☐ E,  ☑ F, or ☑ G below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D,  ☐ F, or  ☐ G below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties: The Special Assessment Fee has been paid.
Financial obligations ordered are to be paid while the defendant is incarcerated, and if payment is not completed during
incarceration, it is to be completed by the end of the term of supervised release; or

G  ☑  Special instructions regarding the payment of criminal monetary penalties:
The defendant shall immediately begin making restitution and/or fine payments of $  100.00  per month, due on the fifth
of each month.  These payments shall be made during incarceration, and if necessary, during supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to Clerk, U. S. District Court, Northern District of West Virginia, P.O. Box 1518,
Elkins, WV 26241.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
See page 8 (Additional Forfeited Property).

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

## JA352

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6B — Schedule of Payments

|   | Judgment—Page | 8 | of | 8 |

DEFENDANT:  DIANA TOEBBE
CASE NUMBER:  3:21CR49-2

## ADDITIONAL FORFEITED PROPERTY

Regarding forfeiture, the defendant has agreed to assist Federal officials in locating and retrieving $100,000, which was paid by the FBI via Monero cryptocurrency in exchange for Restricted Data. The defendant voluntarily abandons all right, title, interest, and claim to the $100,000.

Additionally, the defendant agrees to forfeit and abandon to the United States all of her right, title, and interest in the following items that the defendant agrees constitute money, property, and/or assets derived from or obtained by the defendant as a result of, or used to facilitate the commission of, her illegal activities: all papers; digital media and electronic devices seized from her residence; her vehicles; and Mr. Toebbe's Naval Reactors offices in October 2021.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                    **CRIMINAL ACTION NO.: 3:21-CR-49-2
                                        (Chief Judge Groh)**

**DIANA TOEBBE,**

     **Defendant.**

<u>**NOTICE OF APPEAL**</u>

On this date, I, Diana Toebbe, Defendant in the above named case hereby appeals to the

United States Court of Appeals for the Fourth Circuit from the judgment entered in this action on

November 17, 2022.


<u>**DEFENDANT
BY COUNSEL**</u>


<u>/s/ Barry P. Beck</u>
Barry P. Beck
Power, Beck & Matzureff
308 West Burke Street
Martinsburg, WV  25401
(304) 264-8870


<u>/s/ Jessica Carmichael</u>
Jessica Carmichael
CARMICHAEL ELLIS & BROCK
Counsel for Diana Toebbe
108 N. Alfred Street, 1st Fl
Alexandria, Virginia 22314
703.684.7908 / Fax 649.6360
jessica@carmichaellegal.com


**JA354**

**CERTIFICATE OF SERVICE**

I, Barry P. Beck, counsel for Defendant, hereby certify that on the 29th day of November, 2022, the foregoing **NOTICE OF APPEAL** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Barry P. Beck</u>
Barry P. Beck